Robert B. Carey (011186)
Leonard W. Aragon (020977)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiff

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kimberly Toy, on behalf of herself and all others similarly situated, | No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | |
| Theranos, Inc., a California Corporation; Walgreens Boots Alliance, Inc., a Delaware Corporation; and Elizabeth Holmes, a California resident, | |
| Defendants. | |

## I.     INTRODUCTION

1.      This class action arises from the misleading and false marketing and sale of a blood testing services developed by Theranos, Inc. and sold at Wellness Centers located in Walgreens retail stores.

2.      Used for diagnostics and prevention, accurate, reliable, timely blood tests are a critical component of a patient's healthcare. Inaccurate tests cause emotional distress, lead to unnecessary and improper medical care, and endanger patients' health and lives.

3.      To avoid these problems, lab operators must follow established policies and procedures, provide accurate information about tests—so patients' decisions are ground in fact—and ensure that test results are not needlessly inaccurate.

4.      Similarly, pharmacies that market and offer blood testing services must ensure that their partners follow established policies and procedures and provide accurate information and results to patients/consumers.

5.       Founded in 2003 by Elizabeth Holmes, Theranos, Inc. claims to be a "consumer health technology company," one that entered the laboratory testing market and focused on blood-based tests.

6.      Theranos developed a "tiny" blood test using a device called Edison, which it claimed revolutionized blood testing by using a tiny needle to collect a small blood sample and conduct hundreds of blood tests, all outside a lab.

7.       In 2013, Theranos entered into a partnership agreement with Walgreens to sell its blood tests at Theranos Wellness Centers inside Walgreens retail locations.

8.      Walgreens conducted no substantive due diligence regarding the reliability and accuracy of Theranos's blood tests before entering into an agreement with Theranos to provide its services at Walgreens and heavily advertise those services to its customers. Despite Walgreens reportedly injecting $50 million in capital, Theranos denied Walgreen's access to its technology and laboratory. Nevertheless, to avoid losing Theranos to another retailer, Walgreens entered into the agreement.

1

9.      Walgreens never informed its customers it was "buyer beware" regarding services provided by Theranos inside Walgreens stores, that it did not conduct adequate due diligence or that its own consultant advised Walgreens that it needed more information to assess the proposed partnership with Theranos. Instead, Walgreens placed Theranos's advertisements on its website and in its stores, marketing Theranos's blood tests as revolutionary, fast, affordable, reliable, and accurate.

10.     Had Walgreens insisted on verifying Theranos's technology and inspecting its facilities before entering into an agreement, Walgreens would have learned that Theranos's laboratories were negligently maintained and not compliant with government and regulatory standards.

11.     Had Walgreens conducted proper due diligence it would have learned that most customers would not receive the fast "tiny" blood test that Theranos and Walgreens advertised. With few exceptions, customers received standard blood draws and testing completed with the same protocols as other blood testing companies.

12.     Even worse, customers did not receive accurate results. On May 19, 2016, Theranos admitted it had voided "all" of its blood-testing results from its proprietary Edison device, as well as many tests run on traditional machines, from 2014 and 2015.

13.     Plaintiff brings this action to address Defendants' false and misleading conduct, which led to Plaintiff and thousands of consumers purchasing blood testing service that were not provided as advertised and were not accurate, possibly exposing them to unnecessary medical treatment or denying them the opportunity to seek timely medical treatment.

## II.      PARTIES

14.     Plaintiff Kimberly Toy is a Maricopa County resident and Arizona citizen. She purchased a Theranos test at a Walgreens in Phoenix, Arizona in February 2016.

15.     Defendant Theranos, Inc. ("Theranos") is a California corporation with its principal place of business at 1701 Page Mill Road Palo Alto, California 94304. Theranos operates two laboratories, one in Newark, California, and another in Scottsdale, Arizona.

Theranos sells blood tests at Wellness Centers located in Walgreens retail stores in Arizona and California. Since it began offering blood testing services in 2013, Theranos has conducted approximately 6.1 million diagnostic tests.

16.     Defendant Walgreens Boots Alliance, Inc. ("Walgreens") is a Delaware corporation headquartered in Deerfield, Illinois. Walgreens Boots Alliance describes itself as the "first global pharmacy-led, health and wellbeing enterprise."[1] In addition to other enterprises, Walgreens operates retail stores with pharmacies throughout the United States, including Arizona.

17.     On information and belief, Defendant Elizabeth Holmes, founder and CEO of Theranos, is a resident and citizen of Palo Alto, California.

### III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendants are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

19.     This Court has personal jurisdiction over Defendants Theranos and Walgreens because Defendants have conducted and continue to conduct business in the State of Arizona, and because Defendants committed the acts and omissions complained of herein in the State of Arizona.

20.     This Court has personal jurisdiction over Defendant Elizabeth Holmes because Ms. Holmes controlled and directed the affairs of Theranos in the State of Arizona, including operating the Theranos laboratory located in Scottsdale, Arizona; entering into an agreement with Walgreens to open Theranos Wellness Centers in Arizona and operating those centers; and directing the marketing of Theranos's blood-testing services in the State of Arizona. Ms. Holmes also heavily promoted the company and its alleged revolutionary technology in Arizona. She traveled to Arizona to promote

---

[1] http://www.walgreensbootsalliance.com/about/ (last visited June 7, 2016).

her company and spearhead a change to Arizona law that would allow consumers to directly access the Theranos blood tests without a doctor's order.

21.     Venue is proper in this District under 28 U.S.C. § 1391 because the events that gave rise to the claims occurred in substantial part in this District. Theranos operates a laboratory located in the District. Walgreens operates numerous stores in this District. Theranos and Walgreens sold Theranos blood tests at stores located in this District. Theranos and Ms. Holmes (while in this District) acted in connection with and promoted the purchase of services in this District.

