Lynn Lincoln Sarko (*pro hac vice*)
T. David Copley
Gretchen Freeman Cappio (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: gcappio@kellerrohrback.com

Michael W. Sobol (*pro hac vice*)
Roger N. Heller (*pro hac vice*)
Melissa Gardner (*pro hac vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery St., 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com
Email: mgardner@lchb.com

*Interim Co-Lead Plaintiffs' Counsel*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>Arizona THERANOS, INC.,<br>Litigation | **No. 2:16-cv-2138-HRH**<br>**(Consolidated with)**<br>**No. 2:16-cv-2373-HRH**<br>**No. 2:16-cv-2660-HRH**<br>**No. 2:16-cv-2775-HRH**<br>**-and-**<br>**No. 2:16-cv-3599-HRH**<br><br>**FIRST AMENDED**<br>**CONSOLIDATED CLASS**<br>**ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     JURISDICTION AND VENUE .............................................................. 4

III.    PARTIES .................................................................................................. 5

IV.     FACTUAL BACKGROUND .................................................................. 8

    A.      The Critical Importance of Reliable Blood Tests ....................... 8

    B.      The Edison Device and Theranos's Premature Rush to Market ................. 8

    C.      Theranos and Walgreens Join Forces ......................................... 13

    D.      Defendants   Intentionally   Concealed   the   Truth   From Consumers .......................................................................... 16

    E.      Defendants Falsely Promoted Theranos Testing as Reliable ................... 21

    F.      Theranos's Tests Were Unreliable and Dangerous ................... 31

    G.      Defendants' Fraudulent Scheme Unravels ................................ 35

    H.      Defendants Continue to Fail to Protect Customers ................... 45

    I.      Defendants Misrepresented and Concealed the Purpose of the Theranos Testing Offered to Plaintiffs and the Class .............. 49

    J.      Defendants'   Misconduct   Has   Significantly   Harmed Consumers .......................................................................... 53

    K.      Factual Allegations Regarding Plaintiffs ................................... 54

V.      CLASS ACTION ALLEGATIONS ...................................................... 74

VI.     CAUSES OF ACTION .......................................................................... 78

VII.    PRAYER FOR RELIEF ....................................................................... 119

VIII.   DEMAND FOR JURY TRIAL ............................................................ 120

i

# I.     __INTRODUCTION__

1.      Plaintiffs file this First Amended Consolidated Class Action Complaint against Defendants Theranos, Inc., Walgreens Boots Alliance, Inc., Walgreen Arizona Drug Company, Elizabeth Holmes, and Ramesh Balwani.

2.      This consumer class action lawsuit concerns a massive fraud that Defendants perpetrated on consumers and the public that has recently collapsed in colossal fashion under its own weight.  For years, Defendants marketed and sold Theranos blood tests and other clinical lab tests that they knew were unreliable, not ready-for-market, and failed to meet even basic industry standards.  The tests in question were sold at numerous "Wellness Centers" located in Walgreens pharmacies and at Theranos-owned Wellness Centers, almost exclusively in Arizona and California.

3.      In furtherance of the fraud, Defendants intentionally concealed vital information from consumers, their doctors, and the public at large, about the tests' unreliability and about the deficient nature of the testing facilities and equipment. Defendants also made pervasive misrepresentations—including in their marketing, in the stores where the tests were sold, and in a steady stream of press releases and other media statements—falsely stating and assuring that Theranos tests met the highest standards of reliability, were industry-leading in quality, and had been developed and validated under, and were compliant with, federal guidelines.

4.      Defendants aggressively promoted Theranos tests as being ready-for-market, and encouraged consumers and their doctors to use and rely on them in making important health and treatment decisions, including, but not limited to, regarding such

critical health and treatment matters as cancer, HIV, diabetes, kidney disease, and heart disease.

5.     In reality, as Defendants knew but the consumers could not, Theranos tests were dangerously unreliable, had not been validated as advertised, and did not meet federal guidelines as advertised.  Nevertheless, in a hurry to get the tests to market and thereby assist Defendants in developing their still-in-development products and services, and so that they could advance their own narrative that Theranos's "disruptive" technology had "revolutionized" the medical testing industry, Defendants prematurely marketed and sold the tests to consumers who were, in essence, subjected to beta testing and product development research without their knowledge or consent—a course of conduct that would be wrong in any context but is shockingly improper and dangerous in the context of blood testing.

6.     Defendants' scheme started to unravel when various governmental agencies and others began investigating Theranos's tests and facilities.  After the Center for Medicare and Medicaid Services cited Theranos's Newark, California lab for numerous deficiencies in 2016, Theranos informed regulators that it voided "all" blood-testing results from its proprietary Edison blood testing devices, which consisted of tens of thousands of test results.[1]  Other investigations and reports have revealed numerous other serious deficiencies and problems regarding Theranos's tests, including the manipulation of test results, the dilution of blood samples used in testing, and deficiencies at

---

[1] John Carreyrou, *Theranos Voids Two Years of Edison Blood-Test Results*, Wall St. J. (May 18, 2016) (Ex. 1).

2

Theranos's other testing facility, in Scottsdale, Arizona.  Numerous additional test results, in addition to the tens of thousands of voided Edison-device tests, have now been voided or belatedly "corrected" by Theranos, including results that were "corrected" several months (or even years) after the tests were conducted and the results relied upon by the consumers.  Defendant Holmes, Theranos's founder and CEO, has now been banned from owning or operating a blood-testing business for at least two years.  Defendant Balwani, Theranos's second in command, was banned as well, and Theranos's license to operate a lab was revoked.  Continuing the fallout, Walgreens has now sued Theranos for breach of contract, and Theranos, Holmes, and Balwani have all been sued by multiple investors for misrepresenting and concealing the truth about Theranos's technology and testing.

7.    Before Defendants' scheme collapsed, many thousands of consumers, including Plaintiffs, were deceived by Defendants' misconduct and paid for and were subjected to Theranos tests.  Defendants have failed to deliver the products and services they promised and that their customers reasonably expected, and have endangered their customers' health and well-being, the very thing they promised to promote and protect.

8.    None of the consumers who obtained test results from Theranos received what they paid for and what they reasonably expected.  None of them received tests that they could reasonably rely on given the numerous problems alleged herein that have come to light.  Moreover, the consumers who submitted to Defendants' testing were unwittingly being used by Defendants to further Defendants' research and product development efforts.  Worse yet, as a result of the unreliable and inaccurate Theranos test

results, many consumers have been subjected to unnecessary or potentially harmful treatments, and/or have been denied the opportunity to seek treatment for treatable conditions.

9.     Plaintiffs, for themselves and all others similarly situated, (*i.e.*, the members of the Classes described and defined herein), bring this action for, *inter alia*, damages, restitution, punitive damages, statutory damages, other monetary relief, and an order enjoining Defendants from engaging in further deceptive representations, concealment and other unlawful acts, and requiring them to provide adequate notice to their customers, pursuant to the Arizona Consumer Fraud Statute A.R.S. §§ 44-1521 *et seq.*; California Business and Professional Code §§17200, *et seq.*; California Business & Professional Code §§ 17500, *et seq.*; California Civil Code §§1750, *et seq.*; California Civil Code §§1709-1710; Civil RICO 18 U.S.C. §§ 1961-1968; California Health & Safety Code §§ 24170 *et seq.*; and common law causes of action for fraud, civil conspiracy to commit fraud, negligent misrepresentation, unjust enrichment, aiding and abetting, battery, and medical battery.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because at least one member of the Class is a citizen of a state that is different from at least one of the Defendants and because the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest, and there are more than 100 members in each of the proposed Class and Subclasses.

11.     This Court has personal jurisdiction over Defendants because Defendants

have conducted and continue to conduct business in the State of Arizona, and because Defendants have committed acts and omissions complained of herein in the State of Arizona.

12.     Venue as to Defendants is proper in this judicial district because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District. Venue is also proper because Defendants have conducted, and continue to conduct, business within this District.

### III.     PARTIES

13.     Plaintiff A.R. is a resident and citizen of San Jose, California and is using his initials to protect his privacy in this litigation.

14.     Plaintiff B.B. is a resident and citizen of Chandler, Arizona, and is using her initials to protect her privacy in this litigation.

15.     Plaintiff B.P. is a resident and citizen of Phoenix, Arizona and is using his initials to protect his privacy in this litigation.

16.     Plaintiff D.L. is a resident and citizen of Maricopa, Arizona and is using her initials to protect her privacy in this litigation.

17.     Plaintiff L.M. is a resident and citizen of Chandler, Arizona and is using her initials to protect her privacy in this litigation.

18.     Plaintiff M.P. is a resident and citizen of Scottsdale, Arizona and is using his initials to protect his privacy in this litigation.

19.     Plaintiff R.C. is a resident and citizen of Sun City West, Arizona and is using his initials to protect his privacy in this litigation.

20.     Plaintiff R.G. is a resident and citizen of Gilbert, Arizona and is using his initials to protect his privacy in this litigation.

21.     Plaintiff S.J. is a resident and citizen of Mesa, Arizona and is using her initials to protect her privacy in this litigation.

22.     Plaintiff S.L. is a resident and citizen of Chandler, Arizona and is using his initials to protect his privacy in this litigation.

23.     Defendant Theranos, Inc. ("Theranos" or the "Company") is based in Palo Alto, California.  Theranos operates, or during the relevant time period operated, two laboratories: one in Newark, California, and another in Scottsdale, Arizona.  Through Wellness Centers located predominantly in Walgreens pharmacies in Arizona and California, and also in Theranos-owned Wellness Centers in Arizona and California, Theranos, along with Walgreens, sold blood and other clinical testing services to individuals.  According to reports, since it began offering testing services in 2013, Theranos has conducted 6.1 million diagnostic tests.

24.     Defendant Walgreens Boots Alliance, Inc., of Deerfield, Illinois, is a global pharmacy-led health and well-being enterprise, which, among other segments, operates the Walgreens retail pharmacy chain in the United States.  Defendant Walgreen Arizona Drug Company, an Arizona corporation, is a wholly-owned subsidiary of Walgreens Boots Alliance, Inc. involved in operating Walgreens retail stores in Arizona.  Walgreens Boots Alliance, Inc. and Walgreen Arizona Drug Company are referred to collectively herein as "Walgreens."

25.     Defendant Elizabeth Holmes, a citizen and resident of California, is the

founder of Theranos and at all relevant times has been Theranos's Chief Executive Officer.  On information and belief, Holmes has had a primary role in, and in significant part has personally directed, Theranos's misconduct as alleged herein.  Further, Holmes personally made material misrepresentations and omissions as alleged herein.  On information and belief, Holmes has personally received millions, if not billions, of dollars in compensation as a result of the business and revenue generated through the misconduct alleged herein.

26.     Defendant Ramesh "Sunny" Balwani, a resident of California, is the former President and Chief Operating Officer of Theranos, and was Theranos's second in command, behind Defendant Holmes, before he resigned from the Company in 2016 amid the various investigations.  Balwani had a primary role in Theranos's misconduct alleged herein.  Mr. Balwani personally directed misconduct alleged herein.  Further, Balwani personally made material misrepresentations and omissions as alleged herein.  On information and belief, Balwani has personally received millions of dollars in compensation as a result of the business and revenue generated through the misconduct alleged herein.

27.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, Theranos was acting as the agent and co-venturer of Walgreens, that Walgreens was acting as agent and co-venturer of Theranos, and at all times mentioned was acting within the course and scope of said agency and/or employment with the other party's full knowledge, permission, consent, and ratification.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by,

each of the other Defendants.

## IV.    FACTUAL BACKGROUND

### A.    The Critical Importance of Reliable Blood Tests

28.    Blood tests and other clinical lab tests ("test results") are an everyday and invaluable part of the practice of modern medicine.  Test results can offer crucial details about an individual's health, and doctors rely on test results to detect everything from cholesterol and glucose levels to infections, blood cell counts and cancer.

29.    Test results aid in the process of medical diagnosis and treatment decisions, and in some cases are a prerequisite for additional medical tests.  Because test results are such a foundational part of medical treatment, test results that are unreliable or inaccurate can be catastrophic: serious conditions may go undetected, patients may not receive the treatments and medications that they need, and patients may be misdiagnosed and receive treatments or medications that they have no need for.  It is absolutely critical that consumers be able to rely on test results.

30.    As the Theranos "direct testing menu" (Ex. 2 hereto) reflects, the tests offered and conducted by Defendants here, including in the Wellness Centers located at Walgreens stores and in Theranos-owned facilities, included more than 200 different medical tests and combinations of tests (panels).  The tests offered by Defendants included tests concerning critical medical and health issues including, but not limited to, cancer, heart disease, diabetes, kidney disease, auto-immune disorders, and viruses.  *Id.*

### B.    The Edison Device and Theranos's Premature Rush to Market

31.    Theranos was founded in 2003 by Elizabeth Holmes, then a sophomore at

8

Stanford studying chemical engineering, who dropped out a few months later to focus on the Company. Holmes, the Company's CEO, has maintained that she developed the idea for Theranos as a result of her self-professed phobia of needles.[2] According to published reports, Theranos initially focused on development of a hand-held device that would use a tiny needle to obtain a small drop of blood for analysis. By 2008, the project had grown into what is now known as the "Edison" device.

32.    In contrast to the large needle and numerous tubes required in a typical venipuncture blood draw, Theranos's Edison device was designed to eliminate the need for laboratories altogether. The Edison device (which Theranos has never allowed to be photographed) was supposedly able to take a few drops of blood from a patient's finger placed into a nanotainer capsule, and reliably conduct hundreds of blood tests, all outside a lab. This concept would have enabled Theranos to conduct all testing outside of the laboratory in the Wellness Centers and thus—according to Defendants—revolutionize testing by significantly reducing the time and costs involved.

33.    Neither Holmes nor the other Defendants ever explained to the public the science or technology underlying the Edison device, and they, in fact, refused to provide any meaningful explanation based on the claimed need to protect Theranos's intellectual property. Despite the industry practice for companies to publish their results and allow for peer review by experts in the field when launching a new medical product, Theranos

---

[2] Marco della Cava, *Change Agents: Elizabeth Holmes Wants Your Blood*, USA Today (July 26, 2014), available at http://www.usatoday.com/story/tech/2014/07/08/change-agents-elizabeth-holmes-theranos-blood-testing-revolution/12183437/ (last visited Jan. 26, 2017).

has still never published its data or allowed for peer review.[3]  One writer described

Holmes's explanation of what Theranos does as "comically vague" after she explained,

"[a] chemistry is performed so that a chemical reaction occurs and generates a signal

from the chemical interaction with the sample, which is translated into a result, which is

then reviewed by certified laboratory personnel."[4]

34.     Despite the fact that Theranos testing was, to put it generously, still in

development and not ready-for-market, Defendants prematurely rushed to get the services

to market.

35.     In connection with the launch of Theranos testing to the consumer public,

Defendants embarked on a large-scale media campaign designed to, *inter alia*, let the

medical profession and the consuming public know that Theranos's testing technology

was revolutionary and ready for public use for the full range of medical testing offered.

In a September 8, 2013 interview with the *Wall Street Journal*, for example, Holmes

boasted that Theranos was able to "run any combination of tests, including sets of follow-

on tests" quickly from a single tiny blood sample.[5]

36.     Various press releases and other statements to the media during that time

period trumpeted the same themes.  For example, a September 9, 2013 joint press release

from Theranos and Walgreens stated: "For the first time, Theranos is introducing CLIA-

[3] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. 3).
[4] Ken Auletta, *Blood, Simpler*, The New Yorker (Dec. 15, 2014), available at http://www.newyorker.com/magazine/2014/12/15/blood-simpler (last visited Jan. 26, 2017).
[5] Joseph Rago, *Elizabeth Holmes: The Breakthrough of Instant Diagnosis*, Wall St, J. (Sept. 8, 2013) (Ex. 4).

10

certified laboratory services with the ability to run its tests on micro-samples.  Theranos's proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results.  Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. . . .  For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most."[6]  A second joint press release, issued on November 13, 2013, included many of the same themes.[7]

37.     Theranos's website similarly began claiming that its "laboratory can perform your tests quickly and accurately on samples as small as a single drop."

38.     In a recorded interview with Medscape's Eric J. Topol, M.D., Holmes reaffirmed her claims that Theranos tests were validated, run on tiny samples, and more accurate than traditional blood tests: "We spent many years redeveloping every test that is recognized by Medicare in the form of a CPT (Current Procedural Terminology) code to be able to run it on a tiny sample" . . . "we focused a great deal on these tests and validated and verified them over the years, building an infrastructure that was highly automated and standardized such that the quality of the data that we generate could be

---

[6] Press Release, Theranos, Inc., *Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service* (Sept. 9, 2013) (Ex. 5).

[7] Press Release, Theranos, Inc., *Theranos and Walgreens Expand Diagnostic Lab Testing to the Phoenix Metropolitan Area; New Theranos™ Wellness Centers at Walgreens stores provide consumers with less invasive, fast, affordable testing on samples as small as a few drops of blood* (Nov. 13, 2013) (Ex. 6).

used in an actionable manner."[8]

39.     Balwani publicly spread the misleading claims that Theranos testing was safe, reliable, and ready for use by the public.  In a presentation before the Arizona Senate Health and Human Services Committee on March 12, 2014, Balwani stated that Theranos was "able to provide a majority of the testing from only two or three drops of blood," and although those drops of blood could be taken from a traditional venipuncture, "most likely patients will prefer a simple finger stick, and we are able to do that."[9] Later in 2014, Balwani emphasized Theranos's supposedly ready technological advancement in an interview with the *The New Yorker*, claiming that "[o]ur platform is about automation . . . We have automated the process from start to finish." [10]

40.     Based on Defendants' representations, people believed that Theranos's technology was a true disruptive technology breakthrough.  Holmes was hailed as the next Steve Jobs, and by 2014, Theranos was valued at $9 billion—approximately the same as each of its two largest and long established competitors in the medical testing

---

[8] Eric J. Topol, M.D., *Creative Disruption? She's 29 and Set to Reboot Lab Medicine*, Medscape (Nov. 18, 2013), available at http://www.medscape.com/viewarticle/814233 (last visited Jan. 25, 2017).
[9] Presentation by Dr. Ramesh Balwani to Arizona Senate Health and Human Services Committee (Mar. 12, 2014), at 3:08-3:22, available at http://azleg.granicus.com/MediaPlayer.php?clip_id=13816 (last visited Jan. 24, 2017).
[10] Ken Auletta, *Blood, Simpler, One woman's drive to upend medical testing*, The New Yorker (Dec. 15, 2014), available at http://www.newyorker.com/magazine/2014/12/15/blood-simpler (last visited Jan. 25, 2017).

industry.[11]

**C.      Theranos and Walgreens Join Forces**

41.      By 2011, Theranos was in talks with both Safeway and Walgreens to offer Theranos testing in their stores.  In or around 2012, Theranos entered into a partnership agreement with Walgreens, under which Walgreens invested $140 million in Theranos, $100 million of which was characterized as an "Innovation Fee," and Theranos agreed to operate clinics, which it called "Wellness Centers," at Walgreens Pharmacies in Arizona and California.  Following the launch of the partnership in 2013, Theranos and Walgreens planned to build Theranos Wellness Centers in Walgreens stores nationwide.[12]

42.      Under the Theranos/Walgreens partnership agreement, Defendants opened a total of 40 Wellness Centers within Walgreens pharmacy stores in Arizona, and one in a Walgreens pharmacy in California, to sell the majority of Theranos's tests.[13]

43.      At all times that Theranos tests were being sold in Walgreens stores, Walgreens knew and/or should have known that the tests could not reasonably be relied on by consumers and their doctors in making health and treatment decisions.  Walgreens was aware of numerous serious red flags about the tests that put it on notice about the unreliability of the tests, and deliberately chose to ignore, not follow up on, and conceal

---

[11] Steve Denning, *Is Theranos Too Good To Be True?*, Forbes (Feb. 13, 2016), available at http://www.forbes.com/sites/stevedenning/2016/02/13/is-theranos-too-good-to-be-true/#47de558857f8 (last visited Jan. 26, 2017).
[12] Press Release, Theranos, Inc., *Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service* (Sept. 9, 2013) (Ex. 5).
[13] James B. Stewart, *A Marriage Gone Bad: Walgreens Struggles to Shake Off Theranos*, N.Y. Times (Apr. 21, 2016), available at http://www.nytimes.com/2016/04/22/business/a-once-avid-ally-walgreens-is-struggling-to-shake-off-theranos.html (last visited Jan. 26, 2017).

that information.

