WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re ) | No. 2:16-cv-2138-HRH |
| ) | (Consolidated with |
| Arizona THERANOS, INC., Litigation, ) | No. 2:16-cv-2373-HRH |
| ) | No. 2:16-cv-2660-HRH |
| ) | No. 2:16-cv-2775-HRH |
| _____ ) | -and- |
| | No. 2:16-cv-3599-HRH) |

<u>O R D E R</u>

<u>Motions to Dismiss</u>

Defendants move to dismiss plaintiffs' first amended consolidated class action complaint.[1] The motions to dismiss are opposed.[2] Oral argument was not requested and is not deemed necessary.

<u>Background</u>

Plaintiffs are A.R.; B.B.; B.P.; D.L.; L.M.; M.P.; R.C.; R.G.; S.J.; and S.L. A.R. is alleged to be a resident of California.[3] The other plaintiffs are alleged to be residents of

---

[1]Docket Nos. 122 and 123.

[2]Docket No. 132.

[3]First Amended Consolidated Class Action ("CCA") Complaint at 5, ¶ 13, Docket No.
(continued...)

Arizona.[4]  Defendants are Theranos, Inc. ("Theranos"); Elizabeth Holmes; Ramesh Balwani; Walgreens Boots Alliance, Inc.;  and Walgreen Arizona Drug Company.[5]

In 2003, Theranos was founded by defendant Holmes.[6]  Balwani was the President and Chief Operating Officer of Theranos until he resigned in 2016.[7]

"Theranos initially focused on development of a hand-held device that would use a tiny needle to obtain a small drop of blood for analysis."[8]  "By 2008, the project had grown into what is now known as the 'Edison' device."[9]  "The Edison device ... was supposedly able to take a few drops of blood from a patient's finger placed into a nanotainer capsule, and reliably conduct hundreds of blood tests, all outside a lab."[10]  However, the project did not apparently get that far because the blood drawn from clients such as plaintiffs was actually tested at Theranos laboratories.

---

[4]First Amended CCA Complaint at 5-6, ¶¶ 14-22, Docket No. 107.

[5]The Walgreen defendants are collectively referred to as "Walgreens" herein.  Any reference to the "Theranos defendants" means Theranos, Inc., Holmes and Balwani.

[6]First Amended CCA Complaint at 8, ¶ 31, Docket No. 107.

[7]First Amended CCA Complaint at 7, ¶ 26, Docket No. 107.

[8]First Amended CCA Complaint at 9, ¶ 31, Docket No. 107.

[9]First Amended CCA Complaint at 9, ¶ 31, Docket No. 107.

[10]First Amended CCA Complaint at 9, ¶ 32, Docket No. 107.

Plaintiffs allege that defendants knew that the Theranos blood tests "were unreliable, not ready-for-market, and failed to meet even basic industry standards,"[11] but that in 2012, "Theranos entered into a partnership agreement with Walgreens, under which Walgreens invested $140 million in Theranos ... and agreed to operate clinics, which it called 'Wellness Centers,' at Walgreen Pharmacies in Arizona and California."[12] Through the Wellness Centers, "Theranos, along with Walgreens, sold blood [tests] to individuals."[13] Plaintiffs allege that Walgreens entered into this agreement with Theranos even though "Walgreens was aware of numerous serious red flags about the tests that put it on notice about the unreliability of the tests[.]"[14]

Plaintiffs allege that "[d]efendants intentionally concealed vital information from consumers, their doctors, and the public at large, about the tests' unreliability and about the deficient nature of the [Theranos] testing facilities and equipment."[15] Plaintiffs allege that

> [d]efendants also made pervasive misrepresentations – including in their marketing, in the stores where tests were sold, and in a steady stream of press releases and other media statements – falsely stating and asserting that Theranos tests met the highest standards of reliability, were industry-leading in quality, and had

---

[11]First Amended CCA Complaint 1, ¶ 2, Docket No. 107.

[12]First Amended CCA Complaint at 13, ¶ 41, Docket No. 107.

[13]First Amended CCA Complaint at 6, ¶ 23, Docket No. 107.

[14]First Amended CCA Complaint at 13, ¶ 43, Docket No. 107.

[15]First Amended CCA Complaint at 1, ¶ 3, Docket No. 107.

been developed under and validated under, and were compliant with, federal guidelines.[16]

Plaintiffs allege that "[d]efendants aggressively promoted Theranos tests as being ready-for-market, and encouraged consumers and their doctors to use and rely on them in making important health and treatment decisions, including, but not limited to, ... such ... matters as cancer, HIV, diabetes, kidney disease, and heart disease."[17]

But, plaintiffs allege that "[i]n reality, [d]efendants knew ... Theranos tests were dangerously unreliable, had not been validated as advertised, and did not meet federal guidelines as advertised."[18]  Plaintiffs allege that "in a hurry to get the tests to market and thereby assist [d]efendants in developing their still-in-development products and services, ... [d]efendants prematurely marketed and sold the [blood] tests to consumers who were, in essence, subject to beta testing and product development research without their knowledge and consent...."[19]  Plaintiffs allege that they "were misinformed about the essential purpose of [the blood tests] and thus they did not provide, and could not have provided, consent for such procedure[s] and intrusion."[20]  Plaintiffs allege that "[o]ffering blood tests to the general public enabled [d]efendants to collect blood samples from human subjects without sacrificing

---

[16]First Amended CCA Complaint at 1, ¶ 3, Docket No. 107.

[17]First Amended CCA Complaint at 1-2, ¶ 4, Docket No. 107.

[18]First Amended CCA Complaint at 2, ¶ 5, Docket No. 107.

[19]First Amended CCA Complaint at 2, ¶ 5, Docket No. 107.

[20]First Amended CCA Complaint at 49, ¶ 147, Docket No. 107.

the time and money necessary to recruit volunteers for formal clinical trials."[21]  Plaintiffs

further allege that this helped defendants "evade regulatory scrutiny...."[22]

Plaintiffs allege that in 2016, "[a]fter the Center for Medicare and Medicaid Services

cited Theranos's Newark, California lab for numerous deficiencies," Theranos voided the test

results "from its proprietary Edison blood testing devices, which consisted of tens of

thousands of test results."[23]  Plaintiffs further allege that "[n]umerous additional test results

... have now been voided or belatedly 'corrected' by Theranos[.]"[24]  Plaintiffs allege that

"[a]s a result of revelations regarding problems with Theranos's technology and laboratory

standards, Theranos test results have lost all credibility within the medical community."[25]

Holmes and Balwani have been banned "from owning or operating a blood-testing business

for at least two years" and Theranos's license to operate a blood lab in California has been

revoked.[26]  Theranos is now working on developing a "miniLab" which is apparently a

device that could run diagnostic tests on small amounts of blood.[27]

---

[21]First Amended CCA Complaint at 50, ¶ 149, Docket No. 107.

[22]First Amended CCA Complaint at 50, ¶ 149, Docket No. 107.

[23]First Amended CCA Complaint at 2, ¶ 6, Docket No. 107.

[24]First Amended CCA Complaint at 3, ¶ 6, Docket No. 107.

[25]First Amended CCA Complaint at 40, ¶ 120, Docket No. 107.

[26]First Amended CCA Complaint at 48, ¶ 145, Docket No. 107.

[27]First Amended CCA Complaint at 48, ¶ 145, Docket No. 107; see also, An Open
Letter from Elizabeth Holmes, Exhibit A, Declaration of David Taylor, which is appended
(continued...)

In their first amended complaint, plaintiffs assert seventeen causes of action and seek damages and injunctive relief. Pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6), defendants now move to dismiss all of plaintiffs' causes of action.

<u>Discussion</u>

"A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." <u>Cetacean Community v. Bush</u>, 386 F.3d 1169, 1174 (9th Cir. 2004). "In that event, the suit should be dismissed under Rule 12(b)(1)." <u>Id.</u>

"'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Zixiang Li v. Kerry</u>, 710 F.3d 995, 999 (9th Cir. 2013) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." <u>Id.</u> "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). "[T]he complaint must provide

---

[27](...continued)
to Theranos Defendants' Motion to Dismiss, Docket No. 122 ("We will return our undivided attention to our miniLab platform").

'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012).

"Rule 9(b) provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc., 637 F.3d 1047, 1054-55 (9th Cir. 2011) (quoting Fed. R. Civ. P. 9(b)). "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" Id. at 1055 (quoting Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).

### Arizona Consumer Fraud Act and Fraud Claims[28] (First and Second Causes of Action)

"The Arizona Consumer Fraud Act ["CFA"] is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions." State ex rel. Woods v. Hameroff, 884 P.2d 266, 268 (Ariz. Ct. App. 1994). "Generally stated, claims under the CFA, like common law fraud claims, can be based on affirmative misrepresenta-

---

[28]The Arizona Consumer Fraud Act claim in the First Cause of Action is only asserted on behalf of the Arizona plaintiffs.

tions, concealment, or omission of material facts." Tavilla v. Cephalon, Inc., 870 F. Supp. 2d 759, 776 (D. Ariz. 2012). An affirmative "misrepresentation causes injury where the consumer actually relies on" the statement, although the consumer's reliance does not need to be justifiable. Cheatham v. ADT Corp., 161 F. Supp. 3d 815, 825-26 (D. Ariz. 2016). An omission is actionable under the CFA if it "is material and 'made with intent that a consumer rely thereon.'" Id. at 830 (quoting State ex rel. Horne v. AutoZone, Inc., 275 P.3d 1278, 1281 (Ariz. 2012)).

Under Arizona law, to prevail on a common law fraud claim, a plaintiff must show

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

Peery v. Hansen, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). The "representation" may be an affirmative representation or an omission of fact that the defendant had a duty to disclose. Tavilla, 870 F. Supp. 2d at 776. Under California law "'[t]he elements of common law fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.'" Arei II Cases, 157 Cal. Rptr. 3d 368, 382 (Cal. Ct. App. 2013) (quoting Robinson Helicopter Co. v. Dana Corp., 102 P.3d 268, 274 (Cal. 2004)).

Plaintiffs have asserted both fraud by affirmative misrepresentation claims and fraud by omission claims. Defendants argue that all of plaintiffs' fraud claims are subject to

dismissal for failure to comply with the heightened pleading requirements of Rule 9(b).[29]

"Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong.'" Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Bly–Magee v. Calif., 236 F.3d 1014, 1019 (9th Cir. 2001)) "'Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged.'" Id. (quoting Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003)). However, "'a plaintiff in a fraud-by-omission suit faces a slightly more relaxed burden, due to the fraud-by-omission plaintiff's inherent inability to specify the time, place, and specific content of an omission in quite as precise a manner.'" Schellenbach v. GoDaddy.com LLC, No. CV-16-00746-PHX-DGC, 2017 WL 192920, at *2 (D. Ariz. Jan. 18, 2017) (quoting Tait v. BSH Home Appliances Corp., No. SACV 10-00711 DOC, 2011 WL 3941387, at *2 (C.D. Cal. Aug. 31, 2011)).

