IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re ) | No. 2:16-cv-2138-HRH |
| ) | (Consolidated with |
| Arizona THERANOS, INC., Litigation, ) | No. 2:16-cv-2373-HRH |
| ) | No. 2:16-cv-2660-HRH |
| ) | No. 2:16-cv-2775-HRH |
| _____) | -and- |
| | No. 2:16-cv-3599-HRH) |

O R D E R

Motion for Reconsideration

Pursuant to LRCiv. 7.2(g), plaintiffs move[1] for reconsideration of two portions of the court's June 13, 2017 order[2] on defendants' motions to dismiss. In a prior order,[3] the court disposed of all the issues raised by plaintiffs in their motion for reconsideration save one. The court decided that, in connection with plaintiffs' battery and medical battery claims, it would "further evaluate the question of whether it made a premature factual determination that research and development was a collateral purpose that would not serve to vitiate plaintiffs' consent."[4] The court permitted the filing of a response and a reply as to this one

---

[1] Docket No. 140.

[2] Docket No. 139.

[3] Docket No. 141.

[4] Id. at 7.

issue only.[5] Defendants have timely filed their responses[6] and plaintiffs have timely filed their reply.[7] Oral argument was requested and has been heard.

Discussion

"The [c]ourt will ordinarily deny a motion for reconsideration of an [o]rder absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence." LRCiv. 7.2(g)(1); see also, Sch. Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993) ("[r]econsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law"). "A motion for reconsideration may not be used to ask the [c]ourt 'to rethink what the court had already thought through—rightly or wrongly.'" Sprint Commc'ns Co., L.P. v. W. Innovations, Inc., 618 F. Supp. 2d 1121, 1122 (D. Ariz. 2009) (quoting Defenders of Wildlife v. Ballard, 73 F. Supp. 2d 1094, 1115 (D. Ariz. 1999)).

The sole issue here is whether the court committed clear or manifest error[8] by making a premature factual determination in connection with plaintiffs' battery and medical battery claims. "'[M]anifest error' is 'an error that is plain and indisputable, and that amounts to a

---

[5]Id.

[6]Docket Nos. 144 and 145.

[7]Docket No. 146.

[8]"Manifest error is, effectively, clear error." Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc., 282 F.R.D. 216, 231 (D. Ariz. 2012).

complete disregard of the controlling law or the credible evidence in the record.'" Estrada v. Bashas' Inc., No. CV-02-00591-PHX-RCB, 2014 WL 1319189, at *1 (D. Ariz. Apr. 1, 2014) (quoting Black's Law Dictionary 622 (9th ed. 2009)).

The court dismissed plaintiffs' battery and medical battery claims because "[p]laintiffs' contention that they were not aware of the character of the conduct to which they consented is implausible, even if, as plaintiffs allege, defendants were using plaintiffs' blood samples and test results for research and development purposes."[9] The court found it implausible "that plaintiffs were not aware of the nature of the invasion to which they consented"[10] and that "any use by defendants of plaintiffs' blood samples or test results to evaluate the Edison device or for other research and development purposes was collateral to the blood testing for which plaintiffs plainly gave their consent."[11] The court dismissed the battery and medical battery claims with prejudice because amendment would be futile "in light of the consent that was given" by plaintiffs.[12]

Plaintiffs argue that the court made a premature factual determination that research and development was not the essential purpose for the blood draws to which they consented,

---

[9] Order re Motions to Dismiss at 24, Docket No. 139.

[10] Id. at 24-25.

[11] Id. at 22.

[12] Id. at 25.

-3-

but rather was a collateral purpose. Plaintiffs argue that their allegations that the essential purpose of the blood draws was research and development are plausible.

"Establishing the plausibility of a complaint's allegations is a two-step process that is 'context-specific' and "requires the reviewing court to draw on its judicial experience and common sense." Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 995–96 (9th Cir. 2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "First, a court should 'identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" Id. at 996 (quoting Iqbal, 556 U.S. at 679). "Then, a court should 'assume the[] veracity' of 'well pleaded factual allegations' and 'determine whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679). "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678). "When considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior.'" Id.

> "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."

