### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **In re:  Arizona Theranos** | ) | |
| **Incorporated Litigation** | ) | No.  **2:16-CV-02138-HRH** |
| | ) | |
| | ) | |
| | ) | |
| | ) | Phoenix, Arizona |
| | ) | **September 26, 2017** |
| | ) | 4:00 p.m. |
| | ) | |
| | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE H. RUSSEL HOLLAND, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**MOTION HEARING**</u>

Official Court Reporter:
Robin G. Bobbie, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

3    For the Plaintiffs:
         LIEFF, CABRASER, HEIMANN & BERNSTEIN
         By:  **Roger N. Heller,** Esq.
4        275 Battery Street, 29th Floor
         San Francisco, CA 94111-3339
5
         KELLER ROHRBACK, LLP.
6        By:  **T. David Copley,** Esq.
         1201 3rd Avenue, Ste. 3200
7        Seattle, WA  98101

8

9    For the Defendant Theranos Incorporated:
         WILMER HALE
         By:  **Christopher T. Casamassima,** Esq.
10       350 S. Grand Avenue, Ste. 2100
         Los Angeles, CA 90071
11
     For the Defendants Theranos and Walgreens:
12       LEWIS, ROCA, ROTHGERBER & CHRISTIE, LLP
         By:  **Dan W. Goldfine,** Esq.
13       201 East Washington Street, Ste. 1200
         Phoenix, AZ 85004

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2        (Proceedings begin, 4:00 p.m.)

3            THE CLERK:  Civil case number 16-2138.  In re: Arizona

4    Theranos Incorporated Litigation, on for motion hearing.

5            Counsel, please announce your appearances.                    16:01:22

6            MR. HELLER:  Good afternoon, Your Honor.  Roger Heller

7    on behalf of plaintiffs.

8            MR. COPLEY:  David Copley on behalf of the plaintiffs.

9            MR. CASAMASSIMA:  Good afternoon, Your Honor.  Chris

10   Casamassima on behalf of Theranos.                                    16:01:33

11           MR. GOLDFINE:  Dan Goldfine on behalf of Theranos and

12   Walgreens.

13           THE COURT:  Thank you, gentlemen.  Please be seated.

14           We have scheduled this afternoon oral argument on a

15   motion for reconsideration that you all have briefed.  I think      16:01:49

16   we've suggested -- no, I know we suggested 15 minutes per side.

17   I appreciate your observing that suggestion.

18           And by way of introduction, the plaintiffs in this

19   case contend that the Court impermissibly made a factual

20   determination rather than crediting the plaintiffs' contention     16:02:16

21   that the defendants were drawing blood from the plaintiffs for

22   research and development purposes.

23           MR. CASAMASSIMA:  Your Honor, thank you.  When you

24   speak down, your mike is not picking you up.

25           THE COURT:  Oh.                                               16:02:35

1           MR. GOLDFINE:  Sorry about that.

2           THE COURT:  I appreciate your calling it to my

3    attention.  I didn't hear that I wasn't hearing right.  But it

4    is different now, even for me.

5           Anyway, the problem that we're dealing with here is          16:02:49

6    the line that must be drawn between what is possible when a

7    claim fails, and what is plausible when a claim can go forward.

8    In doing that, we're to assume the veracity of well-pleaded

9    facts, which we have tried today.  We've tried to properly

10   apply our common sense and so forth in evaluating the          16:03:19

11   situation.  Nevertheless, we have recognized in the fact that

12   we're all here this afternoon that there's a potential problem

13   with our decision in the initial ruling on a motion to dismiss

14   brought by the plaintiffs.

15          The question that we have to deal with is whether or          16:03:40

16   not the defendants have plausibly pleaded that their purpose

17   was blood testing as opposed to research and development on the

18   Edison project, more specifically as to those claimants whose

19   test reports came from the old-fashioned vein puncture

20   procedure.  The question that I would have you think about, how          16:04:13

21   can the plaintiffs plausibly claim that blood drawn the old way

22   as opposed to a finger prick, how can they claim that that was

23   research and development for the Edison project?  I'm having

24   trouble with that.

25          Once we get past that, we may still have to deal with          16:04:41

1   a Rule 9 problem, but with that introduction, let's go.  Who is

2   going to talk to me from the plaintiff?

3          MR. HELLER:  It's our motion for reconsideration.  I'm

4   happy to start.

5          THE COURT:  Please.                                    16:04:56

6          MR. HELLER:  Would you like us to use the podium?

7          THE COURT:  Actually, it's a matter of indifference

8   for me, but given my druthers, I'd have you stand up front

9   there.

