WO         IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re ) | No. 2:16-cv-2138-HRH |
| ) | (Consolidated with |
| Arizona THERANOS, INC., Litigation, ) | No. 2:16-cv-2373-HRH |
| ) | No. 2:16-cv-2660-HRH |
| ) | No. 2:16-cv-2775-HRH |
| _____ ) | -and- |
| | No. 2:16-cv-3599-HRH) |

O R D E R

Motions to Dismiss

Defendants move to dismiss plaintiffs' second amended consolidated class action complaint.[1]  These motions are opposed.[2]  Oral argument was requested and has been heard.

Background

Plaintiffs are A.R., B.B., B.P., D.L., L.M., M.P., R.C., R.G., S.J., and S.L.  A.R. is alleged to be a resident of California.[3]  The other plaintiffs are alleged to be residents of

_____

[1]Docket Nos. 166 and 167.

[2]Docket No. 171.

[3]Second Amended Consolidated Class Action Complaint ("SAC") at 5, ¶ 19, Docket No. 159.

Arizona.[4]  Defendants are Theranos, Inc. ("Theranos"); Elizabeth Holmes; Ramesh Balwani; Walgreens Boots Alliance, Inc.;  and Walgreen Arizona Drug Company.[5]

In 2003, Theranos was founded by Holmes.[6]  Balwani was the President and Chief Operating Officer of Theranos until he resigned in 2016.[7]

"Theranos initially focused on development of a hand-held device that would use a tiny needle to obtain a small drop of blood for analysis.  By 2008, the project had grown into attempting to develop what is now known as the 'Edison' device."[8]  "The Edison device . . . was supposedly able to take a few drops of blood from a patient's finger placed into a 'nanotainer' capsule, and reliably conduct hundreds of blood tests, all outside a lab."[9] However, the project did not apparently get that far because the blood drawn from clients such as plaintiffs was actually tested at laboratories.  Plaintiffs allege that Theranos did 90 percent of the blood testing at its Scottsdale lab, which "only performed analyses on venipuncture tests" and that Theranos "outsourced a limited number of 'highly complex' tests

---

[4]SAC at 5-6, ¶¶ 20-28 Docket No. 159.

[5]The Walgreen defendants are collectively referred to as "Walgreens" herein.  Any reference to the "Theranos defendants" means Theranos, Holmes, and Balwani.

[6]SAC at 8, ¶ 38, Docket No. 159.

[7]SAC at 7, ¶ 33, Docket No. 159.

[8]SAC at 8, ¶ 38, Docket No. 159.

[9]SAC at 8, ¶ 39, Docket No. 159.

to third-party, university-affiliated labs[.]"[10] Plaintiffs further allege that "all the finger stick blood samples [the Edison blood tests] were analyzed at the Newark[, California] facility[.]"[11]

Plaintiffs allege that the Theranos defendants knew that "the Edison technology was . . . still in development and not ready-for-market"[12] and that "none of the testing services . . . were reliable or certified,"[13] but that in 2012, "Theranos entered into a partnership agreement with Walgreens, under which Walgreens invested $140 million in Theranos . . . and agreed to place and operate clinics, which it called 'Wellness Centers,' at Walgreen Pharmacies in Arizona and California."[14] Through the Wellness Centers, "Walgreens, along with Theranos, sold blood and other clinical testing services to individuals."[15] Plaintiffs allege that Walgreens entered into this agreement with Theranos even though "Walgreens was aware of numerous serious red flags about the [blood] tests that put it on notice about the unreliability of the tests[.]"[16]

---

[10]SAC at 41, ¶ 132, Docket No. 159.

[11]SAC at 41, ¶ 131, Docket No. 159.

[12]SAC at 9, ¶ 41, Docket No. 159.

[13]SAC at 11, ¶ 48, Docket No. 159.

[14]SAC at 12, ¶ 49, Docket No. 159.

[15]SAC at 6, ¶ 31, Docket No. 159.

[16]SAC at 13, ¶ 54, Docket No. 159.

Plaintiffs allege that

> [d]efendants Walgreens and Theranos knowingly and intention-
> ally concealed vital information from consumers, their doctors,
> and the public at large, including that the "Edison" "tiny" blood
> technology was, throughout the time the "tiny" blood draws
> were being administered, still in-development, not ready-for-
> market, and nowhere near in a position to serve the purpose of
> providing reliable blood test results.[17]

Plaintiffs further allege that Walgreens and Theranos "embarked on a pervasive promotional campaign that misrepresented and clearly portrayed the 'tiny' blood tests as being market-ready and serving the purpose of providing reliable blood test results."[18]

As for non-Edison tests, plaintiffs allege that defendants "concealed material information about the unreliability of all of the testing services, and about the grossly deficient nature of the testing facilities and equipment."[19] Plaintiffs further allege that Walgreens and Theranos "made pervasive misrepresentations, including through their broad marketing campaign, falsely touting" the non-Edison blood tests "as . . . meeting the highest standards of reliability, [being] industry-leading in quality, and [being] developed and validated under, and compliant with federal guidelines."[20]

---

[17]SAC at 1, ¶ 4, Docket No. 159.

[18]SAC at 1, ¶ 4, Docket No. 159.

[19]SAC at 2, ¶ 5, Docket No. 159.

[20]SAC at 2, ¶ 6, Docket No. 159.

But, plaintiffs allege that "[i]n reality, as each of the [d]efendants contemporaneously knew, [the] Theranos tests were dangerously unreliable, had not been validated as advertised, and did not meet federal guidelines as advertised."[21]  With respect to the Edison tests, plaintiffs allege that

> each of the [d]efendants knew . . . that the Edison technology
> was still in development, not ready-for-market, and nowhere
> near in a position to serve . . . the purpose of legitimate blood
> testing . . .  Nevertheless, in a hurry to begin marketing and
> administering the[] "tiny" blood draws, and thereby assisting in
> researching and developing the still-in-development technology,
> to advance the narrative that Theranos's "disruptive" technology
> had "revolutionized" the medical testing industry, and to woo
> and placate investors, potential investors, and co-investors by
> giving the false impression that they had a market-ready
> breakthrough project, Walgreens and Theranos prematurely
> marketed, sold, and administered, the "tiny" blood draws to tens
> of thousands of unwitting consumers who were, in essence,
> subjected to beta testing and product development research
> without their knowledge and consent. . . . [[22]]

Plaintiffs allege that "[n]one of the consumers who obtained test results from Theranos received what they paid for and what they reasonably expected.  None of them received tests that they could reasonably rely on given the numerous problems [with the tests] that have come to light."[23]  Plaintiffs further allege that "the tens of thousands of consumers

---

[21]SAC at 2, ¶ 8, Docket No. 159.

[22]SAC at 2-3, ¶ 9, Docket No. 159.

[23]SAC at 4, ¶ 12, Docket No. 159.

who submitted to the 'tiny' blood draws . . . did so under false pretenses and [were] substantially mistaken about the essential nature and purpose of those blood draws[.]"[24]

Plaintiffs allege that in 2016, "[a]fter the Center for Medicare and Medicaid Services cited Theranos's Newark, California lab for numerous deficiencies," Theranos "voided 'all' blood-testing results from the Edison devices."[25] Plaintiffs further allege that "[n]umerous additional test results . . . have now been voided or belatedly 'corrected' by Theranos[.]"[26] Holmes and Balwani have been "banned from owning or operating a blood-testing business for at least two years" and Theranos's license to operate a blood lab in California has been revoked.[27]

In their first amended complaint, plaintiffs asserted seventeen causes of action and sought damages and injunctive relief. Defendants moved to dismiss all seventeen causes of action, and the court granted the motions in part and denied the motions in part.[28] Plaintiffs were given leave to amend as to a number of the dismissed claims.[29]

---

[24]SAC at 4, ¶ 13, Docket No. 159.

[25]SAC at 3, ¶ 10, Docket No. 159.

[26]SAC at  3, ¶ 10, Docket No. 159.

[27]SAC at 3, ¶ 10, Docket No. 159.

[28]Order re Motions to Dismiss at 58, Docket No. 139.

[29]Id. at 59-60.

Plaintiffs timely filed a second amended consolidated class action complaint ("SAC") in which they assert fourteen causes of action. Pursuant to Rules 9(b) and 12(b)(6), Federal Rules of Civil Procedure, defendants now move to dismiss all of the claims asserted in plaintiffs' SAC.

Discussion

"'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." Id. "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 996 (9th Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

"When considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior." Id. (quoting Iqbal, 556 U.S. at 678).

> "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative

> explanation. Something more is needed, such as facts tending
> to exclude the possibility that the alternative explanation is true,
> in order to render plaintiffs' allegations plausible."

Id. at 996-97 (quoting In re Century Aluminum Co. Secs. Litig., 729 F.3d 1104, 1108 (9th

Cir. 2013)). A "'[p]laintiff's complaint may be dismissed only when defendant's plausible

alternative explanation is so convincing that plaintiff's explanation is implausible.'" Id.

(quoting Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

"[T]he complaint must provide 'more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do.'" In re Rigel Pharmaceuticals, Inc.

Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the

complaint's well-pleaded factual allegations as true and draws all reasonable inferences in

the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-

43 (9th Cir. 2012).

"Rule 9(b) provides that '[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.'" United States ex rel. Cafasso

v. General Dynamics C4 Systems, Inc., 637 F.3d 1047, 1054-55 (9th Cir. 2011) (quoting Fed.

R. Civ. P. 9(b)). "To satisfy Rule 9(b), a pleading must identify 'the who, what, when,

where, and how of the misconduct charged, as well as what is false or misleading about [the

purportedly fraudulent] statement, and why it is false.'" Id. at 1055 (quoting Ebeid ex rel.

United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).

## CFA and Common Law Fraud Claims (First and Second Causes of Action)

"The Arizona Consumer Fraud Act ["CFA"] is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions." State ex rel. Woods v. Hameroff, 884 P.2d 266, 268 (Ariz. Ct. App. 1994). "Generally stated, claims under the CFA, like common law fraud claims, can be based on affirmative misrepresentations, concealment, or omission of material facts." Tavilla v. Cephalon, Inc., 870 F. Supp. 2d 759, 776 (D. Ariz. 2012). An affirmative "misrepresentation causes injury where the consumer actually relies on" the statement, although the consumer's reliance does not need to be justifiable. Cheatham v. ADT Corp., 161 F. Supp. 3d 815, 825-26 (D. Ariz. 2016). An omission is actionable under the CFA if it "is material and 'made with intent that a consumer rely thereon.'" Id. at 830 (quoting State ex rel. Horne v. AutoZone, Inc., 275 P.3d 1278, 1281 (Ariz. 2012)).