## IV.     FACTS

**A.     Theranos Developed The Edison Blood Testing Device, Which It Claimed Would Revolutionize The Blood-Testing Industry And Entered Into A Partnership With Walgreens.**

22.     In 2003, Elizabeth Holmes founded Theranos and focused on developing a hand-held device that would use a tiny needle to obtain a small amount of blood for testing. This idea evolved into the development of a device that became known as Edison.

23.     Theranos's Edison device was designed to eliminate not only the large needle and numerous tubes required by a typical blood test, but also the need for a laboratory. Theranos claimed that it could take a few drops of a blood from a finger stick of a patient, place it into a nanotainer capsule, and conduct hundreds of blood tests, all outside a lab.

24.     According to Theranos, a staff member working at its Wellness Center could place a cartridge containing the patient's blood into the proprietary Edison device and with the push of a button, generate test results and automatically transmit those results to Theranos's database. Theranos claimed its Edison device revolutionized blood testing and reduced costs to consumers.

25.     In 2013, Theranos entered into a partnership agreement with Walgreens and opened fifty-six Theranos Wellness Centers at Walgreens stores in Arizona and

California.[2] The Wellness Centers were physically located in Walgreens and staffed by Theranos employees. Theranos and Walgreens planned to open Theranos Wellness Centers at more than 8,200 Walgreens stores nationwide.

26.     Walgreens also provided Theranos with $50 million in funding and assisted Theranos with scheduling and collecting payments from customers.

**B.  Walgreens Did Not Verify That Theranos's Technology Worked Before Entering Into The Agreement With Theranos.**

27.     In 2010, Walgreens was looking to grow its business with new technology. Walgreens added a health-innovations unit to invest in startups and move Walgreens into other areas of healthcare. Walgreens had built a fast-growing vaccination business and therefore knew that medical-lab based ventures could generate revenue.

28.     The same year, Dr. Jay Rosen, an executive in Walgreens's health-innovations unit, met Elizabeth Holmes at a health technology convention. Walgreens and Theranos began discussing a partnership in early 2011.

29.     Walgreens has a Chief Medical Officer whose duties include evaluating the safety and efficacy of new diagnostic technologies prior to their use at Walgreens stores. This position and its duties are industry standard.

30.     In the case of Theranos, Walgreens received no information satisfying this standard. To the contrary, its due diligence process raised numerous red flags that Walgreens simply ignored because it was afraid that Theranos would partner with one of its competitors instead.

31.     Dr. Rosen hired John Hopkins University to evaluate potential investments for Walgreens. At a spring of 2011 meeting, a Johns Hopkins University scientist asked Ms. Holmes to provide his researchers with Theranos's blood testing device so that they could verify the technology. Ms. Holmes and Theranos President Sunny Balwani initially

---

[2] Theranos also opened two Wellness Centers outside of Walgreens stores – one at the downtown Phoenix campus of Arizona State University and one at Generations Medical Center in Tempe, Arizona.

agreed to provide one but never did. Instead, Walgreens received a prototype and provided it to the Hopkins team. However, the prototype was useless when evaluating the accuracy and reliability of the tests because it produced results such as "low" or "high" rather than numeric values that could be compared to other commercially available tests.

32.     In the summer of 2011, just after Theranos and Walgreens signed an initial letter of agreement, Walgreens sent representatives, including its finance chief, internal auditor, and lab experts from the consulting firm Collaborate, LLC, to Theranos's headquarters in Palo Alto, to review Theranos's business and laboratory.

33.     The Walgreens representatives were chaperoned during the entire visit and denied access to Theranos's lab area and Edison device. Based on the limited information they received, one consultant identified problems with Theranos's information management systems for tracking patients.

34.     Walgreens' executives did not press for further verification because of concerns that Theranos would respond by partnering with another retail chain.

35.     Later in 2011, consultants for Walgreens concluded that Walgreens needed more information to assess the proposed partnership with Theranos.

36.     In October 2012, two Walgreens executives and Paul Rust, a retired executive at Quest Diagnostics Corp., a clinical-lab company, went to Theranos to review quality-control data.

37.     Mr. Rust stated that it was "a very strange situation" because he was never allowed in Theranos's lab, and while they were "led to believe" the results they reviewed were from the Edison device, he had "no idea" if they actually were. Mr. Rust was surprised to learn that no one from Walgreens had been granted access to the lab.

38.     Despite being denied access to Theranos's laboratory and the Edison blood-testing device itself, thus being alerted to the possibility that Theranos's technology was a fraud, Walgreens continued to work on the partnership agreement because Walgreens was worried about losing Theranos's business to competitors.

39.     Walgreens had considered whether it could integrate its pharmacy record-keeping system with Theranos's lab management software, but as the companies finalized their agreement, Theranos asked for more control – another red flag Walgreens ignored. To finalize the agreement, Walgreens gave up the right to review Theranos's clinical data or financial records

40.     Despite numerous red flags, Walgreens entered into a final agreement with Theranos to open Wellness Centers in Walgreens stores and offer a comprehensive slate of approximately 200 lab tests.

**C.     Walgreens And Theranos Worked Together To Market The Wellness Centers To Walgreens Customers.**

41.     Following its partnership, Theranos and Walgreens worked together to market Theranos's blood tests to Walgreens customers.

42.     In a September 9, 2013 press release, Kermit Crawford, Walgreens President of Pharmacy, Health and Wellness, stated: "Theranos's service offers affordable certified lab testing with quicker response times, and furthers our mission to provide a differentiated patient experience. This is the next step in Walgreens's efforts to transform community pharmacy, giving our patients and customers convenient access to the comprehensive care they need, right in their communities." On behalf of Theranos, Elizabeth Holmes stated, "For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most. Clinicians can now see their patients having received lab results from fresh samples in a matter of hours," and the partnership with Walgreens would "further [Theranos's] goal to bring high quality, affordable lab testing to people everywhere, with [its] new Wellness Centers in Walgreens retail locations closest to homes and workplaces."