44.     Before entering into the partnership with Theranos, Walgreens's Chief Medical Officer neither reviewed Theranos's technology nor independently validated or verified the accuracy, reliability, or results of the tests.[14]  Nevertheless, and despite the fact that Walgreens executives had expressed doubts about the reliability of Theranos tests and the quality of its equipment and/or facilities, Walgreens said it was confident in the data before introducing the services.[15]

45.     In fact, although a Johns Hopkins University scientist had requested, on Walgreens' behalf, that Theranos provide his researchers with an Edison device so that they could verify the technology for Walgreens, and Holmes initially agreed to provide one, the device was never provided.[16]  Instead, Walgreens got a prototype which the Johns Hopkins team tried to evaluate, but the prototype was useless when evaluating the accuracy and reliability of the tests because it produced results such as "low" or "high" rather than numeric values that could be compared to other labs' tests.  As a result, there was no way to compare results from the prototype Edison device to the results of other commercially-available tests.[17]

46.     In the summer of 2011, just after Theranos and Walgreens signed an initial

---

[14] *Pressure is Mounting on a Startup That Has Tried to Shake Up the Lab-Test Market,* The Economist (Apr. 23, 2016), available at http://www.economist.com/news/business/21697273-pressure-mounting-startup-has-tried-shake-up-lab-test-market-blood-sports (last visited Jan. 26, 2017).
[15] *Id.*
[16] Christopher Weaver and John Carreyrou, *Craving Growth, Walgreens Dismissed Its Doubts About Theranos*, Wall St. J. (May 25, 2016) (Ex. 7).
[17] *Id.*

14

letter of agreement, Walgreens sent a delegation, including its finance chief, internal auditor, and lab experts from a consulting firm called Colaborate, LLC, to a meeting at Theranos headquarters in Palo Alto, the purpose of which was to gain a firsthand view of the Theranos business and its capabilities.[18]

47.    At that meeting, however, the consulting lab experts were chaperoned during the entire visit, including during visits to the restroom, and were not allowed access to Theranos's lab area or Edison technology.  Despite the lack of access, Walgreens did discover problems with Theranos's information management systems meant to keep track of patients.[19]

48.    According to published reports, throughout the process, despite their concerns and the numerous red flags they identified, Walgreens executives nevertheless looked the other way.  They did not press for further verification, and instead went ahead with the Theranos partnership, despite their concerns and known problems about the reliability of Theranos's facilities and tests.  Walgreens apparently was afraid that Theranos would respond to its questions by choosing another retail chain to work with as a partner.[20]

49.    Later in 2011, Colaborate, LLC, issued a report concluding that Walgreens needed more information to assess the proposed partnership with Theranos.[21]

50.    Similarly, in October 2012, Walgreens sent two executives and a retired

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

15

Quest Diagnostics Corp. executive to Theranos to review quality-control data.  According to reports, the retired Quest executive stated that they were not allowed inside Theranos's lab, and while they were led to believe the data they reviewed was from an Edison device, Theranos did not confirm that it was.[22]  Walgreens continued to work on the partnership agreement despite the lack of access to the technology and despite its concerns about the reliability of Theranos's facilities and tests.

51.     According to published reports, Walgreens executives were privy to information that Safeway, Inc. had also agreed to host Theranos testing sites at some of its stores.  According to reports, Safeway dissolved its partnership with Theranos before it began hosting Theranos testing sites in Safeway stores due, in part, to its due diligence that raised questions about the accuracy of Theranos's testing.  For example, the unreliability of Theranos tests became apparent after Safeway employees in Pleasanton, California had their blood tested by both Theranos and another conventional lab, and the test results differed significantly.[23]

52.     In response to pressure from Theranos, and despite its concerns and knowledge about problems, Walgreens ceded even more control over the Wellness Centers to Theranos in the final agreement reached between Walgreens and Theranos, and Walgreens gave up the right to review Theranos's clinical data or financial records.

**D.     Defendants Intentionally Concealed the Truth From Consumers**

53.     Defendants intentionally concealed known problems regarding Theranos

---

[22] *Id.*
[23] John Carreyrou, *Safeway, Theranos Split After $350 Million Deal Fizzles*, Wall St. J. (Nov. 10, 2015) (Ex. 8).

testing equipment and facilities, and regarding the unreliability of Theranos testing.  The information that Defendants concealed was highly material information.

54.    For example, Defendants knew, but concealed, that: (a) Theranos's laboratories were not in compliance with federal guidelines; (b) Theranos's Edison device lacked regulatory approval; (c) with the exception of a single approved test, Theranos tests had not been approved by the FDA despite attempts to get such approval for more than 100 tests; (d) internal testing and data showed that Theranos's technology was unreliable; (e) Theranos's testing equipment had failed proficiency testing and Theranos manipulated the testing process in an attempt to cover that up; (f) for some tests that were to be conducted on "tiny blood samples," Theranos diluted the samples prior to conducting the tests; (g) Defendants knew that Theranos testing was not ready-for-market and was using the consumer tests, in essence, to experimentally beta test their products for research and product development purposes; (h) inspections by regulators had revealed a wide range of serious deficiencies at Theranos; and (i) Walgreens had identified numerous red flags regarding the reliability of Theranos testing, but had nevertheless gone ahead with offering the tests in its stores while deliberately failing to conduct any meaningful investigation or to follow up regarding the problems and concerns identified.

55.    With respect to the undisclosed material information, all such information was known by Theranos.  Theranos knowingly engaged in and assisted the concealment of material information as alleged herein.

56.    With respect to the undisclosed material information, all such information

17

was known by Walgreens and/or would have been known but for Walgreens' deliberate choice to ignore and/or not obtain such information or conduct a reasonable investigation. Walgreens knowingly engaged in and assisted the concealment of material information as alleged herein.

57.     Holmes and Balwani were personally privy to the material undisclosed information by virtue of their extensive, hands-on involvement in these matters and their respective roles as leader and second in command, at Theranos.  Holmes and Balwani knowingly engaged in and assisted the concealment of material information as alleged herein.

58.     Defendants went to great lengths to conceal the truth about Theranos testing.  For example, Theranos refused to allow its Edison device to be photographed; would not permit peer review of its testing or technology, even though that is customary in the medical testing and health care industry; and refused to even provide meaningful explanations when asked about how its technology worked.  Defendants affirmatively covered up reliability problems when they were identified internally, and concealed and downplayed the fact that Theranos had phased out, and then discontinued entirely, use of the Edison device to conduct tests due to the fact that it did not work.  When the discontinuation of the Edison device occurred, Defendants misrepresented the reason.[24]

---

[24] In an interview at Fortune's Global Forum on November 2, 2015, Holmes claimed she "was the person who chose, voluntarily, to stop using our nanotainer tubes" and that it was the "decision to transition our systems to the FDA framework, which led us right now, as of this moment, for the last few weeks only, to run just one test" using the finger-stick and nanotainer collection method. "Temporarily," she emphasized, "as we transition, which has now been just a few weeks, we would not be using that [nanotainer] tube to

59.     When concerns were raised internally by Theranos employees, Defendants minimized, mocked, and threatened the employees.[25]  And when media outlets began questioning Theranos, Defendants attacked the sources and falsely denied there were any problems.  For example, when the *Wall Street Journal* published a story raising alleged issues about Theranos in October 2015, Theranos responded by issuing a press release which stated, in part: "Today's Wall Street Journal story about Theranos is factually and scientifically erroneous and grounded in baseless assertions by inexperienced and disgruntled former employees and industry incumbents."[26]  On Twitter, Theranos and Holmes claimed: "We got FDA clearance of the exact system that @WSJ is questioning"; "3.5 million successful tests, tens of thousands of patients, 1 article w/ anonymous sources"; and "We offered to bring our technology to @WSJ offices… and they denied that request to show it to them."[27]

60.     Defendants intentionally concealed material information from Plaintiffs and the proposed Class members.

61.     Defendants had a duty to Plaintiffs and the proposed Class members, all of whom were consumers of Theranos tests, to disclose material information concerning the unreliability of Theranos testing.  Defendants breached their duty.

---

collect our samples." Recorded interview available at
http://fortune.com/2015/11/02/theranos-elizabeth-holmes-fda/ (last visited Jan. 24, 2017).
[25] John Carreyrou, *Theranos Whistleblower Shook the Company—And His Family*, Wall St. J., (Nov. 16, 2016.) (Ex. 9).
[26] Press Release, Theranos, Inc., *Statement from Theranos* (Oct. 15, 2015) (Ex. 10).
[27] Archived Twitter page of Elizabeth Holmes, *@eholmes2003*, retweeting posts by Theranos (*@Theranos*) dated Oct. 15, 2015; Oct. 16, 2015, available at
https://archive.is/iMEhb (last visited Jan. 24, 2017).

62.     The information Defendants did not disclose was within the exclusive possession of Defendants, and Defendants were in a position of significantly far superior knowledge, particularly in light of Defendants' concealment of information.

63.     Moreover, the scientific and technical nature of blood and other clinical testing is such that Defendants knew that consumers depended and relied on Defendants to provide accurate and complete material information for the consumers' use in making decisions.

64.     Defendants' duty to disclose also arose from the fact that they made numerous misleading and/or partial statements to consumers and the public about, *inter alia*, the readiness, quality, reliability, and regulatory approval and compliance of Theranos testing.  In promoting Theranos testing, Defendants (including Thearnos, Walgreens, and Holmes and Balwani personally) repeatedly made statements, in marketing and elsewhere, that the testing was accurate, reliable, and of the highest-quality.  Defendants also repeatedly expressly stated and implied that Theranos testing was validated by, and compliant with, federal regulations and guidelines.  Defendants had a duty to disclose material information regarding the unreliability of Theranos testing and the fact that such testing was not ready-for-market, because Defendants' affirmative representations were misleading and likely to deceive consumers in the absence of full disclosure.

65.     Defendants' duty to disclose also arose from the very nature of the information in question.  Given the critical role that blood testing and other clinical testing plays in monitoring one's health and in making health and treatment decisions,

and the corresponding importance of consumers' ability to rely on their test results, Defendants knew that the information not disclosed was highly material and that reasonable consumers would not have entered into the transactions in question, and would not have agreed to have their blood drawn and tested by Defendants, had the true information about Theranos testing been disclosed, and knew that consumers submitting to Theranos blood testing were doing so based on mistaken facts, without material information and, in fact, with misleading information disseminated by Defendants.

**E.** **Defendants Falsely Promoted Theranos Testing as Reliable**

66.     Not only did Defendants conceal and fail to disclose material information about Theranos testing from consumers and their doctors, but they affirmatively and falsely promoted the tests—including in their marketing, in the stores, and in press releases and other media statements—as meeting the highest standards of reliability, industry-leading in quality, and developed and validated under, and compliant with, federal guidelines.  Defendants promoted the testing services as being ready-for-market, and aggressively encouraged consumers and their doctors to rely on the test results in making critical health and treatment decisions.

67.     Defendants' representations were false and misleading.

68.     Defendants' representations were pervasive such that Plaintiffs and all proposed Class members, as well as medical providers in all relevant geographic areas, were exposed to them.

69.     Defendants' advertisements for Theranos were rampant, including in Arizona and in California where Theranos testing was offered.  In addition to prominent

advertisements and disclosures in the Walgreens stores and Theranos Wellness Centers, Defendants ran commercials on television, had billboards along the main interstate in Phoenix, and had advertisements in the Phoenix Sky Harbor International Airport.[28]

70.     Defendants designed their representations and marketing to give the false impression to consumers and medical providers that Theranos testing was reliable and accurate and could and should be used in making health and treatment decisions.

71.     For example, Defendants advertised that Theranos testing was of "the highest levels of accuracy," and that the tests were "validated" under and in compliance with federal regulations and guidelines:



72.     Theranos's website suggested that Theranos's test results could be relied on

---

[28] Seung Lee, *Arizona: Where Theranos Still Has a Friend*, Newsweek (June 14, 2016), available at http://www.newsweek.com/arizona-where-theranos-still-has-friend-469942 (last visited Nov. 8, 2016).

22

by consumers and their doctors in making health decisions, that they provided

"actionable health information at the time it matters" to consumers, and that they "lead

the industry in transparency and quality."



73.   Walgreens' website stated that the Theranos technology supported "better,

more informed treatment."[29]  The Theranos website similarly claimed that Theranos's "laboratory can perform your tests quickly and accurately on samples as small as a single drop."

74.    At Wellness Centers where Theranos tests were offered, including in Walgreens stores, Defendants prominently advertised that Theranos's "CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples."

75.    Theranos's marketing further stated that "[w]e continuously conduct proficiency testing and participate in multiple proficiency testing programs," and that all "tests are developed and validated under and to the CLSI, FDA Centers for Disease Control, and World Health Organization guidelines."

76.    Similar, additional representations were made at the Wellness Centers to consumers at the point of purchase.  To obtain one or more of the testing services offered by Defendants, the consumer needed to complete a one-page "Theranos direct testing order form."  (Ex. 11).  The testing services were marketed and sold directly to consumers, as explained in the pamphlet "a guide to direct testing."  (Ex. 12).  The Theranos testing order form and guide to direct testing pamphlet, which Plaintiffs and the Class were all exposed to, contained further representations and promises that Theranos tests were reliable and could and should be used in medical treatment decisions and other

[29] Walgreens website, *Theranos, the Lab Test, Reinvented* (archive, Mar. 30, 2014; Apr. 6, 2016), available at
https://web.archive.org/web/20140330223244/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Jan. 26, 2017);
https://web.archive.org/web/20160407050109/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Jan. 26, 2017).

health decisions.  For example, the testing order form encouraged consumers to consult

with their doctors for "interpretation of the test results."  The guide to direct testing

touted that the Theranos tests would allow consumers to "own your own health like never

before," allow consumers to "get vital information about their health when it matters

most," allow them to "become better informed earlier" and enable them to "work with

their physician to be proactive and address potential problems sooner."  The guide also

stated that consumers could use Theranos test results to monitor their vital health issues

such as "monitor[ing their] thyroid, blood glucose, sexual health, and more," and directed

consumers to consult with their physicians using the test results once they received them.

77.    These same themes were consistently advanced and highlighted by

Defendants in press releases and in statements to mainstream and industry media.

78.    For example, when the Theranos-Walgreens partnership was publicly

announced in September 2013, a joint press release from Theranos and Walgreens stated

that the deal would offer consumers access to "less invasive and more affordable

clinician-directed lab-testing, from blood samples as small as a few drops, or 1/1000 the

size of a typical blood draw."[30] The joint press release touted Theranos's "CLIA-certified

laboratory services," and promised that its "proprietary laboratory infrastructure

minimizes human error through extensive automation to produce high quality results." [31]

It further stated, "[t]his is the next step in Walgreens' efforts to transform community

pharmacy, giving our patients and customers convenient access to the comprehensive

---

[30] Press Release, Theranos, Inc., *Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service*, (Sept. 9, 2013) (Ex. 5).
[31] *Id.*

1   care they need, right in their communities."[32]

2      79.   In November 2013, Theranos and Walgreens issued another joint press

3   release, announcing the opening of Theranos Wellness Centers in Walgreens stores in

4   Arizona, which stated that "Theranos test results can be made available to physicians in a

5   matter of hours, enabling fast diagnoses to help make informed treatment choices."[33]

6      80.   Numerous other press releases and statements to the media by Defendants

7   repeatedly promoted these same themes, including that Theranos tests were government

8   approved and reliable.  By way of example only:

- *Theranos Files Comment In Support Of Food and Drug Administration Oversight Of Laboratory-Developed Tests* (Mar. 6, 2015) ("[We] believe that FDA oversight plays a critical role in ensuring that individuals and their physicians get the most accurate test results….there are limits on the adequacy of the peer review system….That is why we will continue to submit our work to the FDA and why we believe the decision to do so is essential in providing accurate results for individuals and patients.") (Ex. 13).

- *Theranos receives FDA clearance and review and validation of revolutionary finger stick technology, test, and associated test system* (July 2, 2015) (Ex. 14).

- *Theranos Receives CLIA Waiver, Paving the Way for Greater Accessibility of Health Information at the Time and Place it Matters* (July 16, 2015) ("FDA has concluded that the Theranos test and technology is eligible for waiver under CLIA.  The waiver means FDA determined the Theranos test and technology is reliable and accurate and can be used in a broader set of locations outside of a traditional CLIA certified

---

[32] *Id.*

[33] Press Release, Theranos, Inc., *Theranos and Walgreens Expand Diagnostic Lab Testing to the Phoenix Metropolitan Area; New Theranos™ Wellness Centers at Walgreens stores provide consumers with less invasive, fast, affordable testing on samples as small as a few drops of blood*, (Nov. 13, 2013) (Ex. 6).

laboratory, including Theranos Wellness Centers.") (Ex. 15).

81.     Holmes told *The New Yorker* that Theranos "ha[s] data that show you can get a perfect correlation between a finger stick and a venipuncture for every test that we run."[34]  Holmes knew that statement to be false and misleading when she made it.