Defendants argue that plaintiffs' fraud by affirmative misrepresentation claims have not been pled with the required particularity because plaintiffs have failed to delineate the

---

[29]In their reply brief, the Theranos defendants point out that Theranos recently entered into a consent decree with the Arizona Attorney General, which resolved parens patriae claims under the Arizona Consumer Fraud Act. Under the consent decree, Theranos has agreed to pay $4.652 million in restitution for the costs of blood tests purchased by Arizona consumers. The Theranos defendants contend that this consent decree extinguishes plaintiffs' Arizona Consumer Fraud claim but because the consent decree did not become final until after they had filed their motion to dismiss, they state that they will wait to make such an argument in the event that the court does not dismiss plaintiffs' First Cause of Action.

alleged fraudulent conduct of each defendant. "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[] in the alleged fraudulent scheme.'" Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007) (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989)). "'Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to "defendants."'" United States v. Aurora Las Encinas, LLC, Case No. LA CV10-01031 JAK (RZx), 2011 WL 13137312, at *2 (C.D. Cal. Sept, 8, 2011) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). Defendants argue that plaintiffs repeatedly refer to alleged misrepresentations made by "defendants" without attributing those statements to any particular defendant. For example, plaintiffs allege that 1) "[d]efendants' representations were false and misleading[,]"[30] 2) "[d]efendants' representations were pervasive",[31] 3) "[d]efendants' advertisements for Theranos were rampant,"[32] 4) "[d]efendants designed their representations and marketing to give [a] false impression",[33] 5)"[d]efendants advertised that Theranos testing was of 'the highest levels of accuracy,'"[34] and 6) "[d]efendants made material misrepresentations [and] false promises ...

_____

[30]First Amended CCA Complaint at 21, ¶ 67, Docket No. 107.

[31]First Amended CCA Complaint at 21, ¶ 68, Docket No. 107.

[32]First Amended CCA Complaint at 21, ¶ 69, Docket No. 107.

[33]First Amended CCA Complaint at 22, ¶ 70, Docket No. 107.

[34]First Amended CCA Complaint at 22, ¶ 71, Docket No. 107.

regarding Theranos testing services[.]"[35]

There are a few instances in the amended complaint where plaintiffs have alleged that a certain defendant made an alleged misrepresentation. For example, in the section of their amended complaint titled "Defendants Falsely Promoted Theranos Testing as Reliable", plaintiffs allege that specific statements were on Walgreens' website, Theranos's website, in advertising at the Wellness Centers in Walgreens stores, in Theranos's marketing materials, in the Theranos direct testing order form, and in the Theranos guide to direct testing.[36] Plaintiffs have also alleged that on September 8, 2013, "Holmes boasted that Theranos was able to 'run any combination of tests, including sets of follow-on tests' quickly from a single tiny blood sample"[37] and later stated that

> "[w]e spent many years redeveloping every test that is recognized by Medicare ... to be able to run it on a tiny sample" ... "we focused a great deal on these tests and validated and verified them over the years, building an infrastructure that was highly automated and standardized such that the quality of data that we generate could be used in an actionable manner."[[38]]

Plaintiffs have also alleged that on March 12, 2014, "Balwani stated that Theranos was 'able to provide a majority of the testing from only two or three drops of bloods' and ... 'most

---

[35]First Amended CCA Complaint at 79, ¶ 310, Docket No. 107.

[36]First Amended CCA Complaint at 23-25, ¶¶ 73-76, Docket No. 107.

[37]First Amended CCA Complaint at 10, ¶ 35, Docket No. 107.

[38]First Amended CCA Complaint at 11-12, ¶ 38, Docket No. 107.

likely patients will prefer a simple finger stick, and we are able to do that.'"[39]  Plaintiffs also allege that in a joint press release in September 2013, Theranos and Walgreens stated that Theranos's labs were "CLIA-certified" and that Theranos's "'proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results.'"[40]  And, plaintiffs allege that Holmes stated that "Theranos 'ha[s] data that show you can get a perfect correlation between a finger stick and a venipuncture for every test that we run.'"[41]  These allegations indicate that plaintiffs have attempted to meet Rule 9(b) requirements in terms of attributing specific misrepresentations to specific defendants, but plaintiffs' amended complaint is still replete with allegations that "defendants" (with no delineation as to which defendant) made the misrepresentation in question.  Each defendant must be in a position to defend its particular conduct and as currently pled, plaintiffs' fraud by affirmative misrepresentation claims inadequately delineate the conduct attributed to each defendant.  Thus, plaintiffs' fraud by affirmative misrepresentation claims are dismissed.

Defendants argue that plaintiffs should not be given leave to amend these claims because plaintiffs have already amended their complaint once.  But, plaintiffs' amended consolidated action complaint was filed by stipulation of the parties,[42] after defendants filed

---

[39]First Amended CCA Complaint at 12, ¶ 39, Docket No. 107.

[40]First Amended CCA Complaint at 25, ¶ 78, Docket No. 107.

[41]First Amended CCA Complaint at 27, ¶ 81, Docket No. 107.

[42]Docket No. 101.

their first motions to dismiss and before the court had ruled on those motions. Because the court has not previously ruled on the sufficiency of plaintiffs' allegation and because of the nature of this case, the court will exercise its discretion and grant plaintiffs leave to amend with respect to their fraud by affirmative misrepresentation claims in the First and Second Causes of Action.

Because plaintiffs are being given leave to amend, the court addresses the three other arguments raised by defendants as to plaintiffs' fraud by affirmative misrepresentation claims. First, defendants argue that plaintiffs have failed to identify the alleged misrepresentations to which each plaintiff was exposed, when they each allegedly viewed or heard the misrepresentations, and which misrepresentations each plaintiff considered material to his or her decision to purchase Theranos testing services. To comply with Rule 9(b), a plaintiff "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Schreiber Distrib. Co. v. Serv–Well Furniture Co., 806 F.2d 1393, 1400 (9th Cir. 1986).

Some plaintiffs allege that they "relied on the representations in [d]efendants' materials regarding the reliability of [d]efendants' services[.]"[43] One plaintiff alleges that she "relied on representations in [d]efendants' materials (including on Theranos and Walgreens websites, and in press releases) regarding the reliability of [d]efendants'

---

[43]First Amended CCA Complaint at 55, ¶ 162; 63, ¶ 216; Docket No. 107.

services."[44] Some allege that they "relied on representations in [d]efendants' materials (including at the Walgreens store) regarding the reliability of [d]efendants' services."[45] One alleges that he "relied on representations in [d]efendants' materials (including at the Walgreens store and the information he viewed on the Theranos website) regarding the reliability of [d]efendants' services."[46] One alleges that "he relied on representations in [d]efendants' materials (including a billboard) regarding the reliability of [d]efendants' services."[47] And one alleges that "he relied on representations in [d]efendants' materials (including on Theranos website and in advertisements) regarding the reliability of [d]efendants' services."[48] Defendants argue that these allegations do not satisfy Rule 9(b) requirements because they do not identify any specific misrepresentation or even when plaintiffs viewed any of the press releases, billboards, or advertisements.

In general, plaintiffs allege that they saw misrepresentations that were part of defendants' advertising campaign. In cases,

> where a fraud claim is based upon numerous misrepresentations, such as an advertising campaign that is alleged to be misleading, plaintiffs need not allege the specific advertisements the

---

[44]First Amended CCA Complaint at 57, ¶ 175, Docket No. 107.

[45]First Amended CCA Complaint at 59, ¶ 188; 61, ¶ 202; 66, ¶ 240; 70, ¶ 269; Docket No. 107.

[46]First Amended CCA Complaint at 65, ¶ 229, Docket No. 107.

[47]First Amended CCA Complaint at 69, ¶ 255, Docket No. 107.

[48]First Amended CCA Complaint at 73, ¶ 283, Docket No. 107.

> individual plaintiffs relied upon; it is sufficient for the plaintiff
> to provide a representative selection of the advertisements or
> other statements to indicate the language upon which the
> implied misrepresentations are based.

Morgan v. AT & T Wireless Servs., Inc., 99 Cal. Rptr. 768, 790 (Cal. Ct. App. 2009).

Plaintiffs have done this here.[49]

This is not a case where there were one-on-one communications between a plaintiff and a defendant. Rather, in this case, the advertising done by Theranos and Walgreens was addressed to the public at large. In such cases, where the plaintiffs rely upon broadside advertising, as opposed to personalized representations, some latitude in pleading should be allowed since one can reasonably infer that the defendants intended that the public at large would respond to the ads. Plaintiffs are those who, in this case, responded. That said, assuming that plaintiffs elect to replead their fraud by affirmative misrepresentation claims, plaintiffs would do well to include some factual allegations as to when each plaintiff viewed defendants' advertising.

Defendants next argue that many of the statements in the advertising campaign on which plaintiffs allegedly relied are non-actionable "puffery." "[T]he determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion." Newcal Industries, Inc. v. Ikon Office Solution, 513 F.3d 1038, 1053 (9th Cir. 2008) (quoting Cook, Perkiss, &

---

[49]See, e.g., First Amended CCA Complaint at 22-23, ¶¶ 71-72; 27-29, ¶¶ 83-84, Docket No. 107.

Liehe v. N. Calif. Collection Service, Inc., 911 F.2d 242, 245 (9th Cir. 1990)).  "A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance."  Id.  "[A] statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery."  Id. (quoting Cook, Perkiss, & Liehem, 911 F.2d at 245).  "While product superiority claims that are vague or highly subjective often amount to nonactionable puffery, 'misdescriptions of specific or absolute characteristics of a product are actionable.'"  Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997) (quoting Cook, Perkiss & Liehem, 911 F.2d at 246)).

Plaintiffs allege that defendants misrepresented that the "Theranos tests were reliable", that "Theranos's testing facilities were industry leading in quality", that "Theranos's testing services ... were quicker that traditional tests;" and that "Theranos's laboratory infrastructure ... produce[d] high quality results[.]"[50] Defendants argue that these types of statements, that a product is "reliable", "accurate", "quicker", and "industry leading", are exactly the types of statements that courts have found to be non-actionable puffery.  See, e.g., Shields v. Alere Home Monitoring, Inc., Case No. C15-2580 CRB, 2015 WL 7272672, at *10 (N.D. Cal. Nov. 18, 2015) (holding that representations that a blood-testing device was "accurate and reliable" and a "convenient alternative to traditional lab tests" were non-actionable puffery).

---

[50]First Amended CCA Complaint at 79-80, ¶ 310, Docket No. 107.