Id. at 996-97 (quoting In re Century Aluminum Co. Secs. Litig., 729 F.3d 1104, 1108 (9th Cir. 2013)). A "'[p]laintiff's complaint may be dismissed only when defendant's plausible

alternative explanation is so convincing that plaintiff's explanation is <u>implausible</u>.'" <u>Id.</u> at 996 (quoting <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Plaintiffs argue that they have alleged sufficient facts to exclude the possibility that reliable test results were the essential purpose for finger-stick blood draws that were then tested via the Edison device and that they have alleged sufficient facts to contradict defendants' contention that reliable test results were the essential purpose for the venipuncture blood draws as well. Plaintiffs argue that their allegations are sufficient to contradict defendants' contention that reliable test results were the essential purpose for all the blood draws.

Plaintiffs contend that they have alleged that defendants used the blood samples collected from unwitting consumers to avoid the cost of bona fide clinical trials. For example, plaintiffs allege 1) that when the Walgreens Wellness centers were opened, "the Edison devices were not yet beyond the prototype stage,"[13] 2) that the "Theranos technology was still experimental and not ready-for-market at the time it was released[,]"[14] 3) that "[o]ffering blood tests to the general public enabled [d]efendants to collect blood samples from human subjects without sacrificing the time and money necessary to recruit volunteers for formal clinical trials[,]"[15] 4) that "in 2016 it was revealed that Theranos had conducted

---

[13]First Amended Consolidated Class Action Complaint at 32, ¶ 95, Docket No. 107.

[14]<u>Id.</u> at 49, ¶ 148.

[15]<u>Id.</u> at 50, ¶ 149.

a study on a blood test for the Zika virus using data that was collected from human test subjects without any IRB approval[,]"[16] and 5) that "[d]efendants' hidden strategy was also designed to avoid the costs associated with alternative methods for obtaining blood samples for research, such as to purchase the samples ... from facilities that have obtained research approval from ethical review boards."[17] Plaintiffs also contend that they have alleged that defendants knew at the time the blood draws were being taken that the Theranos technology, particularly the Edison device, did not work. Plaintiffs allege that defendants were attempting to compete "in the lucrative laboratory testing market" and that they prematurely marketed their testing services.[18] Plaintiffs allege that Theranos has endeavored to keep the fact that its technology was not ready-for-market by withholding the technology from any kind of public or peer review,[19] by not allowing Walgreens' experts to test the actual Edison device,[20] and by concealing information from regulatory authorities.[21] Plaintiffs further allege that even after the CMS report about Theranos' California lab became public in 2016,

---

[16] Id. at 50, ¶ 150.

[17] Id. at 50, ¶ 151.

[18] Id. at 49, ¶ 146.

[19] Id. at 9-10, ¶ 33.

[20] Id. at 14, ¶¶ 44-45.

[21] Id. at 31, ¶ 91.

defendants continued to take blood samples.[22] Plaintiffs insist that these allegations tend to exclude the possibility that the essential purpose for the blood draws was to provide consumers with reliable test results.

Plaintiffs argue that their allegations not only tend to exclude the possibility that reliable test results were the essential purpose for the blood draws but also support their contention that research and development was the essential purpose. For example, plaintiffs have alleged that Theranos has claimed that it has data showing the correlation between finger-stick and venipuncture tests.[23] Plaintiffs contend that this data could only have come from research using finger stick blood samples and they allege that the only way Theranos could have gotten these samples was from consumers who paid for blood tests at the Wellness centers.[24] Plaintiffs also point out that they have alleged that Theranos "corrected" thousands of tests long after the blood had been drawn,[25] which plaintiffs argue means that defendants were keeping blood samples long after any diagnostic testing had been done, which plaintiffs contend creates an inference that defendants were using the blood samples for something other than diagnostic testing. Plaintiffs argue that defendants' theory of the case, that the essential purpose was to provide reliable test results, does not explain why

---

[22]Id. at 37-38, ¶ 111.

[23]Id. at 51, ¶ 152.

[24]Id. at 50-51, ¶¶ 151-152.

[25]Id. at 44, ¶ 135.

samples were kept years after any testing would have been completed. Because their allegations tend to exclude defendants' theory of the case, that the essential purpose of the blood draws was to provide reliable test results, plaintiffs argue that it is plausible that research and development was the essential purpose of all the blood draws, and not a collateral purpose as the court found.