10         MR. HELLER:  Okay.  Happy to.                          16:05:11

11         Well, Your Honor, we would submit that the question at

12   this stage is whether the Court prematurely resolved what we

13   see as a factual question as to what was the essential or what

14   was collateral purpose.  Respectfully, plaintiffs believe that

15   the Court did prematurely resolve that.  At this stage, at the  16:05:30

16   pleading stage, the question is are there sufficient facts

17   alleged that if true would plausibly support our version of

18   what the essential nature and purpose was, i.e., that it was

19   product development, or some purpose other than testing.  And

20   that would tend to exclude the defendant's explanation, which  16:05:53

21   is that this was all about testing, including for the tiny

22   blood draw universe, and everything else just collateral.  We

23   would respectfully submit that the answer to that question is

24   yes, the allegations are absolutely sufficient.  We would

25   certainly recognize that the claim is strongest, certainly with  16:06:10

respect to the tiny blood draw people.  The people whose blood

was tested on the quote, unquote, tested on the Edison device.

With respect to that group, we have alleged facts that would

support the conclusion, not only that testing was not the

purpose, but if what we allege is true about Edison, Edison was    16:06:32

nowhere near ready.  It was still in development; still in the

product development stage; still in prototype.  So our facts

would support the conclusion that testing could not possibly

have been the true essential purpose, at least for those tiny

blood draws for the Edison folks, and that's because Edison       16:06:53

simply was nowhere near in a position where it could even serve

that purpose.

        And I would refer the Court specifically to the

following allegations in the complaint.

        Paragraph 34:  Edison still in development when it was    16:07:11

prematurely rushed to market.

        Paragraph 54, and 122 to 126:  It had repeatedly

failed internal proficiency tests and there were repeated

manipulations to cover that up.

        Paragraph 58:  Edison was hidden from inspection, and     16:07:29

then the defendants inconspicuously ran away from using it once

they were essentially busted by the government.

        Paragraph 91:  They passed off proficiency tests that

had been wrong on other machines as having been run on Edison,

because they knew that Edison would fail.                         16:07:47

7

```
1              Paragraph 95:  Edison is still in prototype.

2              Paragraph 96:  The FDA denied approval for all 100

3    tests of Edison.

4              Paragraph 106:  Edison still uncleared after they

5    stopped using it even.                                              16:08:04

6              And Paragraph 135:  Every single Edison test voided.

7              And these are not just conclusory allegations, these

8    are substantial facts that are based on investigative reporting

9    by the Wall Street Journal and others, based on information

10   provided by insiders to regulators and to reporters.               16:08:20

11             As I think the Court mentioned, we also alleged that

12   there were other purposes here that were not disclosed, in

13   particular, accelerating the development of the as-yet unready

14   Edison device, and we also allege that they wanted to -- what I

15   would call keeping up appearances.  They wanted to give the        16:08:41

16   impression to their investors, co-investors, potential

17   investors, that they had something going here with Edison.

18   They knew it wasn't ready, but they rushed it to market.  They

19   put it out there anyway to make it look like they had something

20   going.  And they kept that charade going as long as they           16:08:58

21   possibly could, until the government literally stepped in and

22   effectively made them stop, at which point in or around June of

23   2015, they stopped using Edison entirely and they phased out

24   the use of the tiny blood draws.

25             I understand the Court had asked about the non-Edison    16:09:19
```

UNITED STATES DISTRICT COURT

1   folks, the universe of people who were tested in other tests.

2   We completely acknowledge that the claim is strongest with

3   respect to the tiny blood draw people, because for those

4   people, they have what we would argue is a very strong argument

5   that the facts alleged, if they are true -- what we're saying          16:09:37

6   about Edison is true -- that not only was testing not the

7   purpose, the facts -- the facts alleged would support the

8   conclusion that testing could not possibly have been the

9   purpose.

10          With that said, we do contend that we've alleged a          16:09:52

11   viable claim for battery with respect to the non-Edison folks

12   as well, and that's because there are facts alleged still, even

13   for that universe, that would support a conclusion that testing

14   was not the essential nature.  And in particular, that the

15   defendants were primarily using even those non-Edison tests for   16:10:14

16   purposes of calibrating Edison and trying to develop Edison,

17   and also to try to continue to keep this appearance up like

18   they had of viable testing operation.  They effectively needed

19   to keep the machine going.  They needed to have a test out

20   there to make it appear that they were viable.  But we would      16:10:32

21   certainly acknowledge that the claim is clearest and strongest

22   with respect to the folks who are subjected to the tiny blood

23   draws.