Under Arizona law, to prevail on a common law fraud claim, a plaintiff must show

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

Peery v. Hansen, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). The "representation" may be an affirmative representation or an omission of fact that the defendant had a duty to disclose. Tavilla, 870 F. Supp. 2d at 776. Under California law "[t]he elements of common law fraud are: '(1) a misrepresentation (false representation, concealment, or nondisclosure); (2)

knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.'" <u>Arei II Cases</u>, 157 Cal. Rptr. 3d 368, 382 (Cal. Ct. App. 2013) (quoting <u>Robinson Helicopter Co. v. Dana Corp.</u>, 102 P.3d 268, 274 (Cal. 2004)).

In the SAC, the Arizona plaintiffs assert CFA claims against Theranos and Walgreens based on affirmative misrepresentations and CFA claims against all defendants based on omissions. Plaintiffs also assert common law fraud claims against Theranos and Walgreens based on affirmative misrepresentations and common law fraud claims against all defendants based on omissions.

As an initial matter, defendants argue that the Arizona plaintiffs' CFA claims have been mooted by the Consent Decree between the Arizona Attorney General ("AG") and Theranos. "[A] claim becomes moot once the plaintiff <u>actually</u> <u>receives</u> all of the relief to which he or she is entitled on the claim." <u>Chen v. Allstate Ins. Co.</u>, 819 F.3d 1136, 1145 (9th Cir. 2016).

In April 2017, the Arizona AG filed suit against Theranos in Maricopa County Superior Court, asserting a single cause of action under the CFA. The Arizona AG's complaint sought injunctive relief, restitution, disgorgement of profits, civil penalties, and attorneys' fees.[30]

---

[30]Civil Complaint at 8, Exhibit 1, Declaration of Roger N. Heller, which is appended to Plaintiffs' Omnibus Response [etc.], Docket No. 171. The court may take judicial notice of this complaint without converting the instant motions to dismiss into motions for summary judgment. <u>See</u> <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001).

The Arizona AG alleged that:

a. Between 2013 and 2016, [Theranos] sold approximately 1,545,339 blood tests to approximately 175,940 Arizona consumers, which yielded 7,862,146 test results.

b. [Theranos] ultimately voided or corrected approximately 834,233 or 10.0% of these test results.

c. The sales of the blood tests were made without informed consent of the consumers because [Theranos] misrepresented, omitted, and concealed material information regarding its testing service's methodology, accuracy, reliability, and essential purpose.

d. [Theranos] intended for its customers to rely on its misrepresentations, omissions, and concealments in their decision to purchase its testing services.[31]

Although Theranos denied the allegations,[32] Theranos and the Arizona AG entered into a consent decree. "Th[e] Consent Decree [was] intended to provide full restitution to Arizona consumers for all monies paid by Arizona consumers for [Theranos's] blood testing services."[33] Theranos agreed to pay $4,652,000 in restitution for amounts paid out-of-pocket for Theranos blood tests, $200,000 in civil penalties, and $25,000 in attorney's fees.[34]

_____

[31]Consent Decree at 2, ¶ 4, Exhibit A, Defendants' Request for Judicial Notice, Docket No. 165. The court may take judicial notice of the consent decree without converting the instant motions to dismiss into motions for summary judgment. See Lee, 250 F.3d at 689.

[32]Id. at 2-3, ¶ 5.

[33]Id. at 3, ¶ 7.

[34]Id. at 3-4, ¶ 2, 3, and 6.

In December 2017, the Arizona AG's office began mailing restitution checks to affected Arizona consumers.[35] The letter accompanying a restitution check stated that the enclosed check "reflects the total amount you paid for blood testing services from Theranos" and that "[c]ashing this check does not obligate you in any way[.]"[36]

Since defendants' motions to dismiss were briefed, plaintiff B.P. has moved to intervene in the Arizona Superior Court action which led to the Consent Decree.[37] B.P. seeks to challenge the provision of the Consent Decree which states that "[t]he Parties intend this Consent Decree to extinguish all existing or potential claims under the CFA or for breach of contract, fraud, battery, negligence, negligent misrepresentation, unjust enrichment, or civil RICO violations arising from" the alleged conduct of Theranos.[38]

If intervention is granted by the Arizona Superior Court, and if B.P.'s challenge to the foregoing term of the Consent Decree fails – that is, if the Arizona Superior Court validates

---

[35]Letter from Arizona AG, Exhibit 2, Heller Declaration, which is appended to Plaintiffs' Omnibus Response [etc.], Docket No. 171. The court may take judicial notice of this letter without converting the instant motions to dismiss into a motion for summary judgment. See Daugherty v. Experian Information Solutions, Inc., 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) ("A court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[36]Id.

[37]See Exhibit A, Notice of State Court Proceedings, Docket No. 177.

[38]Consent Decree at 3, ¶ 8, Exhibit A, Defendants' Request for Judicial Notice, Docket No. 165.

any or all of the foregoing extinguishment of claims - this court will have to reexamine its rulings as to the Arizona plaintiffs' CFA claims as well as other claims asserted by them in the SAC.

But, based on the present status of this case and the briefing now before the court, the Arizona plaintiffs' CFA claims have not been mooted by the Consent Decree.  Pursuant to the Consent Decree, the Arizona plaintiffs will recover their out-of-pocket expenses.  But, this is not the only relief to which they might be entitled were they to prevail on their CFA claims.  The CFA provides for the disgorgement of all "profits, gain, gross receipts, or other benefits obtained by means of" the alleged misconduct. A.R.S. § 44-1528(A)(3).  Walgreens, Holmes, and Balwani have not disgorged any profits or gains as a result of the Consent Decree and it is possible that Theranos has not disgorged all of its profits or gains.  In addition, the CFA provides for punitive damages, see Holeman v. Neils, 803 F. Supp. 237, 242-43 (D. Ariz. 1992), which the Consent Decree did not address.

To the extent that the Theranos defendants intended to argue that the Arizona plaintiffs' common law fraud claims have been mooted by the Consent Decree, this argument also currently fails.  At the very least, if the Arizona plaintiffs were to prevail on any of their common law fraud claims, they may be entitled to punitive damages, which the Consent Decree did not address.  See Hunter Contracting Co. v. Sanner Contracting Co., 492 P.2d 735, 741 (Ariz. Ct. App. 1972)  ("punitive damages are allowable where the fraud is gross, or where extraordinary facts are present, indicating malice and ill will").

Turning then to the merits of plaintiffs' CFA and common law fraud claims, in the SAC, plaintiffs allege that defendants have violated the CFA because they "marketed and sold unreliable Theranos testing services that they knew to be unreliable and/or which they failed to take sufficient steps to ensure the reliability of, and encouraged consumers to rely on such tests to make decisions about their health and treatment."[39] Plaintiffs allege that Walgreens and Theranos made affirmative misrepresentations about the reliability of the Theranos blood tests and that each of defendants concealed material misinformation about the reliability of the Theranos blood tests.[40] Plaintiffs alleged that they have been harmed by their reasonable reliance on defendants' omissions and affirmative misrepresentations "by paying (out-of-pocket and/or through health insurance or another collateral source) for Theranos testing services, permitting [d]efendants to take blood samples from them under false pretenses, and relying on unreliable Theranos test results to make decisions about their health."[41] As for their common law fraud claims, plaintiffs allege that Theranos and Walgreens made affirmative misrepresentations about the reliability of the blood tests;[42] that all defendants concealed information about the reliability of the blood tests;[43] that defendants

---

[39]SAC at 90, ¶ 389, Docket No. 159.

[40]SAC at 91, ¶ 395, Docket No. 159.

[41]SAC at 93-94, ¶ 403, Docket No. 159.

[42]SAC at 95, ¶ 415, Docket No. 159.

[43]SAC at 95, ¶ 418, Docket No. 159.

knew that the affirmative misrepresentations were false and that the material they were concealing was material;[44] that defendants had a duty to disclose material facts;[45] and that plaintiffs relied on defendants' affirmative misrepresentations and omissions.[46]

Although in the order on the first motions to dismiss, the court found that plaintiffs had adequately pled their fraud by omission claims, defendants nonetheless argue that plaintiffs' fraud by omission claims are not plausible and should be dismissed. A defendant can only be liable for fraud by omission if it failed to disclose facts that it had a duty to disclose. Tavilla, 870 F. Supp. 2d at 776; Andren v. Alere, Inc., 207 F. Supp. 3d 1133, 1141 (S.D. Cal. 2016). Under California law,

> a party has a duty to disclose "in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact."

Lassen v. Nissan North America, Inc., 211 F. Supp. 3d 1267, 1284 (C.D. Cal. 2016) (quoting Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1094 (N.D. Cal. 2007)). "Arizona follows the Restatement (Second) of Tort" to determine if there is a duty to disclose. Loomis v. U.S. Bank Home Mortg., 912 F. Supp. 2d 848, 857 (D. Ariz. 2012). Section 551(2) provides:

---

[44]SAC at 95, ¶ 419, Docket No. 159.

[45]SAC at 96, ¶ 424, Docket No. 159.

[46]SAC at 96, ¶ 426, Docket No. 159.

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Walgreens argues that plaintiffs have failed to plead that Walgreens had any duty to disclose the information that plaintiffs allege was concealed. In paragraph 398, plaintiffs allege that defendants failed to disclose information about the reliability of the Theranos blood tests, information about the deficiencies and non-compliance of Theranos's testing facilities and/or equipment, the fact that Theranos's testing services were not ready-for-market and that Theranos and Walgreens were using the tests for research and development, the fact that Walgreens had agreed to not obtain objective proof that Theranos's testing services were reliable, the fact that Walgreens agreed to conduct no oversight of Theranos's laboratory testing practices, the fact that Theranos employees were not adequately trained,

the fact that Theranos had manipulated its internal proficiency testing processes and covered up known reliability problems; the fact that Theranos's internal validation tests showed that the testing was unreliable, and the fact that the Edison technology was not market-ready and that the true purpose for the tiny blood draws was research and development.[47]  Plaintiffs allege that Walgreens

> owed a duty to [p]laintiffs . . . to provide them material informa-
> tion about the unreliability of Theranos tests  . . .  because they
> had exclusive and far superior knowledge regarding the material
> information, because of the nature of the information in ques-
> tion, because they knew that customers would rely on them to
> provide accurate and complete material information about the
> reliability and readiness of the tests, and because they had
> disseminated pervasive false and/or partial representations about
> Theranos testing that were misleading absent full disclosure.[[48]]

In the order on the first motions to dismiss, the court found, in the context of the aiding and abetting claim, that plaintiffs' allegations were "sufficient to suggest that it is plausible that Walgreens was aware of more than just 'suspicious activity' but was actually aware of the alleged fraud."[49]  In the SAC, plaintiffs have again alleged that it is plausible that Walgreens was actually aware of the alleged fraud.  If Walgreens were actually aware of the alleged fraud, then it is plausible that Walgreens had a duty to disclose information regarding the unreliability of the tests.  Plaintiffs have adequately alleged that Walgreens had

---

[47]SAC at 91-93, ¶ 398, Docket No. 159.