43.     Theranos focused its marketing on its alleged new approach to blood testing, using smaller needles and "tiny samples." Theranos claimed it could analyze

7

1    samples as small as 1/1,000 the size of the typical blood draw. Theranos informed

2    prospective customers that its tests were "fast, easy, and the highest level of quality."

3         44.    In multiple advertisements appearing on Walgreens's website, Theranos

4    and Walgreens announced their partnership and boasted about the benefits of Theranos's

5    proprietary technology:



**the blood tests that need just a tiny sample.**

**Walgreens partners with Theranos to provide lab services**

Theranos is working to shape the future of lab testing. Now, for the first time, their high-complexity CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples.[1]

Learn more at Theranos.com
Para información en español haga clic aquí



26        45.  Theranos and Walgreens endorsed that getting accurate results in a timely

27    manner is essential, declaring that doing so "means a more timely diagnosis to support a

28    better, more informed treatment."



**fast results. fast answers.**

Theranos performs their test analyses fast, so they can return results to your clinician[3] faster than ever before.[3] That means a more timely diagnosis to support better, more informed treatment.

46.    Walgreens and Theranos told customers that Theranos's testing was a technological breakthrough that allowed customers to receive fast and affordable blood testing that could even be life-saving so that "no one has to say goodbye too soon":[3]



[3] http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited June 9, 2016).

47.     Walgreens's website has links to Theranos's website, which advertised that its smaller samples provided benefits to every customer, including cancer patients, children, and senior citizens:



48.     Despite using smaller samples, Theranos promised consumers that its tests were accurate and "validated under and to CLSI, FDA, Centers for Disease Control and World Health Organization guidelines":



49.     Describing itself on its website, Theranos claimed it had conducted "more than six million tests in the nearly two years since we began serving individuals and physicians through our clinical labs," and worked with over 9,000 physicians" and that it was leading the industry in transparency:

Theranos is the first lab to commit to voluntarily submitting its laboratory developed tests to the FDA. We are working to build a model for the transition to the FDA framework. We are doing this even though we don't need to – opening up to regulators like no lab before.

50.    Theranos also claims to be leading the lab industry in transparency by publishing Proficiency Testing performance statistics.

**D.    Despite Its Claims Of Transparency, Theranos Kept Its Technology Secret.**

51.    Theranos's path to success was far from open and public. Despite its claims of transparency, Theranos kept information about its technology and blood tests secret.

52.    Holmes's most descriptive statements were that Theranos uses "the same fundamental chemical methods" as existing labs do, and its advances relate to "optimizing the chemistry" and "leveraging software" to permit those conventional methods to work with tiny sample volumes.[4]

53.    Nor has Theranos engaged the scientific community. Theranos, to this day, has not published on its work in peer-reviewed biomedical literature. Reportedly, by January 5, 2015, a search for Theranos in PubMed returned only two unrelated articles co-authored by Theranos employees, neither of which offered insights about the company.

54.    Holmes has said the company has proof its tests are as accurate as traditional ones, but has provided no support for the statement. For example, in a January 2015 interview at the Stanford Graduate School of Business, she claimed that Theranos had "validated every single one of our tests" by taking "a bunch of finger sticks" and "a bunch of venous draws" and comparing "the results" to "see if they're the same." In the same interview, she claimed that Theranos had "a massive amount of . . . resources" devoted to "understanding the quality of the tests."

55.    To allay criticism of Theranos's tests, its spokesperson promised that Theranos planned to publish data "in the near future. Stay tuned!" Despite its promise, no data has been forthcoming on this topic.

---

[4] "This CEO is Out for Blood," Roger Parloff, *Fortune*, June 12, 2014.

11

56.     Theranos did not even disclose its methodologies to its medical services partners. As part of a "long-term strategic alliance" to use Theranos's technology, the Cleveland Clinic and Theranos agreed to a joint study that would compare the effectiveness of Theranos's approach to traditional approaches. In January, three Cleveland Clinic scientists visited Theranos's headquarters, where they were shown the company's Edison devices, but Theranos did not show the scientists how the devices worked or provide written materials on how exactly the machines operated.

57.     Because details of the Theranos technology have not been disclosed, peers cannot evaluate or comment on its claims.

58.     Without such review and assessment, patients receive the opposite of what was promised. They must manage their health based on assumptions and promises, not timely, accurate information.

**E.      Theranos Used Its Claims About Its Technology To Lobby For Changes In State Law And Increase Its Funding And Profits.**

59.     To help further its bottom line, Theranos pushed to change Arizona law, and in April 2015, it succeeded. Arizona became the first state to allow consumers to purchase a blood test without a provider's order and to expressly recognize an individual's right to their own health information.

60.     To accomplish this, Theranos worked closely with leaders in Arizona. Its assistance came from the top:  Arizona Governor Doug Ducey wholeheartedly adopted Theranos's claims and pressed to change the law for Theranos to do business.

61.     Theranos's lobbying resulted in Ducey expressing a favorable impression: "My administration is focused on making Arizona the easiest and most attractive place in the nation for 21st-century companies like Theranos to operate and grow. By reducing burdensome regulations and red tape, this law not only shows innovative companies we're open and ready for business, it also gives Arizonans access to more efficient, cost-effective services while promoting preventive health care and price transparency. That's

good for business, good for patients and providers, and good for taxpayers – an all-around win for Arizona."[5]

62.     In her remarks at the signing of the Arizona bill, Elizabeth Holmes said, "My life's mission in building Theranos is to change this outdated, expensive, and disenfranchising health care paradigm. I believe every individual has the right to access actionable health care information when they need it the most – to feel better, do more, and live better … and at a time when they have an opportunity to change outcomes. Our work at Theranos is about access — eliminating the need for painful needles and vials of blood, replacing that with tiny samples taken in convenient locations at convenient hours of operation, always for a fraction of the cost charged elsewhere — to build a health care system in which early detection and prevention become reality. That is why we worked to pass this law; it is why we believe Arizona's law can and should serve as a model for the nation for direct access testing. Every state should have a law like Arizona's because it demonstrates how it is possible to help health care providers engage with patients in preventative care, save money for the government and individuals, protect physicians and health care providers from liabilities that can hinder preventive care, and strengthen an individual's basic right to information about themselves."[6]

63.     In lobbying to change the law, Theranos disseminated claims of astonishing advancements in the lab testing industry. "We can perform hundreds of tests, from standard to sophisticated, from a pinprick and tiny sample of blood, and we have performed more than 70 tests from a single tiny sample," said a Theranos representative.