82.     Walgreens CFO, Wade Miquelon, told *The Arizona Republic* that Theranos could perform tests "more accurately" than traditional blood tests.[35]

83.     Defendants' sales materials also highlighted the proprietary "tiny blood test" technology and described its offerings as "revolutionary" and a "new way" of testing.  The materials repeatedly referenced a smaller sample size and depicted the nanotainer, leading customers to be believe that if they had their blood tested by Theranos it would be via this "tiny blood test" technology, and that such testing was reliable and had been validated.  For example:

---

[34] Ken Auletta, *Blood, Simpler*, The New Yorker, (Dec. 15, 2014), available at http://www.newyorker.com/magazine/2014/12/15/blood-simpler (last visited Jan. 26, 2017).
[35] Ken Alltucker, *Get Your Blood Tested at the Store*, The Arizona Republic (Nov. 13, 2013), available at http://archive.azcentral.com/business/news/articles/20131113get-your-blood-tested-store.html (last visited Jan. 26, 2017).

84.     According to reports, prior to October 2015, promotional materials promised that "usually only three tiny micro vials" of blood would be collected "instead of the six or more large ones," because "many" of Theranos's tests required no more than "a few drops of blood."  Theranos reportedly deleted the highlighted portions of the materials below in mid-2015 to supposedly improve its "marketing accuracy," after it moved away from Edison testing following a surprise inspection by the FDA:[36]

---

[36] John Carreyrou, *Hot Startup Theranos Dials Back Lab Tests at FDA's Behest*, Wall St. J. (Oct. 16, 2015) (Ex. 16).

July 16, 2015 screenshot from www.theranos.com

THE DIFFERENCE

Smaller samples.
Smaller needles.
A better experience.

Many of our tests require only a few drops of blood. And all our tests, including venous draws, require smaller samples than traditional labs. Usually only three tiny micro-vials, instead of the usual six or more large ones. We also use much smaller needles. Ones designed specifically for collecting venous draws from small children. So whether it's a finger stick, or the smallest venous draw sample possible, Theranos tests mean less blood, an easier process and a clear difference.

Oct. 15, 2015 screenshot from www.theranos.com

THE DIFFERENCE

Smaller samples.
Smaller needles.
A better experience.

Our tests, including venous draws, require smaller samples than traditional labs. We also use much smaller needles. Ones designed specifically for collecting venous draws from children. So whether it's a few drops collected with a finger stick, or the smallest venous draw sample possible, Theranos tests mean less blood, an easier process, and a clear difference.

85.     On another webpage advertisement to Walgreens customers, Defendants stated that smaller samples directly benefited patients by dramatically reducing the time it takes to analyze samples because its technology enabled a "more timely diagnosis to support better, more informed treatment."[37]

86.     Defendants' advertising served another purpose as well: to lobby the State of Arizona to pass a law allowing consumers to purchase a blood test without a healthcare provider's order.  Theranos's lobbying and advertising efforts were successful and the bill was signed in April 2015, despite opposition from the Arizona Medical Association.  At the bill's signing, Holmes stated that "Theranos is about access—

_____

[37] Walgreens website, *Theranos, the Lab Test, Reinvented* (archive, Apr. 7, 2016), https://web.archive.org/web/20160407050109/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited Jan. 26, 2017).

eliminating the need for painful needles and vials of blood, replacing that with tiny samples taken in convenient locations at convenient hours of operation, always for a fraction of the cost charged elsewhere—to build a health care system in which early detection and prevention become reality.  That is why we worked to pass this law; it is why we believe Arizona's law can and should serve as a model for the nation for direct access testing."[38] The law also allowed laboratories to provide blood test results directly to patients, bypassing involvement by doctors, who are trained to question unusual results.

87.    Walgreens and Theranos jointly marketed Theranos testing services to consumers.  On information and belief, marketing decisions about the representations that Plaintiffs and Class members saw were made by Theranos and Walgreens, in California and Arizona, and Theranos maintained its website from California.  Holmes and Balwani knowingly engaged in and assisted the dissemination of false and misleading representations as alleged herein.

88.    Defendants knew and intended for consumers to rely on their representations, knew that, by the very nature of blood tests and also based on Defendants' representations, consumers who purchased and submitted to Theranos testing would reasonably expect the test results to be reliable, and knew that the Theranos partnership with Walgreens, a well-established pharmacy entity, and the presence of Wellness Centers in Walgreens stores, would further lead customers to believe that the

---

[38] Press Release, Theranos, Inc., *Theranos Founder and CEO Elizabeth Holmes Speaks at Arizona Bill Signing*, (Apr. 6, 2015) (Ex. 17).

1   Theranos tests were reliable and trustworthy.

2   **F.    <u>Theranos's Tests Were Unreliable and Dangerous</u>**

3       89.    Defendants' pervasive representations to customers, including that the

4   Theranos tests were reliable, CLIA-certified, and complaint with federal guidelines, were

5

6   knowingly false and misleading.

7       90.    In fact, Theranos testing—including testing conducted using the Edison

8   device and the other testing performed with other devices—was decidedly unreliable and

9   posed a serious danger to any consumer who might rely on it.  Defendants knew this to be

10  the case, and yet represented otherwise to consumers and concealed that material

11  information from consumers for years.

12

13      91.    Defendants also concealed that information from regulatory authorities.

14  For example, in order to maintain CLIA certification, laboratories are required to

15  administer "proficiency testing" of samples provided by CMS in order to prove that they

16  can produce accurate results.  According to reports, Theranos split some of the

17  proficiency-testing samples it got into two pieces: One was tested with Edison machines

18  and the other with instruments from other companies.  When Theranos lab employees

19  asked Balwani, by email, which results should be reported back to test administrators and

20  the government, he replied, copying Holmes, that "samples should have never run on

21  Edisons to begin with." [39]  Balwani reportedly ordered lab personnel to stop using Edison

22  machines on any of the proficiency-testing samples and report only the results from

23

24

25

26

27  [39] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 15, 2015) (Ex. 3).

28

31

instruments bought from other companies.  The former employees say they did what they were told but were concerned that the instructions violated federal rules, which state that a lab must handle "proficiency testing samples…in the same manner as it tests patient specimens" and by "using the laboratory's routine methods."[40]

92.     Theranos tests were not fit for their ordinary purposes and the purposes for which they were sold by Defendants.

93.     Theranos tests were neither CLIA-certified, nor "validated" under or compliant with federal guidelines, as Defendants represented.

94.     Any consumer who had a Theranos test could not reasonably rely on the results of such test in light of the litany of problems that have now come to light.

95.     When the Theranos and Walgreens Wellness Centers opened, the Edison devices were not yet beyond the prototype stage.

96.     As Theranos, Holmes, and Balwani knew, and Walgreens knew or would have known at the time had it conducted a reasonable inquiry, Theranos did not have the necessary FDA approval, known as a CLIA waiver, to use the Edison device for conducting on-site blood testing at the Wellness Centers, with the sole exception of a single test (Herpes Simplex HSV-1), for which the Company obtained approval in July 2015.[41]  Theranos sought FDA approval for more than 120 of its tests, none of which

---

[40] *Id.*

[41] Press Release, Theranos, Inc., *Statement from Theranos* (Oct. 28, 2015) (Ex. 18); Lauren F. Friedman, *Controversial Multibillion-Dollar Health Startup Theranos Just Got a Huge Seal of Approval from the US Government* (July 2, 2015), available at http://www.businessinsider.com/theranos-gets-fda-approval-2015-7 (last visited Jan. 26, 2017).

have been approved at this time.[42]

97.     Despite Defendants' representations to the public about the centrality of the nanotainer and Theranos's proprietary technology, by the end of 2014, Theranos was using its proprietary Edison devices and nanotainers for only 15 out of 205 tests.[43] By June 2015, Theranos had stopped using the Edison device altogether.[44] In a report detailing objectionable conditions at Theranos dated September 16, 2015, the FDA informed Theranos that, among other things, the agency considered the nanotainer devices to be uncleared medical devices being shipped in interstate commerce between California, Arizona, and Pennsylvania.[45]

98.     Thousands of consumers arrived at the Wellness Centers expecting a finger prick, but instead they received conventional venous blood draws.  Defendants knew that customers were receiving venous blood draws and therefore knew, or should have known, that Theranos was not in fact using its finger prick Edison devices.  At no point did Defendants disclose to consumers that the blood draw would be anything other than the minimal blood draw they were advertising.

---

[42] Roger Parloff, *A Second FDA Approval Frees Theranos to Do a Blood Test Outside Lab*, Fortune (July 16, 2015), available at http://fortune.com/2015/07/16/fda-clears-theranos-to-do-test-outside-lab/ (last visited Jan. 26, 2017).

[43] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. 3).

[44] Beth Mole, *Theranos Throws in the Towel on Clinical Labs, Officially Pivots to Devices*, Ars Technica (Oct. 5, 2016), available at http://arstechnica.com/science/2016/10/theranos-throws-in-the-towel-on-clinical-labs-officially-pivots-to-devices/ (last visited Jan. 26, 2017).

[45] Department of Health and Human Services, Form FDA-483 (Inspection Report) (Sept. 16, 2015), available at http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Jan. 26, 2017).

99.     Because Theranos did not have FDA approval to conduct tests on the Edison device outside of a laboratory setting (with the limited exception for HSV-1 noted above), when Defendants drew blood at the Wellness Centers, the samples obtained then had to be couriered to one of two centralized labs, either in Newark, California, or Scottsdale, Arizona.  The proprietary Edison devices were only located in the Newark laboratory.  Accordingly, all the finger stick blood samples were analyzed at the Newark facility, with the potential exception of samples that Theranos diluted in order to run them on conventional machinery.[46]

100.     The Scottsdale Lab only performed analyses on venipuncture tests. According to reports, over 90 percent of Theranos's testing was done at its Scottsdale lab. Theranos has also disclosed that it outsourced certain "highly complex" tests to third-party, university-affiliated labs, despite its statements that it was able to run all of the over 200 tests it offers on its Edison devices.

101.     In the context of a regulated laboratory, Theranos did not need FDA approval to perform testing using the Edison devices (because they were not selling the Edison devices), so long as Theranos's lab operations were in compliance with federal guidelines and met proficiency testing and other safeguards.  However, the labs that Theranos used failed to comply with such testing and guidelines.

102.     Defendants' statements to customers—that testing was accomplished through proprietary analysis, which was accurate and compliant with federal regulations

---

[46] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. 3).

and guidelines—were false, both as to the Edison-device tests and the other tests.  Simply put, consumers did not receive what they paid for and what they reasonably expected when they obtained testing services from Defendants.  None of them could reasonably rely on the test results they received, in light of the litany of problems that have come to light.

## G.  **Defendants' Fraudulent Scheme Unravels**

103.    In March 2014, a former Theranos employee alleged to New York State's public-health lab that Theranos may have manipulated the proficiency testing process, in part by intentionally excluding data that showed Theranos's technology to be unreliable.[47]  The New York State lab responded that the practices described would be a "violation of the state and federal requirements," and forwarded the allegations to the Centers for Medicare and Medicaid Services ("CMS").[48]

104.    In April 2015, Arizona Department of Health Services inspectors identified multiple deficiencies at Theranos's Scottsdale laboratory, including serious issues with Theranos's proficiency testing.[49]  For example, in the Scottsdale facility, regulators found that Theranos used mis-programmed machines to evaluate blood coagulation tests, failed to properly gauge water purity in machines it used, and failed to meet laboratory quality

---

[47] John Carreyrou, *Theranos Whistleblower Shook the Company—And His Family*, Wall St. J. (Nov. 16, 2016) (Ex. 9).
[48] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. 3).
[49] Ken Alltucker, *Arizona Inspectors Find Theranos Lab Issues*, The Arizona Republic, (Nov. 30, 2015), available at http://www.azcentral.com/story/money/business/consumers/2015/11/27/arizona-inspectors-find-theranos-lab-issues/76021416/ (last visited Jan. 26, 2017).

standards.

105.    In September 2015, a former Theranos lab employee filed a complaint with CMS alleging that Theranos instructed lab employees to keep testing patients with the Edison devices despite indications of "major stability, precision and accuracy" problems with those devices.[50]

106.    In October 2015 the FDA released inspection reports of Theranos declaring the nanotainer to be an "uncleared medical device." The investigation also found deficiencies in Theranos's processes for handling customer complaints, monitoring quality and vetting suppliers.[51]

107.    In January 2016, CMS cited the Theranos Newark, California lab for multiple serious deficiencies.  Among other things, the report stated that in October 2014, 29 percent of quality control checks performed on the Edison devices produced results outside the acceptable range, and that in February 2015, quality checks on an Edison test measuring a hormone affecting testosterone levels failed 87 percent of the time.

108.    The letter from CMS, dated January 25, 2016, noted that, based on a December 2015 survey, Theranos was found to be out of compliance with five CLIA Condition-level requirements, at least one of which posed "immediate jeopardy to patient health and safety," meaning the condition had "already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the

---

[50] John Carreyrou, *U.S. Probes Theranos Complaints*, Wall St. J. (Dec. 20, 2015) (Ex. 19).
[51] *Id.*

laboratory or the health and safety of the general public."[52]

109.    Inspection reports found that Edison devices in the lab often failed to meet the Company's own accuracy requirements, including a test to detect prostate cancer.  In one report, inspectors found that 81 of 81 final patient results of a blood clotting test reported to patients on the blood thinner Warfarin were not accurate.[53]

110.    In addition, the FDA observed that there were no quality audits being performed at Theranos's Newark lab, in contravention of FDA regulations.[54]

111.    At the very time that Defendants were widely touting Theranos's compliance with federal regulations, Theranos had been repeatedly sanctioned by federal authorities for non-compliance, yet Defendants failed to disclose that fact and in fact continued to represent that there were no problems.  After CMS issued findings regarding the Newark facility, Theranos made statements to reassure the public that its Scottsdale, Arizona facility was "not impacted" by the CMS findings and Theranos remained "open for business, confident in our technologies, and unwavering in our commitment to

---

[52] Carolyn Y. Johnson, *Deficiencies at Theranos 'Pose Immediate Jeopardy to Patient Health,'* Washington Post (Jan. 27, 2016), available at https://www.washingtonpost.com/news/wonk/wp/2016/01/27/regulators-find-deficiencies-at-theranos-that-pose-immediate-jeopardy-to-patient-health/ (last visited Jan. 26, 2017).

[53] Andrew Pollack, *Report Shows Theranos Testing Plagued by Problems,* N.Y. Times (Mar. 31, 2015), available at http://www.nytimes.com/2016/04/01/business/report-shows-theranos-testing-plagued-by-problems.html?_r=0 (last visited Jan. 26, 2017).

[54] Department of Health and Human Services, Form FDA-483 (Inspection Report) (Sept. 16, 2015), available at http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Jan. 26, 2017).

provide Arizonans with the care and service they deserve."[55]

112.    On March 18, 2016, Theranos received another letter from CMS referenced, "RE: PROPOSED SANCTIONS - CONDITIONS NOT MET IMMEDIATE JEOPARDY," which stated that the Company had not remedied the deficiencies identified by CMS in its January letter.  Outlining Theranos's failures to meet quality-control standards, such as improper freezer temperatures, lack of proper documentation, improper equipment calibration, and unqualified personnel, CMS notified Theranos that it was out of compliance with accepted clinical laboratory standards, still had not established compliance with the CLIA requirements previously identified, and had not demonstrated that the laboratory had "abated immediate jeopardy."  Notice of Sanctions pursuant to the Clinical Laboratory Improvement Amendments of 1988 (CLIA) was provided.[56]

113.    As these reports indicate, Theranos's conventional laboratory operations in both Scottsdale and Newark were found to be deeply flawed and deficient by government regulators.  According to published reports, at Theranos's Scottsdale lab, the Company performed lab tests with certain Siemens lab equipment programmed to the wrong settings, and failed to adequately gauge the purity of the water input into Siemens lab equipment, which could affect the outcome of the results of testing run on such devices.

---

[55] Geoff Weiss, *Walgreens Pumps the Brakes on Theranos Partnership Amid Problematic Lab Audit*, Entrepreneur (Jan. 28, 2016), available at https://www.entrepreneur.com/article/270154 (last visited Jan. 26, 2017).
[56] CMS, *Notice of Proposed Sanctions* (Mar. 18, 2016), available at http://www.wsj.com/public/resources/documents/hhslettertheranos.pdf (last visited Jan. 26, 2017).

114.    The personnel in charge of operating Theranos's laboratories were dangerously underqualified.  For example, the Director of Theranos's Newark laboratory was Dr. Sunil Dhawan, a dermatologist who had no prior experience running a blood lab.

115.    A peer-reviewed study published March 28, 2016 by researchers at the Icahn School of Medicine at Mount Sinai showed that results for cholesterol tests done by Theranos differed enough from the two largest laboratory companies that it could negatively impact patient care.

116.    Regardless, Defendants continued to conceal this critical information, to falsely market Theranos testing services as accurate and reliable, and to encourage consumers to use Theranos test results to make decisions about their health and treatment.

117.    In April 2016, Theranos revealed that it was under investigation by the U.S. Department of Justice as well as the Securities and Exchange Commission, and that the Department of Justice had requested documents.  Walgreens and the New York State Department of Health also received subpoenas.  Investigators are also examining whether Theranos misled government officials. [57]

118.    On June 30, 2016, members of the House Energy and Commerce Committee requested briefing from Theranos regarding Theranos's failure to comply with federal regulatory standards governing clinical laboratory testing, and the resulting impact on patients nationwide.  The Committee expressed concern over "Theranos's disregard for patient safety and its failure to immediately address concerns by federal

---

[57] Christopher Weaver, John Carreyrou, and Michael Siconolfi, *Theranos Is Subject of Criminal Probe by U.S.*, Wall St. J. (Apr. 18, 2016) (Ex. 20).

regulators," and requested "information about how company policies permitted systematic violations of federal law."[58]

119.   On July 7, 2016, CMS issued a 33-page Notice to Theranos executives stating that it was revoking the CLIA certificate of Theranos's Newark laboratory and banning the owners and operator(s) of Theranos, including Defendants Holmes and Balwani, from owning or running a lab for at least two years.  Citing deficiencies in Theranos's training of lab personnel, quality assurance, and procedures for assessing the "patient impact" of its proficiency testing, among other shortcomings, CMS also threatened to impose a monetary penalty of $10,000 per day for each day of non-compliance.[59]

120.   As a result of revelations regarding problems with Theranos's technology and laboratory standards, Theranos test results have lost all credibility within the medical community.  Dr. Geoffrey Baird, a pathology professor at the University of Washington, reportedly said about Theranos: "I'm incredibly confused by what these people [at Theranos] are doing.  No lab is run like this."[60]  Tim Hamill, medical director of UC San

---

[58] Press Release, Committee on Energy & Commerce Democrats, *Democratic Committee Leaders Request Information from FDA and CMS on Theranos' Inaccurate Blood Tests* (July 26, 2016), available at http://democrats-energycommerce.house.gov/newsroom/press-releases/democratic-committee-leaders-request-information-from-fda-and-cms-on (last visited Jan. 26, 2017).