Plaintiffs aptly point out that at least some of the alleged affirmative misrepresentations are not puffery. For example, plaintiffs allege that in the Wellness Centers, defendants "advertised that Theranos's 'CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples.'"[51] Plaintiffs also allege that defendants advertised that "'[a]ll tests are developed and validated under and to the CLSI, FDA, Centers for Disease Control and World Health Organization guidelines.'"[52] Plaintiffs allege that Theranos's marketing materials "stated that '[w]e continuously conduct proficiency testing and participate in multiple proficiency testing programs[.]'"[53] Such types of statements are not puffery.

As for defendants' alleged misrepresentations about Theranos testing being accurate and reliable, it is at least plausible that these statements may not be puffery. Evidence may demonstrate that the reliability of a blood test can be measured and quantified. See Cheatham, 161 F. Supp. 3d at 828 (claims that a wireless security system provided "reliable security protection" not puffery because "[a]t least in some circumstances, the reliability and efficacy of a security system are facts that can be measured and quantified").

Finally, defendants argue that at the very least plaintiffs have failed to comply with Rule 9(b) as to any alleged misrepresentations about the use of finger sticks to perform Theranos blood tests. Although plaintiffs include numerous allegations in the amended

---

[51]First Amended CCA Complaint at 24, ¶ 74, Docket No. 107.

[52]First Amended CCA Complaint at 24, ¶ 75, Docket No. 107.

[53]First Amended CCA Complaint at 24, ¶ 75, Docket No. 107.

complaint about the Edison device and the Theranos finger-stick technology, only three plaintiffs allege that these are the representations that they saw. Plaintiff B.B. alleges that "[w]hen she purchased Theranos tests, one or more vials of blood were drawn from a vein in [her] arm" and that ""[t]his was different from the less invasive test that she had expected based on the representations from [d]efendants that she saw."[54] Plaintiffs L.M. and S.L. make identical allegations.[55] But defendants argue that these plaintiffs cannot possibly ever show that they relied on the finger-stick representations because they would have known before their blood was drawn that they were not purchasing a finger-stick blood test.

Reliance is an essential element of both a CFA claim and a common law fraud claim. No plaintiff could plausibly allege that he or she relied on misrepresentations about finger-stick blood tests, given that he or she must have known that the blood test actually being performed was not a finger-stick blood test. Many of the misrepresentations that are attributed to a specific defendant, which are set out above, have to do with the finger-stick technology. If a plaintiff could not have possibly relied on these representations, then a fraud by affirmative misrepresentation claim based on these representations would not be plausible.

Turning then to plaintiffs' fraud by omission claims,

> to plead the circumstances of omission with specificity, [a] plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or

---

[54]First Amended CCA Complaint at 57, ¶ 177, Docket No. 107.

[55]First Amended CCA Complaint at 63, ¶ 218; 73, ¶ 285; Docket No. 107.

other representations that [the] plaintiff relied on to make her purchase and that failed to include the allegedly omitted information.

Marolda v. Symantec Corp., 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009). "Reliance can be proved ... by establishing that had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently." Hoffman v. 162 N. Wolfe LLC, 175 Cal. Rptr. 3d 820, 833 (Cal. Ct. App. 2014) (citation omitted).

In the amended complaint, plaintiffs allege a litany of information that was concealed or omitted from defendants' advertising and other material.[56] They have also provided representative samples of websites, press releases, statements to the press, direct order forms, and other marketing materials that could have included the omitted or concealed information.[57] Plaintiffs have alleged that they would not have purchased Theranos blood tests if they had known that defendants were using their blood samples for research and product development.[58] Because the Rule 9(b) standard is somewhat relaxed for fraud by omission claims, the court concludes that plaintiffs have pled their fraud by omission claims with the required particularity.

**Battery and Medical Battery Claims (Third and Sixteenth Causes of Action)**

Plaintiffs allege that they "submitted to blood draws performed by [d]efendants which

---

[56]First Amended CCA Complaint at 17, ¶ 54, Docket No. 107.

[57]First Amended CCA Complaint at 22-29, ¶¶ 71-85, Docket No. 107.

[58]First Amended CCA Complaint at 56, ¶ 169; 58, ¶ 182; 60, ¶ 196; 62, ¶ 210; 64, ¶ 223; 65, ¶ 234; 68, ¶ 249; 69-70, ¶ 263; 72, ¶ 277; 74, ¶ 290, Docket No. 107.

involved [d]efendants penetrating their skin and tissue to draw blood[.]"[59]  Plaintiffs allege

that "[d]efendants induced [them] to submit to blood draws ... through fraud, concealment,

and substantial misrepresentations, and without informing them about the essential purpose

of the procedures."[60]  More specifically, plaintiffs allege that

> [d]efendants misrepresented and concealed ... the essential
> purpose of the blood draws and procedures to which they
> submitted....  Defendants led [p]laintiffs ... to believe that
> Theranos testing was ready-for-market and that the purpose of
> the blood draws and procedures submitted to was to provide
> [p]laintiffs ... [with] reliable information that they could and
> should rely upon in making health treatment decisions.  In fact,
> not disclosed by [d]efendants, [d]efendants had prematurely
> rushed Theranos testing services to market, the procedures
> [p]laintiffs ... submitted to were experimental in nature and
> being used by [d]efendants for research and development, and
> the essential purpose of the blood draws and procedures ... was
> to aid in [d]efendants' research and product development.[[61]]

Plaintiffs allege that they believed that they were submitting to blood tests for legitimate

treatment purposes,[62] that they did not consent to have their blood drawn for research and

product development purposes,[63] and that defendants intended to and did use their blood

---

[59]First Amended CCA Complaint at 85, ¶ 339; 115, ¶ 492, Docket No. 107.

[60]First Amended CCA Complaint at 86, ¶ 341;  see also, First Amended CCA
Complaint at 115, ¶ 496, Docket No. 107.

[61]First Amended CCA Complaint at 86, ¶ 340; Docket No. 107.

[62]First Amended CCA Complaint at 54-55, ¶ 161; 56-57, ¶ 174; 58, ¶ 187; 60, ¶ 201;
63, ¶ 215; 65, ¶ 228;  66, ¶ 239; 68, ¶ 254; 70, ¶ 268; 72, ¶ 282, Docket No. 107.

[63]First Amended CCA Complaint at 55, ¶ 164; 57, ¶ 177; 59, ¶ 190; 61, ¶ 204; 63, ¶
(continued...)

samples and test results for product development purposes.[64]  Thus, plaintiffs allege that any

consent that they gave for the blood draws was not effective.[65]

Battery and medical battery occur in "situations in which the patient is mistaken about

the nature of the invasion and the mistake is induced by a health care provider's misrepresen-

tation."  Duncan v. Scottsdale Medical Imaging, Ltd., 70 P.3d 435, 441 (Ariz. 2003).  As

Section 892B of the Restatement (Second) of Torts, to which both courts in Arizona and

California look, explains,

> [i]f the person consenting to the conduct of another is induced
> to consent by a substantial mistake concerning the nature of the
> invasion of his interests or the extent of the harm to be expected
> from it and the mistake is known to the other or is induced by
> the other's misrepresentation, the consent is not effective for the
> unexpected invasion or harm.

But, this rule "is limited to substantial mistakes, known to the actor, concerning the nature

of the invasion or the extent of the harm that is to be expected.  If the consent is induced by

mistake concerning other matters, the rule does not apply."[66]  In other words, if the mistake

or misrepresentation goes to a "collateral matter", consent is not vitiated.[67]  But if a patient

---

[63](...continued)
218; 65, ¶ 230; 67, ¶ 242; 69, ¶ 257;71, ¶ 273; 73, ¶ 285, Docket No. 107.

[64]First Amended CCA Complaint at 50-52, ¶¶ 149-154, Docket No. 107.

[65]First Amended CCA Complaint at 86, ¶ 342; 115, ¶ 496, Docket No. 107.

[66]Restatement (Second) of Torts § 892B (1979), cmt. to subsection 2.

[67]Id.

is not fully aware of "the particular character of the contact[,]" then any consent given by the patient is ineffective.  <u>Duncan</u>, 70 P.3d at 441.

Plaintiffs argue that they were not aware of the true "character of the contact" because defendants concealed the true purpose of the blood tests.  Plaintiffs argue that defendants were engaged in research and development, not legitimate blood testing; that this true purpose was not known to plaintiffs, and that this true purpose was not a collateral matter.

Plaintiffs cannot plausibly allege that they were not aware of the character of the contact at issue here.  Plaintiffs were fully aware that they were consenting to blood draws. They were fully aware of the nature of the invasion.  The blood tests to which plaintiffs consented were intended to result in, and plaintiffs received, reports of what were to  have been accurate analyses of the blood samples that were drawn.  On a Rule 12(b)(6) motion to dismiss, the court must accept plaintiffs' allegations that defendants were using plaintiffs' blood samples and test results for research and development purposes as true.  But, any use by defendants of plaintiffs' blood samples or test results to evaluate the Edison device or for other research and development purposes was collateral to the blood testing for which plaintiffs plainly gave their consent.

Nothing in <u>Rains v. Superior Court</u>, 198 Cal. Rptr. 249 (Cal. Ct. App. 1984), the primary case relied on plaintiffs, is to the contrary.  In <u>Rains</u>, the plaintiffs consented to "the

use of physical violence ... as a therapeutic[68] treatment...." <u>Id.</u> at 251.  In asserting a battery

claim against the defendants, the plaintiffs argued that their consent had been vitiated by

defendants' "alleged misrepresentation as to the therapeutic purpose[.]"  <u>Id.</u> at 252.  The

defendants moved to dismiss the plaintiffs' battery claim.  <u>Id.</u> at 251.  The court held that

"the therapeutic versus nontherapeutic purpose of touching by a psychiatrist goes to the

'essential character of the act itself' and thus vitiates consent obtained by fraud as to that

character."  <u>Id.</u> at 254.  The plaintiffs' battery claims were thus not subject to dismissal.  <u>Id.</u>

The court explained that when "a physician intends to perform treatment for a nontherapeutic

purpose when consent was given only for a therapeutic purpose," the physician has deviated

from the consent that was given and the consent cannot be considered effective.  <u>Id.</u> at 255.

Plaintiffs argue that similarly here, the therapeutic versus nontherapeutic purpose of

the blood draws goes to the "essential character of the act itself" and is not a collateral

matter.   Plaintiffs insist that they have plausibly alleged that defendants intentionally

deviated from the consent that was given and thus they have plausibly alleged that their

consent was not effective.