Plaintiffs' research and development allegations focus on the Edison device, which was designed to do blood tests using "tiny" blood samples, not blood samples taken via venipuncture. Other than a vague allegation that Theranos may have been doing comparisons between tests done with "tiny" blood samples and samples taken by venipuncture, plaintiffs have not alleged any facts that would suggest that the purpose of the venipuncture blood draws was research and development. Rather, many of plaintiffs' alleged facts support the alternative explanation offered by defendants, that the essential purpose of the venipuncture blood draws was testing and not Edison research and development. For example, plaintiffs allege that "by the end of 2014, Theranos was using its proprietary Edison devices and nanotainers for only 15 out of 205 tests" and that "[b]y June 2015, Theranos had stopped using the Edison device altogether."[26] Plaintiffs also allege that "customers were receiving venous blood draws" which meant that "Theranos was not in fact using its finger prick Edison devices."[27] These allegations, taken as true, indicate that most of the tests done by

---

[26] Id. at 33, ¶ 97.

[27] Id. at 33, ¶ 98.

Theranos were not being run on the Edison device, which directly contradicts plaintiffs' assertion that the essential purpose for the venipuncture blood draws was research and development related to the Edison device. In addition, plaintiffs have alleged that "over 90 percent of Theranos's testing was done at its Scottsdale lab", which "only performed analyses on venipuncture tests" and that Theranos "outsourced certain 'highly complex' tests to third-party, university-affiliated labs[.]"[28] Based on these allegations, it would not be reasonable for the court to infer that research and development was the essential purpose for the venipuncture blood draws. Plaintiffs have not alleged sufficient facts to "nudge[]" their battery and medical battery claims based on venipuncture draws "across the line from conceivable to plausible[.]" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plaintiffs' battery and medical battery claims based on venipuncture blood draws are implausible and the court did not commit clear error in dismissing these claims with prejudice.

But, plaintiffs have alleged sufficient facts to exclude the possibility that reliable test results were the essential purpose for the finger-stick blood draws. As set out above, plaintiffs have repeatedly alleged in their first amended complaint that the Edison device was not ready for market and thus it is plausible that the essential purpose of the finger-stick blood draws was research and development related to the Edison device. Because these claims are plausible, it was clear error for the court to dismiss them with prejudice.

---

[28]Id. at 34, ¶ 100.

Plaintiffs' motion for reconsideration is granted as to the battery and medical battery claims involving finger-stick blood draws. Upon reconsideration, the court concludes that the battery and medical battery claims involving finger-stick blood draws should be dismissed without prejudice. Although these claims are plausible, plaintiffs have not pled these claims with the particularity required by Rule 9(b). Rule 9(b) applies to the battery and medical battery claims because they are "grounded in fraud." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-04 (9th Cir. 2003). "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged[.]'" United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).

Plaintiffs have not adequately alleged the "who, what, when, where, and how" as to the battery and medical battery claims involving finger-stick blood draws. For example, plaintiffs have not alleged which defendant actually performed the blood draws at issue. Instead plaintiffs generally allege that "[d]efendants performed blood draws...."[29] This type of allegation does not meet the requirements of Rule 9(b). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together...." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). Rather, a complaint must "'inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'" Id. at 764-64 (quoting Haskins v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437, 1439 (M.D. Fla. 1998)).

---

[29]See, e.g., id. at 115, ¶ 496.

Conclusion

Based on the foregoing, plaintiffs' motion for reconsideration[30] is granted in part and denied in part. It is granted as to plaintiffs' battery and medical battery claims involving finger-stick blood draws. It is otherwise denied.

Upon reconsideration, plaintiffs' battery and medical battery claims involving finger-stick blood draws are dismissed without prejudice. Plaintiffs are given leave to amend these battery and medical battery claims. Plaintiffs' battery and medical battery claims involving venipuncture blood draws remain dismissed with prejudice.

Should plaintiffs elect to file a second amended consolidated class action complaint, that complaint shall be filed on or before October 21, 2017. Plaintiffs are again reminded that it is not necessary to replead "[c]laims dismissed with prejudice and without leave to amend ... to preserve them for appeal." Lacey v. Maricopa Cty., 693 F.3d 896, 928 (9th Cir. 2012).

DATED at Phoenix, Arizona, this 28th day of September, 2017.

/s/ H. Russel Holland
United States District Judge

---

[30]Docket No. 140.