24          THE COURT:  You've told me the paragraphs that you're

25   relying on as to the pin-prick side of it.                        16:10:46

1              MR. HELLER:  Yes.

2              THE COURT:  What are the paragraphs you're relying on

3     with respect to the contention that research and development

4     somehow was also the purpose of the old-fashioned testing?

5              MR. HELLER:  Well, sure.  Sure.  I appreciate that,          16:11:03

6     Your Honor, and I would refer the Court to Paragraphs 146 to

7     156, in particular, and there are other -- there are other

8     parts of the complaint that address, I think, both the Edison

9     and non-Edison, and in particular, explain why the regular --

10    what we call venous blood draw tests -- could be used to help      16:11:23

11    try to calibrate and try to, essentially, develop what they

12    weren't otherwise able to develop with Edison.  So that's --

13    that's -- that's the answer to that question.

14             I think what it boils down to here, Your Honor, is

15    that Edison was simply -- the way we've alleged it, and I think   16:11:43

16    our allegations are substantial, they have a really firm basis

17    in investigative reporting.  If what we're alleging is true,

18    that Edison simply could not serve the purpose of testing, and

19    so that could not have been the essential nature or purpose of

20    the test.                                                         16:11:59

21             The other question, I think, that's posed at this

22    stage, although it's not directly raised by the Court's order

23    on the motion for reconsideration, is whether the allegations

24    are sufficient with respect to Walgreens's involvement in the

25    battery.  And at least with respect to the tiny blood draws, we   16:12:15

would submit that the allegations are absolutely sufficient there.  The plaintiffs allege that Walgreens's personnel did the touching.  The plaintiffs allege that Walgreens's personnel stuck these folks with needles and drew blood from their bodies.  That's alleged in the complaint.  The contract between Walgreens and Theranos specifically provides that Walgreens's personnel are going to be administering the blood draws.  Every single one of our plaintiffs, including the two who were subjected to the tiny blood draws, had their blood drawn at a Walgreens facility.

We also allege with respect to Walgreens that Walgreens had knowledge that these folks were operating under a mistake, at least with respect to the tiny blood draws, in terms of what the essential purpose was, and that Walgreens concealed information that contributed to these folks making their mistake.

I'd also point out to the Court that in response to the Court's motion to dismiss order, we intend to file an amended complaint after this is done alleging more detailed affirmative misrepresentations that Walgreens made that also contributed to the mistake that these folks had.  With respect to Walgreens's knowledge and their concealment of information, this Court has already found in the context of the aiding and abetting fraud claim that plaintiffs have sufficiently alleged that Walgreens knew Edison wasn't ready, concealed information

16:12:35
16:12:56
16:13:11
16:13:30
16:13:48

1    from these folks; and that to the extent it lacked any more

2    detailed knowledge, it was by virtue of its own deliberate

3    choice.

4         To the extent the Court feels that any of that needs

5    to be more explicit or could be more explicit, we could          16:14:05

6    certainly do that in an amended complaint.  But we would submit

7    that, at least, with respect to the tiny blood draws, the

8    allegations are absolutely sufficient that -- existing

9    allegations are sufficient.

10        The only other point that I wanted to make, Your           16:14:20

11   Honor, on that is that the Court, in its motion to dismiss

12   order, identified certain allegations which it felt were

13   inconsistent with a battery claim.  All of those allegations,

14   and we address this in our papers, so I don't want to repeat

15   myself too much, but all of those allegations relate to the     16:14:39

16   non-Edison universe; in other words, the non-tiny blood draw

17   folks.  With respect to the approximately 10 percent of the

18   people who were subjected to the tiny blood draws, those

19   allegations have no bearing.

20        Finally, the defendants put a lot of weight on this        16:14:57

21   *Daum* case, and their treatment of *Daum*, I think, is somewhat

22   flawed.  I actually think *Daum* is helpful for us.  I think it

23   creates a very useful comparison, at least where we're talking

24   about the tiny blood draw folks.  In *Daum*, you have a doctor

25   who is treating their patient using a procedure, and there is    16:15:16

1   no dispute, no question, that the nature and purpose of that

2   was treatment.  The plaintiff didn't even dispute that.  There

3   wasn't even a battery claim in *Daum*.  The issue there was that

4   the doctor could have done a better job informing the patient

5   of the full context, in particular, that the procedure there          16:15:34

6   was a clinical trial, which is basically the last stages of the

7   FDA-approval process.  That is nothing like what we have here,

8   at least when we're talking about the tiny blood draws.  Based

9   on what we've alleged, Edison was just entirely unready to

10  serve the purpose of testing.  Defendants knew that.  It was          16:15:52

11  still in prototype, and that's critical here because the

12  mistake, the misrepresentations, the concealment went right to

13  the heart, right to the very essential nature of what this

14  thing was about, at least for the tiny blood draw folks, right?