[48]SAC at 93, ¶ 400, Docket No. 159.

[49]Order re Motions to Dismiss at 36, Docket No. 139.

a duty to disclose at least some of the information that plaintiffs allege was concealed. Plaintiffs' fraud by omission claims against Walgreens are plausible.

The Theranos defendants argue that the non-Edison plaintiffs' fraud by omission claims are not plausible because the only omissions plaintiffs have alleged have to do with the Edison device. But as set out above, in paragraph 398 of the SAC, plaintiffs allege that defendants failed to disclose information concerning the reliability of the non-Edison tests. The non-Edison plaintiffs' fraud by omission claims against Theranos are plausible.[50]

Plaintiffs' CFA and common law fraud claims are also based on affirmative misrepresentations. In the SAC, plaintiffs only assert affirmative misrepresentation fraud claims against Walgreens and Theranos.

As to those claims, Walgreens first argues that plaintiffs have not alleged that Walgreens knew that the Theranos blood tests were unreliable or that Walgreens knew that Theranos was deceiving plaintiffs and other consumers. Rather, Walgreens contends, the SAC indicates that Theranos was a secretive technology company and that Theranos did not allow Walgreens access to its technology and laboratories.[51] Walgreens argues that the alleged secretive behavior on the part of Theranos does not lead to an inference that Walgreens actually knew, or even suspected, that the Theranos defendants' representations about the reliability of the blood tests were false. Walgreens also points out that plaintiffs

---

[50]The Edison plaintiffs' fraud by omission claims against Theranos are also plausible.

[51]SAC at 14-16, ¶¶ 57-59, 62, Docket No. 159.

all allege that they purchased their Theranos blood tests prior to January 25, 2016 and Walgreens insist that plaintiffs have not alleged that Walgreens knew that the blood tests were unreliable before then. Walgreens argues that other allegations in the SAC suggest that Walgreens could not possibly have known about the alleged fraud prior to January 25, 2016 (the date that the CMS made public its findings about the deficiencies at the Theranos labs).

Walgreens may be correct that one inference that could be drawn from plaintiffs' allegations is that because of Theranos's secretive behavior, Walgreens had no way of knowing that the Theranos blood tests were unreliable. But another reasonable inference that could be drawn from these allegations is that Theranos's secretive behavior should have put Walgreens on notice that there might be some problems with Theranos's technology. On a motion to dismiss, the court must draw inferences in plaintiffs' favor. This second inference supports plaintiffs' allegation that Walgreens knew that the blood tests were unreliable. In addition, plaintiffs have alleged that there were public reports of problems with the blood tests prior to January 25, 2016. Plaintiffs allege that in April 2015, the "Arizona Department of Health Services inspectors identified multiple deficiencies at Theranos's Scottsdale laboratory" and plaintiffs cite to a November 30, 2015 newspaper article as the source of this information.[52] The article includes Theranos's self-serving representations that "the inspection findings were routine and all issues were addressed or corrected within days or

_____

[52]SAC at 42, ¶ 136 and n.60, Docket No. 159.

weeks of the April inspection."[53] Plaintiffs also allege that "[i]n October 2015 the FDA released inspection reports of Theranos declaring the nanotainer to be an 'uncleared medical device.' The investigation also found deficiencies in Theranos's processes for handling customer complaints, monitoring quality and vetting suppliers."[54] Based on these allegations and the reasonable inferences that can be drawn in plaintiffs' favor, the court finds that plaintiffs have alleged that it is plausible that Walgreens knew that the blood tests were unreliable and that they knew so prior to January 25, 2016.

Walgreens next argues that plaintiffs have again failed to plead their affirmative misrepresentation fraud claims with the particularity required by Rule 9(b). Walgreens argues that plaintiffs continue to lump Walgreens and Theranos together and thus have failed to attribute any specific affirmative misrepresentation to Walgreens. For example, Walgreens cites to paragraph 87 of the SAC in which plaintiffs allege that "Theranos and Walgreens caused . . . prominent billboards to be erected in the high-visibility areas in Arizona[.]"[55] The examples of the billboards that plaintiffs include in the SAC bear only the Theranos name and Walgreens argues that plaintiffs do not allege what involvement Walgreens had in their creation or display. Walgreens also cites to paragraph 97, in which

---

[53]Ken Alltucker, <u>Arizona Inspectors Find Theranos Lab Issues</u>, The Arizona Republic Nov. 30, 2015) available at http://www.azcentral.com/story/money/business/consumers/2015/ 11/27/arizona-inspectors-find-theranos-lab-issues/76021416 (last visited April 9, 2018).

[54]SAC at 43, ¶ 138, Docket No. 159.

[55]SAC at 22-24, ¶ 87, Docket No. 159.

plaintiffs allege that "Theranos and Walgreens also widely disseminated social media commercials and television commercials,"[56] but the only example plaintiffs include in paragraph 97 is a commercial that allegedly appeared on Theranos's twitter page.[57] Walgreens acknowledges that plaintiffs allege generally that Theranos and Walgreens "jointly designed, approved, and implemented" a broad marketing campaign,[58] but Walgreens argues that such an allegation is insufficient to meet the requirements of Rule 9(b) because plaintiffs have not alleged any specifics about Walgreens' involvement in the marketing campaign. Walgreens argues that it cannot be liable based on Theranos's alleged misrepresentations in the advertising campaign without some factual support that Walgreens was involved in developing that campaign.

While the SAC does still contain allegations in which plaintiffs lump Walgreens and Theranos together, plaintiffs have also alleged a number of specific affirmative misrepresentations made by Walgreens. For example, in paragraph 56, plaintiffs allege that in 2015, "Walgreens reportedly said it was 'confident in the quality of Theranos's services[.]'"[59] In paragraph 71, plaintiffs allege that "[w]hen the discontinuation of the Edison device occurred . . . Walgreens, via its divisional vice-president . . . told reporters: 'TRUST me. If the

---

[56]SAC at 30, ¶ 97, Docket No. 159.

[57]SAC at 30, ¶ 97 and n.4, Docket No. 159.

[58]SAC at 21, ¶ 80, Docket No. 159.

[59]SAC at 14, ¶ 56, Docket No. 159.

results are not there we would hear.'"[60] In paragraph 92, plaintiffs allege that "[t]hroughout the time that the 'tiny' blood 'tests' were being offered in Walgreens stores, Walgreens' website promoted the 'blood tests' that could be run on 'just a tiny sample', alongside images of the 'tiny' collection vials, and stating that the technology supported 'better, more informed treatment.'"[61] In paragraph 93, plaintiffs allege that "during this same time period," Walgreens' website "claimed . . . that Theranos's 'high-complexity CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples' and 'can perform tests on any sample type. . . . It's fast, easy and the highest level of quality."[62] In paragraph 94, plaintiffs allege that during the time that the blood tests were being sold in Walgreens' stores, Walgreens' website "stated that Theranos had 'reinvented' testing with its technology, directly benefitting consumers of this testing by dramatically reducing the time it takes to analyze samples because its technology enabled a 'more timely diagnosis to support better, more informed treatment.'"[63] In paragraph 111, plaintiffs alleged that "Walgreens' website stated that the Theranos technology supported 'better, more informed treatment.'"[64] In paragraph 112, plaintiffs allege that "[t]hroughout its partnership with Theranos, Walgreens

---

[60]SAC at 18, ¶ 71, Docket No. 159.

[61]SAC at 27, ¶ 92, Docket No. 159.

[62]SAC at 27, ¶ 93, Docket No. 159.

[63]SAC at 28, ¶ 94, Docket No. 159.

[64]SAC at 35, ¶ 111, Docket No. 159.

endorsed the information on Theranos's website, directing its customers to visit www.theranos.com for more information."[65]   In paragraph 115, plaintiffs allege that Walgreens issued joint press releases with the Theranos defendants in which Walgreens represented "that Theranos testing was government approved and reliable" and that Walgreens made other statements to the media about the reliability of the tests.[66]  By way of example, plaintiffs allege that in November 2013, Walgreens' president told a newspaper that "Theranos could perform tests 'more accurately' than traditional blood tests."[67]  In paragraph 100, plaintiffs allege that in September 2013, in a joint press release with Theranos, Walgreens "touted Theranos's 'CLIA-certified laboratory services' and promised that its 'proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results."[68]

These allegations are sufficient to meet plaintiffs' Rule 9(b) obligation to plead their claims with particularity.   Although some of these allegations are related to the size, affordability, and convenience of the tiny blood draws, others amount to affirmative misrepresentations about the reliability of the non-Edison tests.  Plaintiffs have alleged that representations about the reliability of both the Edison and non-Edison tests were false.  For

---

[65]SAC at 35, ¶ 112, Docket No. 159.

[66]SAC at 36-37, ¶ 115, Docket No. 159.

[67]SAC at 37, ¶ 115e and n.47, Docket No. 159.

[68]SAC at 31, ¶ 100, Docket No. 159.

example, plaintiffs allege that none of the Theranos tests "were . . . conducted in conformity with CLIA regulations, nor 'validated' under or compliant with federal guidelines[.]"[69] And as discussed above, plaintiffs have adequately alleged that Walgreens knew that the blood tests were unreliable.

Walgreens next argues that plaintiffs have not alleged that they relied on any alleged affirmative misrepresentations by Walgreens nor have they alleged what advertisements they saw with particularity. As to most of the plaintiffs, Walgreens is correct.

Plaintiffs A.R., B.P., D.L., R.C., S.J., and S.L. all allege that they viewed Walgreens' marketing prior to going to the store to get a blood test.[70] Walgreens argues, however, that a vague allegation that they viewed "marketing" does not meet the particularity requirements of Rule 9(b). Walgreens acknowledges that if

> a fraud claim is based upon numerous misrepresentations, such as an advertising campaign that is alleged to be misleading, plaintiffs need not allege the specific advertisements the individual plaintiffs relied upon; it is sufficient for the plaintiff to provide a representative selection of the advertisements or other statements to indicate the language upon which the implied misrepresentations are based.