64.     According to Holmes, the claim went even further—Theranos's new technology applied across the board: "Every test that we offer in our lab can be run on our proprietary devices." Espousing this claim—that the Edison machines can run all

---

[5] https://www.theranos.com/news/posts/theranos-recognizes-milestone-in-new-era-of-preventive-health (last visited June 14, 2016).

[6] https://www.theranos.com/news/posts/theranos-founder-and-ceo-elizabeth-holmes-speaks-at-arizona-bill-signing (last visited June 14, 2016).

tests Theranos submitted to the FDA—on a nationally syndicated financial TV program helped bolster Theranos's prospects and reputation with many stakeholders.

65.    As Theranos's reputation grew, so did its funding. According to CrunchBase, Theranos raised over $686 million.[7]

66.    Theranos adeptly spun its storyline about its successes and "revolutionary" testing. It pushed and embraced positive, glowing reports of the company's "transformative" nature and industry-changing technologies. These efforts spanned the media spectrum—old and new, big and small—including The Wall Street Journal, Business Insider, San Francisco Business Times, Fortune, Forbes, Medscape, and Silicon Valley Business Journal. The reports adopt Theranos's assessment that its work is novel and the coming of a "golden idea."

67.    The result of Theranos's promotional efforts:  a market value over $9 billion by 2014[8] and a CEO widely acclaimed as one of the most successful entrepreneurs in the world—and one of the youngest billionaires ever.

68.    Theranos, however, didn't keep its promises that its services allow consumers to proactively engage in their own healthcare decisions using accurate, timely information provided by Theranos. As one health reporter said, Theranos purposely ginned up excitement and funding, pushed that it was disrupting an antiquated, stodgy industry, and shrouded its product in secrecy. "New innovations can't simply surf on excitement when people's lives are at stake."[9]

---

[7] https://www.crunchbase.com/organization/theranos#/entity (last visited June 9, 2016).

[8] "This CEO is Out for Blood," Roger Parloff, *Fortune*, June 12, 2014.

[9] "The Wildly Hyped $9 Billion Blood Test Company that No One Really Understands," Carolyn Y. Johnson, *Washington Post*, October 15, 2015.

**F.     Walgreens Failed to Inform Consumers that It Had Not Verified Theranos's Technology and the Limited Due Diligence It Conducted Raised Serious Red Flags.**

69.     Walgreens never told its customers that it had not verified Theranos's technology and that it had actually been denied access to Theranos's Edison device and laboratory.

70.     Walgreens's customers were not aware of the red flags raised during Walgreens's minimal due diligence investigation, including that Walgreens's own consultants concluded that more information about Theranos's technology was needed.

71.     Upon information and belief, Walgreens did nothing after it signed the agreement with Theranos to ensure that the tests conducted by Theranos were reliable and accurate.

72.     Instead of informing its customers of the actual facts of its relationship with Theranos, Walgreens promoted through massive advertising campaigns and links to Theranos's website that Theranos's technology was revolutionary, fast, and affordable. Walgreens endorsed and promoted Theranos' claims that customers could receive numerous accurate results from a "tiny" blood test.

**G.     Walgreens And Theranos Misled Consumers And Induced Them To Purchase Theranos Tests With False Claims And Material Omissions.**

73.     Behind the claims of revolution and accuracy, there were unfounded, false, deceptive, and misleading claims of superiority over existing systems and practices.

**1.     Theranos's labs were negligently maintained and operated and did not follow proper procedures and policies.**

74.     On March 18, 2016, Centers for Medicare & Medicaid Services wrote Theranos to notify it of proposed sanctions against Theranos's Clinical Laboratory Improvement Amendments of 1988 (CLIA) certificate. CLIA is a federal regulatory standards program whose goal is to ensure accuracy, reliability and timeliness of test results, regardless of where the test was performed, for all clinical laboratory tests on humans.

75.     CMOS conducted a CLIA recertification and complaint survey at Theranos's laboratory, completing its onsite portion on November 20, 2015, and concluding the survey on December 23, 2015.

76.     Based on this survey, Theranos was out of compliance with five CLIA Condition-level requirements, including (a) D5024: 42 C.F.R. § 493.1215; (b) D5400: 42 C.F.R. § 493.1250; (c) D6076: 42 C.F.R. § 493.1441; (d) D6108: 42 C.F.R. § 493.1447; and (e) D6168: 42 C.F.R. § 493.1487.

77.     In a January 25, 2016, letter, CMS outlined these deficiencies and notified Theranos of the seriousness of the deficiencies under 42 C.F.R. § 493.1215, which resulted in a finding of immediate jeopardy to patient safety and health, and demanded immediate action to remove the jeopardy and come into compliance.

78.     Theranos, after requesting an extension, responded on February 12, 2016.

79.     After reviewing Theranos's response, CMS concluded that Theranos's response did not "constitute a credible allegation of compliance and acceptable evidence of correction for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015, and does not demonstrate that the laboratory has come into Condition-level compliance and abated immediate jeopardy."

80.     A credible allegation of compliance is a statement or document that is (1) made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required; (2) realistic in terms of the possibility of corrective action being accomplished between the survey and the date of the allegation; and (3) indicates resolution of the problem.

81.     The report found that Theranos's blood tests often failed to meet the lab's own standards, and that Theranos employed unqualified staff to review patient test results.