[59] CMS, *Notice of Imposition of Sanctions* (July 7, 2016), available at http://online.wsj.com/public/resources/documents/r_Theranos_Inc_CMS_07-07-2016_Letter.pdf (last visited Jan. 26, 2017).

[60] Matthew Herper, *Something May Be Working At Theranos, But You Don't Know What It Is*, Forbes (June 17, 2016), available at http://www.forbes.com/sites/matthewherper/2016/06/17/something-may-be-working-at-theranos-but-you-dont-know-what-it-is/#42ced77176a8 (last visited Jan. 25, 2017).

Francisco's clinical labs at China Basin and Parnassus reportedly stated: "The fact that there are so many [deficiencies identified by CMS] gives me the impression that these guys don't know what they're doing."[61]  Other doctors "stopped steering patients to Theranos because of results they didn't trust."[62]  In the words of one Forbes reporter, "If there is working technology at Theranos . . . you wouldn't be able to tell."[63]

121.    In 2016, Theranos whistleblower Tyler Schultz stepped forward to provide a disturbing, detailed account of his experience as a Theranos employee.  Mr. Schultz was reportedly the first to report Defendants' fraudulent conduct to state regulators.[64]

122.    Mr. Schultz was employed by Theranos as an assay validation team member and was responsible for verifying and documenting the accuracy of tests run on Edison devices before they were deployed in the lab for use with patients.

123.    Mr. Schultz stated that he found the results varied widely when tests were rerun with the same blood samples.  In order to reduce this variability, he states that Theranos routinely discarded outlying values from validation reports it compiled.

124.    For example, one validation report about an Edison test to detect a sexually-transmitted infectious disease said the test was sensitive enough to detect the

---

[61] Nick Stockton, *Theranos's Lab Problems Go Way Deeper Than Its Secret Tech*, Wired (Apr. 27, 2016), available at https://www.wired.com/2016/04/theranos-lab-problems-go-way-deeper-secret-tech/ (last visited Jan. 26, 2017).
[62] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, Wall St. J. (Oct. 16, 2015) (Ex. 3).
[63] Matthew Herper, *Something May Be Working At Theranos, But You Don't Know What It Is*, Forbes (June 17, 2016), available at http://www.forbes.com/sites/matthewherper/2016/06/17/something-may-be-working-at-theranos-but-you-dont-know-what-it-is/#42ced77176a8 (last visited Jan. 26, 2017).
[64] John Carreyrou, *Theranos Whistleblower Shook the Company–and His Family*, Wall St. J. (Nov. 16, 2016) (Ex. 9).

41

disease 95% of the time.  But when Mr. Shultz looked at the two sets of experiments from which the report was compiled, they showed sensitivities of 65% and 80%.  Thus, if 100 people infected with the disease were tested only with the Edison device, as many as 35 of them would likely incorrectly get a result concluding they were disease-free.

125.    Mr. Schultz then moved to Theranos's production team, where he was responsible for quantifying how much patient tests should be allowed to vary during daily quality-control checks.  Labs are permitted to set those parameters subject to them being within the bounds of accepted industry guidelines.

126.    Mr. Schultz observed that the Edison devices often failed Theranos's quality-control standards.  Mr. Schultz further stated that Balwani, the No. 2 executive at Theranos under Holmes, pressured lab employees to ignore the failures and run blood tests on the devices anyway, contrary to accepted lab practices.

127.    Mr. Schultz also states that he informed Holmes of his concerns in early 2014.

128.    Unsatisfied with the actions that Balwani and Holmes had taken, Mr. Schultz states that he anonymously emailed his complaint to New York officials who administered a proficiency-testing program in which Theranos was enrolled.

129.    In April 2014, Mr. Schultz again informed Holmes of the quality-control failures.  A few days later, Balwani responded to Mr. Schultz with the following email:

> We saw your email to Elizabeth.  Before I get into specifics,
> let me share with you that had this email come from anyone
> else in the company, I would have already held them
> accountable for the arrogant and patronizing tone and reckless

comments.[65]

130.    Mr. Schultz resigned from his position with Theranos shortly thereafter.

131.    On November 8, 2016, Walgreens filed a lawsuit against Theranos in federal court the District of Delaware, alleging that Theranos breached its contractual obligations by, *inter alia*, providing testing services to Walgreens customers that Theranos knew lacked accuracy or reliability, and by misrepresenting that its testing was ready-for-market, reliable and accurate and concealing that the opposite was true.[66]

132.    Partner Fund Management, which invested $96.1 million in Theranos in early 2014, filed a shareholder suit on October 10, 2016.  The lawsuit names Holmes, Balwani, and Theranos and alleges that the three engaged in securities fraud, negligent misrepresentation and violations of the Delaware deceptive trade practices act, among other things. [67]

133.    On November 28, 2016, a second Theranos investor filed a putative class action against Theranos, Holmes, and Balwani alleging, *inter alia*, that they concealed material information about reliability problems and concerns with Theranos tests, and affirmatively misrepresented that the tests were ready-for-market and reliable.[68]

134.    In January 2017, it was reported that Theranos's Scottsdale, Arizona

---

[65] John Carreyrou, *Theranos Whistleblower Shook the Company—And His Family*, Wall St. J. (Nov. 16, 2016) (Ex. 9).
[66] Case No. 1:16-cv-01040-SLR (D. Del.), Amended Complaint,  Dkt. 14.
[67] Reed Abelson and Katie Benner, *Theranos Sued by Investor Who Accuses It of Securities Fraud*, N.Y. Times (Oct. 10, 2016), available at http://www.nytimes.com/2016/10/11/business/theranos-sued-by-investor-who-accuses-it-of-securities-fraud.html (last visited Jan. 26, 2017).
[68] Case No. 5:16-cv-06822-NC (N.D. Cal.), Complaint, Dkt. 1.

laboratory, where the majority of Theranos tests were conducted, had failed a September 2016 inspection by CMS, thus subjecting Theranos to a new round of potential sanctions. According to reports, Theranos responded to the inspection findings with a plan to correct the deficiencies found, but CMS rejected the plan as deficient.[69]  Defendants failed to disclose any of these developments.

135.    In May 2016, as its scheme was collapsing, Theranos announced that it had voided *all* blood tests conducted on its Edison device in 2014 and 2015 (which consisted of tens of thousands of tests), and had belatedly "corrected" thousands of other test results it had provided to consumers.  In December 2016, Theranos further voided and/or belatedly "corrected" numerous additional test results for tests conducted at its Scottsdale, Arizona laboratory.  Defendants have failed to provide adequate notice or disclosure regarding the nature and extent of the tests it has already voided or belatedly "corrected," leaving consumers in the dark.  Based on the limited information disclosed by Defendants, however, it is apparent that a very substantial portion of the tests have already been voided or belatedly "corrected."  For example, the complaint in Walgreens' action against Theranos indicates that the voided Edison-device tests represented some 10% or more of the overall tests conducted at Walgreens stores.  That does not include the thousands of other tests that have been, and continue to be, voided and/or belatedly "corrected."

---

[69] Christopher Weaver and John Carreyrou, *Second Theranos Lab Failed U.S. Inspection*, Wall St. J. (Jan. 17, 2017) (Ex. 21).

**H.      Defendants Continue to Fail to Protect Customers**

136.     Defendants' misrepresentations, omissions, and fraudulent conduct alleged herein persisted from before the tests were first offered to the public all the way through the present.

137.     Even after the highly damning CMS report became public in January 2016, Defendants still did not take immediate steps to protect the consumers who obtained testing services from Theranos.  Walgreens, for its part, failed to take immediate action even at this stage and instead gave Theranos 30 days to resolve the critical issues CMS identified at the Newark lab, and closed only a single Wellness Center.  Not only did Walgreens permit the remaining 40 Wellness Centers to remain open at that time, it made no effort to notify prospective patients about potential concerns about the reliability of Theranos's testing.  Nor did Walgreens notify patients who had previously received Theranos's tests at the Wellness Centers that their test results may not have been accurate or reliable.

138.     Because it had no choice due to regulatory action, Theranos has now completely voided and belatedly "corrected" many thousands of its tests results.  In many cases, it took months (or even a year or more) to inform customers and their doctors that the test results should not be relied on.

139.     Defendants' belated "correction" of test results, long after Defendants even had access to the blood samples in question, is inconsistent with industry standards.  The Wall Street Journal reported on Theranos sending so-called "corrected results" to some patients.  Disturbingly, in some instances, the "corrected" results were even more

45

inaccurate than the initial inaccurate and unreliable results Theranos provided.[70]

140.    Even beyond the many thousands of tests that have already been completely voided and belatedly "corrected," no consumer who had a Theranos test could reasonably rely on the results they received given the sweeping litany of compliance issues and the extensive list of other accuracy and reliability problems that have come to light, a list that seems to be expanding on a near-weekly basis.

141.    Defendants have failed to keep customers informed and notified, including but not limited to by: failing to inform customers about the numerous problems when Defendants were aware of them; pervasively misrepresenting that Theranos tests could and should be trusted when they knew that was not the case; and failing to promptly and properly notify customers about voided and belatedly "corrected" tests results.  Even after their scheme began collapsing under its own weight, Defendants continued to engage in a pattern of denying and downplaying the problems, further leaving customers in the dark.

142.    It was not until June 14, 2016, almost six months after CMS's report first became public, and long after Defendants were aware of reliability problems across the Theranos testing spectrum, that Walgreens announced it was ending its relationship with Theranos.[71]  Days later, Theranos sent letters to providers encouraging them to direct patients to one of four Theranos-operated Wellness Centers in Arizona.  The letters

---

[70] Christopher Weaver, *Agony, Alarm and Anger for People Hurt by Theranos's Botched Blood Tests*, Wall St. J. (Oct. 20, 2016) (Ex. 22).

[71] Michael Siconolfi, Christopher Weaver, and John Carreyrou, *Walgreen Terminates Partnership with Blood-Testing Firm Theranos*, Wall St. J. (June 13, 2016) (Ex. 23).

assured providers that Theranos was "*open for business*, confident in our technologies, and steadfast in our commitment to make lab tests fast, convenient, and affordable for everyone." (emphasis in original).  The letters did not disclose, among other things, CMS's sanctions, that Theranos no longer used the Edison device and finger prick tests, the numerous other problems identified with both the Newark and Scottsdale testing facilities, that it had voided all Edison tests performed in 2014 and 2015 as well as other tests, or that the tests were unreliable.  To the contrary, Theranos continued to suggest that its test were accurate and reliable.  In the provider letters, Defendants also directed providers and their patients to Theranos's website, which also concealed the material information omitted from the provider letters.

143.    On July 19, 2016, Theranos issued a statement on the CMS findings that included further misleading statements and falsehoods:

> **What practices do you undertake to ensure that your test results are accurate?  What processes do you use to ensure compliance and quality results?**
> We undertake quality and compliance measures including the following that ensures:
> - Our laboratory leadership, including our lab director and testing personnel, are highly qualified and well trained
> - Processes are properly reviewed and maintained
> - Quality control and quality assessment programs are followed
> - Lab processes, including assay verification, calibration, equipment maintenance and environmental controls, are followed[72]

144.    Given, *inter alia*, the lack of transparency and outright fraud from

---

[72] Press Release, Theranos, Inc., *Theranos Statement and Q&A on CMS Findings* (July 19, 2016) (Ex. 24).

47

Defendants, the fundamental and sweeping nature of the numerous deficiencies that have been identified regarding Theranos testing, and the fact that both the list of serious deficiencies made public and the list of tests that have been voided and belatedly "corrected" have continued to expand with no apparent end in sight, the only reasonable conclusion for any Plaintiff or Class member here to reach is that they cannot and should not be relying on the results of their Theranos tests.

145.   Theranos has apparently not learned its lesson, despite endangering the health and lives of thousands of patients.  CMS banned Holmes and Balwani from owning or operating a blood-testing business for at least two years and revoked Theranos's license to operate a lab in California. [73]  Yet Theranos and Holmes, apparently undeterred, are now working on developing a "miniLab" to run diagnostic tests on small amounts of blood.  One doctor, after watching Holmes's presentation at the annual meeting of the American Association for Clinical Chemistry, noted that it was not clear how the Edison and miniLab differed, and that Holmes had not actually shown that the device could perform a large number of tests on a single drop of blood.[74]  Theranos's deception and secrecy continues; the miniLab has not been evaluated by a third party and lacks FDA approval.

---

[73] John Carreyrou, Michael Siconolfi, and Christopher Weaver, *Theranos Dealt Sharp Blow as Elizabeth Holmes is Banned From Operating Labs*, Wall St. J. (July 8, 2016) (Ex. 25).

[74] Abigail Tracy, *The Medical Community Isn't Letting Theranos Off the Hook*, Vanity Fair (Aug. 4, 2016), available at http://www.vanityfair.com/news/2016/08/theranos-interview-what-went-wrong (last visited Jan. 26, 2017).

## I. Defendants Misrepresented and Concealed the Purpose of the Theranos Testing Offered to Plaintiffs and the Class

146.     Defendants prematurely rushed Theranos testing to market in an attempt to "disrupt" and capitalize upon the market for medical laboratory testing, a highly competitive and fast-growing market estimated to be worth $198.5 billion by 2024.[75] Defendants' over-eagerness led them to promote and market their testing services prematurely, when the services were not market ready, and when Defendants lacked sufficient data validating the services.  On information and belief, the premature opening of Wellness Centers and release of Theranos testing to the public was part of Defendants' strategy for competing in the lucrative laboratory testing market.

147.     Defendants intentionally misled Plaintiffs and the Class about the essential purpose of the blood draws to which they submitted.  In permitting Defendants to engage in the procedure of drawing blood from their bodies, Plaintiffs and the Class were misinformed about the essential purpose of such procedure and thus they did not provide, and could not have provided, consent for such procedure and intrusion.

148.     While not disclosed to consumers, the medical field, or otherwise, Theranos technology was still experimental and not ready-for-market at the time it was released. By testing its services on many thousands of unwitting customers who thought they were purchasing a ready-for-market service, Defendants intended to develop their product so that it might compete with more established laboratories.  In essence, though not

---

[75] Press Release, Grand View Research, Inc., *Clinical Laboratory Tests Market Size Worth USD 198.5 Billion by 2024* (Dec. 2016), available at https://www.grandviewresearch.com/press-release/global-clinical-laboratory-tests-market (last visited Jan. 26, 2017).

disclosed to consumers and indeed represented very differently, Defendants' Wellness Centers, throughout the relevant period, were used to gather blood samples and other data for use in Defendants' research and product development.

149.   Offering blood tests to the general public enabled Defendants to collect blood samples from human subjects without sacrificing the time and money necessary to recruit volunteers for formal clinical trials.  Defendants' Wellness Center pretense also helped them evade regulatory scrutiny and in particular the additional regulatory scrutiny that accompanies human testing, such as the requirement to obtain approval for such research by an Institutional Review Board (IRB) in order to protect patient safety.

150.   Theranos's disregard for IRB standards and patient safety is well-established.  For example, in 2016 it was revealed that Theranos had conducted a study on a blood test for the Zika virus using data that was collected from human test subjects without any IRB approval.[76]

151.   Defendants' hidden strategy was also designed to avoid the costs associated with alternative methods for obtaining blood samples for research, such as to purchase the samples (which would be provided without personal identifying information about the subject) from facilities that have obtained research approval from ethical review boards. On information and belief, because most samples available for research are collected through venous draws, samples taken with a finger-stick method (the type most important to Theranos's development of its technology) were particularly costly and difficult to

---

[76] Carolyn Y. Johnson, *Theranos withdraws Zika test after regulators flag problems*, L.A. Times (Aug. 31, 2016), available at http://www.latimes.com/business/la-fi-theranos-zika-20160831-snap-story.html (last visited Jan. 26, 2017).

obtain.  By disguising their research agenda and activity as a legitimate, ready-for-market testing service, Defendants misled consumers not only into providing Defendants with valuable blood samples for their research, but in fact *to pay Defendants* in the process, in exchange for unreliable test results.

152.    According to reports, Elizabeth Holmes has claimed that Theranos possesses "data that show you can get a perfect correlation between a finger stick and a venipuncture for every test that we run." [77]  Defendants have refused to identify how these comparison test results were obtained, except to say that "[t]he clinical tests were conducted by a combination of Theranos and external labs."[78]  The fact that Theranos has belatedly "corrected" test results several months (and even years) after taking customers' blood samples indicates that customers' blood samples, submitted at Wellness Centers, were likely used in generating that data.

153.    There is additional evidence that Defendants misled consumers about the essential purposes of Wellness Center blood draws.  For example, in the case of Plaintiff B.P., Defendants sometimes took blood using *both* finger stick and traditional methods, and sometimes used only one method or the other—for the same panel of tests.  On information and belief, Defendants took multiple samples in different ways in an attempt to analyze the results obtained by Theranos technology using a variety of sample types, to generate more data correlating the results of finger stick tests and venous draws.

---

[77] Ken Auletta, *Blood, Simpler, One woman's drive to upend medical testing*, The New Yorker (Dec. 15, 2014), available at http://www.newyorker.com/magazine/2014/12/15/blood-simpler (last visited Jan. 26, 2017).

[78] *Id.*

154.    A related undisclosed purpose underlying Theranos's premature rush to market was to collect and analyze highly confidential health data about large numbers of people.  Like other Silicon Valley companies that collect and analyze "big data," Theranos recognized that sufficiently numerous blood samples, if combined with biographical and other information, could reveal patterns that could help Theranos to develop lucrative products.  On information and belief, data analysis at Theranos was overseen by Balwani who reportedly said about his decision to join the Company: "When I saw what they were doing at Theranos, [] I thought this will be a really good application for machine learning,[79] because we are going to generate a lot of data, and we'll be able to do some interesting work around that."[80]  On information and belief, the most direct way for Theranos to obtain a data set sufficiently large to support a machine learning application was to convince, by deception, many thousands of people to submit to blood draws and provide blood samples and other valuable personal information.

155.    According to the Wall Street Journal, when a Theranos employee emailed Holmes in April 2014 to voice his concerns about quality control failures at Theranos, she forwarded the internal inquiry to Balwani, who—contrary to his representations to Arizona's Senate Health and Human Services Committee just weeks before—responded to the employee that the failures were due to the "newness of some of our processes,

---

[79] Machine learning is a branch of artificial intelligence through which machines, such as laboratory testing equipment, are exposed to enormous data sets and use statistical analysis and predictive analytics to draw inferences, identify patterns, and generate predictions.

[80] Roger Parloff, *Theranos Resignation Is a Major Bid for Atonement*, Fortune (May 12, 2016), available at http://fortune.com/2016/05/12/presidents-departure-atonement/ (last visited Jan. 26, 2017).

which we are improving every day."  "**This is product development**," he continued, "this is how startups are built."[81]

156.    Defendants concealed from consumers that Theranos testing services were experimental and not ready-for-market, and in fact affirmatively misled them to believe the services were ready-for-market and that the corresponding test results could and should be relied upon in making health and treatment decisions.  Defendants misrepresented the purpose of the blood draws and did not disclose to Plaintiffs and the Class that the purpose of the blood draws to which they were submitting was for Defendants' use in research and product development.