Plaintiffs' reliance on <u>Rains</u> is misplaced because <u>Rains</u> centered on there being <u>no</u>

_____

[68]"[T]he term 'therapeutic' is used in [medical battery cases] to distinguish drugs or
treatments which are <u>intended</u> to affect treatment and cure, as distinguished from applications
which do not have that objective. That the intent was misguided or the utilization of the
particular therapy inappropriate does not detract from the characterization of the application
as 'therapeutic.'" <u>Freedman v. Superior Court,</u> 263 Cal. Rptr. 1, 4 (Cal. Ct. App. 1989).

therapeutic purpose for the violent therapy to which the <u>Rains</u> plaintiffs had consented.  But here, plaintiffs have alleged that either they or their health care providers ordered the blood tests and that Theranos actually conducted the blood tests and delivered results to either plaintiffs or their health care providers.  Although these results may not have been accurate, it is implausible for plaintiffs to contend that there was no therapeutic purpose for their blood tests, particularly in light of some of the allegations in plaintiffs' amended complaint.  Plaintiffs allege that Theranos did 90 percent of the blood testing at its Scottsdale lab, which did not use the Edison device and "only performed analysis on venipuncture tests" and that Theranos "outsourced certain 'highly complex' tests to third-party, university-affiliated labs[.]"[69]  These allegations contradict plaintiffs' contention that there was no therapeutic purpose for the blood tests to which they consented.  It is clear from plaintiffs' allegations, which the court accepts as true on a Rule 12(b)(6) motion, that there were dual purposes attributed to defendants:  giving people test results (which plaintiffs in fact got, although those results may not have been accurate), and research and development (which is a collateral matter).

In sum, plaintiffs have failed to plead plausible battery and medical battery claims.  Plaintiffs' contention that they were not aware of the character of the conduct to which they consented is implausible, even if, as plaintiffs allege, defendants were using plaintiffs' blood samples and test results for research and development purposes.  It is not plausible that

---

[69]First Amended CCA Complaint at 34, ¶ 100, Docket No. 107.

plaintiffs were not aware of the nature of the invasion to which they consented. Because plaintiffs' battery claims are not plausible, these claims are dismissed. Plaintiffs are not given leave to amend as to these claims as amendment would be futile because, in light of the consent that was given, plaintiffs could never state plausible battery and medical battery claims.

**Negligence Claim (Fourth Cause of Action)**

Under Arizona law, "[t]o establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." Gipson v. Kasey, 150 P.3d 228, 230 (Ariz. 2007). Under California law, "[a]ctionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." United States Liab. Ins. Co. v. Haidinger–Hayes, Inc., 463 P.2d 770, 774 (Cal. 1970).

Plaintiffs allege that defendants had a duty to disclose all material facts regarding Theranos blood testing, that defendants breached this duty by making material misrepresentations and omissions and by selling unreliable tests, and that they were injured as a result of relying on these misrepresentations and omissions.[70] For the most part, these are allegations that would support a negligent misrepresentation claim, as opposed to an ordinary negligence

---

[70]First Amended CCA Complaint at 88-91, ¶¶ 353-361, Docket No. 107.

claim which is what plaintiffs appear to be trying to assert in their Fourth Cause of Action.

Because most of the allegations in plaintiffs' Fourth Cause of Action concern misrepresenta-

tions and omissions, it is difficult to determine the basis for plaintiffs' ordinary negligence

claim. Plaintiffs' negligence claim is dismissed for failure to comply with Rule 8, which

"requires that each claim in a pleading be supported by 'a short and plain statement of the

claim showing that the pleader is entitled to relief....'" Landers v. Quality Commc'ns, Inc.,

771 F.3d 638, 640 (9th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiffs are given leave

to amend their negligence claim but this claim must not based on allegations of misrepresen-

tations and omissions, which are more appropriately addressed in a negligent misrepresenta-

tion claim. The court would also note that because plaintiffs' negligence claim must be

based on something other than misrepresentations and omissions, this claim need not be pled

with the particularity required by Rule 9(b).

### Negligent Misrepresentation Claim (Fifth Cause of Action)

Under Arizona law,

> [t]he elements of negligent misrepresentation are: (1) the
> defendant provided false information in a business transaction;
> (2) the defendant intended for the plaintiff to rely on the
> incorrect information or knew that it reasonably would rely; (3)
> the defendant failed to exercise reasonable care in obtaining or
> communicating the information; (4) the plaintiff justifiably
> relied on the incorrect information; and (5) resulting damage.

KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co., 340 P.3d 405, 412 n.7 (Ariz. Ct. App.

2014). The elements are the same under California law. Goonewardene v. ADP, LLC, 209

Cal. Rptr. 3d 722, 741 (Cal. Ct. App. 2016). Under Arizona law, "[a] claim for negligent misrepresentation must meet the particularity requirements of Rule 9(b)." <u>Howard v. JPMorgan Chase Bank, N.A.</u>, No. CV12- 0952-PHX-DGC, 2012 WL 6589330, at *2 (D. Ariz. Dec. 17, 2012); And, "[u]nder California law, negligent misrepresentation is a species of actual fraud." <u>Lorenz v. Sauer</u>, 807 F.2d 1509, 1511–12 (9th Cir. 1987).

Plaintiffs allege that defendants misrepresented material facts that defendants knew were false and misleading, that defendants knew consumers were likely to rely on these facts, that plaintiffs did rely on this misinformation, and that they were damaged as result.[71] These allegations suffer from the same problem as plaintiffs' fraud by affirmative misrepresentation allegations in the First and Second Causes of Action, which are discussed above, namely that plaintiffs have failed to delineate which defendant made which alleged misrepresentations. Plaintiffs' negligent misrepresentation claim is dismissed for failure to plead with the particularity required by Rule 9(b). Plaintiffs are, however, given leave to amend this claim.

### **Breach of Contract Claim (Sixth Cause of Action)**

Under Arizona law, "'[t]o bring an action for ... breach of ... contract, the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages.'" <u>Thomas v. Montelucia Villas, LLC</u>, 302 P.3d 617, 621 (Ariz. 2013) (quoting <u>Graham v. Asbury</u>, 540 P.2d 656, 657 (Ariz. 1975)). Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance

---

[71]First Amended CCA Complaint at 91, ¶¶ 365-371, Docket No. 107.

or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." Oasis West Realty, LLC v. Goldman, 250 P.3d 1115, 1121 (Cal. 2011).

Plaintiffs allege that "[d]efendants offered to provide reliable, ready-for-market testing services using proprietary Theranos technology, in exchange for submission to blood draws ... and payment of financial compensation...."[72] Plaintiffs allege that they accepted this offer by submitting to blood draws and paying money for the Theranos test results.[73] Plaintiffs allege that defendants breached their contracts with plaintiffs by failing to deliver reliable, ready-for-market testing services, by conducting blood tests using traditional methodologies instead of the promised minimally invasive methodology, by using equipment that did not meet quality standards, by not tendering services with reasonable care and workmanlike effort, and by failing to timely notify them that their tests results were not accurate.[74]

Defendants argue that plaintiffs have not alleged that there was an enforceable contract between plaintiffs and Walgreens and/or Theranos. While plaintiffs have generally alleged that there was "an offer, an acceptance, [and] consideration," for there to be an enforceable contract, there must also be "sufficient specification of terms so that the obligations involved can be ascertained." Rogus v. Lords, 804 P.2d 133, 135 (Ariz. Ct. App.

---

[72]First Amended CCA Complaint at 92, ¶ 375, Docket No. 107.

[73]First Amended CCA Complaint at 93, ¶ 381, Docket No. 107

[74]First Amended CCA Complaint at 93-94, ¶ 382, Docket No. 107.

1991).  Plaintiffs allege that the terms of their contracts "were set forth, in among other places, the Theranos direct testing order forms ..., the Theranos guide to direct testing ..., and in marketing materials and other statements by [d]efendants regarding Theranos's testing services...."[75]  Defendants argue that none of these sources provide the basis for an enforceable contract.

As for the "direct testing order forms", although plaintiffs allege that "the consumer needed to complete a one-page 'Theranos direct testing order form[,]"[76] no plaintiff alleges that he or she actually completed such a form.  Moreover, several of plaintiffs would not have needed to complete the direct testing order form because they allege that they received their testing pursuant to a healthcare provider's order.[77]  The direct testing form provides that it is "[f]or use only by guests in Arizona who are ordering tests without a physician's orders."[78]  Similarly, the guide to direct testing would have only been given to persons who were ordering a test "without a lab order."[79]  It is not plausible that the direct testing materials provided the terms of the alleged contracts.

---

[75]First Amended CCA Complaint at 92, ¶ 376, Docket No. 107.

[76]First Amended CCA Complaint at 24, ¶ 76, Docket No. 107.

[77]First Amended CCA Complaint at 55, ¶ 162; 57, ¶ 175; 59, ¶ 188; 61, ¶ 202; 63, ¶ 216; 66, ¶ 240; Docket No. 107.

[78]theranos direct testing order form at 1, Exhibit 11, First Amended CCA Complaint, Docket No. 107.

[79]a guide to direct testing at 1, Exhibit 12, First Amended CCA Complaint, Docket No. 107.

As for the "marketing materials", it may be plausible that the promises that defendants made in their advertising could be considered terms of the parties' contracts. See Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc., No. C-13-1803 EMC, 2013 WL 4530470, at *11 (N.D. Cal. Aug. 26, 2013) (finding that alleged misrepresentations contained in advertisements that were seen by the plaintiffs "became a part of the sales contract"). It may also be plausible that some of the terms of the parties' contracts can be implied and that an implied term would include that the services provided by defendants were market-ready testing services. See Gherna v. Ford Motor Co., 55 Cal. Rptr. 94, 103 (Cal. Ct. App. 1966) ("when a manufacturer engages in advertising in order to bring his goods and their quality to the attention of the public and thus to create a consumer demand, the representations made constitute an express warranty running directly to a buyer who purchases in reliance thereon").

Plaintiffs' amended complaint describes a usual sale-and-purchase of services arrangement. Plaintiffs went to Walgreens, asked for blood tests that defendants had promised would be reliable, and were given blood tests for a fee. Plaintiffs allege that the blood tests they received were not reliable, which is a plausible breach of the sale-and-purchase agreement But, the problem with plaintiffs' breach of contract claim is that plaintiffs have failed to adequately allege which defendants were parties to the alleged contracts. Rather, plaintiffs have generally alleged that "[d]efendants had express and/or

implied contracts with [p]laintiffs[,]"[80] which is insufficient.  See Howard, 2012 WL 6589330, at *2 (dismissing breach of contract claim, in part, because the plaintiffs had failed to identify which defendants were parties to the contract).  It is implausible that plaintiffs contracted with each defendant.

Plaintiffs' breach of contract claim is dismissed.  Plaintiffs are, however, given leave to amend this claim.

### Unjust Enrichment Claim (Seventh Cause of Action)

Under Arizona law, "in order to prevail upon a theory of unjust enrichment, a plaintiff must establish that, (1) plaintiff conferred a benefit upon the defendant; (2) defendant's benefit is at plaintiff's expense; and (3) it would be unjust to allow defendant to keep the benefit."  USLife Title Co. of Arizona v. Gutkin, 732 P.2d 579, 584 (Ariz. Ct. App. 1986). Under California law, "the elements for a claim of unjust enrichment [are] receipt of a benefit and unjust retention of the benefit at the expense of another."  Elder v. Pacific Bell Telephone Co., 141 Cal. Rptr. 3d 48, 61 (Cal. Ct. App. 2012) (citation omitted).