15  So, in *Daum* you've got somebody consenting to a procedure for       16:16:11

16  treatment, and that's what they got.  They could have been

17  somewhat better informed, but that's what they got.

18          In this case, at least when you're talking about the

19  tiny blood draw folks, they gave their consent under entirely

20  false pretenses about what -- what it was supposed to be about,      16:16:27

21  or even what it was capable of being about, based on what we've

22  alleged.  So it's an entirely different -- it's an entirely

23  different context.

24          So just to summarize, Your Honor, at least with

25  respect to the tiny blood draw folks, we would submit that the       16:16:40

```
1    allegations are sufficient to allow us to proceed on these
2    claims, take discovery on these claims, and to try to prove
3    these claims.  Thank you very much.
4            Does Your Honor have any questions?
5            THE COURT:  No, I started with a question.  Thank you,     16:16:53
6    sir.
7            MR. HELLER:  Thank you.
8            THE COURT:  Over to the defense.
9            MR. CASAMASSIMA:  Good afternoon, Your Honor.
10           THE COURT:  I must confess, I lost your name.             16:17:06
11           MR. CASAMASSIMA:  It's Casamassima is my last name.
12   Yeah, that's one way.  I could give you the proper Italian way,
13   and I would have to use my hands, and it would be a whole
14   thing.
15           THE COURT:  My Italian isn't so good.                    16:17:21
16           MR. CASAMASSIMA:  Well, Your Honor, I think you hit
17   the nail on the head in focusing on sort of how does this claim
18   make any sense with respect to the over 90 percent of the
19   patients that went in and got venipuncture draws and tests at
20   the Theranos Wellness Center, because that goes to whether or   16:17:43
21   not one could plausibly say that the essential purpose for the
22   testing at all was to run this secret R&D program.  I think,
23   you know, just going right to the heart of it, and I'll come
24   back to pick up some of the other points.  You know, Paragraph
25   97, plaintiffs allege that only 15 out of the 205 tests were    16:18:01
```

```
1    done according to the Edison.  And then in 99 and 100,
2    plaintiffs allege that blood tests were done in either
3    Scottsdale or in Newark, and that over 90 percent of the
4    Theranos testing was done in Scottsdale.  And there was no
5    Edison device in Scottsdale, only in Newark.                    16:18:22
6              So right out of the bat, you have people going to get
7    their blood drawn to get tested, for whatever tests they
8    wanted, and those tests were done in Scottsdale, not on the
9    Edison, but on largely, as they allege in Paragraph 113,
10   Siemens lab equipment, other highly complex tests that were    16:18:44
11   sent out to university-affiliated labs.  What plausible reason
12   is there for buying other people's equipment to run tests, and
13   sending out highly complex tests to third parties, other than
14   to generate test results that you could give to your patients?
15   There's no -- there's no plausible R&D secret theory here when  16:19:06
16   Theranos internally says, gee, we want to deliver accurate
17   results, and we're going to have to -- to do that one way or
18   another.  Internally, the testing results from the Edison were
19   -- at least, according to the allegations, not as high as they
20   should have been, and they weren't.  And we regret that.  But   16:19:27
21   that is a different -- that is a much different proposition
22   than saying, and therefore you must make the inferential leap
23   that the purpose for all the testing was to engage in this
24   secret R&D plan, okay?
25             I mean, if you credit the fact that they have alleged 16:19:47
```

1    faulty tests, and that they have alleged knowing faulty tests,

2    that still doesn't mean that it is plausible to then infer that

3    the entire essential purpose of the test was to conduct this

4    secret R&D program.

5            And I direct you, Your Honor, to *Iqbal*.  I mean, this          16:20:05

6    is straight, as you commented on when you sat down.  This is --

7    this is a plausibility analysis and this is -- and what you

8    did, you correctly evaluated the allegations in the complaint

9    and concluded the testing was the essential purpose, and that,

10   therefore, the plaintiffs consented to the testing.  And I          16:20:28

11   think it's right in line with a straightforward application of

12   the principles in *Twombly* and *Iqbal*.  It's not that

13   complicated.  In fact, in *Iqbal*, itself, says that you have to

14   determine whether the claim is plausible in a context-specific

15   way that requires you to draw on your judicial experience and         16:20:51

16   common sense.