Morgan v. AT & T Wireless Services, Inc., 99 Cal. Rptr. 3d 768, 790 (Cal. Ct. App. 2009). But Walgreens contends that the representative selection of pamphlets that were in Walgreens stores that plaintiffs have provided simply state that the blood tests that Theranos

---

[69]SAC at 40, ¶ 126, Docket No. 159.

[70]SAC at 63, ¶ 211; 67, ¶ 239; 71, ¶ 262; 76, ¶ 303; 81, ¶ 340; 85, ¶ 363; Docket No. 159.

administered were "tiny" and do not contain any representations about the reliability or accuracy of the blood tests.[71] Likewise, Walgreens argues that the representative signage that plaintiffs have provided does not contain any representations about the reliability of the blood tests, but simply read "drop off + pick up Theranos lab testing."[72]

Plaintiffs A.R., B.P., D.L., R.C., S.J., and S.L. have failed to plead their affirmative misrepresentation fraud claims against Walgreens with particularity. They have not pled sufficient information about the Walgreens marketing material that they viewed prior to going to Walgreens for a blood test. These plaintiffs' affirmative misrepresentation claims against Walgreens are dismissed. These plaintiffs are not given leave to amend as they have already had one opportunity to amend these claims. See Chodos v. West Publishing Co., 292 F.3d 992, 1003 (9th Cir. 2002) (quoting Griggs v. Pace Am. Group, Inc., 170 F.3d 877, 879 (9th Cir. 1999) ("when a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is 'particularly broad'").

Plaintiffs L.M., M.P., and R.G. do not allege that they viewed any Walgreens marketing materials prior to going to get a blood test.[73] Thus, their allegations that they relied on Walgreens' marketing materials in deciding to get a blood test are not plausible. These plaintiffs' affirmative misrepresentation fraud claims are dismissed and these plaintiffs

---

[71]SAC at 25-26, ¶¶ 89, 91, Docket No. 159.

[72]SAC at 26, ¶ 90, Docket No. 159.

[73]SAC at 73, ¶ 277; 74, ¶ 291; 79, ¶ 325; Docket No. 159.

are not given leave to amend as they have already had one opportunity to amend these claims.

Plaintiff B.B. alleges that "she relied on marketing by Theranos and Walgreens regarding the reliability of their services, including, she specifically recalls, on the Theranos and Walgreens websites and press releases which she read before visiting the Walgreens store" for her blood tests.[74]  She alleges that she viewed the websites and press releases in early October 2014.[75]  Plaintiffs have alleged that Walgreens made statements about the reliability of the Theranos tests on its website and in press releases prior to October 2014.[76]  And contrary to Walgreens' contention, plaintiffs have adequately alleged that Walgreens was aware, or should have been aware, of the fraud before October 2014.  B.B. has adequately alleged an affirmative misrepresentation fraud claim against Walgreens.

As for plaintiffs' affirmative misrepresentation fraud claims against Theranos, Theranos first argues that the non-Edison plaintiffs have failed to state plausible claims.  Theranos argues that plaintiffs' theory of the case boils down to a fraudulent scheme in which the Edison device was rushed to market before it was ready in an effort to use the blood samples obtained for research and development.  But, Theranos argues that these allegations cannot support a fraud claim that is not based on the tiny blood draws.  Theranos

---

[74]SAC at 65, ¶ 225, Docket No. 159.

[75]SAC at 65, ¶ 225, Docket No. 159.

[76]SAC at 27, ¶ 93; 31, ¶ 100; Docket No. 159.

argues that the non-Edison plaintiffs fail to identify a single false affirmative misrepresentation about the testing on which they relied.

Plaintiffs have alleged that Theranos made numerous affirmative misrepresentations about the non-Edison blood tests. In paragraph 110, plaintiffs allege that "Theranos's website. . . advertised that Theranos's test results could be relied on by consumers and their doctors in making health decisions that they provided 'actionable health information at the time it matters' to consumers, and that they 'lead the industry in transparency and quality.'"[77] In paragraph 108, plaintiffs allege that "Theranos's marketing . . . stated that 'we continuously conduct proficiency testing and participate in multiple proficiency testing programs,' and that all 'tests are developed and validated under and to the CLSI, FDA Centers for Disease Control, and the World Health Organization guidelines."[78] In paragraph 109, plaintiffs allege that "[o]n its website, Theranos advertised that Theranos testing was of 'the highest levels of accuracy,' and that the tests were 'validated under and in compliance with federal regulations and guidelines[.]'"[79] In paragraph 107, plaintiffs allege that in "marketing that appeared on Theranos's website and in the Wellness Centers, Theranos and Walgreens touted that their testing services would help patients 'evaluate' health issues and

---

[77]SAC at 34, ¶ 110, Docket No. 159.

[78]SAC at 33, ¶ 108, Docket No. 159.

[79]SAC at 33, ¶ 109, Docket No. 159.

to screen for diseases[.]"[80]  In paragraph 115, plaintiffs allege that the Theranos defendants

issued press releases that included representations "that Theranos testing was government

approved and reliable."[81]

While Theranos does not dispute that plaintiffs have made the foregoing allegations

in the SAC, Theranos argues that none of the non-Edison plaintiffs allege that they saw any

of these statements, except for S.L.  S.L. alleges that he went to Walgreens twice to get a

Theranos blood test and that

> [p]rior to each visit, [he] had seen and heard advertisements for
> Theranos that caused him to believe that Theranos test results
> would be as reliable as other labs' results, and that Theranos was
> the cheapest and least invasive alternative option for blood
> testing.  S.L. specifically recalls seeing a pamphlet advertise-
> ment and visiting the Theranos website in or around January and
> October 2015 and viewing representations to the effect that
> Theranos was "as reliable" as other laboratories.[[82]]

Theranos argues that these scant allegations are not sufficient for Rule 9(b) purposes. But,

these allegations are sufficient as to S.L.

B.B., D.L., and M.P. also specifically allege that they viewed representations about

reliability on Theranos's website prior to going to get blood tests.[83]  Thus, they have pled

---

[80]SAC at 33, ¶ 107, Docket No. 159.

[81]SAC at 36, ¶ 115, Docket No. 159.

[82]SAC at 85, ¶ 363, Docket No. 159.

[83]SAC at 65, ¶ 225; 71, ¶ 262; 74,-75, ¶ 291; Docket No. 159.

their affirmative misrepresentation fraud claims against Theranos with the required particularity.

R.G. alleges that he heard radio ads and saw advertisements at the Phoenix airport but these ads may or may not have had to do with the reliability of non-Edison tests.[84]  Thus, R.G. has failed to plead his affirmative misrepresentation fraud claim against Theranos with particularity.  A.R. and L.M. generally allege they relied on Theranos's marketing,[85] which is not sufficient for Rule 9(b) purposes.  These plaintiffs' affirmative misrepresentation fraud claims against Theranos are dismissed and these plaintiffs are not given leave to amend their affirmative misrepresentation fraud claims as they have already had one opportunity to amend these claims.

Theranos next argues that the non-Edison plaintiffs' fraud claims fail because they have not alleged that Theranos knew that the non-Edison tests were unreliable.  Theranos argues that plaintiffs have not alleged any facts that suggest that Theranos knew that the venipuncture tests were unreliable nor have plaintiffs alleged any facts that would negate the obvious alternative explanation, which is that Theranos intended to offer accurate blood testing services that extended beyond the Edison device, but problems in the execution of its clinical lab services led Theranos, out of an abundance of caution, to void its test results.  Theranos contends that plaintiffs are pleading "fraud by hindsight" which is not sufficient.

---

[84]SAC at 79, ¶ 325, Docket No. 159.

[85]SAC at 63, ¶ 211; 73, ¶ 277; Docket No. 159.

"A plaintiff does not satisfy the falsity requirement by merely asserting that a company's later revelation of bad news means that earlier, cheerier statements must have been false. This is a classic definition of so-called fraud by hindsight and it does not establish falsity." Glen Holly Entertainment, Inc. v. Tektronix, Inc., 100 F. Supp. 2d 1086, 1098–99 (C.D. Cal. 1999) (internal citation omitted).

Plaintiffs are not pleading fraud by hindsight. Plaintiffs have alleged numerous facts, based on published investigative articles and government reports, that, if true, support the conclusion that Theranos knew, during the time tests were being offered, that the non-Edison test results lacked sufficient reliability. For example, plaintiffs allege that "[i]n March 2014, a former Theranos employee alleged to New York State's public-health lab that Theranos may have manipulated the proficiency testing process, in part by intentionally excluding data that showed Theranos's technology to be unreliable."[86] Plaintiffs also allege that "in April 2015, Arizona Department of Health Services inspectors identified multiple deficiencies at Theranos's Scottsdale laboratory, including serious issues with Theranos's proficiency testing."[87] Based on these allegations, it is plausible that Theranos knew that the non-Edison tests were not reliable at the time those tests were being sold.

Theranos next argues that the Edison plaintiffs (B.P., R.C., and S.J.) have failed to plead their affirmative misrepresentation fraud claims with particularity because they have

_____

[86]SAC at 42, ¶ 135, Docket No. 159.

[87]SAC at 42, ¶ 136, Docket No. 159.

still failed to adequately delineate the conduct attributed to each defendant. Theranos argues that plaintiffs' advertising allegations fail to support any conclusion other than that the advertisements encouraged members of the public to purchase Theranos's product. Theranos emphasizes that the advertising does not say anything about which clinical analyzer (the Edison device or a commercial device) would be used to run patient blood samples. Theranos argues that plaintiffs cannot allege that advertising about the efficacy of the Edison device was material to their decision to purchase Theranos testing.

The Edison plaintiffs have alleged that they relied on Theranos's marketing materials.[88] They have also alleged with particularity that Theranos made affirmative misrepresentations about the tiny blood draws[89] and that Theranos knew that these representations were false.[90] The Edison plaintiffs have pled plausible affirmative misrepresentation fraud claims against Theranos.

**Battery and Medical Battery Claims (Third and Fourteenth Causes of Action)**

Battery and medical battery occur in "situations in which the patient is mistaken about the nature of the invasion and the mistake is induced by a health care provider's misrepresentation." Duncan v. Scottsdale Medical Imaging, Ltd., 70 P.3d 435, 441 (Ariz. 2003). As

---

[88]SAC at 67, ¶ 239; 76, ¶ 303; 81, ¶ 340; Docket No. 159.