82.     According to the Wall Street Journal, which viewed an unredacted report, 13 tests conducted on Theranos's inventions performed poorly. Examples include (1) 29 percent of the quality control checks performed on the company's inventions in October

16

2014 fell outside the normal range; (2) a hormone test run on Theranos's proprietary machines failed 87 percent of quality control checks; and (3) a test used to detect prostate cancer failed quality control verifications 22 percent of the time between April and May 2015.

83.     Theranos never notified its customers that it was out of compliance with the CLIA Condition-level requirements, failed to meet its own standards, failed to comply qualified staff to review patient test results, and failed to correct the issues in time to ensure that the tests run at the lab were reliable and accurate.

**2.     Theranos and Walgreens claimed that Theranos used revolutionary technology when in fact the bulk of tests offered were processed using standard testing equipment.**

84.     Through advertising and marketing, Theranos and Walgreens claimed that Theranos had "reinvented" the lab test with its technology that required only a "tiny" sample.

85.     Theranos's new technology did not extend to its entire product line and, even where it did, it was not always used.

86.     Theranos told regulators it used the Edison, its proprietary device, for 12 types of tests out of over 200 types offered to consumers and stopped using the device altogether in late June 2015.

87.     Consumers arrived expecting to have minimal blood drawn and small needles or finger pricks, but they got conventional venous blood draws.

88.     Likewise, the tests were often then run on standard testing equipment (operated incorrectly or with inadequate training), not the novel technology touted in the promotional efforts or marketing material.

89.     Walgreens knew that customers were receiving venous blood draws and therefore knew (or should have known) that Theranos was not using its much touted "Edison" machines.

90.     Even when the technology existed, it wasn't used. Theranos consequently halted its finger-stick draws, collected in a small tube called a nanotainer, after the FDA

declared the container was a medical device that should be regulated. Theranos ceased using its proprietary technology in June 2015.

91.     Theranos's Arizona lab handled the vast majority of blood samples collected at Arizona-based Walgreens locations and at Arizona State University's clinic and the Generations Medical Center.

92.     The June 2015 decision to cease using Edison did not affect the company's Arizona lab because it exclusively used traditional FDA-approved blood analyzers and instruments made by companies such as Siemens and Olympus.

93.     Arizona patients could have blood drawn through capillary draw or venous draw, and the samples would be sent to the applicable lab by Theranos. But Theranos did not inform consumers it had new technology only for twelve of the 200 tests and that conventional equipment would be used for many tests. Nor did Theranos advise that the blood draw might not be the minimally invasive draw, a fact consumers learned only during the blood draw.

**3.      Theranos and Walgreens's promises of the highest levels of accuracy and quality are unfounded, false and misleading.**

94.     Through advertising and marketing, Theranos and Walgreens claimed that Theranos's blood tests provided fast and accurate test results to support better medical treatment.

95.     A study showed that Theranos's results are not as accurate as the two dominant players in the industry. In March 2016, Theranos's results were compared to those from LabCorp and Quest Diagnostics in a study funded by Icahn Institute for Genomics and Multiscale Biology and the Harris Center for Precision Wellness at the Icahn School of Medicine at Mount Sinai.

96.     The percentages for measurements outside their normal range were 8.3%, 7.5%, and 12.2% for LabCorp, Quest, and Theranos, respectively. Although LabCorp and Quest showed no significant difference in the rates of their tests outside the reference

range, the odds ratio that Theranos reported a measurement outside its normal range compared with the other services was 1.6.

97.     This increase in abnormal test results can have negative consequences for medicine—usually extra testing, additional patient visits to clinics or hospitals, and added doctor services, all of which result in additional costs and burdens to patients or to the healthcare system and are potentially harmful where the abnormal tests were misdiagnoses (i.e., false positives).

98.     Nor did Theranos's labs meet state and federal standards—all of which are designed to protect patients.

99.     Arizona inspectors claimed that Theranos could not provide back-up data showing that it had fully validated three lab instruments used to analyze test samples despite federal regulations requiring labs to furnish such data.

100.    Theranos also failed to meet proficiency testing and lab-instrument validation requirements, which are key to ensuring patients and doctors get accurate results.

101.    During a separate inspection, the Federal Drug Administration issued 14 "observations" after a review of Theranos's testing facilities in California from August 25 through September 16, 2015. Most findings addressed problems with quality-control issues, but notably the FDA determined Theranos's nanotainer was an unapproved medical device.

**4.     Consumers did not get what they paid for when they received blood tests from Theranos and Walgreens.**

102.    In May 2016, Theranos voided two years of test results—comprising tens of thousands of tests—from 2014 and 2015, and corrected some results and did not revise others, leaving the void results as the only result the consumer received.

103.    These tests were conducted on both Edison equipment and conventional tests, and at multiple labs.

104.    It was reported that the Arizona lab performed the blood-coagulation tests with a traditional machine from Siemens AG programmed to the wrong settings by Theranos, and failed several tests to gauge the purity of the water it used in its Siemens machines, which could affect the accuracy of some blood tests run on the devices.

105.    Brooke Buchanan, a Theranos spokeswoman, confirmed that Theranos "made mistakes in the past in the Newark" lab, which housed the Edison.[10]

106.    Based on reports, both Theranos laboratories have been identified as operationally deficient in material ways.

107.    Theranos's cure for deficient results was to re-run tests using conventional means with either the residual blood from the minimal draw or with blood already tested (presumably an amount that wouldn't work with traditional machines, since Theranos's approach was the "first time" testing was accomplished using small amounts of blood), calling into question the reliability of any retesting program.

108.    Theranos and Walgreens have also misrepresented the import of the timeliness of its results. Theranos claims the usual delay of testing in centralized laboratories is approximately three days and that they will generate and deliver their data much faster (e.g., within four hours).