157.    Defendants persuaded Plaintiffs and the Class to submit to blood draws under false pretenses and without their consent.  No Plaintiff or Class member knew or could have known the truth, and any purported consent by them in submitting to blood draws by Defendants was obtained through fraud, concealment, and substantial misrepresentation.

158.    All Defendants engaged in and assisted Defendants' tortious conduct alleged herein.

**J.    <u>Defendants' Misconduct Has Significantly Harmed Consumers</u>**

159.    As a direct result of Defendants' misconduct alleged herein, Plaintiffs and the other consumers who comprise the proposed Class and Subclasses in this case have been harmed in numerous respects, including but not limited to:  (a) paying—out-of-

---

[81] John Carreyrou, *At Theranos, Many Strategies and Snags*, Wall St. J. (Dec. 27, 2015) (Ex. 26).

pocket, through health insurance, or through another collateral source—for Theranos tests

that they cannot reasonably rely upon, that unknown to them were experimental in nature,

and that in some cases have already been voided or belatedly "corrected"; (b) paying for

subsequent replacement testing services from other companies; (c) paying additional

money to doctors or other health professionals as a result of the inaccurate and unreliable

Theranos tests; (d) being subject to unnecessary or potentially harmful treatments, and/or

being denied the opportunity to seek treatment for a treatable condition; (e) harm to their

health, injury, and/or death, and corresponding monetary and other damages; (f) invasion

of privacy and bodily integrity without their consent, and corresponding damages

therefrom; and (g) severe emotional stress and anxiety.

160.    Defendants have all benefited, financially and otherwise, from their

misconduct alleged herein, including but not limited to from revenue that all of the

Defendants have received for Plaintiffs' and the Class members' tests, from the

development of their products through research Plaintiffs and the Class were unwittingly

being used for, and additional business that Walgreens has generated as a result of having

Theranos testing facilities in its retail stores.  On information and belief, Holmes and

Balwani, respectively, have each personally received millions of dollars as a direct result

of their misconduct alleged herein.

## K.    Factual Allegations Regarding Plaintiffs

### Plaintiff A.R.

161.    On or around June 19, 2015, Plaintiff A.R. purchased Theranos blood tests

at a Walgreens Pharmacy in Palo Alto, California.  The tests that he purchased included

tests regarding protein, blood sugar, cholesterol, and vitamin levels.  A.R. purchased

Theranos tests to get accurate and reliable results about his health.  He trusted Theranos

and Walgreens to provide accurate and reliable test results.

162.     A.R. had received orders from his medical care provider to have blood

testing performed.  A.R. was referred to Theranos by his medical care provider.  In

choosing to have his blood tested by Theranos, he relied on the representations in

Defendants' materials regarding the reliability of Defendants' services.  He also expected

tests conducted at Walgreens to be trustworthy and reliable.

163.     A.R. paid approximately $41.79 out of pocket for the Theranos tests.

164.     When he purchased Theranos tests, one or more vials of blood were drawn

from a vein in A.R.'s arm.  A.R. did not know that Defendants drew his blood for the

purpose of research and product development and he did not consent to such procedure

for such purpose.  He believed that Defendants' services were ready-for-market.

165.     Having been led to believe the Theranos results were reliable, A.R. relied

on them, using the results to make decisions concerning his health.

166.     Approximately one year before having his blood tested by Theranos, A.R.

had his blood tested by another company, and the results showed that A.R.'s blood

contained a normal level of Vitamin D.  His Theranos tests indicated that his Vitamin D

levels were low, his blood sugar was high, and his LDL (cholesterol) level was high, and

medication was prescribed for him as a result.  The medication that A.R.'s doctor

prescribed to supplement his Vitamin D levels caused excess absorption and buildup of

calcium in A.R.'s blood, and caused pain and other adverse effects to A.R.

167.   The Theranos tests that A.R. purchased were unreliable and/or inaccurate.

168.   After learning that his Theranos tests were unreliable and/or inaccurate, he revisited his doctor, and had his blood tested by another company.  The results reflected that he is healthier than the Theranos tests had indicated.

169.   Plaintiff A.R. would not have purchased any Theranos tests if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff A.R. would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product development.

170.   Plaintiff A.R. was battered, injured, damaged and harmed by Defendants' misconduct.

171.   Plaintiff A.R. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

172.   In addition to the other harm described herein, Plaintiff A.R. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

173.   Any purported consent by A.R. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff B.B.**

174.   On or around October 3, 2014, Plaintiff B.B. purchased eight Theranos blood tests at a Walgreens Pharmacy in Gilbert, Arizona.  The tests that she purchased included tests regarding her thyroid.  B.B. purchased Theranos tests to get accurate and

reliable results about her health.  She trusted Theranos and Walgreens to provide accurate and reliable test results.

175.    B.B. had received orders from her medical care provider to have blood testing performed.  B.B. was informed by her medical care provider that Theranos was the least invasive alternative for blood testing, and also that Theranos tests were cheaper and that the Walgreens locations provided extended hours for her to get tested.  In choosing to have her blood tested by Theranos, she relied on representations in Defendants' materials (including on the Theranos and Walgreens websites, and in press releases) regarding the reliability of Defendants' services.  She also expected tests conducted at Walgreens to be trustworthy and reliable.

176.    B.B. paid approximately $81.04 out of pocket for the Theranos tests.

177.    When she purchased Theranos tests, one or more vials of blood were drawn from a vein in B.B.'s arm.  This was different from the less invasive test that she had expected based on the representations from Defendants that she saw.  B.B did not know that Defendants drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose.  She believed that Defendants' services were ready-for-market.

178.    On information and belief, B.B.'s tests were conducted at Theranos's Newark, California facility.

179.    Having been led to believe the results were reliable, B.B. relied on them, using the results to make decisions concerning her health.

180.    The Theranos tests that B.B. purchased were unreliable and/or inaccurate.

181.   After learning that her Theranos tests were unreliable and/or inaccurate, she had her blood retested multiple times by another company.

182.   Plaintiff B.B. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff B.B. would not have submitted to Theranos tests if she had known that Defendants were using her blood tests for research and product development.

183.   Plaintiff B.B. was battered, injured, damaged and harmed by Defendants' misconduct.

184.   Plaintiff B.B. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

185.   In addition to the other harm described herein, Plaintiff B.B. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased and the invasion of her body under false pretenses and without her consent.

186.   Any purported consent by B.B. to have her blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

*Plaintiff B.P.*

187.   Beginning approximately in early 2014, Plaintiff B.P. purchased Theranos blood tests several times at a Walgreens Pharmacy in Ahwatukee Village, Phoenix, Arizona.  The tests that he purchased included tests regarding diabetes and cholesterol.  B.P. purchased Theranos tests to get accurate and reliable results about his health.  He

trusted Theranos and Walgreens to provide accurate and reliable test results.

188.    B.P. had received orders from his medical care provider to have blood testing performed.  B.P. was informed by his physician that Theranos was the cheapest and least invasive alternative for the tests.  In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including at the Walgreens store) regarding the reliability of Defendants' services.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

189.    B.P. paid hundreds of dollars out of pocket for the Theranos tests.

190.    The first several times that B.P. underwent blood testing by Theranos, nanotainer technology was used to draw relatively small blood samples.  Starting in or around mid-2015, Theranos began collecting both nanotainer vials and one or more larger vials of blood from a vein in B.P.'s arm.  By around early 2016, Theranos collected one or more larger vials of blood from a vein in B.P.'s arm during each of his quarterly visits. B.P. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.  He believed that Defendants' services were ready-for-market.

191.    On information and belief, at least one of B.P.'s tests was conducted at Theranos's Newark, California laboratory.

192.    Having been led to believe the results were reliable, B.P. relied on them, using the results to make decisions concerning his health.

193.    Based on his Theranos test results, his doctor diagnosed him with diabetes and high cholesterol, and prescribed certain medications.

194.    The Theranos tests that B.P. purchased were unreliable and/or inaccurate.

195.    After learning that his Theranos tests were unreliable and/or inaccurate, he had his blood tested by another company.  The results reflected that he is healthier than the Theranos tests had indicated.

196.    Plaintiff B.P. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff B.P. would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product development.

197.    Plaintiff B.P. was battered, injured, damaged and harmed by Defendants' misconduct.

198.    Plaintiff B.P. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

199.    In addition to the other harm described herein, Plaintiff B.P. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

200.    Any purported consent by B.P. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff D.L.**

201.    On or around June 1, 2015, and December 14, 2015, Plaintiff D.L. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona.  D.L. purchased Theranos tests to get accurate and reliable results about her health.  She trusted

Theranos and Walgreens to provide accurate and reliable test results.

202.    D.L. had received orders from her medical care provider to have blood testing performed.  D.L. was informed by her physician that Theranos was the quickest and cheapest alternative for the tests.  In choosing to have her blood tested by Theranos, she relied on representations in Defendants' materials (including at the Walgreens store) regarding the reliability of Defendants' services.  She also expected tests conducted at Walgreens to be trustworthy and reliable.

203.    D.L. paid for the Theranos tests out of pocket and/or through her health insurer.

204.    Each time she purchased a Theranos test, one or more vials of blood were drawn from a vein in D.L.'s arm.  D.L. did not know that Defendants drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose.  She believed that Defendants' services were ready-for-market.

205.    On information and belief, tests of D.L. were conducted at Theranos's Newark, California and Scottsdale, Arizona laboratories.

206.    Having been led to believe the results were reliable, D.L. relied on them, using the results to make decisions concerning her health.

207.    Based on the results of her Theranos tests, D.L. tested positive for Sjogrens syndrome, which required her to seek treatment from her doctor, to be tested for food allergies, and to spend considerable time learning about Sjogrens syndrome and the impact her diagnosis would have on her lifestyle.

208.    The Theranos tests that D.L. purchased were unreliable and/or inaccurate.

209.    After learning that her Theranos tests were unreliable and/or inaccurate, she had her blood tested by another company and consulted with her doctor, who after reviewing the new test results has now confirmed that she does not have Sjogrens syndrome.

210.    Plaintiff D.L. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff D.L. would not have submitted to Theranos tests if she had known that Defendants were using her blood tests for research and product development.

211.    Plaintiff D.L. was battered, injured, damaged and harmed by Defendants' misconduct.

212.    Plaintiff D.L. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

213.    In addition to the other harm described herein, Plaintiff D.L. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased and the invasion of her body under false pretenses and without her consent.

214.    Any purported consent by D.L. to have her blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

***Plaintiff L.M.***

215.    On or around October 5, 2015, Plaintiff L.M. purchased Theranos blood

tests at a Walgreens Pharmacy in Chandler, Arizona.  The tests that she purchased included tests regarding her thyroid.  L.M. purchased Theranos tests to get accurate and reliable results about her health.  She trusted Theranos and Walgreens to provide accurate and reliable test results.

216.    L.M. had received orders from her medical care provider to have blood testing performed.  L.M. was informed by her physician that Theranos was the cheapest alternative for the tests.  In choosing to have her blood tested by Theranos, she relied on representations in Defendants' materials regarding the reliability of Defendants' services.  She also expected tests conducted at Walgreens to be trustworthy and reliable.

217.    L.M. paid approximately $59.34 out of pocket for the Theranos tests.

218.    When she purchased Theranos tests, one or more vials of blood were drawn from a vein in L.M.'s arm.  This was different from the less invasive test that she had expected based on the representations from Defendants that she saw.  L.M. did not know that Defendants drew her blood for the purpose of research and product development and she did not consent to such procedure for such purpose.  She believed that Defendants' services were ready-for-market.

219.    Having been led to believe the results were reliable, L.M. relied on them, using the results to make decisions concerning her health.

220.    Based on the results of her Theranos tests, L.M. was diagnosed by her physician as having Hashimoto's Disease, which was devastating to her and required lifestyle changes, medical appointments, and taking unnecessary medication.

221.    The Theranos tests that L.M. purchased were unreliable and/or inaccurate.

222.    In approximately March 2016, at her physician's direction, L.M. had her blood re-tested by a different testing company, repeating the same tests that Theranos had conducted.  These results were dramatically different than the Theranos test results, and as per her physician invalidated the diagnosis of Hashimoto's Disease, meaning L.M. had been needlessly pursuing a course of treatment for a condition she did not have.

223.    Plaintiff L.M. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff L.M. would not have submitted to Theranos tests if she had known that Defendants were using her blood tests for research and product development.

224.    Plaintiff L.M. was battered, injured, damaged and harmed by Defendants' misconduct.

225.    Plaintiff L.M. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

226.    In addition to the other harm described herein, Plaintiff L.M. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased and the invasion of her body under false pretenses and without her consent.

227.    Any purported consent by L.M. to have her blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

***Plaintiff M.P.***

228.    On or around November 2015, Plaintiff M.P. purchased Theranos blood

tests at a Walgreens Pharmacy in Tempe, Arizona.  The tests that he purchased included STI panels.  M.P. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide reliable test results.

229.    In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including at the Walgreens store and the information he viewed on the Theranos website) regarding the reliability of Defendants' services.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

230.    Plaintiff M.P. had his blood drawn by Defendants.  M.P. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.  He believed that Defendants' services were ready-for-market.

231.    M.P. paid for the Theranos tests out-of-pocket.

232.    The tests that M.P. purchased were unreliable and/or inaccurate.

233.    M.P. paid out-of-pocket to be retested with STI panels after learning that the Theranos tests were unreliable and/or inaccurate.

234.    Plaintiff M.P. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff M.P. would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product development.

235.    Plaintiff M.P. was battered, injured, damaged and harmed by Defendants' misconduct.

65

236.   Plaintiff M.P. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

237.   In addition to the other harm described herein, Plaintiff M.P. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

238.   Any purported consent by M.P. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff R.C.**

239.   On or around February 2015, Plaintiff R.C. purchased Theranos blood tests at a Walgreens Pharmacy in Sun City West, Arizona.  The tests that he purchased included tests regarding his heart health.  R.C. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide accurate and reliable test results.

240.   R.C. had received orders from his medical care provider to have blood testing performed to monitor his heart health.  In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including at the Walgreens store) regarding the reliability of Defendants' services.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

241.   R.C. paid for the Theranos tests through Medicare.

242.   When R.C. purchased Theranos tests, Theranos drew relatively small blood samples from him.  Unlike what had been advertised, however, the process was painful and was not quick as advertised.  The phlebotomist struggled to secure enough blood

from R.C.'s finger and had to repeat the painful process several times before collecting enough to test.  R.C. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.  He believed that Defendants' services were ready-for-market.

243.   Having been led to believe the results were reliable, R.C. relied on them, using the results to make decisions concerning his health.

244.   The results from his Theranos tests indicated that R.C. was in good health. Based on these results, his doctor recommended that R.C. maintain his current medication regimen and to return in one year for repeat testing, and R.C. believed his current lifestyle and medication regimen was working for him and that he had been successful in getting his heart health under control.

245.   The Theranos tests that R.C. purchased were unreliable and/or inaccurate.

246.   Less than one month later, R.C. suffered a heart attack.  R.C. was admitted to the hospital, had two stents placed, and had numerous follow up medical appointments. R.C. and his cardiologist were particularly concerned that R.C. had suffered a heart attack given that his blood panels came back clear (from his Theranos tests) less than a month prior.  Additional blood work performed during his hospitalization strongly suggested that the near-contemporaneous Theranos blood tests were inaccurate.

247.   Subsequently, as alleged above, Theranos voided the results of all of the "tiny" blood tests, which on information and belief would have included R.C.'s tests.

248.   Since his 2015 heart attack, R.C. has been receiving medical care using traditional blood testing procedures from companies other than Theranos.

67

249.    Plaintiff R.C. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff R.C. would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product development.

250.    Plaintiff R.C. was battered, injured, damaged and harmed by Defendants' misconduct.

251.    Plaintiff R.C. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

252.    In addition to the other harm described herein, Plaintiff R.C. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

253.    Any purported consent by R.C. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff R.G.**

254.    On or around September 10, 2015, Plaintiff R.G. purchased Theranos blood tests at a Walgreens Pharmacy in Gilbert, Arizona.  The tests that he purchased included tests regarding his sexual health.  R.G. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide accurate and reliable test results.

255.    R.G. had seen and heard advertisements for Theranos that caused him to believe it was a revolutionary technology.  In choosing to have his blood tested by

Theranos, he relied on representations in Defendants' materials (including a billboard) regarding the reliability of Defendants' services.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

256.    R.G. paid approximately $121.63 out of pocket for the Theranos tests.

257.    When he purchased Theranos tests, one or more vials of blood were drawn from a vein in R.G.'s arm.  R.G. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.  He believed that Defendants' services were ready-for-market.

258.    On information and belief, one or more of R.G.'s tests were conducted at Theranos's Newark, California laboratory.

259.    Having been led to believe the results were reliable, R.G. relied on them, using the results to make decisions concerning his health.

260.    The results from his Theranos tests indicated that he had tested positive for HIV (specifically, the HIV 1+2 Antigen/Antibody Combo was "reactive").

261.    After receiving the test results from Theranos, R.G., he was extremely concerned and visited his physician, began doing research about HIV/AIDS, and had his blood re-tested by two different companies.  These test results came back negative.

262.    The Theranos tests that R.G. purchased were unreliable and/or inaccurate.

263.    Plaintiff R.G. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff R.G. would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product

69

development.

264.    Plaintiff R.G. was battered, injured, damaged and harmed by Defendants' misconduct.

265.    Plaintiff R.G. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

266.    In addition to the other harm described herein, Plaintiff R.G. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

267.    Any purported consent by R.G. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff S.J.**

268.    In or around July 2015, Plaintiff S.J. purchased her first Theranos blood test and urinalysis at a Theranos Wellness Center located at a Walgreens retail store in Mesa, Arizona.  The tests that she purchased were for a routine health check including diabetes and triglyceride levels.  S.J. purchased Theranos tests to get accurate and reliable results about her health.  She trusted Theranos and Walgreens to provide accurate and reliable test results.

269.    S.J. was referred to Theranos by her physician, based on plaintiff's financial needs and Theranos's reputation for affordable testing.  In choosing to have her blood tested by Theranos, S.J. relied on representations in Defendants' materials (including at the Walgreens store) regarding the reliability of Defendants' services.  S.J. trusted Theranos and Walgreens to provide reliable test results.  She expected tests

70

conducted at Walgreens to be trustworthy and reliable.

270.    S.J.'s results from her first Theranos test indicated that she had diabetes, and S.J.'s physician immediately ordered her to be placed on diabetic medications.