Plaintiffs allege that they "lost money as a result of [d]efendants' conduct alleged herein", that Walgreens and Theranos received revenue, that Holmes and Balwani "personally received at least millions of dollars", and that "[i]t would be inequitable and unjust for [d]efendants to retain the money that they  have received by their conduct."[81]

---

[80]First Amended CCA Complaint at 92, ¶ 377, Docket No. 107.

[81]First Amended CCA Complaint at 94-95, ¶¶ 388-391, Docket No. 107.  Plaintiffs'
(continued...)

First, defendants argue that plaintiffs were required to plead their unjust enrichment claim with particularity because it is grounded in fraud. Defendants argue that the only conduct plaintiffs can be referring to when they refer to "defendants' conduct herein" is defendants' alleged affirmative misrepresentations about the reliability of the Theranos blood tests and defendants' alleged concealment of the true purpose of the tests.

The court concludes that plaintiffs' unjust enrichment claim must be pled with particularity. As to the portion of plaintiffs' unjust enrichment claim which is based on defendants' alleged affirmative misrepresentations, plaintiffs have failed to plead this claim with the required particularity for the same reasons discussed above in connection with plaintiffs' fraud by affirmative misrepresentation claims in the First and Second Causes of Action. The portion of plaintiffs' unjust enrichment claim which is based on defendants' alleged affirmative misrepresentations is dismissed. Plaintiffs are, however, given leave to amend this portion of their unjust enrichment claim.

The portion of plaintiffs' unjust enrichment claim that is based on defendants' alleged concealment of the true purpose of the blood tests has been pled with the required particularity. But, Holmes and Balwani argue that this claim should still be dismissed as to them because such a claim against them is implausible. Although plaintiffs' allegations that Holmes and Balwani received millions of dollars in compensation is based on "information

---

[81](...continued)
unjust enrichment claim may be impacted by the consumer fraud settlement between Theranos and the Arizona Attorney General. See footnote number 29.

and belief", "'[t]he <u>Twombly</u> plausibility standard ... does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant...." <u>Soo Park v. Thompson</u>, 851 F.3d 910, 928 (9th Cir. 2017) (quoting <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010)).  The particular facts about Holmes' and Balwani's compensation, including how the compensation they received as executives of Theranos is tied the alleged concealment,  would be in Holmes' and Balwani's possession and control.  While it is the court's perception that any unjust enrichment claim plaintiffs might assert is potentially very weak (especially under California law), the court cannot conclude, at this time, that such a claim would be implausible as to Holmes and Balwani.

### Aiding and Abetting Fraud Claim against Walgreens (Eighth Cause of Action)

Under Arizona law,

> [c]laims of aiding and abetting tortious conduct require proof of three elements:
>
> "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff;
>
> (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach."

<u>Federico v. Maric</u>, 226 P.3d 403, 405 (Ariz. Ct. App. 2010) (quoting <u>Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund</u>, 38 P.3d

12, 23 (Ariz. 2002)).  Under California law, "[a] plaintiff may state a claim for aiding and abetting an intentional tort if (1) the defendant knew that the primary tortfeasor's conduct constitutes a breach of duty, and (2) the defendant gave substantial assistance or encouragement to the other to so act."  Hunter v. Citibank, N.A., No. C09-02079-JW, 2010 WL 2509933, at *18 (N.D. Cal. Feb. 3, 2010).

Plaintiffs have alleged that Walgreens aided and abetted fraud.[82]  More specifically, they allege that "Theranos, Holmes, and Balwani committed fraud" and that Walgreens' conduct "enabled, substantially assisted, encouraged, and was a substantial factor in, the commission of such fraud."[83]  Because this claim is grounded in fraud, it must be pled with the particularity required by Rule 9(b).  The portion of plaintiffs' aiding and abetting claim which is based on defendants' alleged affirmative misrepresentations is dismissed because, as has been discussed above, plaintiffs have failed to satisfy the requirements of Rule 9(b) as to their fraud by affirmative misrepresentation claims.  Plaintiffs are, however, given leave to amend this portion of their aiding and abetting claim.

As to the portion of plaintiffs' aiding and aiding claim based on allegations of fraud by omission, Walgreens argues that such a claim is not plausible because plaintiffs have not adequately alleged that Walgreens knew that the primary tortfeasors' conduct constituted a breach of duty. Walgreens argues that plaintiffs' allegations actually show that Walgreens

---

[82]First Amended CCA Complaint at 95, Docket No. 107.

[83]First Amended CCA Complaint at 95, ¶ 395, Docket No. 107.

did not know that "Theranos testing was not reliable"[84] because Walgreens was not provided the requisite information to determine if Theranos's blood testing technology was accurate and reliable. For example, plaintiffs allege that "a John Hopkins University scientist ... requested, on Walgreens' behalf, that Theranos provide his researchers with an Edison device so that they could verify the technology for Walgreens [but] the device was never provided."[85] Plaintiffs allege that "[a]s a result, there was no way to compare results from the prototype Edison device to the results of other commercially-available tests."[86] Walgreens argues that by alleging that it was denied the knowledge and information to establish the reliability of Theranos's blood test technology, plaintiffs cannot plausibly allege that Walgreens had <u>actual</u> knowledge that Theranos was misrepresenting that its tests were reliable and ready-for-market. Walgreens insists that plaintiffs have to allege that Walgreens "actually agreed" with Theranos to defraud consumers in order to state a plausible aiding and abetting claim. <u>Hillis v. Heineman</u>, No. CV-09-73-PHX-DGC, 2009 WL 2222709, at *4 (D. Ariz. July 23, 2009).

Plaintiffs allege that if "Walgreens lacked any more detailed knowledge, it was by virtue of Walgreens' own deliberate choices and conduct in ignoring the problems it identified, deliberately failing to follow up on the concerns and information it had, and

---

[84]First Amended CCA Complaint at 95, ¶ 396, Docket No. 107.

[85]First Amended CCA Complaint at 14, ¶ 45, Docket No. 107.

[86]First Amended CCA Complaint at 14, ¶ 45, Docket No. 107.

ceding to Theranos's requests to carry on without further information being provided."[87]

Knowledge that Walgreens knew the conduct they allegedly aided and abetted was fraudulent "may be inferred from the circumstances presented. Actual and complete knowledge of the details of the primary tort may not be necessary in all cases; the knowledge requirement may be satisfied by showing general awareness of the primary tortfeasor's fraudulent scheme." Dawson, 163 P.3d at 1052. Plaintiffs have alleged that Walgreens had a general awareness of the fraud by the Theranos' defendants, in large part because Walgreens identified several red flags that put it on notice that the tests were not market-ready, still in development, and unreliable. For example, plaintiffs allege that when in the summer of 2011, Walgreens sent a delegation to Theranos's Palo Alto headquarters, they were not allowed access to the lab area or the Edison technology; that Colaborate, LLC, the consulting firm hired by Walgreens, issued a report in the fall of 2011, that Walgreens needed more information to assess the proposed partnership between Theranos and Walgreens; and that in 2012, another team from Walgreens visited Theranos but was not allowed inside the lab.[88] These allegations are sufficient to suggest that it is plausible that Walgreens was aware of more than just "suspicious activity" but was actually aware of the alleged fraud. Stern v. Charles Schwab & Co., No. CV-09-1229-PHX-DGC, 2009 WL 3352408, at *7 (D. Ariz. Oct. 16, 2009).

---

[87]First Amended CCA Complaint at 96, ¶ 398, Docket No. 107.

[88]First Amended CCA Complaint at 14-16, ¶¶ 46, 47, 49, 50, Docket No. 107.

## Conspiracy and RICO Conspiracy Claims (Ninth and Eleventh Causes of Action)

Under Arizona law, "'[f]or a civil conspiracy to occur, two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages.'" Hearn v. R.J. Reynolds Tobacco Co., 279 F. Supp. 2d 1096, 1117 (D. Ariz. 2003) (quoting Wells Fargo Bank, 38 P.3d at 36). Under California law, "[t]he elements of a civil conspiracy are: (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from an act done in furtherance of the common design." I-CA Enterprises, Inc. v. Palram Americas, Inc., 185 Cal. Rptr. 3d 24, 36 n.2 (Cal. Ct. App. 2015). A RICO conspiracy claim requires proof of "an agreement involving either a violation of a substantive provision of RICO or a violation of two predicate offenses" and "a showing that the defendant was aware of the essential nature and scope of the enterprise and intended to participate in it." Tonnemacher v. Sasak, 859 F. Supp. 1273, 1277 (D. Ariz. 1994) (citations omitted).

In their Ninth Cause of Action, plaintiffs allege that defendants agreed to commit fraud[89] and in their Eleventh Cause of Action, plaintiffs allege that defendants agreed to commit mail and wire fraud.[90] Defendants argue that these are nothing more than conclusory allegations that defendants entered into an agreement to commit fraud.

---

[89]First Amended CCA Complaint at 97-100, ¶¶ 407-413, Docket No. 107.

[90]First Amended CCA Complaint at 105-106, ¶ 438, Docket No. 107.

Plaintiffs first argue that they have alleged that there was an <u>express</u> agreement between Theranos and Walgreens to commit fraud.[91]  Plaintiffs cite to paragraph 41 of the amended complaint in support, in which they allege that "[i]n or around 2012, Theranos entered into a partnership agreement with Walgreens, under which Walgreens invested $140 million in Theranos, $100 million of which was characterized as an 'Innovation Fee,' and Theranos agreed to operate clinics, which it called 'Wellness Centers,' at Walgreens Pharmacies in Arizona and California."[92]  Plaintiffs contend that they have alleged that this agreement was for an unlawful purpose.  For example, plaintiffs allege that "Walgreens and Theranos jointly marketed Theranos testing services to consumers", that defendants knew that consumers would rely on this marketing, and that much of this marketing was false, which defendants knew and which defendants concealed from consumers.[93]  Plaintiffs also specifically allege that "[d]efendants agreed to a partnership through which they would enter the market for direct-to-consumer testing by advertising, promoting, and selling products and

[91]Plaintiffs argue that Holmes and Balwani, in their individual capacities, can be liable for conspiring with each other, Theranos, and Walgreens because there is "[n]o Arizona authority ... to support [a] contention that principals and agents cannot, as a matter of law, be co-conspirators[,]" <u>Morrow v. Boston Mutual Life Ins. Co.</u>, Case No. CIV 06-2635-PHX-SMM, 2007 WL 3287585, at *9 (D. Ariz. Nov. 5, 2007), and under California law, corporate directors and officers "may be held liable, as conspirators or otherwise, for violation of their own duties towards persons injured by the corporate tort."  <u>Doctors' Co. v. Superior Court</u>, 775 P.2d 508, 513 (Cal. 1989).  But plaintiffs do not argue that there was an express agreement between either or both of the individual defendants and any of the corporate defendants.