17           And there's a case in the Ninth Circuit that I found

18   when I was preparing for hearing, it's called the *Eclectic*

19   *Properties*, 751 F.3d 990, that says you must also consider

20   obvious alternative explanations in making the plausibility           16:21:07

21   determination, and that's exactly what happened here.  That's

22   what you did here.

23           If you take a step back and you start with the second

24   paragraph of their complaint, and the third paragraph of their

25   complaint, the introduction, when they talk about what this           16:21:24

1   case is about, they talk about defendants knew the tests were

2   unreliable and that they intentionally concealed it.  That's

3   what this case is about, and that goes through to the remainder

4   of factual allegations.  We talked about some of the

5   allegations in Paragraphs 97, 99 and 100 about the overwhelming          16:21:45

6   majority of tests that were done pursuant to the venipuncture

7   method that were sent out to ensure their accuracy, and that is

8   consistent with the essential purpose of providing testing to

9   the customers.

10          Also, if you look at, later on in the complaint,                 16:22:05

11  Paragraphs 114, 119, and then 121 through 128, the complaint

12  details allegations that, you know, Theranos's personnel were

13  allegedly unqualified.  Doesn't say they were researchers.  It

14  says the Newark lab was deficient for testing.  It doesn't say

15  it's a research facility.  It details whistleblower complaints          16:22:27

16  by Tyler Shultz, and that Mr. Shultz's complaints were of known

17  inaccuracies and quality control.  They don't talk about an

18  undisclosed R&D program that Mr. Shultz complained about.  That

19  wasn't what the case was about.  That wasn't what Mr. Shultz

20  was blowing the whistle on.  Paragraph 142, again, they talk           16:22:46

21  about reliability problems.

22          But what I think, Your Honor, is most telling, as far

23  as when you take a step back and think about what is your

24  responsibility in determining what's plausible and deciding

25  what you think the plaintiffs case should be going forward             16:23:01

```
 1    which, again, you're obviously entitled to do and required to
 2    do under Iqbal and Twombly.  It's when you look at the
 3    allegations of the individual -- of the individual plaintiffs
 4    and they go from Paragraphs 161 all the way to 293.  So we're
 5    talking about 130 plus paragraphs.  In sum, they allege -- the      16:23:22
 6    plaintiffs -- in consultation with their health care
 7    professionals ordered Theranos tests, consented to the physical
 8    contact that they received, and obtained test results for the
 9    tests that they ordered, some of which were later voided.
10    That's what happened.  That's what Theranos was doing.  It was      16:23:46
11    testing people.
12          Now, again, they want to then say that because the
13    error rate was over 10 percent for the Edison tests that that
14    must mean that all these facts support a hidden R&D human
15    guinea pig theory, or whatever they want to call it.  And I        16:24:05
16    would submit, as you determined in your motion to dismiss, that
17    that's just not plausible.  It does not, in the language of
18    Twombly, nudge the theory from the conceivable to the probable.
19          So what's in there we've talked about?  Well, what
20    isn't in the complaint, Your Honor?  There's no allegation of      16:24:23
21    R&D, and this R&D theory with respect to the venipuncture
22    draws.  It's not there.  There's no allegation of unwanted
23    physical contact.  There's no allegation describing the alleged
24    R&D.  They talk about this R&D effort, but what are they
25    actually talking about?  What are facts there?  We don't even      16:24:44
```

1    know what it is.  They put a label on it.  What are they

2    talking about?  No allegations of what R&D was done with the

3    drawn -- with the blood draw at the wellness center.  So was

4    there a different source of blood?  Maybe, maybe not.  We don't

5    know.  Was all the R&D done with blood drawn from wellness          16:25:02

6    centers, or only some of it?  And importantly, there were no

7    allegations that exclude the possibility.  Again, under

8    *Twombly,* it's one of the things we have to look at, that R&D

9    was done through other means.  Of course there was R&D going on

10   at Theranos at the time.  Like most good -- like most            16:25:20

11   companies, you know, they want to make sure their product is

12   getting better and is good.  So of course they are doing R&D,

13   but there's no allegation to exclude the probability that R&D

14   was done through means other than using the blood drawn through

15   Edison devices.  There's just nothing there.  It's not alleged.  16:25:38

16   No allegations that the alleged R&D was for anything other than

17   improving the accuracy of the tests.  There's really no

18   allegation that Theranos was trying to do anything other than

19   test the customers and improve the quality of those tests.

20         Plaintiffs don't allege, Your Honor, that Theranos was      16:25:54

21   taking the blood and doing something nefarious with it.  They

22   weren't taking the blood and selling it on the black market.