[89]SAC at 24-26, ¶¶ 88, 89, 91, 92; 29-30 ¶¶ 95-97; Docket No. 159.

[90]SAC at 38-39, ¶¶ 121, Docket No. 159.

Section 892B of the <u>Restatement (Second) of Torts</u>, to which courts in both Arizona and

California look, explains,

> [i]f the person consenting to the conduct of another is induced
> to consent by a substantial mistake concerning the nature of the
> invasion of his interests or the extent of the harm to be expected
> from it and the mistake is known to the other or is induced by
> the other's misrepresentation, the consent is not effective for the
> unexpected invasion or harm.

But, this rule "is limited to substantial mistakes, known to the actor, concerning the nature

of the invasion or the extent of the harm that is to be expected. If the consent is induced by

mistake concerning other matters, the rule does not apply."[91] If the mistake or misrepresenta-

tion goes to a "collateral matter", consent is not vitiated.[92] But if a patient is not fully aware

of "the particular character of the contact[,]" then any consent given by the patient is

ineffective. <u>Duncan</u>, 70 P.3d at 441.

In the SAC, the Edison plaintiffs (B.P., R.C., and S.J.) assert battery and medical

battery claims against Walgreens and Theranos. The Edison plaintiffs allege that they

consented to the tiny blood draws "under false pretenses and under a substantial mistaken

belief as to the essential nature and purpose of the blood draws."[93] The Edison plaintiffs

allege that they believed "that the essential nature and purpose of [the] blood draws was

legitimate blood testing" but that

---

[91]<u>Restatement (Second) of Torts</u> § 892B (1979), cmt. g to subsection 2.

[92]<u>Id.</u>

[93]SAC at 98, ¶ 440, Docket No. 159.

the true essential nature and purposes of the "tiny" blood draws was to assist efforts to research and develop the still-in-development Edison technology, expedite the narrative of Edison as a "disruptive" technology in the industry; and woo and appease investors, potential investors, and co-investors by creating the false impression that Edison was market-ready, breakthrough technology.[94]

The Edison plaintiffs allege that they "were mistaken and misinformed about the essential nature and purpose of" the tiny blood draws "and thus they did not provide, and could not have provided, consent for such procedure and intrusion."[95] The Edison plaintiffs allege that they believed that the essential nature and purpose of the tiny blood draws was legitimate testing.[96]

B.P. alleges that he had tiny blood draws at a Walgreens store and that "the blood draws were administered by an individual who B.P. understood to be and who B.P. alleges to be a Walgreens employee, who worked at the Walgreens store, approached B.P. from behind the Walgreens pharmacy counter and was wearing a Walgreens smock."[97] B.P. further alleges that there was "a second individual, who [he] understood to be and who [he] alleges to be a Theranos employee, . . . also present" who "assisted with and observed[] the

---

[94]SAC at 98, ¶ 441; 100, ¶ 449; Docket No. 159.

[95]SAC at 55, ¶ 184, Docket No. 159.

[96]SAC 68, ¶ 245; 77, ¶ 307; 82, ¶ 344; Docket No. 159.

[97]SAC at 67, ¶ 241, Docket No. 159.

blood draws."[98]  R.C. alleges that he had tiny blood draws at a Walgreens store, that "the blood draws were administered by an individual who worked at the Walgreens store, and who identified themselves as being affiliated with Theranos testing[,]" and that "this individual was a Walgreens employee or worked for both Walgreens and Theranos."[99]  S.J. alleges that she had a tiny blood draw at a Walgreens store, that the tiny blood draw "was administered by an individual who worked at the Walgreens store and who identified themselves as being affiliated with Theranos testing[,]" and that "this individual was a Walgreens employee or worked for both Walgreens and Theranos."[100]

Walgreens argues that the Edison plaintiffs have failed to plead plausible battery and medical battery claims against Walgreens because plaintiffs do not allege that Walgreens ever knew that the essential purpose of the tiny blood draws was research and development. Walgreens contends that while plaintiffs allege that Walgreens knew that the Edison device was not ready-for-market, this allegation does not suggest that Walgreens knew about the alleged research and development purpose.  Walgreens argues that it is implausible that it knew that this was the true purpose of the tiny blood draws, given the Master Service Agreement (MSA).  Walgreens argue that the MSA describes a contractual relationship for which Walgreens paid $140 million as well as describing what the essential purpose of the

---

[98]SAC at 67, ¶ 241, Docket No. 159.

[99]SAC at 76, ¶ 305, Docket No. 159.

[100]SAC at 81-82, ¶ 341, Docket No. 159.

contractual relationship was, which was for Walgreens to draw blood for legitimate blood testing. Walgreens argues that the fact that plaintiffs have alleged that Walgreens was aware of red flags does not mean that Walgreens knew about the research and development purpose. At best, Walgreens argues that such allegations would suggest that Walgreens was negligent.

In the SAC, plaintiffs allege that Walgreens knew that the Edison device was still in development, not market-ready, and incapable of being used for legitimate blood testing; that Walgreens knew that any consumer submitting to a tiny blood draw was doing so under the mistaken belief that the essential purpose was for legitimate blood testing; and that Walgreens substantially contributed to this mistaken belief through its own misrepresentations and omissions.[101] Plaintiffs also allege that Walgreens directly participated in the tiny blood draws by physically performing the blood draws and otherwise providing support for same.[102] If, as plausibly alleged, Walgreens knew that the Edison device was not market-ready, then Walgreens at least had constructive knowledge that the essential nature of the tiny blood draws was not legitimate testing. That Walgreens knew that Edison device was not market-ready supports the further allegation that Walgreens understood that research and

_____

[101]SAC at 1 ¶ 4; 2, ¶ 9; 13-17, ¶¶ 54-66; 17, ¶ 68; 17-18, ¶ 70; 22-29, ¶¶ 87-95; 30-33, ¶¶ 97-107; 35-37, ¶¶ 111-115; 38, ¶ 117; 38, ¶ 119; 42, ¶ 134; 55-58, ¶¶ 184-195; 97-98, ¶ 435; 98-101, ¶¶ 441-450; 101, ¶ 455; 122, ¶ 591; 122-125, ¶¶ 593-606; Docket No 159.

[102]SAC at 6, ¶ 31; 54, ¶¶ 180-81; 58, ¶ 194; 67, ¶ 241; 76, ¶ 305; 81-82, ¶ 341; 97, ¶ 435; Docket No. 159.

development was the true purpose of the tiny blood draws. The Edison plaintiffs have stated plausible battery and medical battery claims against Walgreens.

Theranos also argues that the Edison plaintiffs have failed to state plausible battery and medical battery claims against it. Theranos argues that because plaintiffs admit that they consented to the blood draws, plaintiffs must allege more than that their consent was uninformed because "battery and lack of informed consent are separate causes of action." Saxena v. Goffney, 71 Cal. Rptr. 3d 469, 475 (Cal. Ct. App. 2008). Theranos contends that plaintiffs have sought to allege that their consent was vitiated by fraud or misrepresentation but what they are really attempting to do is recast an informed consent theory as a battery. Theranos argues that as long as the essential character of the treatment in question was therapeutic then consent cannot be vitiated even if plaintiffs were induced to give their consent via deception. Theranos argues that the actionable conduct is the blood draws, which is exactly what plaintiffs consented to. Theranos insists that this is not a case in which plaintiffs made a "substantial mistake concerning the nature of the invasion of [their] interests or the extent of harm to be expected from it. . . ."[103] But rather, Theranos contends that the Edison plaintiffs have pled that they were not fully informed about the status of the Edison device, i.e., that it was still in development. Such allegations, Theranos argues, sound in negligence, not battery. Theranos also argues that plaintiffs are attempting to expand the scope of consent required for a procedure to include not only the blood draw but also the

---

[103]Restatement (Second) of Torts § 892B.

running of the blood sample from that blood draw on a particular analyzer. Theranos argues that this is not plausible because plaintiffs cannot contend that they only provided consent for a particular method of analyzing their blood sample. Theranos contends that the crux of its argument is that in light of the Edison plaintiffs' consent to the essential conduct (the blood draw), what plaintiffs are in fact alleging is that Theranos did not disclose a research interest behind that procedure.

If this is the crux of Theranos's argument, this argument fails. The Edison plaintiffs are not just alleging that there was a "research interest" behind the Edison blood draws; they are alleging that the true and essential purpose of the Edison blood draws was research and development and that there was no legitimate purpose, allegations that the court has already found plausible. It is plausible that the Edison plaintiffs' consent to the blood draws was rendered ineffective by Theranos's alleged misrepresentations. Thus, the Edison plaintiffs have stated plausible battery and medical battery claims against Theranos.

### Negligence Claims (Fourth Cause of Action)

In the SAC, plaintiffs assert negligence claims against Theranos and Walgreens. Plaintiffs allege that "Walgreens and Theranos owed a duty of care . . . to provide testing services that were safe, reliable, and compliant with applicable laws and regulations."[104] Plaintiffs allege that this duty arose from "the nature of [Walgreens' and Theranos's] relationship to, and bargain with, the consumers, the medical related nature of the services

---

[104]SAC at 102, ¶ 462, Docket No. 159.

at issue, and the special position of trust occupied by Theranos and Walgreens in the context of blood and clinical testing."[105]  Plaintiffs allege that Walgreens also had an additional duty "to take reasonable steps to ensure that Theranos testing was reliable and safe prior to offering Theranos services for sale in its stores."[106]  Plaintiffs allege that Walgreens and Theranos breached their duty of care by

> designing and/or selling services that were unreliable, not ready-for-market, not safe for consumers to rely on, conducted in a manner that did not satisfy applicable laws, regulations and/or standards for quality control, conducted in laboratories that did not meet applicable laws, regulations, and/or standards for safety and training, and conducted on inadequately maintained and calibrated equipment.[107]

Plaintiffs also allege that Walgreens breached its duty to ensure that the Theranos testing was reliable and safe

> by deliberately ignoring and intentionally remaining ignorant of material facts about Theranos testing, despite the fact that it had identified numerous red flags and concerns that put it on notice of the problems, without requiring objective evidence from Theranos that the tests were reliable, and while deliberately and knowingly maintaining no oversight of Theranos's testing services.[108]

---

[105]SAC at 102, ¶ 462, Docket No. 159.

[106]SAC at 103, ¶ 465, Docket No. 159.

[107]SAC at 102-103, ¶ 463, Docket No. 159.