109.    But according to a leading practitioner, the three-day delay claim is not accurate. The bulk of laboratory testing in centralized laboratories is completed within an hour or two (calculated from time of sample collection to time of results posting for physician review). For these tests, the claim that Theranos gets results faster is false. While there may be some tests that takes days, not hours, those are typically situations where time is not critical for adjusting patient care and faster analysis will not assist patient management or outcomes.

---

[10] http://www.theverge.com/2016/3/31/10888956/theranos-lab-inspection-cms-newark-quality-control-personnel (last visited June 14, 2016).

**H.      Walgreens Ends Its Relationship With Theranos.**

110.     On June 14, 2016, Walgreens announced that it is ending its relationship with Theranos.

111.     In a statement released by Walgreens, Brad Fluegal, senior vice president and chief health care commercial market development officer said: "In light of the voiding of a number of test results, and as the Centers for Medicare and Medicaid Services (CMS) has rejected Theranos' plan of correction and considers sanctions, we have carefully considered our relationship with Theranos and believe it is in our customers' best interests to terminate our partnership."

112.     Theranos responded that it was disappointed with Walgreens's decision but "remain[s] fully committed to [its] mission to provide patients access to affordable health information and look[s] forward to continuing to serve customers in Arizona and California through [its] retail locations.

113.     On or about June 17, 2016, Theranos sent letters from Kimberly Alfonso, General Manager, Sales & Business Development, to providers to assure them that they are ""**open for business,** confident in our technologies, and steadfast in our commitment to make lab tests fast, convenient, and affordable for everyone." (emphasis in original).

114.     The letter went on to explain that despite the closure of Theranos Wellness Clinics located inside Walgreens stores, "patients can experience Theranos lab testing—complete with our full test menu—in four Theranos Wellness Center locations throughout the Valley, with more to come over the next few months."

115.     The letter also encouraged providers to "direct your patients to theranos.com to find [the] nearest Theranos Wellness Center location," and reminded providers that they can fax lab orders directly to Theranos or submit them directly through an "interfaced EMR platform."

116.     Upon information and belief, these letters were sent to providers whose patients were tested at a Theranos Wellness Clinic in Arizona.

117.    The letters did not disclose that it no longer uses the Edison system, all Edison tests performed in the past are unreliable, its tests are substantively less accurate than its competitors, finger prick testing is no longer used, its regulatory failures at the Newark testing lab, or that its proprietary testing procedures were never peer tested. Nor is this information available from the Theranos.com website it asked providers to send their patients.

I.      **Plaintiff's Experience With Theranos And Walgreens.**

118.    Plaintiff's experience is illustrative of Defendants' false and misleading conduct.

119.    Plaintiff Kimberly Toy is a resident and citizen of Arizona.

120.    Previous blood tests from non-Theranos labs indicated that Ms. Toy was pre-Diabetic. Concerned that she might contract the disease, Ms. Toy closely monitored her health.

121.    In early 2016, after visiting her primary care doctor, Ms. Toy was instructed by her physician to have her blood tested to, among other things, screen for Diabetes.

122.    Ms. Toy had the option of having her blood tested anywhere, but choose to have the tests conducted at a Theranos clinic near her home after seeing a Walgreens advertisement on television and Theranos advertisements inside the Walgreens store at 204 East Bell Road, Phoenix Arizona .

123.    On February 19, 2016, Ms. Toy had her blood tested at the Theranos Service Center located inside the Walgreens on East Bell Road.

124.    After receiving a notice, Ms. Toy reviewed her test results at Theranos.com.

125.    Her test results indicated that she was borderline Diabetic—at the highest end of the scale for increased risk for future Diabetes.

126.    The test result from Theranos was considerably higher than previous test results for Diabetes.

127.    Concerned that her tests were abnormally high and hearing reports that the Theranos tests may not be reliable and accurate, Ms. Toy had her blood re-tested at Sonora Quest Laboratories on March 18, 2016. The Sonora Quest test result for the same test was substantially lower, and indicated that Ms. Toy was at the low-end of the scale for an increased risk of Diabetes, borderline non-Diabetic, and clearly not near the diagnostic criteria for Diabetes.

128.    Ms. Toy took each relevant test at approximately the same time of day and fasted before taking each test.

129.    The Sonoran Quest test and earlier tests confirm that the Theranos test was an outlier.

130.    Ms. Toy paid Theranos for the tests she received and, upon information and belief, a portion of her payment went to Walgreens.

131.    Ms. Toy would not have had her blood tested at Theranos had she known the facts alleged in this case, including that Theranos did not provide accurate and reliable test results, Walgreens did not conduct due diligence on the accuracy and reliability of Theranos's testing, the Newark and Arizona labs failed to meet applicable standards, and the services advertised were not the services rendered.

## V.    CLASS ALLEGATIONS

132.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following class: All consumers who purchased a Theranos blood test in a Theranos "Wellness Center" located in a Walgreens' store in Arizona.

133.    Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which Defendants has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants. Also, excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

134.   Plaintiff does not know the exact number of Class members. But Theranos's June 17, 2016 letter claims that it has conducted over 6 million tests and worked with over 10,000 physicians, the overwhelming number of whom are located in Arizona, meaning there are at least tens of thousands of Class members such that joinder of all Class members is impracticable.

135.   The Class is easily determined by objective criteria using Defendants' own records, which by law must exist. Walgreens and Theranos know where each test was performed, by whom, for whom, and when.

136.   There are questions of law and fact common to the Class. Defendants' illegal business practices and unlawful omissions similarly impact Class members, all of whom purchased a Theranos blood test.

137.   Plaintiff asserts claims that are typical of the Class. Plaintiff and all Class members have been subjected to the same wrongful conduct because they all purchased a Theranos blood test marketed and sold by Theranos at Walgreens's stores using the same marketing or substantively similar marketing materials or received a test conducted or handled in a similar way. And like other members of the Class, Plaintiff purchased and paid for a Theranos blood test, which she otherwise would not have paid for had the test been properly marketed based on truthful and accurate information or did not receive the test promised or due as a matter of law.