271.    S.J. firmly believed she did not have diabetes and obtained a re-test.  For the re-test, she went back to the same Theranos Wellness Center located at a Walgreens retail store in Mesa, Arizona.

272.    S.J. paid for her Theranos tests through Medicare.

273.    Plaintiff S.J. had her blood drawn by Defendants, and had urine collected by Defendants, for her Theranos tests.  S.J. did not know that Defendants drew her blood or collected her urine for the purpose of research and product development and she did not consent to such procedures for such purpose.  She believed that Defendants' services were ready-for-market.

274.    Having been led to believe the test results were reliable, following two similarly reported Theranos tests, S.J. and her physician relied on the results to make decisions concerning her health, including a course of medications which ultimately made S.J. very ill.  S.J. became so ill that she was treated at urgent care where she made the decision to cease all medications prescribed for diabetes.

275.    Following her reaction to the diabetes medication, along with her original belief that she did not have diabetes, S.J. began seeing another physician who ordered repeat lab testing to be done at a non-Theranos facility.  The results confirmed that S.J. did not have diabetes, and had been improperly diagnosed and treated based on the Theranos test results.

276.    The Theranos tests that S.J. purchased were unreliable and/or inaccurate.

277.    Plaintiff S.J. would not have purchased any Theranos test if she had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff S.J. would not have submitted to Theranos tests if she had known that Defendants were using her blood and urine tests for research and product development.

278.    Plaintiff S.J. was battered, injured, damaged and harmed by Defendants' misconduct.

279.    Plaintiff S.J. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

280.    In addition to the other harm described herein, Plaintiff S.J. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos tests she purchased and the invasion of her body under false pretenses and without her consent.

281.    Any purported consent by S.J. to have her blood drawn or her urine collected by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

**Plaintiff S.L.**

282.    On or about February 19, 2015, and October 5, 2015, Plaintiff S.L. purchased Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona.  The tests that he purchased included tests regarding diabetes and his liver.  S.L. purchased Theranos tests to get accurate and reliable results about his health.  He trusted Theranos and Walgreens to provide accurate and reliable test results.

283.    Prior to each visit, S.L. had seen and heard advertisements for Theranos that caused him to believe that Theranos test results would be as reliable as other labs' results, and that Theranos was the cheapest and least invasive alternative option for blood testing.  In choosing to have his blood tested by Theranos, he relied on representations in Defendants' materials (including on Theranos's website and in advertisements) regarding the reliability of Defendants' services.  He also expected tests conducted at Walgreens to be trustworthy and reliable.

284.    S.L. paid approximately $100 out of pocket for the Theranos tests.

285.    When he purchased Theranos tests, one or more vials of blood were drawn from a vein in S.L.'s arm.  This was different from the less invasive test that he had expected based on the representations from Defendants that he saw.  S.L. did not know that Defendants drew his blood for the purpose of research and product development and he did not consent to such procedure for such purpose.  He believed that Defendants' services were ready-for-market.

286.    Having been led to believe the results were reliable, S.L. relied on them, using the results to make decisions concerning his health.

287.    The results from his Theranos test indicated certain levels that were elevated from the prior year and that he was diabetic.  His doctor ordered an ultrasound of the liver, and he took medication for diabetics.

288.    The Theranos tests that S.L. purchased were unreliable and/or inaccurate.

289.    At his doctor's direction, S.L. had his blood re-tested by another company and his results were in the normal range, including showing he was pre-diabetic,

73

significantly different from his Theranos tests.

290.   Plaintiff S.L. would not have purchased any Theranos test if he had known that the Theranos testing facilities were not as described, and that Theranos's tests were inaccurate or unreliable.  Plaintiff S.L would not have submitted to Theranos tests if he had known that Defendants were using his blood tests for research and product development.

291.   Plaintiff S.L. suffered damages as a result of Defendants' conduct, in an amount to be proven at trial.

292.   In addition to the other harm described herein, Plaintiff S.L. suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased and the invasion of his body under false pretenses and without his consent.

293.   Any purported consent by S.L. to have his blood drawn by Defendants was induced by fraud, concealment and misrepresentation, and was not effective.

## V.   CLASS ACTION ALLEGATIONS

294.   Plaintiffs bring this action on behalf of themselves and proposed Class and Subclasses pursuant to Federal Rules of Civil Procedure Rule 23, defined as follows:

**Class**:  All purchasers of Theranos testing services, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source (collectively, "Purchasers").

**Arizona Subclass**:  All Purchasers of Theranos testing services in Arizona.

**California Subclass:**   All Purchasers of Theranos testing services in California.

295.   This action is brought as a class action and may properly be so maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs

reserve the right to amend or modify the Class and Subclass descriptions with greater

specificity or further division into subclasses or limitation to particular issues, based on

the results of discovery.  Excluded from the Class and Subclasses are Defendants, their

affiliates, employees, officers and directors, persons or entities, and the Judge(s) assigned

to this case.

296.   **Numerosity** – The members of the Class and Subclasses are so numerous

that their individual joinder is impracticable.  On information and belief, there are at least

thousands of members in each Class/Subclass.  The membership of the Class and

Subclasses are determinable by objective criteria using Defendants' own records.

297.   **Common Question of Fact and Law** – There are questions of law and fact

common to the Class and Subclasses.  These questions predominate over any questions

affecting only individual Class members.  These common legal and factual issues

include, but are not limited to:

a)  Whether Defendants intentionally concealed material information about the

reliability of Theranos test results and/or about the compliance of Theranos's

testing facilities and/or equipment;

b)  Whether Defendants had a duty to disclose to Plaintiff and the Class material

information regarding the reliability of Theranos's testing services;

c)  Whether Defendants' representations regarding Theranos tests were likely to

deceive a reasonable consumer;

d)  Whether Theranos and Walgreens had contractual obligations with Plaintiffs and

the Class regarding Theranos's testing services;

e)  Whether Defendants were obligated to provide testing services and test results that were reliable;

f)  Whether Defendants agreed to a partnership through which they would enter the market for direct-to-consumer testing by advertising, promoting, and selling products and services that consumers would use to make decisions about their health;

g)  Whether Defendants together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c);

h)  Whether Defendants misrepresented and concealed the essential purpose of the blood draw procedures Plaintiffs and the Class members submitted to;

i)  Whether Defendants' conduct violates the laws as set forth in the causes of action;

j)  Whether Plaintiffs and the Class have been harmed as a result of Defendants' conduct alleged herein; and

k)  Whether Defendants have been unjustly enriched as a result of their conduct alleged herein.

298.  **Typicality** – The claims of the representative Plaintiffs are typical of the claims of the Class and Subclasses.  Plaintiffs and the Class and Subclasses were subject to the same common pattern of conduct by Defendants, and the Plaintiffs, like the other members of the Class and Subclasses, have sustained damages arising from Defendants' violations of the law, as alleged herein.

299.  **Adequacy** – The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclass members and have retained

counsel who are experienced and competent trial lawyers in complex litigation and class action litigation.  There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class and Subclasses that would make class certification inappropriate.  Counsel for the classes will vigorously assert the claims of all Class and Subclass members.

300.  **Predominance and Superiority** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclasses predominate over the questions affecting only individual members, and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by individual Class and Subclass members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct.  Further, it would be virtually impossible for each of the Class members to individually redress effectively the wrongs done to them.  Even if Class members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Plaintiffs

1   anticipate no unusual difficulties in managing this class action.

2       301.   Plaintiffs contemplate the eventual issuance of notice to the proposed Class

3   and Subclass members setting forth the subject and nature of the instant action.  On

4   information and belief, Defendants' own business records and electronic media can be

5   utilized for the contemplated notice.  To the extent that any further notice may be

6   required, Plaintiffs would contemplate the use of additional media and/or mailings.

### VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### (Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*)
#### (Against All Defendants)
#### (On Behalf of Arizona Subclass Only)

302.   Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

303.   Plaintiffs bring this claim on behalf of themselves and the Arizona Subclass.

304.   Defendants are "persons" within the meaning of A.R.S. § 44-1521(6).

305.   Theranos lab panels and blood and other clinical tests sold in Arizona are "merchandise" within the meaning of A.R.S. § 44-1521(5).

306.   Defendants have engaged in deception, unfair acts or practices, fraud, false pretenses, false promises, misrepresentation, concealment, suppression and omission of material facts, as prohibited by A.R.S. § 44-1522(A).

307.   Defendants marketed and sold unreliable Theranos testing services that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the

reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment.

308.   Defendants marketed Theranos testing services as being ready-for-market when they knew such testing was still in development and not ready for market, and that Defendants were using the tests conducted on consumers for research and product development purposes.

309.   Defendants knew that Plaintiffs and the Class would reasonably expect Theranos tests to be reliable, given, *inter alia,* the nature and importance of blood and other clinical testing, Defendants' representations, and the involvement of Walgreens.

310.   Defendants made material misrepresentations, false promises, and omissions regarding Theranos testing services, as alleged above and herein, including but not limited to:

a) False and misleading statements that Theranos tests were reliable, CLIA-certified, and validated and compliant with federal guidelines;

b) False and misleading statements that Theranos's testing facilities and equipment were compliant with laws and regulations;

c) False and misleading statements that Theranos's testing services were industry leading in quality;

d) False and misleading statements that Theranos's testing services were ready-for-market;

e) False and misleading statements that Theranos's testing services were less invasive than traditional tests and/or were quicker than traditional tests;

f)  False and misleading statements that Theranos's laboratory infrastructure minimized human error to produce high quality results;

g)  Failure to disclose and intentional concealment of known material information about the unreliability of Theranos's testing services;

h)  Failure to disclose and intentional concealment of known material information about deficiencies and non-compliance of Theranos's testing facilities and/or equipment;

i)  Failure to disclose and intentional concealment of the fact that Theranos's testing services were not ready-for-market and that Defendants were using the tests conducted on consumers for research and product development;

j)  Failure to disclose and intentional concealment of the fact that Walgreens had agreed not to require or obtain objective proof that Theranos's testing services were reliable despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems;

k)  Failure to disclose and intentional concealment of the fact that Walgreens had agreed to conduct no oversight of Theranos's laboratory testing practices despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems;

l)  Failure to disclose and intentional concealment of the fact that Theranos employees were not adequately trained to perform their job functions without endangering patients, including as described in letters from CMS;

m) Failure to disclose and intentional concealment of the fact that Theranos

manipulated its internal proficiency testing process and covered up known

reliability problems; and

n) Failure to disclose and intentional concealment of the fact that Theranos's internal

validation tests showed that Theranos testing was unreliable.

311.   Defendants knew, or with reasonable care should have known, that their

promises and representations were false and misleading and material, and that the facts

they failed to disclose and concealed were material.

312.   Defendants owed a duty to Plaintiffs and the Arizona Class to provide them

material information about the unreliability of Theranos tests, including but not limited to

because they had exclusive and far superior knowledge regarding the material

information, because of the nature of the information in question, because they knew that

customers would rely on them to provide accurate and complete material information

about the reliability and readiness of the tests, and because they had disseminated

pervasive false and/or partial representations about Theranos tests that were misleading

absent full disclosure.

313.   Defendants' misrepresentations and omissions were likely to deceive and

had a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the

Arizona Subclass.  The facts misrepresented and concealed by Defendants would be

material to a reasonable consumer.  Defendants' misrepresentations and omissions were

pervasive.

314.   Defendants intended for Plaintiffs and Arizona Subclass members to rely

on their misrepresentations, false promises, and omissions concerning Theranos testing.

315.    Plaintiffs and the Arizona Subclass members have reasonably relied on the false promises, material misrepresentations and omissions made by Defendants, including but not limited to by paying (out-of-pocket and/or through health insurance or another collateral source) for Theranos testing services, permitting Defendants to take blood samples from them under false pretenses, and relying on unreliable Theranos test results to make decisions about their health.

316.    Defendants' conduct was wanton and reckless, and Defendants demonstrated reckless indifference to the rights, health, and safety of Plaintiffs and members of the Arizona Subclass.

317.    As a result of the A.R.S. § 44-1522(A) violations described above, Plaintiffs and each and every Arizona Subclass member have suffered actual damages.

318.    On behalf of themselves and Arizona Subclass members, Plaintiffs seek relief as prayed for below.

**SECOND CAUSE OF ACTION**
**(Fraud)**
**(Against All Defendants)**

319.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

320.    Plaintiffs bring this claim on behalf of themselves and the Class.

321.    Defendants marketed and sold unreliable Theranos testing services that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment.

322.   Defendants marketed Theranos testing services as being ready-for-market when they knew such testing was still in development and not ready for market, and that Defendants were using the tests conducted on consumers for research and product development purposes.

323.   Defendants knew that Plaintiffs and the Class would reasonably expect Theranos tests to be reliable, given, *inter alia*, the nature and importance of blood and other clinical testing, Defendants' representations, and the involvement of Walgreens.

324.   Defendants, who had superior knowledge regarding Theranos testing, were in a unique position to prevent harm to their customers.  Instead, Defendants made false and misleading representations to Plaintiffs and the Class about Theranos tests and the accuracy and reliability of same, and concealed material information from them regarding the true nature of Theranos tests and Theranos's facilities and equipment.

325.   At all relevant times, Defendants had a duty to disclose all facts material to Plaintiffs' and the Class members' submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos test results.  Defendants have intentionally misrepresented, concealed, and otherwise not disclosed material facts as alleged herein.

326.   Defendants owed a duty to Plaintiffs and the Class to provide them material information about the unreliability of Theranos tests, including but not limited to because they had exclusive and far superior knowledge regarding the material information, because of the nature of the information in question, because they knew that customers would rely on them to provide accurate and complete material information about the reliability of the tests, and because they had disseminated pervasive false and and/or

partial representations about Theranos tests that were misleading absent full disclosure.

327.    Defendants' misrepresentations and omissions were known by Defendants to be false, misleading, and material.

328.    Defendants' misrepresentations and omissions were likely to deceive and had a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the Class.  The facts misrepresented and concealed by Defendants would be material to a reasonable consumer.

329.    Walgreens also deliberately ignored and intentionally remained ignorant of material facts about the unreliability of Theranos testing.  Defendants failed to disclose and intentionally concealed the fact that Walgreens had agreed not to require or obtain objective proof that Theranos's testing services were reliable despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems. Defendants failed to disclose and intentionally concealed the fact that Walgreens had agreed to conduct no oversight of Theranos's laboratory testing practices despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems.

330.    Defendants' misrepresentations and omissions were pervasive.

331.    Defendants intended for Plaintiffs and Class members to rely on their misrepresentations and omissions concerning Theranos testing.

332.    Plaintiffs and the Class members have reasonably relied on the misrepresentations and omissions made by Defendants, including but not limited to by paying (out-of-pocket and/or through health insurance or another collateral source) for

Theranos testing services, permitting Defendants to take blood samples from them under false pretenses, and relying on unreliable Theranos test results to make decisions about their health.

333.    Plaintiffs and the Class were actually misled and deceived.  As a direct result of Defendants' conduct, they were induced to undergo blood draws they would not have undergone, to pay for Theranos products and/or services that they would not have purchased (out-of-pocket and/or through health insurance or another collateral source), and to rely on unreliable Theranos test results they would not have relied upon had they known the truth, to make decisions concerning their health.

334.    As a foreseeable and natural consequence of Defendants' conduct, Plaintiffs and the Class have suffered actual damages.

335.    Defendants' misconduct alleged herein was intentional, deliberate, and willful.

336.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## THIRD CAUSE OF ACTION
### (Battery)
### (Against All Defendants)

337.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

338.    Plaintiffs bring this claim on behalf of themselves and the Class.

339.    Plaintiffs and all Class members submitted to blood draws performed by Defendants which involved Defendants penetrating their skin and tissue to draw blood,

and/or to other clinical procedures as alleged herein.

340.   Defendants misrepresented and concealed from Plaintiffs and the Class the essential purpose of the blood draws and procedures that they submitted to.  Through misrepresentations and omissions, as alleged herein, Defendants led Plaintiffs and the Class to believe that Theranos testing was ready-for-market and that the purpose of the blood draws and procedures submitted to was to provide Plaintiffs and the Class reliable information that they could and should rely upon in making health and treatment decisions.  In fact, not disclosed by Defendants, Defendants had prematurely rushed Theranos testing services to market, the procedures that Plaintiffs and the Class submitted to were experimental in nature and being used by Defendants for research and product development, and the essential purpose of the blood draws and procedures that Plaintiffs and the Class submitted to was to aid in Defendants' research and product development.

341.   Defendants induced Plaintiffs and Class members to submit to blood draws and other procedures through fraud, concealment, and substantial misrepresentations, and without informing them about the essential purpose of the procedures.

342.   Any purported consent that Plaintiffs and the Class gave to Defendants to draw their blood or to conduct other procedures alleged herein was induced by fraud, concealment, and misrepresentations, and was not effective.  Defendants drew blood from and conducted other procedures on Plaintiffs and the Class members without their consent.  Consent obtained by fraud, concealment, and misrepresentation is not effective consent.

343.   Defendants willfully and tortiously battered Plaintiffs and the Class

members.

344.     Defendants willfully and tortiously experimented on Plaintiffs and the Class members.

345.     Plaintiffs and Class members did not consent to be subjects for testing, experimentation, research, or product development by Defendants.

346.     Defendants knew or should have known that conducting blood draws and other procedures on Plaintiffs and the Class for product development purposes, and willfully experimenting upon Plaintiffs and the Class, without obtaining their consent would be an affront to the dignity of Plaintiffs and the Class members as human beings.

347.     Defendants' misconduct alleged herein was intentional, deliberate, and willful.

348.     As a foreseeable, proximate, and direct result of Defendants' conduct, Plaintiffs and Class members each have suffered a battery and have been damaged, including but not limited to money they paid out of pocket, being subject to unnecessary or potentially harmful treatments, and/or being denied the opportunity to seek treatment for a treatable condition, harm to their health, injury, and/or death and corresponding monetary and other damages, invasion of privacy and bodily integrity without their consent and corresponding damages therefrom, and severe emotional stress and anxiety.

349.     On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**FOURTH CAUSE OF ACTION**
**(Negligence)**
**(Against All Defendants)**

350.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

351.    Plaintiffs bring this claim on behalf of themselves and the Class.

352.    Defendants, who had or should have had superior knowledge regarding Theranos testing, were in a unique position to prevent harm to their customers.  Instead, Defendants made false and misleading representations to Plaintiffs and the Class about Theranos tests and the accuracy and reliability of same, and concealed material information from them regarding the true nature of Theranos tests and Theranos's facilities and equipment.

353.    At all relevant times, Defendants had a duty to disclose all facts material to Plaintiffs' and the Class members' submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos test results.