[92]First Amended CCA Complaint at 13, ¶ 41, Docket No. 107.

[93]First Amended CCA Complaint at 30-31, ¶¶ 87-91; 53, ¶ 156; Docket No. 107.

services that consumers would use to make decisions about their health, while knowing that the products and services provided were not as advertised and were unreliable, and that their promotions and other statements in marketing such products and services were false, misleading, and/or unproven."[94]

In making the foregoing argument, plaintiffs have, in effect, conceded that the express agreement between Theranos and Walgreens is the Master Services Agreement ("MSA"), which only defines a lawful commercial relationship between Theranos and Walgreens. It would be implausible, in light of the MSA, for there to be an express agreement between Theranos and Walgreens for an unlawful purpose. The portion of plaintiffs' conspiracy claims which are based on an express agreement are dismissed. Plaintiffs are not given leave to amend this portion of their conspiracy claims as amendment would be futile.

Plaintiffs next argue that they have adequately alleged that there was a "tacit" agreement between defendants to commit fraud. "'Although an express agreement need not be shown for a plaintiff to prevail on a civil conspiracy claim, there must be at least a tacit understanding.'" S. Union Co. v. Southwest Gas Corp., 165 F. Supp. 2d 1010, 1021 (D. Ariz. 2001) (quoting In re Sunset Bay Associates, 944 F.2d 1503, 1517 (9th Cir. 1991)). Plaintiffs argue that the allegations of the "'[c]oordination between'" defendants "'is strong circumstantial proof of [a tacit] agreement; as the degree of coordination between conspirators rises, the likelihood that their actions were driven by an agreement increases.'"

---

[94]First Amended CCA Complaint at 97-98, ¶ 407, Docket No. 107.

<u>Joshua David Mellberg LLC v. Will</u>, No. CV-14-02025-TUC-CKJ, 2016 WL 944958, at *9 (D. Ariz. Mar. 14, 2016) (quoting <u>United States v. Iriarte-Ortega</u>, 113 F.3d 1022, 1024 (9th Cir. 1997)).

It is implausible that Walgreens and Theranos would enter into an express agreement for a legitimate purpose and then defendants would reach a tacit understanding to commit fraud. The contention that there was a tacit agreement between some or all of the defendants is implausible in light of the fact that the MSA fully explains the interactions between Theranos and Walgreens. The portion of plaintiffs' conspiracy claims which are based on a tactic agreement between defendants are dismissed. Plaintiffs are not given leave to amend this portion of their conspiracy claims as amendment would be futile.

### RICO Claim (Tenth Cause of Action)

"The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" <u>Grimmett v. Brown</u>, 75 F.3d 506, 510 (9th Cir. 1996) (quoting 18 U.S.C. §§ 1964(c), 1962(c)). "'Racketeering activity' is defined in 18 U.S.C. § 1961(1)(B) as including any act 'indictable' under certain enumerated federal criminal statutes, including 18 U.S.C. § 1341, which makes mail fraud a criminal offense, and 18 U.S.C. § 1343, which makes wire fraud a crime." <u>Schreiber Distributing Co.</u>, 806 F.2d at 1399. Rule 9(b) "applies to civil RICO fraud claims." <u>Edwards v. Marin Park, Inc.</u>, 356 F.3d 1058, 1066 (9th Cir. 2004). "[A]llegations of mail fraud under section

1962(a)–1962(c) 'must identify the time, place, and manner of each fraud plus the role of each defendant in each scheme.'" Schreiber Distributing Co., 806 F.2d at 1401 (quoting Lewis v. Sporck, 612 F. Supp. 1316, 1325 (N.D. Cal. 1985)). And, "Rule 9(b) requires that the plaintiff allege a wire fraud claim with particularity, stating the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Sebastian Int'l, Inc. v. Russolillo, 186 F. Supp. 2d 1055, 1066 (C.D. Cal. 2000).

Defendants argue that plaintiffs have failed to satisfy the heightened pleading requirements of Rule 9(b) as to their RICO claim because plaintiffs have not identified the allegedly fraudulent statements that were made through the mails or wires or the specific time and place of such communications. As for their wire fraud allegations, plaintiffs have identified specific fraudulent statements made on Walgreens' website and when those statements were made. Plaintiffs allege that in March 2014, "Walgreens' website stated that the Theranos technology supported 'better, more informed treatment.'"[95] Plaintiffs have also attached to the amended complaint a joint press release, dated September 9, 2013, by Walgreens and Theranos that plaintiffs contend was on Theranos's website and which contained statements such as "Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples" and that "Theranos' service offers affordable certified lab testing with quicker response times[.]"[96] Thus, plaintiffs have alleged

---

[95] First Amended CCA Complaint at 23-24, ¶ 73, Docket No. 107.

[96] Exhibit 5, First Amended CCA Complaint, Docket No. 107.

two acts of wire fraud with particularity. Plaintiffs' other allegations as to misrepresentations made on Theranos' website do not meet the heightened pleading requirements of Rule 9(b) because plaintiffs have not alleged when these statements were made.[97]

As for mail fraud, plaintiffs argue that they have adequately alleged mail fraud because they have alleged that blood samples were sent through the mail. Plaintiffs cite to paragraph 99 of the amended complaint in which they allege that "[b]ecause Theranos did not have FDA approval to conduct tests on the Edison device outside of a laboratory setting [with one exception], when [d]efendants drew blood at the Wellness Centers, the samples obtained then had to be <u>couriered</u> to one of two centralized labs, either in Newark, California, or Scottsdale, Arizona."[98] This allegation not only says nothing about sending the blood samples in the mail, it does not identify when any particular blood samples were sent nor does it delineate which defendant was responsible for sending any particular blood sample through the mail. Plaintiffs have not alleged any act of mail fraud with particularity.

The portion of plaintiffs' RICO claim which is based on allegations of wire fraud is not dismissed but plaintiffs would be limited to proving this claim based on the two predicate acts discussed above. Plaintiffs may elect to amend this claim to include allegations of additional predicate acts, if plaintiffs can plead those predicate acts with the particularity required by Rule 9(b). The portion of plaintiffs' RICO claim that is based on allegations of

---

[97] First Amended CCA Complaint at 22-23, ¶ 72, Docket No. 107.

[98] First Amended CCA Complaint at 34, ¶ 99, Docket No. 107 (emphasis added).

mail fraud is dismissed.  Plaintiffs are, however, given leave to amend this portion of their RICO claim.

### California Statutory Consumer Protection Claims (Twelfth through Fifteenth Causes of Action)

In their Twelfth Cause of Action, plaintiffs assert a claim based on California's Unfair Competition Law ("UCL").  In their Thirteenth Cause of Action, plaintiffs assert a claim based on California's False Advertising Law ("FAL").  In their Fourteenth Cause of Action, plaintiffs assert a claim based on California's Consumer Legal Remedies Act ("CLRA").  And, in their Fifteenth Cause of Action, plaintiffs assert a California statutory deceit claim.  These claims are asserted on behalf of all plaintiffs.

Defendants argue that the Arizona plaintiffs cannot assert these California state law claims.  Although defendants do not couch their argument in these terms, this is a standing argument.  The issue is whether the Arizona plaintiffs have standing to assert California statutory claims.  "Standing is claim-specific and 'a plaintiff must demonstrate standing for each claim he seeks to press.'"  Harris v. CVS Pharmacy, Inc., No. ED CV 13-02329-AB (AGRx), 2015 WL 4694047, at *4 (C.D. Cal. Aug. 6, 2015) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)).  And contrary to plaintiffs' argument that the court need not decide this issue now, because standing is a jurisdictional requirement, the court must take up this matter now.

"To meet [their] burden of proving standing under [California] law, [the Arizona plaintiffs] must show some plausible basis for invoking that foreign law."  Id. at *4.  The

only possible basis for applying California law to any of the Arizona plaintiffs is that some of the plaintiffs (B.B., D.L., B.P. and R.G.) allege that "upon information and belief", some of their blood tests "were conducted" at the Theranos lab in California.[99]

"Because [Arizona's] choice-of-law rules apply in this diversity action, [p]laintiff[s] may only apply [California] law to [their] alleged injury if [California's] interest in applying its consumer protection laws in [Arizona] outweigh [Arizona's] interest in applying its own consumer protection laws in [Arizona]." Id. at *5. "Courts consistently examine the specific claims made in a particular case to determine whether a claim under a consumer protection statute should be treated as a tort or a contract action for choice of law purposes." In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig., 155 F. Supp. 2d 1069, 1078-79 n.6 (S.D. Ind. 2001). Here, plaintiffs' California statutory consumer protection claims are most analogous to tort claims for fraudulent or negligent misrepresentation, fraud, and common law unfair competition. "Arizona courts apply the Restatement (Second) of Conflict of Laws ... to determine the controlling law for multistate torts." Bobbitt v. Milberg LLP, 801 F.3d 1066, 1070 (9th Cir. 2015). "The Restatement instructs courts to look to the state that has 'the most significant relationship to the occurrence and the parties' of any tort claim." Id. (quoting Restatement (Second) of Conflict of Laws § 145(1)).

---

[99]First Amended CCA Complaint at 57, ¶ 178; 59, ¶ 191; 61, ¶ 205; 69, ¶ 258; Docket No. 107.

The "especially relevant contacts" to be considered include:

1. The place where the injury occurred;

2. The place where the conduct causing the injury occurred;

3. The domicile, residence, nationality, place of incorporation and place of business of the parties;

4. The place where the relationship, if any, between the parties is centered.

Id. (quoting Bates v. Superior Court, 749 P.2d 1367, 1370 (Ariz. 1988)).  Here, the injury to the Arizona plaintiffs occurred in Arizona because that is where they were allegedly deceived, that is where they saw the alleged false advertising, and that is where they purchased the Theranos tests.  Arizona is also where most of the conduct causing injury occurred, and it is where the Arizona plaintiffs reside.  While some of the defendants are alleged to be domiciled in California, the Arizona plaintiffs' relationship with defendants is centered in Arizona.  The only connection any of the Arizona plaintiffs have with California is that some of their blood samples may have been sent to California for testing. This is not a sufficient contact to justify applying California law to the conduct of which the Arizona plaintiffs complain.  The Arizona plaintiffs do not have standing to bring claims under California's consumer protection statutes.  The Arizona plaintiffs' California claims in the Twelfth through Fifteenth Causes of Action are dismissed without leave to amend as amendment would be futile.