23   They weren't taking the blood because they wanted to.  That's

24   like the *Rains* case.  They were basically torturing plaintiffs

25   because they felt like it, and they wanted to get control        16:26:09

over -- some ulterior motive that didn't have to do with the

therapy.  Here, even under plaintiff's allegations, the tests

themselves are still the essential purpose of the -- of the

alleged R&D.  So here we have a theory of alleged R&D that's --

that's supposed to be some other purpose, but yet it is about                16:26:30

the very tests themselves.  So it's a little bit impossible to

draw this bright line that plaintiffs want to have to do when

the conduct Theranos is being accused of with respect to the

battery claims to vitiate consent is, again, is for the very

tests that plaintiffs consented to take, and requested, and                  16:26:51

received results from.  And there's no case like this the

plaintiffs can cite to you.  There's no analogous authority

where there was no ulterior motive and a claim was sustained.

In fact, Your Honor, no case cited by anyone has held that

where there were dual purposes to a medical procedure, and the               16:27:19

plaintiff consented to the contact that the undisclosed,

non-therapeutic purpose vitiated consent.  There's no case that

holds that.  This case, were the battery claims allowed to

proceed, would deviate from any single case that anybody cited.

The bulk of authority of the *Daum* case, the *Tilousi* case, the            16:27:43

*Cobbs* case, they all say that, you know, you just -- you just

end the analysis at the physical contact, consent for the

physical contact itself.  Here there's no question that the

actual contact was consented to, we're just talking about the

other motives.                                                               16:28:02

1           Your Honor, I think I don't have too much else to say

2      to respond to the bulk of Mr. Heller's points.  I would submit

3      that *Daum* is not an inapposite case.  I think it is the most

4      on-point case.  The plaintiff consented to a physical -- to a

5      procedure, and the surgeon used a spinal implant that was          16:28:25

6      still, you know, under investigation, in the final stages of

7      testing.  And indisputably in that context, part of the purpose

8      of using that device is for testing.  And, you know, consent

9      there wasn't vitiated, despite sort of other purpose that the

10     doctor may have had for using that particular device.             16:28:53

11          Your Honor, I do want to say one thing about

12     Walgreens, and that is I represent Theranos, not Walgreens, but

13     I will take a stab at this, and Mr. Goldfine might want to add

14     to it, but everything we're talking about really relates to

15     Theranos.  I will submit these allegations, they add some          16:29:14

16     allegations about Walgreens's knowledge and, gee, they knew or

17     should have known, or something.  But there's no plausible

18     theory in the complaint that connects Walgreens to this hidden

19     alleged R&D essential purpose theory.  It just isn't there, and

20     it's not going to be there in any amendment.  I mean, it is a      16:29:36

21     huge inferential leap that has no factual basis in the

22     allegations.  There's just no Walgreens specific allegations

23     that make the theory plausible.  They were not Walgreens's

24     tests, not a Walgreens testing device.  Walgreens wasn't

25     involved in the R&D.  Walgreens wasn't involved in the             16:29:54

1    decisions to test using one device or another.  There's just no

2    reasonably plausible motive, and certainly no allegation in the

3    complaint, that allows for the inference that Walgreens

4    implemented wellness centers in its stores for Theranos's R&D

5    purposes.                                                          16:30:12

6            THE COURT:  Walgreens did the blood draws.

7            MR. CASAMASSIMA:  You know the --

8            THE COURT:  Didn't they?

9            MR. CASAMASSIMA:  -- the blood draws were done in the

10   Walgreens Wellness Centers, yes, but there's no allegation that    16:30:23

11   connects knowledge of any -- any Walgreens employee that may

12   have done a blood draw to any knowledge of the purpose of an

13   R&D purpose.  They weren't back doing the R&D.  They weren't

14   running the machine, even if the allegation is that a Walgreens

15   person took the blood, they then would have taken it and sent     16:30:42

16   it to Theranos.  I mean, there's -- so that purpose, I think

17   that illustrates actually that the essential purpose from

18   Walgreens's perspective, or at least the Walgreens person to

19   take the blood, was draw the blood and draw the blood to get it

20   tested.  That person would have had no idea about R&D, and they   16:31:00

21   are not going to allege that a person working in the pharmacy

22   knows about Theranos's R&D.