[108]SAC at 103, ¶ 466, Docket No. 159.

Under Arizona law, "[t]o establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." Gipson v. Kasey, 150 P.3d 228, 230 (Ariz. 2007). Under California law, "[a]ctionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." United States Liab. Ins. Co. v. Haidinger–Hayes, Inc., 463 P.2d 770, 774 (Cal. 1970).

Walgreens argues that plaintiffs have failed to state plausible negligence claims because Walgreens did not owe the duties that plaintiffs have alleged because Walgreens did not offer blood testing. Rather, Walgreens contends that it offered blood draws for Theranos's blood testing services. Walgreens argues that plaintiffs have not alleged that the blood draws themselves were unsafe, unreliable, or illegal. Walgreens reminds plaintiffs that while a pharmacy has a duty "to accurately fill a prescription", a pharmacy does not have "a duty to warn or an affirmative duty to counsel customers on the side effects of prescription drugs." Corcoran v. CVS Health Corp., 169 F. Supp. 3d 970, 989 (N.D. Cal. 2016). A pharmacist's duty is construed narrowly. Id. Thus, Walgreens argues that there is no basis for imposing an obligation on a pharmacy to investigate and verify the efficacy of third-party-designed medical products, like Theranos blood testing. Walgreens argues that pharmacies cannot regulate drug companies, second-guess doctors, investigate side effects,

or independently corroborate medical testing. Walgreens insists that its duty here was limited to performing the services conducted by pharmacy staff within the pharmacy's narrow role, which was to do blood draws and store the blood, services which plaintiffs do not allege were done negligently.

Plaintiffs' negligence claims against Walgreens are plausible. Here, Walgreens was not just selling a product produced by a third party. Walgreens was actively involved in a blood testing service. As an active participant, it is plausible that Walgreens owed plaintiffs a duty to provide testing services that were reliable and compliant with applicable laws and regulations.

Theranos argues that the non-Edison plaintiffs' negligence claims are not plausible because they have not alleged how Theranos breached any duty to them, given that they were never told which analyzer would be used to conduct patient testing. Plaintiffs, however, have adequately alleged that Theranos breached the duty of trust to the non-Edison plaintiffs because they plausibly allege that the non-Edison tests were "unreliable and posed a serious danger to any customer who might rely on" them.[109]

Theranos next argues that the non-Edison plaintiffs' negligence claims fail because they are not based on misrepresentations and omissions. In particular, Theranos argues that the non-Edison plaintiffs have not alleged facts supporting their negligence claims because they have not alleged any facts that the tests being run on commercial analyzers were

---

[109]SAC at 39, ¶ 121, Docket No. 159.

unreliable. But, plaintiffs have plausibly alleged that the non-Edison tests were unreliable because of problems in Theranos's labs. The non-Edison plaintiffs' negligence claims against Theranos are plausible.[110]

### Negligent Misrepresentation Claims (Fifth Cause of Action)

In the SAC, plaintiffs assert negligent misrepresentation claims against Walgreens and Theranos. Plaintiffs allege that Walgreens and Theranos made "false statements of fact and provided false information" in their "pervasive marketing" about the Edison technology being ready-for-market and about Theranos blood testing being "reliable and certified by and compliant with government and industry standards."[111] Plaintiffs allege that "Walgreens and Theranos knew, or in the exercise of reasonable diligence should have known, that their express representations regarding Theranos testing were false and misleading. Walgreens and Theranos made such statements without reasonable grounds for believing them to be true."[112]

Under Arizona law,

[t]he elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or

---

[110]The Edison plaintiffs' negligence claims against Theranos are also plausible.

[111]SAC at 104, ¶ 473, Docket No. 159.

[112]SAC at 105, ¶ 479, Docket No. 159.

> communicating the information; (4) the plaintiff justifiably
> relied on the incorrect information; and (5) resulting damage.

KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co., 340 P.3d 405, 412 n.7 (Ariz. Ct. App.

2014).  The elements are the same under California law.  Goonewardene v. ADP, LLC, 209

Cal. Rptr. 3d 722, 741 (Cal. Ct. App. 2016).  A "claim of negligent misrepresentation fails

absent an assertion of facts to show that the party making the representation owed a duty to

a party who justifiably relied on the statement." Lemad Corp. v. Miravista Holdings, L.L.C.,

Case No. 1 CA–CV 12–061, 2014 WL 4649593, at *4 (Ariz. Ct. App. Sept. 18, 2014); see

also, Eddy v. Sharp, 199 Cal. App. 3d 858, 864 (Cal. Ct. App. 1988) ("[R]esponsibility for

negligent misrepresentation rests upon the existence of a legal duty, imposed by contract,

statute or otherwise, owed by a defendant to the injured person").

Walgreens argues that plaintiffs' negligent misrepresentation claims are not plausible

because the only reference to a duty that plaintiffs have alleged is that "Walgreens and

Theranos had a duty to disclose all facts material to [p]laintiffs' and the Class members'

submission to Theranos testing, purchase of Theranos testing, and reliance upon Theranos

test results."[113]  But, Walgreens argues that this duty relates to non-disclosure and plaintiffs'

negligent misrepresentation claims are not based on non-disclosure but rather upon

affirmative statements that were allegedly made in marketing materials.

---

[113]SAC at 104, ¶ 477, Docket No. 159.

While Walgreens is correct that in the allegations that are specific to their negligent misrepresentation claims, plaintiffs only allege a duty to disclose, plaintiffs do incorporate their allegations in prior paragraphs as part of their negligent misrepresentation allegations.[114] And, plaintiffs have alleged some specific duties in connection with their negligence claims. Thus, plaintiffs have adequately alleged a duty as to their negligent misrepresentation claims.

Next, Walgreens and Theranos both argue that plaintiffs have failed to plead their negligent misrepresentation claims with the particularity required by Rule 9(b). Plaintiffs' negligent misrepresentation claims are based on the same affirmative misrepresentations as plaintiffs' affirmative misrepresentation fraud claims. As discussed above, some of plaintiffs failed to plead their affirmative misrepresentation fraud claims with particularity, which means that they have also failed to plead their negligent misrepresentation claims with particularity. The negligent misrepresentation claims asserted against Walgreens by A.R., B.P., D.L., L.M., M.P., R.C., R.G., S.J., and S.L. are dismissed. The negligent misrepresentation claims asserted against Theranos by A.R., L.M., and R.G. are also dismissed. None of these plaintiffs are given leave to amend their negligent misrepresentation claims as they have already had one opportunity to amend these claims.

### Breach of Contract Claims (Sixth Cause of Action)

Under Arizona law, "'[t]o bring an action for . . . breach of . . . contract, the plaintiff has the burden of proving the existence of the contract, its breach and the resulting

---

[114]SAC at 104, ¶ 471, Docket No. 159.

damages.'" Thomas v. Montelucia Villas, LLC, 302 P.3d 617, 621 (Ariz. 2013) (quoting Graham v. Asbury, 540 P.2d 656, 657 (Ariz. 1975)).  Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  Oasis West Realty, LLC v. Goldman, 250 P.3d 1115, 1121 (Cal. 2011).

In the SAC, plaintiffs assert breach of contract claims against Walgreens and Theranos.  They allege that either express or implied contracts were formed when they purchased blood testing services and that the terms of the contracts were set forth in the marketing materials disseminated by Walgreens and Theranos and in the direct testing order forms that some plaintiffs received and submitted.[115]  Plaintiffs allege that plaintiffs who "purchased services at a Walgreens store" had a contract with both Walgreens and Theranos and that plaintiffs "who purchased services at a Theranos-owned facility" had a contract with Theranos.[116]

In the order on the first motions to dismiss, the court dismissed plaintiffs' breach of contract claims based on the direct testing forms as implausible, in large part because no plaintiff alleged that they had completed a direct testing form.[117]  Plaintiffs have fixed this

---

[115]SAC at 105-106, ¶¶ 487-489, Docket No. 159.

[116]SAC at 106, ¶ 489, Docket No. 159.

[117]Order re Motions to Dismiss at 29, Docket No. 139.

problem in the SAC. M.P. and R.G. now allege that they received and submitted the direct testing order forms and corresponding guide to direct testing.[118] Thus, at least as to these two plaintiffs, their contract claims can be based on representations made in these forms.

As for plaintiffs' contention that the terms of their contracts were set forth in the marketing materials, Walgreens and Theranos argue that the marketing materials are not specific enough to define the terms of an agreement. But, the court has already rejected this argument.[119]

Walgreens next argues that plaintiffs have not adequately alleged that Walgreens breached the contracts. Walgreens argues that plaintiffs have basically alleged that the contracts were breached because Walgreens and Theranos failed to provide reliable testing services.[120] However, Walgreens argues that plaintiffs have not alleged that Walgreens ever told plaintiffs that it would be performing testing services. Rather, Walgreens contends that plaintiffs have consistently alleged a division of labor between Walgreens and Theranos. For example, in paragraph 51, plaintiffs allege that Walgreens' tasks were to handle patients, physically draw blood, collect other samples, collect demographic and insurance information, collect co-pays, and properly store and prepare the samples for pick-up.[121] Walgreens insists

---

[118]SAC at 106, ¶ 488, Docket No. 159.

[119]Order re Motions to Dismiss at 30, Docket No. 139.

[120]SAC at 107, ¶ 493, Docket No. 159.

[121]SAC at 12-13, ¶ 51, Docket No. 159.

that nowhere in the SAC do plaintiffs allege that Walgreens was to do the actual blood testing but rather plaintiffs allege that Theranos's task was to test the samples that Walgreens collected.[122]

Walgreens' argument ignores the fact that Walgreens promised customers blood testing services that were reliable and of the highest quality, a promise which plaintiffs allege Walgreens breached. Plaintiffs have plausibly alleged that Walgreens breached the contracts plaintiffs had with Walgreens. Plaintiffs' breach of contract claims against Theranos are also plausible.

### Unjust Enrichment Claims (Seventh Cause of Action)

In order to prevail on an unjust enrichment claim under Arizona law, "a plaintiff must establish that, (1) plaintiff conferred a benefit upon the defendant; (2) defendant's benefit is at plaintiff's expense; and (3) it would be unjust to allow defendant to keep the benefit." USLife Title Co. of Ariz. v. Gutkin, 732 P.2d 579, 584 (Ariz. Ct. App. 1986). Under California law, "the elements for a claim of unjust enrichment [are] receipt of a benefit and unjust retention of the benefit at the expense of another." Elder v. Pacific Bell Telephone Co., 141 Cal. Rptr. 3d 48, 61 (Cal. Ct. App. 2012) (citation omitted).