138.   As a purchaser of Theranos's services, Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff and the Class are represented by counsel competent and experienced in both consumer protection and class action litigation.

139.   Class certification is appropriate because common questions of law and fact substantially predominate over questions that may affect only individual members of the Class, including:

> (a) Whether Theranos's methodologies and equipment complied with industry, state, and federal standards;

(b) Whether Theranos's blood tests were of the highest accuracy and quality;

(c) Whether Defendants misrepresented that Theranos blood tests were fast, minimally invasive, accurate, and reliable;

(d) Whether Defendants made fraudulent omissions to Plaintiff and class members, including but not limited to the fact that many of its tests required a traditional blood draw by the same size needle and vial used by its competitors;

(e) Whether Walgreens made fraudulent omissions by failing to inform Plaintiff and class members that it did not conduct an adequate due diligence investigation of Theranos;

(f) Whether Defendants' conduct violated the Arizona Consumer Fraud Act;

(g) Whether Defendants committed fraud;

(h) Whether Defendants were unjustly enriched;

(i) Whether Theranos breached its contract with Plaintiff and class members;

(j) Whether Walgreens and Theranos conspired to commit fraud;

(k) Whether the challenged practices harmed Plaintiff and class members; and

(l) Whether Plaintiff and members of the Class are entitled to damages, restitution, equitable relief, and/or injunctive relief.

140. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Because the restitution and/or damages suffered, and continue to be suffered, by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult, if not impossible, for individual Class members to redress the wrongs done to each individually and the burden imposed on the judicial system would be enormous.

141. A class action is manageable, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

# VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (AGAINST DEFENDANT THERANOS)

142.   Plaintiff incorporates the allegations in the above paragraphs as if fully set forth herein.

143.   Defendant Theranos entered uniform or substantially similar contracts with class members to provide blood tests.

144.   Theranos assured its customers it had the expertise and capability to provide accurate and reliable blood tests. Theranos promised that its tests were the most accurate and highest quality tests in the market.

145.   For monetary consideration, Theranos agreed to provide blood testing using its proprietary system.

146.   Plaintiff and class members each paid money for the blood tests offered by Theranos.

147.   Theranos breached its contract with Plaintiff and class members by: (1) providing tests that were not of the promised high level of accuracy and quality; (2) conducting tests using traditional blood testing methodologies and equipment instead or its self-proclaimed minimally invasive state-of-the art proprietary system; (3) not drawing blood in the minimally invasive way advertised; (4) not ensuring its equipment met its own quality standards; (5) not ensuring its services were tendered with reasonable care and workmanlike effort, including failing to ensure its equipment met industry, state, or federal standards and failing to ensure lab staff was properly trained and monitored; and (6) failing to act in good faith and deal fairly with class members by acting to deprive class members of the justified expectations they were to receive under the contract, including failing to notify class members in a timely fashion of the deficiencies and problems with the tests or their results and not clarifying that certain services were conventional and no different than other blood tests on the market.

148.    In May 2016, Theranos invalidated the results of all tests conducted using its Edison system between 2014 and 2015. Each class member who had a test conducted using the Edison system did not receive the benefit of its bargain—a reliable, accurate blood test.

149.    Theranos claims it is issuing corrected results, but upon information and belief it is impossible to re-test samples and give accurate and reliable updated results from samples taken in 2014 and 2015, especially when the blood draws should have been minimally invasive, small sample sizes according to Defendant's own advertisements. Even if the samples could be re-tested, there is no reason to believe that the new results would be accurate or reliable, nor are they useful to consumers months or even years after the date.

150.    Because of Defendant's conduct, Plaintiff and class members have been injured.

**SECOND CAUSE OF ACTION**

**VIOLATION OF ARIZONA CONSUMER FRAUD ACT**
**A.R.S. § 44-1521, *et seq.***
**(AGAINST ALL DEFENDANTS)**

151.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

152.    Defendants are "persons" within the meaning of A.R.S. § 44-1521(6).

153.    Theranos's blood testing services sold in Arizona are "merchandise" within the meaning of A.R.S. § 44-1521(5).

154.    The Arizona Consumer Fraud Act provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." A.R.S. § 44-1522(A).

155.   By their conduct, as described herein, Defendants employed fraud, deception, and unfair practices in connection with the marketing and sale of Theranos's blood testing services. For example, Theranos and Holmes engaged in the following false or misleading statements and material omissions:

    (a) Failing to inform Plaintiff and class members that Theranos's tests were not accurate and, in fact, representing them as the most accurate in the industry.

    (b) Representing Theranos's proprietary Edison machine tested blood accurately and reliably using smaller quantities of blood than traditional methods even though each claim is false. By Theranos's own admission, all tests conducted using the Edison machine between 2014 and 2015 are invalid and should be voided.

    (c) Failing to inform Plaintiff and class members that many of its tests require a traditional blood draw by the same size needle and vial used by its competitors, and representing that many of Theranos's tests are minimally invasive, requiring a skin prick or small vial of blood.

    (d) Failing to inform Plaintiff and class members that its proprietary technology only exists for a small fraction of the tests Theranos markets and sells.

    (e) Representing that Theranos performs the highest quality testing in the industry when its testing procedures and equipment are flawed and fail to meet its own standards, standards set by the manufacturer, and industry, state, or federal standards.

    (f) Representing that Theranos's goal is to give consumers actionable information when it conceals and obfuscates on the methodologies of its tests.

    (g) Failing to notify consumers in a timely manner that its tests were inaccurate and voidable despite knowing that the tests were not reliable or accurate.

156.    Walgreens engaged in the following in the following false or misleading statements and material omissions:

    (a) Failing to inform Plaintiff and class members that it had not verified Theranos's technology and that it had actually been denied access to Theranos's Edison device and laboratory.