354.    Defendants breached these duties by, *inter alia,* making material misrepresentations and omissions as alleged herein and by promoting and selling tests that were unreliable, not ready-for-market, not safe for consumers to rely on, conducted in a manner that did not satisfy applicable laws, regulations, and/or standards for quality control, conducted in laboratories that did not meet applicable laws, regulations, and/or standards for safety and training, and conducted on inadequately maintained and calibrated equipment.

355.    At all relevant times, Defendants had a duty to provide Plaintiffs and the

Class with testing that was safe, reliable, and compliant with applicable laws and regulations.  Such duty arose from, *inter alia*, the medical related nature of the services at issue, the special position of trust occupied by Defendants in the context of blood and clinical testing, and the fact that Defendants advertised their services as reliable, compliant, and safe.

356.   Defendants breached these duties by selling tests that were unreliable, not ready-for-market, not safe for consumers to rely on, conducted in a manner that did not satisfy applicable laws, regulations, and/or standards for quality control, conducted in laboratories that did not meet applicable laws, regulations, and/or standards for safety and training, and conducted on inadequately maintained and calibrated equipment.

357.   At all relevant times, Walgreens had a duty to Plaintiffs and the Class to take reasonable steps to ensure that Theranos's testing was reliable and safe.

358.   Walgreens breached this duty and acted unreasonably by deliberately ignoring and intentionally remaining ignorant of material facts about Theranos testing, and by promoting and selling Theranos tests to its patrons as reliable, less invasive, quicker than traditional testing methods, safe, and highly accurate, despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems, without requiring objective evidence from Theranos that the tests were reliable, and while deliberately and knowingly maintaining no oversight of Theranos's testing services.

359.   Walgreens knew and expected that consumers would look to it for information concerning "care they need."  With full knowledge that consumers would rely on its endorsement of Theranos, Walgreens failed to take reasonable steps to prevent

consumers from submitting to, paying for, and relying upon unreliable and unsafe Theranos testing services.

360.    By promoting the Theranos tests without adequately investigating the truth of promotional statements, and by permitting such tests to be conducted in Walgreens clinics, despite identifying numerous red flags and concerns that put it on notice about the unreliability of Theranos tests, and after it had knowledge that the tests were in fact unreliable, Walgreens acted unreasonably under the circumstances.

361.    Plaintiffs and the Class were damaged as a direct and proximate result of Defendants' negligent conduct, including by submitting to blood draws they would not have undergone, paying for Theranos products and/or services that they would not have purchased (out-of-pocket and/or through health insurance or another collateral source), submitting to blood testing under false pretenses, relying on unreliable Theranos test results, they would not have relied upon had they known the truth, to make decisions concerning their health, by taking harmful actions and not taking necessary actions due to their unreliable Theranos test results, and suffering out-of-pocket losses, emotional distress, and other damages as a direct result of the unreliable Theranos tests they were subjected to.

362.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**FIFTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**
**(Against All Defendants)**

363.    Plaintiffs incorporate the substantive allegations contained in all prior and

succeeding paragraphs as if fully set forth herein.

364.    Plaintiffs bring this claim on behalf of themselves and the Class.

365.    Defendants specifically and expressly misrepresented material facts to Plaintiffs and the Class, as alleged herein.

366.    Defendants knew, or in the exercise of reasonable diligence should have known, that their express representations regarding Theranos testing were false and misleading.  Defendants made such statements without reasonable grounds for believing them to be true.

367.    Defendants' misrepresentations were pervasive.

368.    Defendants' misrepresentations were likely to deceive and had a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the Class.  The facts misrepresented by Defendants would be material to a reasonable consumer.

369.    Defendants knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer would rely on and be misled by Defendants' misrepresentations.

370.    Plaintiffs and the Class justifiably relied on Defendants' misrepresentations.

371.    As a result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages.

372.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

### SIXTH CAUSE OF ACTION
### (Breach of Contract)
### (Against Theranos and Walgreens)

373.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

374.    Plaintiffs bring this claim on behalf of themselves and the Class.

375.    To Plaintiffs and the Class, Defendants offered to provide reliable, ready-for-market testing services using proprietary Theranos technology, in exchange for submission to blood draws and other clinical procedures and payment of financial compensation, paid out-of-pocket by the consumer and/or paid through the consumer's health insurance or other collateral sources.  Defendants assured customers that their testing services were ready-for-market, that they had the expertise and capability to provide reliable test results, and that their services were reliable and of the highest quality.

376.    Defendants' promises and obligations were set forth in, among other places, the Theranos direct testing order form (Ex. 11), the Theranos guide to direct testing (Ex. 12), and in marketing materials and other statements by Defendants regarding Theranos's testing services that were pervasive, as alleged herein.

377.    Defendants had express and/or implied contracts with Plaintiffs and the Class members.

378.    In the context of a consumer purchases of blood and clinical testing services, even if Defendants had not represented and promised that their testing services were ready-for-market and reliable (which they did, pervasively), such attributes are

92

implied terms of the purchase contract.  A reasonable consumer would not purchase

blood or clinical testing services unless such services were expected to be reliable.

379.     Plaintiffs and the Class relied on Defendants' promises and covenants

regarding Theranos testing services in agreeing to have their blood and urine tested by

Theranos.

380.     Plaintiffs and the Class members all accepted Defendants' offers, creating

uniform or substantially similar implied and/or express contracts to perform testing and to

provide reliable test results.

381.     Plaintiffs and the Class performed all of their obligations under the

contracts.  They each submitted to blood draws and/or other clinical procedures

performed by Defendants.  They each paid money for Theranos test results offered by

Defendants, either out of pocket or through their health insurance or other collateral

sources.

382.     Defendants breached their contracts with Plaintiffs and the Class by, *inter

alia*:  (1) failing to deliver testing services that were ready-for-market; (2) failing to

deliver testing services and test results that were reliable or of the quality promised; (3)

conducting testing using traditional blood testing methodologies and equipment instead

of the promised minimally invasive state-of-the art proprietary technology; (4) not

ensuring that Theranos's equipment met its own and/or reasonable quality standards; (5)

not ensuring that their services were tendered with reasonable care and workmanlike

effort, including by failing to comply with applicable laws, regulations, and standards for

laboratory testing services; and (5) failing to timely notify customers of the test results'

unreliability and known inaccuracies.

383.   Each Class member did not receive the benefit of their bargain—including reliable test results.

384.   As a result of Defendants' breaches described above, Plaintiffs and the Class have suffered damages.

385.   On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against All Defendants)**

386.   Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

387.   Plaintiffs bring this claim on behalf of themselves and the Class, and as appropriate bring this claim in the alternative to their legal claims.

388.   Plaintiffs lost money as a result of Defendants' conduct alleged herein.

389.   Defendants were unjustly enriched by their conduct alleged herein, including but not limited through revenues received in connection with Plaintiffs' and the Class members' Theranos tests, through development of their products, accumulation and storage of valuable patient information and usable blood samples, and through additional business and revenues that Walgreens received by virtue of having Wellness Centers in their stores.

390.   All Defendants were unjustly enriched, including Holmes and Balwani, who on information and belief personally received at least millions of dollars each as a

direct result of their personal conduct alleged herein, which conduct constituted a fundamental part of Theranos's operations and business.

391.    It would be inequitable and unjust for Defendants to retain the money that they have received by their conduct.

392.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

### EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)
### (Against Walgreens)

393.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

394.    Plaintiffs bring this claim on behalf of themselves and the Class.

395.    Theranos, Holmes, and Balwani committed fraud resulting in injury to Plaintiffs and the Class, as alleged herein.  Walgreens' conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in, the commission of such fraud.

396.    Walgreens knew that Theranos testing was not reliable and that consumers should not be relying on Theranos testing in making health and treatment decisions.

397.    Walgreens identified numerous red flags and concerns about Theranos testing that put it on notice of the problems, but nevertheless made the deliberate choice to partner with Theranos, offer Theranos testing to customers at its stores, and to facilitate the transfer of blood samples and other clinical samples from Walgreens customers to Theranos for use in research and product development.

398.   Walgreens had actual knowledge of the truth and had access to more than sufficient information to understand that Theranos tests were not reliable and were unsafe for consumers.  To the extent Walgreens lacked any more detailed knowledge, it was by virtue of Walgreens' own deliberate choices and conduct in ignoring the problems it identified, deliberately failing to follow up on the concerns and information it had, and ceding to Theranos's requests to carry on without further information being provided.

399.   Walgreens had actual knowledge of measures that it could have taken to prevent Walgreens clinics and marketing from being used to perpetrate fraud, to provide consumers with accurate information, and to reduce the reach of Defendants' fraudulent conduct, but nevertheless knowingly and deliberately decided not to adopt such measures, and instead chose to maintain policies that enabled and assisted the fraud.

400.   Before and during the commission of the fraud, Walgreens intended to aid and abet, and did substantially assist, Theranos, Holmes, and Balwani in fraud perpetrated on Plaintiffs and the Class members by, *inter alia*, marketing, promoting, and otherwise treating Theranos testing as reliable and compliant with applicable laws and standards, although Walgreens knew and/or or knowingly and deliberately failed to discover that this information was false, by concealing material information about the reliability and safety of Theranos tests, by allowing Theranos tests to be sold and conducted in its pharmacies, and by making available Walgreens employees to facilitate the sale and conducting of Theranos testing services, and transmission of blood samples from Walgreens customers to Theranos for use in research and product development.

401.   Walgreens' conduct alleged herein was knowing and intentional, and was

96

carried out by Walgreens in order to benefit Walgreens, including in the form of ill-gotten revenues.  On information and belief, Walgreens received revenue from assisting in the perpetration of fraud by Theranos, Holmes and Balwani, including through sales of Theranos tests and through increased sales of other Walgreens products to new and existing customers.  On information and belief, Walgreens also benefited financially and reputationally as a result of being the first national retail store to provide direct-to-consumer testing services.

402.    Plaintiffs and the Class suffered actual damages as a result of Walgreens' conduct in aiding and abetting fraud.

403.    Walgreens' misconduct alleged herein was intentional, deliberate, and willful.

404.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## NINTH CAUSE OF ACTION
### (Civil Conspiracy to Commit Fraud)
### (Against All Defendants)

405.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

406.    Plaintiffs bring this claim on behalf of themselves and the Class.

407.    Defendants agreed to a partnership through which they would enter the market for direct-to-consumer testing by advertising, promoting, and selling products and services that consumers would use to make decisions about their health, while knowing that the products and services provided were not as advertised and were unreliable, and

that their promotions and other statements in marketing such products and services were false, misleading, and/or unproven.

408.   The object of Defendants' conspiracy was to perpetrate fraud, and in particular to market and sell testing unreliable and not ready-for-market services to unwitting consumers, obtain blood and other clinical samples for research and product development purposes, and assure customers and the public that the tests were reliable—thereby becoming the primary participants in the new, profitable, national market for direct-to-consumer testing services—while concealing that Theranos's testing services were unreliable, unsafe, and should not be used by consumers to make decisions about their health.

409.   In furtherance of the conspiracy, Walgreens, Theranos, Holmes, and Balwani agreed to, and did, commit fraud and other violations of law as described herein.

410.   In furtherance of the conspiracy, Theranos, Holmes, and Balwani committed the acts alleged herein, including but not limited providing the unreliable test results to consumers and encouraging consumers to rely on those results, manipulating proficiency testing and otherwise covering up problems known internally, fraudulently concealing material facts, and falsely representing Theranos's testing services as reliable, ready-for-market, and compliant with applicable laws and regulatory standards.

411.   In furtherance of the conspiracy, Walgreens committed the acts alleged herein.  Among other things, Walgreens deliberately and intentionally ignored problems about the reliability of Theranos testing, and deliberately and knowingly concealed from Plaintiffs and the Class that it had identified numerous red flags about Theranos and

Theranos testing that put it on notice of the problems, and that it had conducted a grossly inadequate investigation of Theranos.  Walgreens further executed an agreement with Theranos to market and provide Theranos products and services to Walgreens customers, concealed material information from consumers, and disseminated, endorsed and promoted misrepresentations about Theranos testing services with knowledge of their falsity and/or ignorance of their truth.  Walgreens further deliberately prevented its staff from conducting any oversight or review of Theranos's conduct, including, but not limited to, toward Walgreens customers, despite having identified numerous red flags and concerns about the reliability of Theranos tests, in an effort to conceal the truth from Defendants' customers, and the public, for as long as possible.  Walgreens further agreed to provide space for Theranos inside its stores to drive retail consumers toward its services, and agreed to make available Walgreens employees who would facilitate the sale and performance of Theranos testing services.

412.    Holmes agreed to, among other things, falsely promote Theranos testing as reliable, ready-for-market, and compliant with applicable laws and regulations, to cover up internally known problems, to conceal material information from consumers, and to dismiss, deny and downplay reported problems once Defendants' scheme began to collapse.

413.    Balwani agreed to, among other things, use consumer tests that were being falsely marketed as being ready-for-market, in order to conduct research and product development, to cover up internally known problems, conceal material information from consumers, to spread, repeat, and otherwise reinforce misleading representations and

omissions about Theranos testing, to cover up quality control failures and falsify information submitted to regulatory authorities, and to make every effort to prevent Defendants' scheme from being reported by employees or otherwise discovered.

414.    As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered actual damages.

415.    Defendants' misconduct alleged herein was intentional, deliberate, and willful.

416.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**TENTH CAUSE OF ACTION**
**(Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))**
**(Against All Defendants)**

417.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

418.    Plaintiffs bring this claim on behalf of themselves and the Class.

419.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

420.    Theranos, Walgreens, Holmes, and Balwani are "persons" within the meaning of 18 U.S.C. § 1961(3).

421.    Theranos, Walgreens, Holmes, and Balwani together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c),

and will be referred to herein as the "Clinic RICO Enterprise."

422.    The Clinic RICO Enterprise engaged in and affected interstate commerce within the meaning of 18 U.S.C. § 1962(c), including but not limited to commerce on the internet, and between residents of California, Arizona, and Pennsylvania.

423.    The Clinic RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.  For example: Theranos concealed material information from consumers and advertised Theranos testing services as revolutionary, ready-for-market, and reliable, when in fact its laboratories were staffed by inadequately trained personnel, used improperly calibrated equipment, and its test results were unreliable.  Walgreens concealed material information from consumers, promoted and agreed to assist in promoting Theranos testing services to consumers, agreed to refrain from conducting any oversight or rigorous investigation regarding Theranos or its facilities and equipment, agreed to provide space for Theranos inside its stores to drive retail consumers toward its services, and agreed to make available Walgreens employees who would facilitate the sale and performance of Theranos testing services.  Holmes agreed to falsely promote Theranos testing as reliable, ready-for-market, and compliant with applicable laws and regulations, to cover up internally known problems, to conceal material information from consumers, and to dismiss, deny and downplay reported problems once Defendants' scheme began to collapse.  Balwani agreed to use consumer tests that were being falsely marketed as being ready-for-market, in order to conduct research and product development, cover up internally known problems, conceal material information from

consumers, spread, repeat, and otherwise reinforce misleading representations and omissions about Theranos testing, cover up quality control failures and falsify information submitted to regulatory authorities, and to make every effort to prevent Defendants' scheme from being reported by employees or otherwise discovered.

424.    At all relevant times, Defendants operated, controlled, or managed the Clinic RICO Enterprise, and profited from the Clinic RICO Enterprise.  Defendants were responsible for the content of all marketing, advertisements, and other public-facing representations regarding Theranos, and for the material omissions alleged herein.

425.    The Clinic RICO Enterprise has had a common purpose: to perpetrate fraud, and in particular to market and sell testing services that were unreliable and not ready-for-market services to unwitting consumers, obtain under false pretenses blood and other clinical samples for research and product development purposes, and assure customers and the public that the tests were reliable—thereby becoming the primary participants in the new, profitable, national market for direct-to-consumer testing services—while concealing that Theranos's testing services were unreliable, unsafe, and should not be used by consumers to make decisions about their health.

426.    Defendants conducted and participated in the conduct of the affairs of the Clinic RICO Enterprise through a pattern of racketeering activity, beginning at the latest in 2013, and continuing until at least 2016, and consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  Defendants' violations of the

federal mail and wire fraud included, but were not limited to, to: (a) the numerous specific false statements in press releases and other media statements alleged herein (the time and place of which are identified herein); (b) the misrepresentations, alleged herein, that Defendants made on their respective websites and in electronic advertisements, which representations were pervasive in the locations in question during a substantial part or all of the time that Defendants sold Theranos testing services; (c) the transmission of test results through the mail, telephone, fax and internet, which transmissions were occurring consistently throughout the relevant time period; and (d) the processing of customer payments and payments among and between Defendants, by electronic transmission, which transmissions were occurring consistently throughout the relevant time period; and (e) shipping an "uncleared medical device in interstate commerce, between California, Arizona, and Pennsylvania," as reported by the FDA.[82]

427.    Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and caused to be transmitted, by means of mail and wire communications traveling in interstate commerce, writing(s), and/or signal(s), including the Theranos and Walgreens websites, online, mailed, televised, or other advertising, press releases, Theranos test results and other materials, and invoices for, and processing of, payments.

428.    The conduct alleged herein was part of a scheme that Defendants formulated to defraud Plaintiffs and the Class, to receive financial and other benefits, and

---

[82] Department of Health and Human Services, Form FDA-483 (Inspection Report) (Sept. 16, 2015), available at http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited Jan. 26, 2017).

to become the primary participants in the new, profitable, national market for direct-to-consumer testing services.  Defendants perpetrated this scheme with the specific intent to deceive and defraud Plaintiffs and the Class, and Defendants did deceive and defraud Plaintiffs and the Class.

429.    These acts of racketeering spanned at least three years and are not isolated or long-ago completed events.  Through the conduct of the Clinic RICO Enterprise, Defendants have fraudulently sold at least many thousands of unreliable and dangerous Theranos tests to consumers.

430.    As a foreseeable and natural consequence of Defendants' scheme, Defendants injured Plaintiffs and the Class, including but not limited to in the form of their submission to and payment, out-of-pocket and/or through their health insurance or other collateral sources, for testing services that were unreliable, did not hold the promised value and were dangerous when used for their advertised purposes, and in the form of steps taken and not taken by Plaintiffs and the Class in reliance upon the test results and the corresponding monetary and other damages therefrom.

431.    Defendants' acts also present a threat of continued racketeering activity, including but not limited to insofar as the Clinic RICO Enterprise has not issued formal invalidation notices for all Theranos test results.

432.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## ELEVENTH CAUSE OF ACTION
### Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)
### (Against All Defendants)

433.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

434.    Plaintiffs bring this claim on behalf of themselves and the Class.

435.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

436.    For years, Defendants aggressively sought to induce and increase sales of Theranos testing services in an effort to bolster their revenues, augment profits, and increase their market share of the new, profitable, national market for direct-to-consumer testing services.  Finding it impossible to achieve their ambitious goals lawfully, Defendants resorted to cheating through their fraudulent scheme and conspiracy.