Defendants next argue that the sole California plaintiff, A.R., also does not have standing to assert these California statutory claims. "[S]tanding requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) the injury is 'fairly traceable' to the challenged conduct, and (3) the injury is 'likely' to be 'redressed by a favorable decision.'" Bates v. United Parcel Service, Inc., 511 F.3d 974, 985 (9th Cir. 2007) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). "When confronted with a motion to dismiss for want of standing, the court must accept each material allegation in the complaint as true and construe the complaint in favor of the complainant." Urantia Found. v. Maaherra, 895 F. Supp. 1328, 1328 (D. Ariz. 1995).

Defendants argue that A.R. has not alleged that he suffered a concrete and particularized injury. A.R. alleges that he purchased Theranos blood tests, that he paid $41.79 for the tests, and that the tests indicated that "his Vitamin D levels were low, his blood sugar high, and his LDL (cholesterol) level was high[.]"[100] A.R. further alleges that his doctor prescribed medication as a result of the Theranos tests and that "[t]he medication that A.R.'s doctor prescribed to supplement his Vitamin D levels caused excess absorption and buildup of calcium in A.R.'s blood, and caused pain and other adverse effects to A.R."[101] A.R. alleges that "[a]pproximately one year before having his blood tested by Theranos, [he]

---

[100]First Amended CCA Complaint at 54-55, ¶¶ 161, 163, 166, Docket No. 107.

[101]First Amended CCA Complaint at 55, ¶ 166, Docket No. 107.

had his blood tested by another company, and the results showed that A.R.'s blood contained a normal level of Vitamin D."[102]  A.R. alleges that "[t]he Theranos tests that [he] purchased were unreliable and/or inaccurate" and that after so learning, "he revisited his doctor, and had his blood tested by another company.  The results reflected that he is healthier than the Theranos tests had indicated."[103]  A.R. alleges that he suffered anxiety and emotional distress "as a result of the unreliable Theranos blood tests he purchased...."[104]

Defendants argue that these allegations, assuming they are true, do not establish that A.R. was injured as a result of an unreliable and/or inaccurate Theranos blood test. Defendants argue that A.R.'s allegations do not plausibly establish that he received inaccurate test results.  Defendants point out that A.R. does not allege that Theranos voided or corrected any of his test results, that his non-Theranos test results were accurate, or how the non-Theranos test showed that he was "healthier."  Defendants contend that A.R. has not alleged any facts that would lead to an inference that any of his test results were inaccurate when they were reported and that in order to have standing, he must allege that the tests he received were, in fact, inaccurate.  Defendants argue that A.R. cannot rely on the fact that other individuals may have received inaccurate test results because that is not a concrete and particularized injury.  Defendants insist that A.R.'s allegations of injury in fact are based

---

[102]First Amended CCA Complaint at 55, ¶ 166, Docket No. 107.

[103]First Amended CCA Complaint at 56, ¶¶ 167-168, Docket No. 107.

[104]First Amended CCA Complaint at 56, ¶ 172.

"entirely on a risk of harm to other consumers", which is not sufficient for standing purposes. Shields, 2015 WL 7272672, at *6.

A.R. has adequately alleged an injury in fact. A.R. has alleged that he became aware of the reports about problems with Theranos blood tests, that he believed that his Theranos blood tests were unreliable, that he became anxious over the situation, and that he had his blood retested. This is an adequate statement of both a monetary loss and an allegation of a physical injury caused by the alleged unreliability of the Theranos blood tests.

But even if A.R. has adequately alleged standing as to the California statutory claims, which he has, defendants argue that all of these claims should be dismissed for failure to comply with Rule 9(b). The UCL "prohibits any 'unlawful, unfair or fraudulent business act or practice.'" Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Cal. Bus. and Prof. Code § 17200). "Rule 9(b)'s particularity requirement applies to each of the three prongs of the UCL ('unlawful,' 'unfair,' and 'fraudulent') where, as here, the claims are based on a 'unified course of fraudulent conduct.'" Rosado v. eBay Inc., 53 F. Supp. 3d 1256, 1265 (N.D. Cal. 2014) (quoting Kearns, 567 F.3d at 1126–27). "To meet Rule 9(b)'s heightened standard, a plaintiff must allege with specificity that purported misrepresentations: (1) were relied on by [the p]laintiff; (2) were material; (3) influenced [the p]laintiff's decision to purchase [the defendants'] product; and (4) were likely to deceive members of the public." Id.

The FAL "prohibits any 'unfair, deceptive, untrue, or misleading advertising.'"

Williams, 552 F.3d at 938 (quoting Cal. Bus. and Prof. Code § 17500).

> To state a claim under the FAL, a plaintiff must plead facts
> showing that he/she has standing by establishing an economic
> injury, which was caused by false advertising that is the grava-
> men of the claim, [and] plead misrepresentation with particular-
> ity by identifying actionable advertising likely to deceive and
> showing actual reliance on such advertising[.]

Smith v. LG Elecs. U.S.A., Inc., No. C-13-4361 PJH, 2014 L 989742, at *10 (N.D. Cal.

March 11, 2014). "Rule 9(b)'s heightened pleading standards apply to claims for violation

of the ... FAL," when, as here, those claims "are grounded in fraud." In re Ferrero Litig., 794

F. Supp. 2d 1107, 1114 (S.D. Cal. 2011).

> [T]he CLRA prohibits a person from "[r]epresenting that goods
> or services have sponsorship, approval, characteristics, ingredi-
> ents, uses, benefits, or quantities which they do not have,"
> "[r]epresenting that goods or services are of a particular
> standard, quality, or grade ... if they are of another," [and]
> "[a]dvertising goods or services with intent not to sell them as
> advertised[.]"

Yastrab v. Apple Inc., 173 F. Supp. 3d 972, 977 (N.D. Cal. 2016) (quoting Cal. Civ. Code

§§ 1770(a)(5), (a)(7), (a)(9), (a)(16)). "'Three elements are necessary to state a claim under

the CLRA: misrepresentation, reliance, and damages.'" Id. (quoting Yastrab v. Apple Inc.,

No. 5:14–cv–01974–EJD, 2015 WL 1307163, at *4 (N.D. Cal. Mar. 23, 2015)). "Rule 9(b)'s

heightened pleading standards apply to claims for violations of the CLRA...." Kearns, 567

F.3d at 1125.

"California Civil Code § 1709 provides damages for 'fraudulent deceit,' stating that '[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.'" <u>Diaz v. Fed. Express Corp.</u>, 373 F. Supp. 2d 1034, 1066–67 (C.D. Cal. 2005).  In order to prevail on this statutory claim, a plaintiff must prove all the elements of a common law fraud claim, <u>id.</u>, which means that Rule 9(b)'s heightened pleading requirements apply to a California statutory deceit claim.

A.R. has failed to plead his California statutory claims with the required particularity.  All A.R. alleges is that "he relied on the representations in [d]efendants' materials regarding the reliability of [d]efendants' services."[105]  He does not identify which defendants made the alleged misrepresentations.  Although A.R. may be attempting to rely on defendants' alleged omissions in connection with these claims, that is not entirely clear from the amended complaint in which it is only alleged that "plaintiffs" were deceived by defendants' omissions and that "plaintiffs" relied on these omissions.[106]  Such allegations are not sufficient for Rule 9(b) purposes for claims being asserted by a single plaintiff.  A.R.'s California statutory claims are dismissed.  A.R., however, is given leave to amend these claims.

Because A.R.'s UCL claims are being dismissed pursuant to Rule 9(b), the court need not address defendants' argument that these claims should be dismissed because A.R. cannot

---

[105]First Amended CCA Complaint at 55, ¶ 162, Docket No. 107.

[106]First Amended CCA Complaint at 107, ¶ 446; 110, ¶ 464; 112, ¶ 478; Docket No. 107.

show that he is entitled to any relief. Were the court to have addressed this argument, it would have concluded that it was at least plausible that A.R. would be entitled to restitution because under the UCL, "it is not essential that money be paid directly to the recipient by the party seeking restitution." Shersher v. Superior Court, 65 Cal. Rptr. 3d 634, 641 (Cal. Ct. App. 2007). The UCL only requires that "the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means." Id.

### Human Subjects Act Claim (Seventeenth Cause of Action)[107]

California's Protection of Human Subjects in Medical Experimentation Act ("the Human Subjects Act") "was based on a legislative finding of a growing need to protect citizens from unauthorized medical experiments. This legislation, enacted in 1978, was intended 'to provide minimum statutory protection for the citizens of this state with regard to human experimentation and to provide penalties for those who violate such provisions.'" Daum v. SpineCare Medical Group, Inc., 61 Cal. Rptr. 2d 260, 272 (Cal. Ct. App. 1997) (quoting § 24171, subd. d). "Section 24175(a)" of the Act "provides in part that 'no person shall be subjected to any medical experiment unless the informed consent of such person is obtained.'" Moorer v. Stemgenex Medical Group, Inc., Case No. 3:16-cv-02816-AJB-NLS, 2017 WL 1281882, at *11 (S.D. Cal. Apr. 6, 2017). "'Informed consent' under section 24173 requires 'a written consent form ... be signed and dated, and the subject ... be informed both verbally and within the written consent form of certain enumerated facts regarding the

_____

[107]This claim is only asserted by A.R.

-51-

proposed medical experiment.'" Id. (quoting Perez v. Nidek Co., Ltd., 657 F. Supp. 2d 1156, 1163 (S.D. Cal. 2009)). "To qualify as a 'medical experiment,' the use of a device must be 'in the practice or research of medicine in a manner not reasonably related to maintaining or improving the health of the subject or otherwise directly benefitting the subject.'" Id. (quoting Cal. Health & Safety Code § 24174(a)).

A.R. alleges that "[d]efendants violated the Human Subjects Act by failing to obtain informed consent prior to conducting medical experiments" on him.[108] Defendants argue that A.R. has failed to state a plausible human experimentation claim because their conduct does not fall within the narrow scope of the Act. Defendants contend that the Human Subjects Act "deals with experiments on human subjects in the course of pure research[,]" Trantafello v. Med. Ctr. of Tarzana, 227 Cal. Rptr. 84, 87 n.2 (Cal. Ct. App. 1986), and that A.R. cannot plausibly contend that the blood tests offered at Theranos Wellness Centers were "pure research."

Plaintiffs argue, however, that there is no requirement that the conduct at issue be "pure research" in order for conduct to fall within the scope of the Act. Plaintiffs point out that this language comes from a footnote in Trantafello and that the plaintiff there was not pursuing a Human Subjects Act claim, but rather a medical malpractice claim. Id. at 85. Plaintiffs argue that the "pure research" language in Trantafello was clearly dicta and thus does not control the analysis of whether conduct falls within the scope of the Act.

---

[108]First Amended CCA Complaint at 118, ¶ 512, Docket No. 107.

But as the only published California state court case on this issue, the court finds this dicta persuasive and concludes that the Human Subjects Act only applies to experiments done in the course of pure research. A.R. cannot plausibly allege that the Theranos blood tests were being conducted for pure research.