23           So if you have --

24           THE COURT:  Before you sit down --

25           MR. CASAMASSIMA:  Yeah.                                    16:31:13

UNITED STATES DISTRICT COURT

1    THE COURT:  -- what about your position early on with

2  respect to the motion to dismiss that there was a Rule 9

3  problem?  Should we grant reconsideration?  Are you still

4  wanting to take the position that the complaint is inadequate

5  because of Rule 9 situations?                                    16:31:39

6    MR. CASAMASSIMA:  I certainly stand by the arguments

7  we made in the motion to dismiss with respect to Rule 9.  I

8  think it applies, but I'm not sure -- I want to make sure I'm

9  addressing your question, Your Honor.  I don't know --

10    THE COURT:  I just wondered whether we needed to go      16:31:54

11  through that drill or not if we grant reconsideration.

12    MR. CASAMASSIMA:  You know, Your Honor, I didn't

13  understand that to be the issue at play here, and I don't know

14  if I'm following the context for the question.  But I think, as

15  far as relates to battery claims?                                16:32:11

16    THE COURT:  We dismissed -- we dismissed the battery

17  claims with prejudice.

18    MR. CASAMASSIMA:  Yes, Your Honor.

19    THE COURT:  If we grant reconsideration, there's at

20  least the possibility that we would nevertheless still dismiss,  16:32:22

21  but this time without prejudice and with leave to renew,

22  because of your Rule 9 argument.

23    So my question was:  Do you still really want to go

24  there, or shall we just get on with things if we grant

25  reconsideration?                                                 16:32:44

1    MR. CASAMASSIMA:  Well, Your Honor, I think the claim

2    should be dismissed with prejudice.  I can say that, because I

3    don't think there's any way that they'll be -- that they should

4    be allowed.

5    THE COURT:  I know that's what you want, but if you          16:32:58

6    don't get what you want --

7    MR. CASAMASSIMA:  Okay.

8    THE COURT:  -- are you still insisting upon that

9    there's a Rule 9 problem, the adequacy of the pleading?

10   MR. CASAMASSIMA:  With respect to the battery claim,        16:33:12

11   Your Honor?

12   THE COURT:  Yeah.

13   MR. CASAMASSIMA:  If -- if -- if I'm understanding you

14   correctly, that if you were to say that the complaint -- the

15   battery claims are not dismissed with prejudice, they can      16:33:21

16   replead them, is the question whether or not they would still

17   be subject to Rule 9(b)?  And I think the answer to that is, is

18   to the extent they are premised on a theory of fraud, it would

19   have to be yes.

20   THE COURT:  So, again, my question to you is:  Do you        16:33:40

21   still really want to insist on that, or don't you know enough

22   about the situation that we should just get on with this?

23   MR. CASAMASSIMA:  Oh, I see what you're saying, Your

24   Honor.

25   You know, I think that -- that -- if the question was        16:33:59

UNITED STATES DISTRICT COURT

```
 1   whether we would bring that, another motion to dismiss and
 2   challenge it on that basis, you know, I'd have to see the
 3   amended complaint, but -- but we would certainly consider
 4   dropping the argument.  I'm sorry, Your Honor.  I know I'm
 5   clearly not answering your question, and I apologize if I'm not    16:34:18
 6   following.  I don't know Dan --
 7            THE COURT:  Clearly I have raised something that you
 8   weren't expecting.
 9            MR. CASAMASSIMA:  Yes.  So stipulated, Your Honor.
10            MR. GOLDFINE:  So, Your Honor, I'm not going to take    16:34:30
11   up much time.  He's argued the Walgreens position.  I would
12   like to address the Rule 9 issue on Walgreens.
13            Absolutely to the extent that they are claiming that
14   Walgreens somehow knew about this fraud, Rule 9 applies, I
15   don't think they can meet the standard.  I mean, how is it ever    16:34:46
16   going to be pled that our essential purpose is this alleged
17   fraudulent scheme at Theranos?
18            THE COURT:  The thing that is forefront in my mind is
19   that the complaint, as presently structured, refers to the
20   defendants in gross.  There's a who problem --    16:35:04
21            MR. GOLDFINE:  Correct.
22            THE COURT:  -- there that, I think, can possibly be
23   fixed.  And the question is, do we need to go through that
24   drill?
25            MR. GOLDFINE:  As to Walgreens, the answer is yes.    16:35:19
```

1        THE COURT:  Okay.  Fine.  I understand.  That answers

2   my question.

3        MR. GOLDFINE:  Although I will take a step back and

4   just, in conclusory fashion, it is not even remotely possible

5   that Walgreens's essential purpose could have been the              16:35:33

6   fraudulent R&D scheme that plaintiffs are alleging at Theranos.