In the SAC, plaintiffs assert unjust enrichment claims against all defendants. Plaintiffs allege they have lost money because they purchased unreliable blood tests and that defendants have each been unjustly enriched "by their conduct . . . including . . . through

---

[122]SAC at 13, ¶ 52, Docket No. 159.

revenues received in connection with [plaintiffs' purchase of] Theranos tests, through development of their products, accumulation and storage of valuable patient information and usable blood samples, and through additional business and revenue Walgreens received by virtue of having Wellness Centers in their stores."[123]   In addition, plaintiffs allege that Holmes and Balwani have been unjustly enriched because they both "personally received" millons of  dollars "as a direct result of their personal conduct. . . ."[124]   Plaintiffs seek restitution and disgorgement of "all profits and compensation improperly obtained by [d]efendants. . . ."[125]

Defendants first argue that the Arizona plaintiffs' unjust enrichment claims have been mooted by the Consent Decree.  Defendants suggest that the only relief that the Arizona plaintiffs could obtain on their unjust enrichment claims is their out-of-pocket expenses, which they have already received under the Consent Decree.  However, there is other relief the Arizona plaintiffs could obtain if they were to prevail on their unjust enrichment claims, such as a disgorgement of profits and compensation that defendants received as a result of the alleged fraud.

As for A.R.'s unjust enrichment claim, defendants argue that it should be dismissed because unjust enrichment is not a separate cause of action under California law.  A.R.'s

---

[123]SAC at 107-108, ¶ 500, Docket No. 159.

[124]SAC at 108, ¶ 501, Docket No. 159.

[125]SAC at 127, ¶¶ 3-4, Docket No. 159.

unjust enrichment claim "will depend upon the viability of [his] other claims." Sanders v. Apple Inc., 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009). Because at least some of A.R.'s other claims survive the motions to dismiss, his unjust enrichment claim survives as well.

### Aiding and Abetting Claims against Walgreens (Eighth Cause of Action)

Under Arizona law,

> [c]laims of aiding and abetting tortious conduct require proof of three elements:
>
> "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff;
>
> (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.

Federico v. Maric, 226 P.3d 403, 405 (Ariz. Ct. App. 2010) (quoting Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund, 38 P.3d 12, 23 (Ariz. 2002)). Under California law, "[a] plaintiff may state a claim for aiding and abetting an intentional tort if (1) the defendant knew that the primary tortfeasor's conduct constitutes a breach of duty, and (2) the defendant gave substantial assistance or encouragement to the other to so act." Hunter v. Citibank, N.A., No. C09-02079-JW, 2010 WL 2509933, at *18 (N.D. Cal. Feb. 3, 2010).

Plaintiffs' aiding and abetting claims are asserted against Walgreens only. Walgreens argues that plaintiffs have not adequately alleged that Walgreens actually knew that the

Theranos defendants were committing fraud. "[M]ere knowledge of suspicious activity is not enough. The defendant must be aware of the fraud." Stern v. Charles Schwab & Co., Case No. CV–09–1229–PHX–DGC, 2009 WL 3352408, at *7 (D. Ariz. Oct. 16, 2009). "Red flags . . . do not amount to . . . actual knowledge of fraud. . . ." Id. at *5. Yet that is all plaintiffs have alleged here, according to Walgreens, which is not sufficient to state plausible aiding and abetting claims.

The court rejected this same argument in the order on the first motions to dismiss.[126] The court found that plaintiffs' allegations were "sufficient to suggest that it is plausible that Walgreens was aware of more than just 'suspicious activity' but was actually aware of the alleged fraud."[127]

Walgreens argues that the court "incorrectly applied the 'general awareness' language articulated in Dawson v. Withycombe, 163 P.3d 1034 (Ariz. Ct. App. 2007)."[128] Presumably, Walgreens is referring to the statement in Dawson that "[a]ctual and complete knowledge of the details of the primary tort may not be necessary in all cases" of aiding and abetting and that in some cases, "the knowledge requirement may be satisfied by showing general awareness of the primary tortfeasor's fraudulent scheme." Id. at 1052. Walgreens seems to be arguing that there are no facts alleged that suggest that it was "generally aware" of the

---

[126]Order re Motions to Dismiss at 34-36, Docket No. 139.

[127]Id. at 36.

[128]Defendant Walgreens's Reply at 8, Docket No. 175.

Theranos defendants' fraudulent scheme, but rather that plaintiffs have alleged that the Theranos defendants attempted to prevent Walgreens from knowing anything about the Theranos technology.

As discussed in more detail above, plaintiffs have plausibly alleged that Walgreens was generally aware of the alleged fraud. Plaintiffs' allegations are sufficient to make their aiding and abetting claims plausible.

### RICO Claims (Ninth Cause of Action)

In the SAC, plaintiffs assert RICO claims against all defendants. "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996) (quoting 18 U.S.C. §§ 1964(c), 1962(c)). "'Racketeering activity' is defined in 18 U.S.C. § 1961(1)(B) as including any act 'indictable' under certain enumerated federal criminal statutes, including 18 U.S.C. § 1341, which makes mail fraud a criminal offense, and 18 U.S.C. § 1343, which makes wire fraud a crime." Schreiber Distributing Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1399 (9th Cir. 1986). Rule 9(b) "applies to civil RICO fraud claims." Edwards v. Marin Park, Inc., 356 F.3d 1058, 1066 (9th Cir. 2004). "[A]llegations of mail fraud under section 1962(a)–1962(c) 'must identify the time, place, and manner of each fraud plus the role of each defendant in each scheme.'" Schreiber Distributing, 806 F.2d at 1401 (quoting Lewis v. Sporck, 612 F. Supp. 1316, 1325 (N.D. Cal. 1985)). And, "Rule 9(b) requires that

the plaintiff allege a wire fraud claim with particularity, stating the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Sebastian Int'l, Inc. v. Russolillo, 186 F. Supp. 2d 1055, 1066 (C.D. Cal. 2000).

In the order on the first motions to dismiss, the court found that plaintiffs had adequately alleged a RICO claim based on two specific predicate acts of wire fraud but dismissed plaintiffs' RICO claim to the extent that it was based on predicate acts of mail fraud.[129] Plaintiffs were given leave to amend their RICO claim based on mail fraud and to add predicate acts of wire fraud.[130]

Plaintiffs have not fixed their mail fraud allegations. Plaintiffs allege that "when Walgreens and Theranos drew 'tiny' blood samples at the Wellness Centers, the samples obtained then had to be shipped to one of two centralized labs[.]"[131] This allegation suffers from some of the same problems as plaintiffs' allegation in the first amended complaint, which plaintiffs contended supported their mail fraud claim, that blood samples had been "couriered" to one of the centralized labs.[132] The court found that allegation insufficient because it said "nothing about sending the blood samples in the mail, it d[id] not identify when any particular blood samples were sent nor d[id] it delineate which defendant was

---

[129]Order re Motions to Dismiss at 41-42, Docket No. 139.

[130]Id. at 42-43.

[131]SAC at 41, ¶ 131, Docket No. 159.

[132]First Amended CCA Complaint at 34, ¶ 99, Docket No. 107.

responsible for sending any particular blood sample through the mail."[133]  Similarly, the reference to "shipping" the blood samples says nothing about sending the blood samples in the mail nor does it identify when any particular samples were sent.  The portion of plaintiffs' RICO claims which are based on mail fraud are dismissed.  Plaintiffs are not given leave to amend these claims as they have already had one opportunity to amend these claims.

As for plaintiffs' RICO claims based on wire fraud, defendants argue that plaintiffs have not adequately pled an association-in-fact enterprise.  "[A]n associated-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct."  Odom v. Microsoft Corp., 486 F.3d 541, 552 (9th Cir. 2007) (citation omitted).  To show an association-in-fact enterprise, plaintiffs must plead a common purpose, "facts showing 'some participation in the operation or management of the enterprise by members[,]" "that the enterprise had the longevity necessary to accomplish its purpose[,]" and "facts indicating that the alleged associates in the enterprise, over time, function[ed] as a continuing unit."  Committee to Protect our Agri. Water v. Occidental Oil and Gas Corp., 235 F. Supp. 3d 1132, 1173–74 (E.D. Cal. 2017) (internal citations omitted).

Defendants argue that plaintiffs have failed to adequately allege that defendants worked together to achieve a common purpose.  "[C]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."  Shaw v. Nissan N. Amer., Inc., 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) (citations omitted).  "In

---

[133]Order re Motions to Dismiss at 42, Docket No. 139.

evaluating the parties' competing arguments regarding the existence of a common purpose, the court will not require an allegation of fraudulent common purpose but is mindful of the guidance that entities engaged in 'ordinary business conduct and an ordinary business purpose' do not necessarily constitute an 'enterprise' bound by common purpose under RICO." Id. (quoting In re Jamster Mktg. Litig., No. 05cv–0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009)). Although plaintiffs allege that defendants' common purpose was to "perpetuate fraud," defendants argue that this is nothing more than a conclusory allegation and that all plaintiffs have alleged is that Walgreens and Theranos entered into a commercial relationship to further their own separate business interests.

Plaintiffs have adequately alleged an association-in-fact. Plaintiffs have alleged that Walgreens knowingly participated with the Theranos defendants in the scheme to defraud purchasers of Theranos blood tests, allegations which support their contention that defendants shared a common purpose to market and sell unreliable blood tests to unsuspecting consumers in order to derive profits and revenues. Plaintiffs have plausibly alleged that Walgreens' relationship with the Theranos defendants was not a routine business relationship, in large part because plaintiffs have alleged that Walgreens itself made affirmative misrepresentations and actively concealed information.

Walgreens next argues that plaintiffs' RICO claims are not plausible because plaintiffs have not adequately alleged the "conduct" element. For purposes of RICO, the "word 'conduct' . . . requires an element of direction." Walter v. Drayson, 538 F.3d 1244, 1247 (9th

Cir. 2008) (internal citation omitted). There must be some indication that Walgreens had "some part in directing [the enterprise's] affairs." Id. at 1249 (citation omitted). Walgreens argues that rather than alleging that Walgreens had some part in directing the enterprise's affairs, plaintiffs have alleged that Walgreens was excluded from such.

Plaintiffs have adequately alleged that Walgreens participated in the conduct of the enterprise because they have alleged that Walgreens injected $140 million into Theranos, knowingly and deceptively marketed the unreliable tests to consumers, concealed material information from consumers, provided the locations for the blood draws themselves, and performed and oversaw the blood draws. These allegations are sufficient to make it plausible that Walgreens had some part in directing the enterprise's affairs.