    (b) Failing to inform Plaintiff and class members that red flags raised during Walgreens's minimal due diligence investigation, including that its own consultants concluded that more information about Theranos's technology was needed.

    (c) Representing that Theranos's technology was revolutionary, fast, affordable, and accurate.

    (d) Failing to inform Plaintiff and class members that they would receive venous blood draws rather than the less invasive blood draws advertised and that not all Theranos testing would be conducted on its Edison device.

157.    Defendants intended that consumers rely on the concealment, suppression or omission of material facts.

158.    Plaintiff and class members reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged.

159.    Pursuant to the Arizona Consumer Fraud Act, Plaintiff seeks damages described above as well orders against Defendants, including, but not limited to, declaring such practices as are complained of herein to be unlawful, unfair, fraudulent and/or deceptive and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions.

160.    In addition, Plaintiff seeks disgorgement of profits and restitution plus interest due thereon at the legal rate.

161.    Plaintiff also seeks punitive damages according to proof and reasonable costs and attorney's fees.

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**
**(AGAINST DEFENDANT THERANOS)**

162.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

163.    In the event that there is no legal contract between Defendant Theranos and class members, Plaintiff alleges the following, in the alternative to the breach of contract claim alleged in the First Cause of Action, on behalf of herself and the Class.

164.    As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, Theranos has profited and benefited from the unlawful sale of its misleading, unreliable, and inaccurate blood tests.

165.    To the detriment of Plaintiff and class members, Theranos has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

166.    Theranos has voluntarily accepted and retained the fees paid by Plaintiff and class members with full knowledge and awareness that as a result of its unlawful conduct, Plaintiff and the class paid substantial monies to Theranos to which it was not lawfully entitled.

167.    Plaintiff and class members paid for minimally invasive, accurate, and reliable blood tests, but received invasive, inaccurate and unreliable tests.

168.    Between Theranos and Plaintiff/class members, it would be unjust for Theranos to retain the benefits attained by its wrongful actions.

169.    Theranos has been unjustly enriched at the expense of Plaintiff and class members who are entitled in equity to disgorgement and restitution of Theranos's wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the court, and any other relief the court deems just and proper to remedy Theranos's unjust enrichment.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(AGAINST DEFENDANT WALGREENS)**

170.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

171.   As part of its agreement with Theranos, Walgreens processes payments for the sale of Theranos's blood tests sold at Wellness Centers located inside Walgreens stores.

172.   As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, Walgreens has profited and benefited from the unlawful marketing and sale of Theranos's misleading, unreliable, and inaccurate blood tests.

173.   To the detriment of Plaintiff and class members, Walgreens has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

174.   Walgreens has voluntarily accepted and processed payments from Plaintiff and class members with full knowledge and awareness that as a result of its unlawful conduct, Plaintiff and the class paid substantial monies to which Theranos and Walgreens were not lawfully entitled.

175.   Between Walgreens and Plaintiff/class members, it would be unjust for Walgreens to retain the benefits attained by its wrongful actions.

176.   Walgreens has been unjustly enriched at the expense of Plaintiff and class members who are entitled in equity to disgorgement and restitution of Walgreens's wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the court, and any other relief the court deems just and proper to remedy Walgreens' unjust enrichment.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

177.  Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

178.  As described in this Complaint, Defendants provided false information in a business transaction – the marketing and sale of Theranos's blood testing services.

179.  Defendants intended, knew, or should have known that Plaintiff and class members would reasonably rely on this false information.

180.  Plaintiff and class members justifiably relied on Defendants' false information and have been damaged.

**SIXTH CAUSE OF ACTION**
**CIVIL CONSPIRACY**
**(AGAINST ALL DEFENDANTS)**

181.  Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

182.  Defendants Theranos and Walgreens agreed to market and sell Theranos's blood testing devices by unlawful means.

183.  The object of the conspiracy was to defraud customers by selling them Theranos's purportedly revolutionary blood testing services while omitting to inform them that Theranos's technology was entirely unproven and Theranos had deliberately prevented Walgreens from evaluating it.

184.  In furtherance of that conspiracy, Walgreens and Theranos agreed to, and did, commit fraud, and the other violations as described herein.

185.  In furtherance of the conspiracy, Theranos and Holmes fraudulently omitted material facts and falsely represented Theranos's blood testing services as revolutionary, minimally invasive, fast, compliant with its own and government standards, and accurate.

186.    In furtherance of the conspiracy, Walgreens failed to inform Plaintiff and class members that it did not conduct an adequate due diligence investigation of Theranos and that the minimal investigation it conducted raised numerous red flags. Under these circumstances and in furtherance of the conspiracy, Walgreens executed the agreement with Theranos and endorsed and promoted its misrepresentations about its blood testing services.

187.    Plaintiff and class members justifiably relied on Defendants' fraudulent representations, and had they known the information Defendants withheld, would not have purchased Theranos's blood testing services.

188.    Plaintiff and members of the class have been damaged by Defendants' conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and for members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

(a)    Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel and Plaintiff as class representative;

(b)    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

(c)    Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

(d)    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

(e)    An award of costs and attorneys' fees; and

(f)    Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

33

1

RESPECTFULLY SUBMITTED this 29th day of June, 2016.

2

HAGENS BERMAN SOBOL SHAPIRO LLP

3

4

By: _s/ Robert B. Carey_____
Robert B. Carey (011186)

5

Leonard W. Aragon (020977)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003

6

Telephone: (602) 840-5900
rob@hbsslaw.com

7

leonard@hbsslaw.com

8

Steve Berman

9

(*Pro Hac Vice* application to be submitted)
HAGENS BERMAN SOBOL SHAPIRO LLP

10

1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101

11

Telephone: (206) 623-7292
steve@hbsslaw.com

12

13

Stuart M. Paynter
(*Pro Hac Vice* application to be submitted)

14

THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800

15

Washington, DC 20005
Telephone: (202) 626-4486

16

stuart@paynterlawfirm.com

17

Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28