437.    Theranos, Holmes, Balwani, and Walgreens objectively manifested an agreement to participate in the scheme to defraud consumers through the Clinic RICO Enterprise.  Theranos, Holmes, Balwani, and Walgreens objectively manifested an agreement on the common purpose of the Clinic RICO Enterprise, deliberately and knowingly selling unreliable and dangerous lab tests to consumers while making false representations and material omissions regarding their accuracy, reliability, fundamental purpose, and compliance with applicable laws and standards.

438.    Defendants objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity.  Walgreens, Holmes, Balwani, and Theranos agreed that some members of the Clinic RICO

105

Enterprise would commit the predicate acts for the benefit of the Enterprise. Defendants further agreed to commit predicate crimes and to aid and abet the commission of predicate crimes by other members of the Clinic RICO Enterprise.

439. As a foreseeable and natural consequence of Defendants' conspiracy, Defendants injured Plaintiffs and the Class, including but not limited to in the form of their submission to and payment for, out-of-pocket and/or through their health insurance or other collateral sources, testing services that were unreliable and did not hold the promised value and were dangerous when used for their advertised purposes, and in the form of steps taken and not taken by Plaintiffs and the Class in reliance upon the test results and the corresponding monetary and other damages therefrom.

440. On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## TWELFTH CAUSE OF ACTION
### (Violation of California Business & Professions Code Sections 17200, *et seq.*)
### (Against All Defendants)

441. Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

442. Plaintiffs bring this claim on behalf of themselves and the Class.

443. California's Unfair Competition Law ("UCL") defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

444. Defendants' unlawful, unfair, and fraudulent business acts and practices are described throughout this Complaint and include, but are not limited to: (a) marketing and selling unreliable Theranos tests that they knew to be unreliable and/or which they

106

failed to take sufficient steps to ensure the reliability of, and encouraging consumers to rely on such tests to make decisions about their health and treatment; (b) marketing Theranos testing services as being ready-for-market when they knew that was not the case and that Defendants were using the tests conducted on consumers for research and product development; and (c) material misrepresentations and omissions as alleged herein.

445.   Defendants' conduct alleged herein constitutes unlawful, unfair, and fraudulent business practices.

446.   Defendants have violated the "fraudulent" prong of the UCL through their conduct, misrepresentations, and omissions alleged herein.  Defendants' misrepresentations and omissions were pervasive.  Defendants' misrepresentations and omissions are likely to deceive and have a tendency to deceive reasonable consumers, and have deceived Plaintiffs and the Class.  The facts misrepresented and concealed by Defendants would be material to a reasonable consumer.

447.   Defendants had exclusive and superior knowledge regarding the material information that they concealed.

448.   Plaintiff and the Class reasonably relied upon Defendants' misrepresentations and omissions to their detriment.

449.   Defendants have violated the "unfair" prong of the UCL through their misconduct alleged herein, under both the *Cel-Tech* "tethering" test[83] and "balancing" test.

---

[83] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

450.    Defendants' conduct alleged herein violates California public policy, including but not limited to as such policy is reflected in California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), Cal. Civ. Code § 1710, Cal. Comm. Code §§ 2314-2315, and in California common law.

451.    Defendants' conduct alleged herein is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  Defendants have engaged in a years-long, pervasive scheme of: (a) promoting and selling unreliable Theranos tests and encouraging consumers to rely on those tests in making decisions about their health; (b) misrepresenting the reliability and other details about Theranos testing services, including that they were ready-for-market when that was not the case; and (c) concealing from consumers material information about the reliability of Theranos tests and the compliance of Theranos with applicable laws and standards.  This conduct is immoral, unethical, and unscrupulous.  Moreover, Defendants' conduct is oppressive and substantially injurious to consumers.  Among other things, as a direct result of Defendants' conduct alleged herein, Plaintiffs and the Class have paid money and submitted to Theranos testing that was not only unreliable, but put their health and lives at risk.  There is no countervailing utility to Defendants' conduct, and certainly none that outweighs the substantial detriment to Plaintiffs and the Class.

452.    Defendants' conduct is also unlawful in that it violates Civil RICO (18 U.S.C. §§ 1961-1968); California's False Advertising Law, (Cal. Bus. & Prof. Code §§ 17500, *et seq.*), California's Consumer Legal Remedies Act, (Cal. Civ. Code § 1750, *et seq.*), statutory deceit, (Cal. Civ. Code § 1710), the Arizona Racketeering Act, (A.R.S.

§§ 13-2301-04), California Health & Safety Code §§ 24170, *et seq.*, and common law

fraud, civil conspiracy to commit fraud, battery, medical battery, negligence, and

negligent misrepresentation, which not only result in liability as to the individual causes

of action, they also provide a basis for a finding of liability under the UCL.

453.    Furthermore, Defendants' conduct violates declared legislative policies as

set forth by the federal government in 40 C.F.R. § 600.307(a)(ii)(A); 40 C.F.R.

§ 600.302-08(b)(4) and 16 C.F.R. § 259.2(a).

454.    As a result of Defendants' violations of California's Unfair Competition

Law, Plaintiffs and the Class have suffered actual damages, including the loss of money

and/or property to Defendants in exchange for testing they would not, with knowledge of

the truth, have allowed to be performed, and which is unreliable, not worth the promised

value, and dangerous, and other money they have spent out-of-pocket as a result of the

unreliable test results they received.

455.    Absent injunctive relief, Defendants' violations will continue to harm

consumers.

456.    Pursuant to California Business and Professions Code §§ 17200 and 17203,

on behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

### THIRTEENTH CAUSE OF ACTION
### (Violation of California Business & Professions Code §§ 17500, *et seq.*)
### (Against All Defendants)

457.    Plaintiffs incorporate the substantive allegations contained in all prior and

succeeding paragraphs as if fully set forth herein.

458.    Plaintiffs bring this claim on behalf of themselves and the Class.

459.   California Bus. & Prof. Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

460.   Defendants have committed acts of untrue and misleading advertising, by disseminating materially misleading and deceptive information, and omitting material information, as alleged herein, for purposes of inducing consumers to purchase and submit to Theranos testing services.

461.   Defendants' misrepresentations and omissions were pervasive.

462.   Defendant's misrepresentations deceived, and have a tendency to deceive the general public regarding the reliability and value of Theranos tests.  The misrepresentations and omissions by Defendants alleged herein were material in that a reasonable person would attach importance to them and would be induced to act on the information in making decisions.

463.   Defendants had exclusive and superior knowledge regarding the material information that they concealed.

464.   Plaintiffs and the Class reasonably relied on Defendants' misrepresentations and omissions to their detriment.

465.    As a result of Defendants' violations, Plaintiffs and the Class have suffered actual damages, including the loss of money and/or property to Defendants in exchange for testing they would not, with knowledge of the truth, have allowed to be performed, and which is unreliable and dangerous, and other money they have spent out-of-pocket as a result of the unreliable test results they received..

466.    Absent injunctive relief, Defendants' violations will continue to harm consumers.

467.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**FOURTEENTH CAUSE OF ACTION**
**(Violation of California Civil Code Section 1750 _et seq._)**
**(Against All Defendants)**

468.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

469.    Plaintiffs bring this claim on behalf of themselves and the Class.

470.    Defendants are "persons" under Cal. Civ. Code § 1761(c).

471.    Plaintiffs and the members of the Class are "consumers" under Cal. Civ. Code § 1761(d).

472.    Plaintiffs and each Class member's purchase of Theranos tests constitute "transactions" under Cal. Civ. Code § 1761(e).

473.    Theranos tests are "goods" and/or "services" under Cal. Civ. Code § 1761 (a-b).

474.    Plaintiff and Class members purchased Theranos tests for personal, family,

and household purposes within the meaning of California Civil Code § 1761(d).

475.    As alleged herein, Defendants have engaged in unfair or deceptive acts or practices that violated California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* by, among other things, representing that Theranos testing services have characteristics, uses, benefits, and qualities which they do not have; representing that Theranos testing services are of a particular standard, quality, and grade when they are not; and advertising Theranos testing services with the intent not to sell them as advertised.  Cal Civ. Code § 1770 (5), (7), and (9).

476.    Defendants actively failed to disclose and concealed material facts about Theranos tests, and otherwise engaged in activities with a tendency or capacity to deceive, as described herein.

477.    Defendants' misrepresentations and omissions were pervasive.

478.    Defendants' CLRA violations materially affected the decisions of Plaintiffs and Class members.  Plaintiffs and the Class members reasonably relied upon Defendants' material misrepresentations and omissions, and would not have purchased Theranos tests or submitted their blood for testing to Defendants had they known the truth.

479.    As a result of the CLRA violations described herein, Plaintiffs and the Class have suffered actual damages.

480.    On behalf of themselves and the Class, Plaintiffs seek injunctive relief to enjoin the CLRA violations alleged herein.  Plaintiffs also seek attorneys' fees and costs.

481.    In accordance with California Civil Code § 1782(a), Defendants Theranos,

Walgreens Boots Alliance, Inc., and Holmes were sent notice of their CLRA violations by certified mail, return receipt requested.  (*See* Dkt. 88, Ex. P).  Theranos, Walgreens Boots Alliance, Inc., and Holmes have failed to provide appropriate relief for their CLRA violations within 30 days of these notification letters.  On behalf of themselves and the Class, Plaintiffs seek actual and punitive damages for the CLRA violations by Theranos, Walgreens Boots Alliance, Inc., and Holmes alleged herein.  Plaintiffs further intend to send a notice to Defendants Balwani and Walgreen Arizona Drug Company concerning their violations of the CLRA.  If Balwani and Walgreen Arizona Drug Company fail to provide appropriate relief for their violations within 30 days thereof, Plaintiffs intend to amend this Complaint to request actual damages and punitive damages for those defendants' CLRA violations.

482.    Venue is proper under California Civil Code § 1780(d) because Defendants do business in this county and a substantial portion of the transactions at issue occurred in this county.  Plaintiffs' declaration establishing that this Court has proper venue for this action was attached as Exhibit Q to Plaintiffs' Consolidated Class Action Complaint (Dkt. 88).

### FIFTEENTH CAUSE OF ACTION
### (California Civil Code §§ 1709- 1710 - Deceit)
### (Against All Defendants)

483.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

484.    Plaintiffs bring this claim on behalf of themselves and the Class.

485.    California Civil Code § 1709 provides that "[o]ne who willfully deceives

another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

486.    California Civil Code § 1710 defines "deceit" as (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;  (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) A promise, made without any intention of performing it.

487.    Defendants' material misrepresentations and omissions alleged herein constitute deceit under California Civil Code § 1710.  Defendants' misrepresentations and omissions were pervasive.  Plaintiffs and the Class have reasonably relied on the material misrepresentations and omissions made by Defendants.  As a result, Plaintiffs and the Class have suffered actual damages.

488.    Defendants' misconduct alleged herein was intentional, deliberate, and willful, and was perpetrated by Defendants with the intent to, *inter alia*, cause Plaintiffs and the Class to rely on Theranos's unreliable test results in making decisions about their health and treatment.

489.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

## SIXTEENTH CAUSE OF ACTION
### (Medical Battery)
### (Against All Defendants)

490.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

491.    Plaintiffs bring this claim on behalf of themselves and the Class.

492.    Plaintiffs and all Class members submitted to blood draws performed by Defendants which involved Defendants penetrating their skin and tissue to draw blood, and/or to other clinical procedures as alleged herein.

493.    Defendants are, and acted as, a medical provider in performing blood draws and blood tests, and other clinical procedures and tests alleged herein, regarding Plaintiffs and the Class.

494.    Defendants' drawing and testing of blood constitute medical procedures.

495.    Defendants' performing other clinical procedures and tests as alleged herein constitute medical procedures.

496.    Defendants performed blood draws and other clinical procedures on Plaintiffs and the Class without their consent.  Defendants misrepresented and concealed the essential purpose of the blood draws and other clinical procedures.  Any purported consent that Plaintiffs and the Class provided was induced by fraud, concealment, and misrepresentation and was not effective.

497.    Defendants willfully and tortiously battered Plaintiffs and the Class members.

498.    Defendants willfully and tortiously experimented on Plaintiffs and the

Class members.

499.    Plaintiffs and Class members did not consent to be subjects for testing, experimentation, research, or product development by Defendants.

500.    Defendants knew or should have known that conducting blood draws and other clinical procedures on Plaintiffs and the Class for product development purposes, and willfully experimenting upon Plaintiffs and the Class, without obtaining their consent would be an affront to the dignity of Plaintiffs and the Class members as human beings.

501.    Defendants' misconduct alleged herein was intentional, deliberate, and willful.

502.    As a foreseeable, proximate, and direct result of Defendants' conduct, Plaintiffs and Class members each have suffered a medical battery and have been damaged, including but not limited to money they paid out of pocket, being subject to unnecessary or potentially harmful treatments, and/or being denied the opportunity to seek treatment for a treatable condition, harm to their health, injury, and/or death and corresponding monetary and other damages, invasion of privacy and bodily integrity without their consent and corresponding damages therefrom, and severe emotional stress and anxiety.

503.    On behalf of themselves and the Class, Plaintiffs seek relief as prayed for below.

**SEVENTEENTH CAUSE OF ACTION**
**(Violation of Protection of Human Subjects in Medical Experimentation Act,**
**California Health & Safety Code §§ 24170 *et seq.*)**
**(Against All Defendants)**

504.    Plaintiffs incorporate the substantive allegations contained in all prior and succeeding paragraphs as if fully set forth herein.

505.    Plaintiff A.R. brings this claim on behalf of himself and the California Subclass.

506.    Defendants concealed from Plaintiff A.R. and the California Subclass that the purpose for drawing their blood, taking blood samples from them, and conducting other clinical procedures and tests on them as alleged herein, was to aid Defendants' research and product development.

507.    The California Protection of Human Subjects in Medical Experimentation Act ("Human Subjects Act") provides minimum statutory protection for the citizens of [the] state with regard to human experimentation." Cal. Health & Saf. Code § 24171. The statute lays out detailed guidelines for informed consent, which must be obtained before a person can be subjected to any "medical experiment." *Id.* § 24175(a); § 24173.

508.    A "medical experiment" under the Human Subject Act includes "[t]he severance or penetration or damaging of tissues of a human subject or the use of a drug or device . . ., in or upon a human subject in the practice or research of medicine in a manner not reasonably related to maintaining or improving the health of the subject or otherwise directly benefiting the subject." *Id.*, § 24174.

509.    The instruments used by Defendants to perform blood draws and tests, and

117

other clinical procedures and tests as alleged herein, on Plaintiff A.R. and California Subclass are "devices."

510.    The blood draws, clinical procedures, and blood and other clinical tests performed on Plaintiff A.R. and the California Subclass were "medical experiments."

511.    Defendants were primarily responsible for the conduct of the medical experiments.  The experiments conducted on Plaintiff A.R. and the California Subclass took place in Defendants' facilities, and were performed by and for the benefit of Defendants, in the development of their products and services, and not for the benefit of Plaintiff A.R. and the California Subclass.

512.    Defendants violated the Human Subjects Act by failing to obtain informed consent prior to conducting medical experiments on Plaintiff A.R. and the California Subclass, including by failing to provide both verbal and written disclosure, in nontechnical terms, of the following facts regarding the medical experiments:

a)  An explanation of the procedure and medical device to be utilized, including the purposes of the procedures, drugs, or devices;

b)  Disclosure of any appropriate alternative procedures, drugs, or devices that might be advantageous to the subject, and their relative risks and benefits;

c)  An instruction to the subject that he or she is free to withdraw his or her prior consent to the medical experiment and discontinue participation in the medical experiment at any time, without prejudice to the subject;

d)  The name, institutional affiliation, if any, and address of the person or persons actually performing and primarily responsible for the conduct of the experiment;

e)   The name of the sponsor or funding source, if any, or manufacturer if the experiment involves a drug or device, and the organization, if any, under whose general aegis the experiment is being conducted;

f)   The name, address, and phone number of an impartial third party, not associated with the experiment, to whom the subject may address complaints about the experiment; and

g)   The material financial stake or interest, if any, that the investigator or research institution has in the outcome of the medical experiment.  *Id.*

513.   Defendants willfully, or, in the alternative, negligently did not provide the above information in writing to Plaintiff A.R. or the California Subclass.

514.   On behalf of the California Subclass, Plaintiff A.R. seeks relief as prayed for below.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class and Subclasses, demand judgment against and general and special relief from Defendants as follows:

1.   An order certifying that the action may be maintained as a class action under Federal Rule of Civil Procedure 23 as defined herein and appointing Plaintiffs and Interim Co-Lead Counsel to represent the defined Class and Subclasses;

2.   An order permanently enjoining Defendants' misconduct alleged herein;

3.   An order requiring Defendants to promptly and adequately notify Plaintiffs and the Class regarding the problems with, and unreliability of, their Theranos tests;

4.      An order awarding Plaintiffs and the Class damages, special damages, general damages, and restitution;

5.      An order requiring Defendants to disgorge all profits and compensation improperly obtained by Defendants as a result of such acts and practices declared by this Court to be an unlawful;

6.      An order requiring Defendants to pay punitive, exemplary, and treble damages;

7.      An order awarding statutory damages to Plaintiff A.R. and the California Subclass for violations of the California Protection of Human Subjects in Medical Experimentation Act;

8.      An order requiring Defendants to pay attorneys' fees, costs, and expenses;

9.      An order requiring Defendants to pay pre-judgment and post-judgment interest; and

10.    Such other and further relief as the Court deems appropriate.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury for all claims so triable.

DATED this 27th day of January, 2017.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: *s/ T. David Copley*
Lynn Lincoln Sarko *(pro hac vice)*
T. David Copley
Gretchen Freeman Cappio *(pro hac vice)*
KELLER ROHRBACK L.L.P.
1201 3rd Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: gcappio@kellerrohrback.com

Mark D. Samson
Christopher Graver
KELLER ROHRBACK L.L.P.
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Telephone: (601) 248-0088
Facsimile: (602) 248-2822
Email: msamson@kellerrohrback.com

Michael Walter Sobol *(pro hac vice)*
Roger N. Heller *(pro hac vice)*
Melissa Gardner *(pro hac vice)*
LIEFF CABRASER HEIMANN
& BERNSTEIN LLP
Embarcadero Ctr West
275 Battery St, 29th Floor
San Francisco, CA 94111
Telephone (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com
Email: mgardner@lchb.com

*Interim Co-Lead Plaintiffs' Counsel*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
MCCUNEWRIGHT LLP
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 200-0580
Email: jgs@mccunewright.com
Email: mds@mccunewright.com
Email: jbk@mccunewright.com

Laurence D. King
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Phone: 415-772-4700
Fax: 415-772-4707
Email: lking@kaplanfox.com

*Additional Plaintiffs' Counsel*

1

## CERTIFICATE OF SERVICE

2

3       I hereby certify that on January 27, 2017, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

4

5                                    By:  s/ T. David Copley

6                                         T. David Copley

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28