Perez v. Nidek Co., 711 F.3d 1109 (9th Cir. 2013), is instructive on this issue. There, the plaintiffs each had eye surgery with "a Nidek EC–5000 Excimer Laser System ('the Laser') to correct farsightedness. Id. at 1112. "They claim[ed] that, at the time of their surgeries, they did not know the FDA had not approved the Laser for this use. According to the Complaint, had they known, they would not have consented to the surgeries." Id. The plaintiffs brought a claim under the Human Subjects Act and the parties disagreed as to "whether the surgeries were performed 'in the practice ... of medicine in a manner not reasonably related to maintaining or improving the health of the subject or otherwise directly benefitting the subject.'" Id. at 1114 (quoting § 24174(a)). The court rejected the plaintiffs' argument that the eye surgeries in question were not reasonably related to maintaining or improving their health because they alleged "that the procedures were undertaken 'to attempt to correct [] farsightedness.' [The plaintiffs] admit[] that the surgeries had a therapeutic purpose" and they did not "claim that this therapeutic purpose was merely incidental to a broader research goal...." Id. at 1115.

Similarly here, A.R. has alleged that the blood tests he purchased had some therapeutic purpose. As discussed above in more detail, plaintiffs have alleged that

defendants had a dual purpose for the blood tests. And, in particular, as to the therapeutic purpose, A.R. alleges that his doctor prescribed medicine as a result of his Theranos blood test, which indicates that the blood tests were not being conducted for pure research. The blood tests were reasonably related to maintaining or improving the health of A.R., even assuming that the results of his blood tests might have been inaccurate. In short, any allegation that the Theranos blood tests were being conducted for pure research would be implausible.

A.R.'s Human Subjects Act claim is dismissed. A.R. is not given leave to amend this claim as amendment would be futile.

### B.B. , M.P., and A.R. Claims

Defendants argue that B.B., M.P., and A.R. lack standing to assert their tort, conspiracy, and breach of contract claims. "'[A] plaintiff must demonstrate standing for each claim he seeks to press....'" Davis v. Fed. Election Com'n, 554 U.S. 724, 734 (2008) (quoting DaimlerChrysler Corp, 547 U.S. at 352). Defendants argue that these plaintiffs have not alleged an injury in fact.

A.R.'s allegations as to injury are set out above. Because he has adequately alleged injury in fact as to his California statutory claims, A.R. has adequately alleged injury in fact as to his tort, conspiracy, and breach of contract claims.

As for B.B., she alleges that she purchased "eight Theranos blood tests", that she paid $81.04 for these tests, that "[t]he Theranos tests [she] purchased were unreliable and/or

inaccurate[,]" and that "[a]fter learning that her Theranos tests were unreliable and/or inaccurate, she had her blood retested multiple times by another company."[109]  B.B. also alleges that she "suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests she purchased...."[110]  Similarly, M.P. alleges that he purchased Theranos blood tests, that he "paid for the Theranos tests out-of-pocket", that "[t]he tests [he] purchased were unreliable and/or inaccurate" and that he paid to have his blood retested "after learning that the Theranos tests were unreliable and/or inaccurate."[111]  M.P. also alleges that he "suffered emotional distress, stress, and anxiety as a result of the unreliable Theranos blood tests he purchased...."[112]

For the same reasons the court concluded that A.R. has adequately alleged an injury in fact, the court finds that B.B. and M.P. have adequately an injury in fact.  B.B. and M.P. have adequately alleged that they suffered an injury in fact because they believed, based upon publicity, that their blood tests might be inaccurate, they became anxious over the situation, and they had their blood retested.

### Joint Venture or Agency Relationship

Plaintiffs allege that at all relevant times, "Theranos was acting as an agent and co-

---

[109]First Amended CCA Complaint at 56-58, ¶¶ 174, 176, 180, 181, Docket No. 107.

[110]First Amended CCA Complaint at 58, ¶ 185, Docket No. 107.

[111]First Amended CCA Complaint at 64-65, ¶¶ 228, 231, 232, 233, Docket No. 107.

[112]First Amended CCA Complaint at 66, ¶ 237, Docket No. 107.

venturer of Walgreens" and "that Walgreens was acting as an agent and co-venturer of Theranos[.]"[113] Plaintiffs' joint venture contention, however, is foreclosed by the MSA, which provides that "Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise."[114] Any allegation that Walgreens and Theranos were engaged in a joint venture or had an agency relationship is implausible. See, e.g., Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington, 633 F. Supp. 386, 401 (D. Del. 1986) (finding that the parties' Operating Agreement did not create a partnership or joint venture in large part because "the Operating Agreement plainly describes Satellite Financial as an 'independent contractor'"). Plaintiffs' claims against Theranos or Walgreens which are based on a joint venture or agency theory of liability are dismissed. Plaintiffs are not given leave to amend these claims as amendment would be futile.

### Injunctive Relief

A plaintiff must establish standing for each form of relief he requests. DaimlerChrysler Corp., 547 U.S. at 352. "To establish standing for prospective injunctive relief, a plaintiff must demonstrate that '[s]he has suffered or is threatened with a concrete and particularized legal harm coupled with 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" Phillips v. Apple Inc., No. 15-CV-04879-LHK, 2016 WL

---

[113]First Amended CCA Complaint at 7, ¶27, Docket No. 107.

[114]MSA at 17, § 26(a), Exhibit A, Declaration of David R. Singh [etc.], which is appended to Walgreens' Motion to Dismiss, Docket No. 123.

1579693, at *5 (N.D. Cal. Apr. 19, 2016) (quoting <u>Bates</u>, 511 F.3d at 985). "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" <u>Id.</u> (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495–96 (1974)). "[P]laintiffs who were induced into purchasing a product through deceptive advertising must allege intent to purchase the deceptively-advertised product in the future in order to have standing to seek injunctive relief." <u>Id.</u> at *9.

Plaintiffs seek "[a]n order permanently enjoining [d]efendants' misconduct...."[115] Plaintiffs lack standing to seek such relief. No plaintiff has alleged that he or she intends to purchase a Theranos blood test in the future. Moreover, defendants contend that "Theranos no longer conducts blood tests on patients through any of its facilities" and that "Theranos has no intention of resuming its consumer laboratory testing operations."[116]

Plaintiffs' allegations about the miniLab that Theranos is allegedly now developing do not save plaintiffs' request for injunctive relief. Plaintiffs allege, and defendants have confirmed, that Theranos is developing the miniLab. Although Theranos may not plan to offer blood testing using this technology directly to consumers, plaintiffs argue that does not mean that consumers would not be affected by this new product. Plaintiffs seem to be implying that it is possible that they could unwittingly purchase a Theranos blood test in the future because it is possible that their blood could be sent to a lab that is using Theranos's

---

[115]First Amended CCA Complaint at 119, ¶ 2, Docket No. 107.

[116]Taylor Declaration at 1-2, ¶¶ 2-3, which is appended to Theranos Defendants' Motion to Dismiss, Docket No. 122.

miniLab technology. But the fact that Theranos may still be working on a blood testing product does not create a sufficient likelihood of future injury. The possibility that a plaintiff, in the future, could have a blood sample sent to a lab using Theranos technology is nothing more than speculation. In order to be entitled to injunctive relief, plaintiffs must allege that they intend to purchase a Theranos blood test in the future. No plaintiff has so alleged; and any such allegation by any plaintiff would be implausible.

Plaintiffs also contend that they are seeking a second injunction, in the form of an order directing defendants "to promptly and adequately notify [p]laintiffs ... regarding the problems with, and unreliability of, their Theranos tests[.]"[117] Plaintiffs' claims are based on their belief that their own Theranos tests were inaccurate. Thus, plaintiffs are not in need of being told anything more about the accuracy or inaccuracy of their respective Theranos tests. Plaintiffs believe their tests are inaccurate, and any plausible claims that they may eventually plead will go forward on that basis.

## Conclusion

Defendants' motions to dismiss[118] are granted in part and denied in part.

Plaintiffs' 1) fraud by affirmative misrepresentation claims in the First and Second Causes of Action, 2) battery and medical battery claims in the Third and Sixteenth Causes of Action, 3) negligence claim in the Fourth Cause of Action, 4) negligent misrepresentation

---

[117]First Amended CCA Complaint at 119, ¶ 3, Docket No. 107.

[118]Docket Nos. 122 and 123.

claim in the Fifth Cause of Action, 5) breach of contract claim in the Sixth Cause of Action, 6) unjust enrichment claim based on affirmative misrepresentations in the Seventh Cause of Action, 7) aiding and abetting claim based on affirmative misrepresentations in the Eighth Cause of Action, 8) conspiracy claims in the Ninth and Eleventh Causes of Action, 9) RICO claim which is based on allegations of mail fraud in the Tenth Cause of Action, 10) California statutory claims in the Twelfth through Fifteenth Causes of Action, 11) claims against Theranos or Walgreens which are based on a joint venture or agency theory of liability, and 12) requests for injunctive relief are dismissed.  In addition, A.R.'s Human Subjects Act claim in the Seventeenth Cause of Action is dismissed.

Plaintiffs' battery and medical battery claims in their Third and Sixteenth Causes of Action, plaintiffs' conspiracy claims in the Ninth and Eleventh Causes of Action, the Arizona plaintiffs' California statutory claims in the Twelfth through Fifteenth Causes of Action, any claims against Theranos or Walgreens which are based on a joint venture or agency theory of liability, A.R.'s Human Subjects Act claim in the Seventeenth Cause of Action, and plaintiffs' requests for injunctive relief are dismissed with prejudice

Plaintiffs are given leave to amend their 1) fraud by affirmative misrepresentation claims in the First and Second Causes of Action, 2) negligence claim in the Fourth Cause of Action, 3) negligent misrepresentation claim in the Fifth Cause of Action, 4) breach of contract claim in the Sixth Cause of Action, 5) unjust enrichment claim which is based on allegations of affirmative misrepresentations in the Seventh Cause of Action, 6) aiding and

abetting claim which is based on affirmative misrepresentations in the Eighth Cause of Action, and 7) RICO claim in the Tenth Cause of Action either in whole or in part. In addition, A.R. is given leave to amend his California statutory claims in the Twelfth through Fifteenth Causes of Action.

Should plaintiffs elect to file a second amended complaint, plaintiffs' second amended consolidated class action complaint shall be filed on or before July 13, 2017. Should plaintiffs elect to file a second amended complaint, they are reminded that it is not necessary to replead "[c]laims dismissed with prejudice and without leave to amend ... to preserve them for appeal." Lacey v. Maricopa Cty., 693 F.3d 896, 928 (9th Cir. 2012).

DATED at Anchorage, Alaska, this 13th day of June, 2017.

/s/ H. Russel Holland
United States District Judge