7   It makes no sense at all.  Your original opinion on this

8   decision was correct.  And as to Walgreens, you know, and I --

9   you know, I want to be careful because I wear both the hats for

10  Theranos and Walgreens in this litigation.                          16:35:57

11       THE COURT:  I've been curious about that situation.

12       MR. GOLDFINE:  As to Walgreens, the essential purpose

13  cannot be effectively alleged or plausibly alleged or credibly

14  alleged, whatever standard you want to use post-*Twombly* and

15  *Iqbal*, that our essential purposes was Theranos's R&D.            16:36:13

16       THE COURT:  Understood.  Thank you, gentlemen.

17       MR. HELLER:  Could I address a couple points, just

18  real quick?

19       THE COURT:  Couple of minutes to respond.

20       MR. HELLER:  Just a couple minutes, sure.                      16:36:24

21       With respect to the last point, it's not about what

22  Walgreens's motivation was.  If Walgreens had knowledge that

23  these folks were operating under a mistake, the tiny blood draw

24  folks in particular, or if they made misrepresentations or

25  concealments that contributed to that mistake, that's enough        16:36:41

1    for them to be on the hook for liability for battery.  It's not

2    about what their motive is, and I'd refer the Court to

3    Restatement (Second) of Torts Section 13 comment C, Section

4    892B, comment C, and Section 892B, comment H.

5         It's not about their motivation, right?  It's about            16:37:04

6    whether they knew these folks were operating under a mistake or

7    concealed information, or both.  And on that, I would say that

8    this Court has already held in the context of the aiding and

9    abetting fraud claim that plaintiffs sufficiently alleged that

10   Walgreens knew the Edison device wasn't ready, and concealed      16:37:23

11   information from these folks.  These are things the Court has

12   already held in the context of this other claim.

13        With respect to the 9(b) point, I think there is no

14   9(b) issue at all.  These guys know exactly what we're talking

15   about.                                                            16:37:40

16        With respect to your point, Your Honor, about using

17   the phrase "defendants" instead of breaking them out

18   individually, we totally understand the Court's concern when it

19   comes to the affirmativeness misrepresentations issue, and we

20   intend to address that in our amended complaint.  When you're    16:37:54

21   talking about affirmative misrepresentations, I can understand

22   wanting to know who exactly said these things and when, right?

23   That's understandable that the Court would want to know which

24   defendant.  But when we talk about knowledge of the mistake, we

25   are saying both of these defendants knew and we can -- we can,   16:38:13

1    in our amended complaint, easily say Walgreens and Theranos

2    knew, but they are not really separate allegations in the same

3    ways as they would be, like, for an affirmative statement,

4    right?  Both of them knew, and I think this Court has already

5    held that that's sufficiently pled for both of these defendants       16:38:30

6    in the context of other claims.

7            Defendants talk a lot about the hidden research and

8    development program and how we haven't alleged details about

9    it.  Well, first of all, I don't know how we would know any

10   more about it, given how secretive these companies are about        16:38:46

11   this stuff.  But the broader point I would make is, we don't

12   need to know the exact alternative purpose that these blood

13   draws served at this stage.  It's sufficient for us to allege

14   sufficient facts that, if true, support that testing was not

15   the essential nature or purpose, because everybody, I think         16:39:07

16   there's no dispute, that the folks who submitted to these blood

17   draws, including the tiny blood draw people, believed this was

18   about testing.  We've alleged facts, that if true, support the

19   conclusion that testing simply could not have been the purpose,

20   because Edison was nowhere near in any sort of position to          16:39:25

21   serve that purpose, and these guys knew that.  So there had to

22   have been some other purpose.

23           The last point that I would make, Your Honor, is that

24   we are not asking the Court to rule today that we are correct

25   about testing was not the essential purpose.  What we're asking     16:39:42

UNITED STATES DISTRICT COURT

1    the Court to do is to allow us to pursue these claims, and

2    allow us to take discovery so we can prove these claims.

3         Thank you.  That's it.

4         THE COURT:  Thank you very much for your additional

5    input today, gentlemen.  The matter is taken under advisement,     16:39:55

6    and we'll get you a decision just as quickly as we can.

7         We'll be in recess subject to call.

8         THE CLERK:  All rise.

9    (Proceedings conclude, 4:40 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, ROBIN G. BOBBIE, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7     a full, true, and accurate transcript of all of that portion of

8     the proceedings contained herein, had in the above-entitled

9     cause on the date specified therein, and that said transcript

10    was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 30th day of

12    September, 2017.

13

14

15                         s/Robin G. Bobbie
16                         Robin G. Bobbie, RMR, CRR

17

18

19

20

21

22

23

24

25