Walgreens next argues that plaintiffs have not adequately alleged wire fraud against Walgreens because plaintiffs have not alleged any facts that suggest that Walgreens acted with a specific intent to defraud. The wire fraud statute "contain[s] three elements: (A) the formation of a scheme to defraud, (B) the use of the . . . wires in furtherance of that scheme, and (C) the specific intent to defraud." Eclectic Properties East, 751 F.3d at 997. Walgreens argues that the wire fraud allegations are limited to its promotion of Theranos's product and that participation in advertising is an insufficient basis upon which to find RICO liability because there is no intent to defraud.

Plaintiffs have identified specific fraudulent statements made on Walgreens' website and when those statements were made. Plaintiffs allege that in March 2014, "Walgreens'

-54-

website stated that the Theranos technology supported 'better, more informed treatment.'"[134]

And, as discussed above, plaintiffs have adequately alleged that Walgreens knew that the Theranos blood tests were not reliable. These allegations are sufficient to make it plausible that Walgreens had an intent to defraud.

Finally, the Theranos defendants argue that plaintiffs' RICO claims are not plausible because plaintiffs have not alleged injury to their business or property. "[T]o state a claim for a civil RICO violation, a private plaintiff must allege facts showing . . . an injury to business or property. . . ." Walker v. Gates, Case No. 2CV 01–10904GAF(PJWX), 2002 WL 1065618, at *7 (C.D. Cal. May 28, 2002). "[A] plaintiff asserting injury to property" must "allege 'concrete financial loss.'" Canyon County v. Syngenta Seeds, Inc., 519 F.3d 969, 975 (9th Cir. 2008) (quoting Oscar v. Univ. Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir. 1992)). "Financial loss alone, however, is insufficient. 'Without a harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law—there is no injury to business or property within the meaning of RICO.'" Id. (quoting Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005)). "In the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money." Id. at 976. But, "personal injury, including emotional distress, is not compensable under section 1964(c) of RICO." Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir. 1990).

---

[134]SAC at 35, ¶ 111 and n.44, Docket No. 159.

The Theranos defendants contend that the only financial loss that plaintiffs allege is the money they paid for their Theranos blood tests, which the Arizona plaintiffs have already recovered under the Consent Decree. The only other losses claimed by plaintiffs, according to the Theranos defendants, are pain, emotional distress, stress, and anxiety, which are not recoverable under RICO.

It is plausible that plaintiffs suffered other financial losses that did not flow from their personal injuries. Plaintiffs A.R., L.M., and S.J. allege that they took unnecessary medication as a result of their Theranos blood tests,[135] which they may have had to pay for in whole or in part. Plaintiffs B.B., B.P., D.L., M.P., R.G. and S.L. allege that after learning of the unreliability of the Theranos tests, they had their blood tested by other companies,[136] tests they presumably had to pay for in whole or in part. R.C. alleges that he was hospitalized due to the unreliability of the Theranos testing and it is reasonable to infer that he had out-of-pocket expenses connected with this hospitalization.[137]

### California Statutory Consumer Protection Claims (Tenth through Thirteenth Causes of Action)

In the Tenth through Thirteenth Causes of Action, plaintiff A.R. asserts the following California statutory claims: 1) a claim based on California's Unfair Competition Law

---

[135]SAC at 64, ¶ 216; 73, ¶ 282; 83, ¶ 353; Docket No. 159.

[136]SAC at 66, ¶ 232; 70, ¶ 255; 72, ¶ 270; 74, ¶ 284; 75, ¶ 296; 80, ¶ 332; 86, ¶ 370; Docket No. 159.

[137]SAC at 78, ¶ 316, Docket No. 159.

("UCL"), 2) a claim based on California's False Advertising Law ("FAL"), 3) a claim based on California's Consumer Legal Remedies Act ("CLRA"), and 4) a California statutory deceit claim. In the SAC, A.R.'s California statutory claims are based on allegations that defendants made affirmative misrepresentations about the Theranos blood tests, that defendants concealed material information about the Theranos blood tests, and that defendants knowingly sold unreliable blood tests.[138] The claims based on omissions are asserted against all defendants. The claims based on affirmative misrepresentations are only asserted against Walgreens and Theranos.

Walgreens first argues that A.R.'s UCL "unfair" claim has not been pled with particularity. "Rule 9(b)'s particularity requirement applies to each of the three prongs of the UCL ('unlawful,' 'unfair,' and 'fraudulent') where, as here, the claims are based on a 'unified course of fraudulent conduct.'" Rosado v. eBay Inc., 53 F. Supp. 3d 1256, 1265 (N.D. Cal. 2014) (quoting Kearns v. Ford Motor Co. 567 F.3d 1120, 1126–27 (9th Cir. 2009)). "An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." Daugherty v. American Honda Motor Co., 51 Cal. Rptr. 3d 118, 129 (Cal. Ct. App. 2006). Walgreens argues that plaintiff A.R. has not alleged what Walgreens did that was supposedly unfair.

---

[138]SAC at 114, ¶ 536; 117, ¶ 554; 119; ¶¶ 567-568; 121, ¶ 580, Docket No. 159.

A.R. has adequately alleged unfairness as to Walgreens. A.R. alleges that "[d]efendants . . . engaged in a years-long, pervasive scheme of . . . concealing from consumers material information about the reliability of Theranos tests and the compliance of Theranos testing with applicable laws and standards."[139] And, plaintiffs have alleged specific information that Walgreens failed to disclose.[140]

The Theranos defendants argue that A.R.'s statutory claims fail for the same reason that the claims asserted by the other non-Edison plaintiffs fail, namely that the non-Edison plaintiffs have failed to adequately allege that the Theranos defendants knew, at the time the non-Edison tests were being sold, that they were unreliable. More specifically, the Theranos defendants argue that A.R. has not adequately pled that they knew, in June 2015, which is when A.R. alleges he had a Theranos blood test,[141] that the testing on non-Edison machines was not reliable. But, as discussed above, plaintiffs have adequately alleged that the Theranos defendants knew by June 2015 that the Theranos blood tests, including the non-Edison tests, were not reliable.

Finally, Walgreens and Theranos argue that A.R.'s statutory claims that are based on affirmative misrepresentations are implausible because A.R. has not alleged any facts that demonstrate that he relied on any statements made by Walgreens or Theranos. "To prevail

---

[139]SAC at 115, ¶ 544, Docket No. 159.

[140]SAC at 16-17, ¶ 66, Docket No. 159.

[141]SAC at 63, ¶ 210, Docket No. 159.

on [his] causes of action under the UCL, FAL, and the CLRA, [A.R.] must demonstrate that [he] actually relied on the challenged misrepresentations and suffered economic injury as a result of that reliance." Wilson v. Frito-Lay N. Amer., Inc., 260 F. Supp. 3d 1202, 1208 (N.D. Cal. 2017). Reliance is also a required element of a statutory deceit claim. Diaz v. Fed. Express Corp., 373 F. Supp. 2d 1034, 1066–67 (C.D. Cal. 2005).

As discussed above, A.R. has failed to adequately plead reliance on Walgreens' and Theranos' affirmative misrepresentations. A.R.'s statutory claims based on affirmative misrepresentations are dismissed.[142] A.R. is not given leave to amend these claims as he has already had one opportunity to amend these claims.

## Conclusion

Defendants' motions to dismiss are granted in part and denied in part.[143] The motions are granted as to

1) the CFA and common law fraud claims in the First and Second Causes of Action based on affirmative misrepresentations which are asserted against Walgreens by plaintiffs A.R., B.P., D.L., L.M., M.P., R.C., R.G., S.J., and S.L.;

---

[142]A.R.'s statutory claims based on omissions are not dismissed as these claims are plausible.

[143]Docket Nos. 166 and 167.

2)   the CFA and common law fraud claims in the First and Second Causes of Action based on affirmative misrepresentations which are asserted against Theranos by plaintiffs L.M., and R.G.;

3)   the common law fraud claim in the Second Cause of Action based on affirmative misrepresentations which is asserted against Theranos by plaintiff A.R.;

4)   the negligent misrepresentation claims in the Fifth Cause of Action asserted against Walgreens by plaintiffs A.R., B.P., D.L., L.M., M.P., R.C., R.G., S.J., and S.L.;

5)   the negligent misrepresentation claims in the Fifth Cause of Action asserted against Theranos by plaintiffs A.R., L.M., and R.G.;

6)   plaintiffs' RICO mail fraud claims in the Ninth Cause of Action asserted against all defendants; and

7)   A.R.'s statutory claims in the Tenth through Thirteen Causes of Action based on affirmative misrepresentations which are asserted against Walgreens and Theranos.

The foregoing claims are dismissed with prejudice. Plaintiffs are not given leave to amend as to these claims.

The motions are denied as to

1)      plaintiffs' CFA and common law fraud claims in the First and Second Causes of Action based on omissions which are asserted against all defendants;

2)      the CFA and common law fraud claims in the First and Second Causes of Action based on affirmative misrepresentations which are asserted against Walgreens by B.B.,

3)      the CFA and common law fraud claims in the First and Second Causes of Action based on affirmative misrepresentations which are asserted against Theranos by plaintiffs B.B., B.P., D.L., M.P., R.C., S.J., and S.L.;

4)      the battery and medical battery claims in the Third and Fourteenth Causes of Action asserted against Walgreens and Theranos by plaintiffs B.P., R.C., and S.J.;

5)      plaintiffs' negligence claims in the Fourth Cause of Action asserted against Walgreens and Theranos;

6)      B.B.'s negligent misrepresentation claim in the Fifth Cause of Action asserted against Walgreens;

7)      the negligent misrepresentations claims in the Fifth Cause of Action asserted against Theranos by plaintiffs B.B., B.P., D.L., M.P., R.C., S.J., and S.L.;

8)      plaintiffs' breach of contract claims in the Sixth Cause of Action asserted against Walgreens and Theranos;

9) plaintiffs' unjust enrichment claims in the Seventh Cause of Action asserted against all defendants;

10) plaintiffs' aiding and abetting claims in the Eighth Cause of Action asserted against Walgreens;

11) plaintiffs' RICO wire fraud claims in the Ninth Cause of Action asserted against all defendants; and

13) A.R.'s statutory claims in the Tenth through Thirteen Causes of Action based on omissions which are asserted against all defendants.

DATED at Anchorage, Alaska, this 10th day of April, 2018.

/s/ H. Russel Holland
United States District Judge