1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3              _____

4
    In re:                      )
5                               )
    Arizona THERANOS, INC.,     ) No. CV 16-2138-PHX-HRH
6   Litigation,                 )    (Consolidated with)
                                ) No. CV 16-2373-PHX-HRH
7                               ) No. CV 16-2660-PHX-HRH
                                ) No. CV 16-2775-PHX-HRH
8                               )       -and-
                                ) No. CV 16-3599-PHX-HRH
9                               )
    _____)
10

11                  Phoenix, Arizona
                    March 19, 2018
12                    1:30 p.m.

13       BEFORE:  THE HONORABLE H. RUSSEL HOLLAND, JUDGE

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               (*Motion Hearing*)

16

17

18

19

20  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
21  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
22  Phoenix, Arizona 85003-2151
    (602) 322-7256
23
    Proceedings Reported by Stenographic Court Reporter
24  Transcript Prepared by Computer-Aided Transcription

25

1    APPEARANCES:

2    For the Plaintiffs:
              LIEFF CABRASER HEIMANN & BERNSTEIN
3             LLP - San Francisco, CA
              By:  Roger N. Heller, Esq.
4             By:  Melissa A. Gardner, Esq.
              275 Battery Street
5             29th Floor
              San Francisco, California 94111

6
              KELLER ROHRBACK LLP
7             By:  T. David Copley, Esq.
              1201 3rd Avenue
8             Suite 3200
              Seattle, Washington 98101

9
     For the Defendant Theranos:
10            WILMER CUTLER PICKERING HALE & DORR
              LLP - Los Angeles, CA
11            By:  Christopher T. Casamassima, Esq.
              By:  Matthew Benedetto, Esq.
12            350 South Grand Avenue
              Suite 2100
13            Los Angeles, California 90071

14   For the Defendant Walgreen's:
              LEWIS ROCA ROTHGERBER CHRISTIE
15            LLP - Phoenix, AZ
              By:  Dan W. Goldfine, Esq.
16            By:  Lindsey C. Herzog, Esq.
              201 East Washington Street
17            Suite 1200
              Phoenix, Arizona 85004
18            .

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  This is Case Number CV 16-2138.

3   This is in regards to Arizona Theranos, Incorporated

4   Litigation, before the Court for motion hearings.

5          Will the parties please announce for the record.          01:31PM

6          MR. HELLER:  Good afternoon, Your Honor.  Roger Heller

7   on behalf of plaintiffs.

8          MS. GARDNER:  Melissa Gardner on behalf of the

9   plaintiffs.

10          MR. COPLEY:  David Copley for plaintiffs.          01:31PM

11          MR. CASAMASSIMA:  Good afternoon, Your Honor.  Chris

12   Casamassima on behalf of Theranos.

13          MR. BENEDETTO:  Matthew Benedetto on behalf of

14   Theranos.

15          MR. GOLDFINE:  Dan Goldfine on behalf of Walgreen's          01:31PM

16   only.

17          MS. HERZOG:  Lindsey Herzog on behalf of Walgreen's.

18          THE COURT:  Please be seated.

19          Couple of preliminaries before we get started on the

20   arguments.  First, we're here in connection with motions for          01:32PM

21   dismissal brought by Theranos and Walgreen's.  We have

22   suggested 15 minutes per side -- no, 15 minutes per party for

23   each of Walgreen's and Theranos and 30 minutes for the

24   plaintiffs.

25          (Discussion off the record between the Court and court          01:32PM

1    staff.)

2             THE COURT:  We have suggested 15 minutes for each of

3    Theranos and Walgreen's and 30 minutes for the plaintiff.  I

4    really would appreciate your observing those restrictions

5    because we have some other scheduling considerations this          01:33PM

6    afternoon.  If the moving parties wish to reserve some time for

7    rebuttal, please do so within the 15 minutes.

8             Couple of preliminary things.  We have received, I

9    believe, two filings since the motions were briefed; one having

10   to do with some state court proceedings instituted by the         01:33PM

11   plaintiffs.  I don't see the subject of that motion having any

12   great impact on what we're doing here.  However, in resolving

13   these motions, should we -- and hopefully we will get that done

14   before the state court does anything -- we'll create a back

15   door so that if something happens in the state court               01:33PM

16   proceedings that I don't expect to happen we can take another

17   look at what the state court did that might affect our

18   proceedings.

19            The second thing that we received came in yesterday

20   based upon the SEC proceedings with respect to the defendant       01:34PM

21   Theranos and the individual defendants.  Again, I don't see

22   that having a whole lot to do with what we're here to discuss

23   today, but I note that we have received that filing and we'll

24   take a look at it.

25            Couple of more preliminary things that might assist in    01:34PM

1    your comments to me today.  First, if I'm correct, there have

2    been a litany of other proceedings that don't directly affect

3    what we're doing.  There apparently was some investor

4    litigation.  There's the SEC litigation.  If there's anything

5    anybody needs to tell me about anything else that's going on,          01:35PM

6    I'm here to listen about it.  I'd rather hear about it here

7    than read it in the newspaper as we did with the SEC materials.

8            One other thing or two.  We've got claims that are the

9    subject of a Motion to Dismiss having to do with negligence,

10   with misrepresentation and breach of contract.  At the risk of        01:35PM

11   jumping ahead of you all, I suspect that those claims are going

12   to survive a Motion to Dismiss.  But I am concerned that having

13   those three claims is not very helpful.  I think the fraud

14   claim here is what we all really need to focus on and that as

15   this matter moves forward, I hope that some of these subsidiary       01:36PM

16   claims might be slimmed down or sloughed off, if you will.

17           And with respect to the contract claim in particular,

18   I'm not having any difficulty understanding that there is a

19   potential plausible claim for breach of contract against

20   Walgreen's.  I'm having real trouble understanding how there         01:36PM

21   could be a contract claim against Theranos given the

22   relationship of the parties here.  And you might want to

23   comment on that.

24           With respect to the unjust enrichment claim, I'm

25   wondering what's left of that in light of what the Attorney          01:37PM

1   General has done with respect to restitution through a consent

2   decree.  I'm having difficulty seeing whether there's any

3   benefit from the plaintiffs to defendants beyond the

4   restitution matter.

5           And one final thing, with respect to the RICO claim,          01:37PM

6   I'm wondering if there is anything to support a RICO claim

7   other than the cost of testing which costs people money.  But

8   if you get to the RICO claim, maybe you can help me with that a

9   little bit.

10          With that introduction, let's start hearing from the        01:37PM

11  parties.  Who wants to go first as between the defendants?

12          MR. GOLDFINE:  Dan Goldfine for Walgreen's.

13          THE COURT:  Let's do it.

14          MR. GOLDFINE:  Good afternoon, Your Honor.  Again, I

15  want to make clear I'm arguing only on behalf of Walgreen's.        01:38PM

16          THE COURT:  Yes.

17          MR. GOLDFINE:  I'm new to this case, or I was new to

18  this case this fall.  And what was obvious then and remains so

19  now with the Second Amended Complaint is plaintiffs simply lump

20  Walgreen's together with Theranos everywhere and as to             01:38PM

21  everything.  Plaintiffs do not allege what Walgreen's did,

22  said, or knew, and most importantly, when Walgreen's knew

23  certain things distinct from Theranos.  They have alleged

24  Theranos deceived Walgreen's into paying it, paying Theranos,

25  $140 million on a proof of concept but with deceptive,             01:38PM

1  allegedly deceptive false statements, coloring and negating

2  plaintiffs' claims that Walgreen's knew Theranos's scheme from

3  the get-go and negating that Walgreen's acted with scienter or

4  intent.

5       The conclusory nature and the inherent implausibility

6  of the knowledge, scienter, and actual reliance allegations as

7  to Walgreen's weren't dismissed in light of *Twombly*,

8  *Matsushita*, and *Eclectic Properties*.  What these cases and

9  their progeny hold relevant to here, among other things, is

10  that plaintiffs can't meet their pleading burden.  When the

11  circumstances in the industry conditions indicate an obvious

12  alternative explanation and the plaintiffs have not pled that

13  something more, quote, unquote, "something more," to rule out

14  that explanation, again, as to Walgreen's.

15       And it's worse than a mere pleading failure.  Like

16  *Eclectic Properties*, by alleging Theranos's overwhelming

17  deception of Walgreen's investors and plaintiffs, Walgreen's

18  knowing involvement in the theme is not only implausible but

19  also logically impossible.  Like *Matsushita*, where the alleged

20  conspiracy didn't make any sense, if Walgreen's knew that the

21  essential purpose was to further Theranos's research and

22  development because the Edison technology was not ready, why

23  would Walgreen's pay $140 million, including a $100 million up

24  front fee, and that Theranos, as alleged, was an incredibly

25  deceptive and secretive technology company, as alleged, a

01:39PM

01:39PM

01:39PM

01:40PM

01:40PM

1    massive grift.  And as many others, to the tune of $700

2    million, as with many others, Walgreen's generally believed

3    that Theranos owned blood testing technology that would change

4    the world.  Walgreen's was deceived.  Walgreen's was not the

5    fraud artist as alleged here.                                    01:41PM

6         Walgreen's motion, I think, is well briefed on both

7    sides, so I'm not going to go through ad infinitum.  I just

8    want to focus on a few items.  9(b) as to the alleged fraud by

9    concealment claim, plaintiffs' joint marketing and lumping

10   together theory, I'd like to address how the briefing for the  01:41PM

11   original Motion to Dismiss led the Court, with all due respect,

12   Your Honor, to misapply the specific intent element of the

13   aiding and abetting allegations; the failure to plead discrete

14   facts that Walgreen's operated or managed the alleged RICO

15   enterprise; and then lastly, plaintiffs' failure to plead       01:41PM

16   actual knowledge as to Theranos' essential purpose in the

17   context of the battery claims.

18        Turning to the 9(b) and the omission of fraudulent

19   concealment context, this Court carefully deconstructed the

20   fraud allegations in the First Amended Complaint.  The Second   01:42PM

21   Amended Complaint is no better.  Again, they have lumped

22   Walgreen's in with Theranos at every turn.  On Pages 10 and 11

23   of your order, June 13, 2017 order, this Court ruled it could

24   not presume that Walgreen's knew what Theranos did.  That's a

25   correct statement of the law.  It also ruled that it could not  01:42PM

1  presume that because Theranos acted with intent and scienter

2  that Walgreen's also acted with intent and scienter. That is a

3  correct statement of the law.

4          Nevertheless, in Paragraph 73 through 75, 77, 78, 80,

5  and 81 of the Second Amended Complaint, plaintiffs do exactly          01:42PM

6  that as to both of these elements. And there are no

7  allegations elsewhere as to Walgreen's knowledge and intent

8  other than red flags and should have been aware before the

9  blood tests were taken. For fraud by concealment, the omission

10 claims, plaintiffs must allege who at Walgreen's concealed,          01:43PM

11 what, generally, Walgreen's concealed, the why Walgreen's

12 concealment was false and misleading. That's critical here

13 because we're in a unique circumstance where we have two

14 competing versions and we have Theranos's alleged fraud that

15 has a big impact.          01:43PM

16          The when, that's really important here because we have

17 blood tests taken on certain dates, and what did we know and

18 what did we say as alleged, and primarily there are no

19 allegations as noted as to what Walgreen's knew and then how

20 Walgreen's concealed. Other elements include plaintiffs'          01:43PM

21 actual reliance of Walgreen's concealment divorced from, and

22 not lumped together with, the overwhelming allegations of

23 Theranos's fraud and deceit; that Walgreen's knew of its own

24 concealment and that its purported concealment was false when

25 that was done, and that Walgreen's acted intentionally with          01:44PM

1    scienter when the purported concealment took place.

2        As deconstructed in detail in Walgreen's briefs, the

3    claim fraud by concealment, what Walgreen's actually knew, and

4    when it was known is missing from the Second Amended Complaint.

5    Alleged knowledge in 2016 does not work here because plaintiffs      01:44PM

6    had their blood tests before then.  Plaintiffs conceded that

7    Walgreen's did not know the problems until 2016.  That's in

8    their opposition to the Motion to Dismiss the First Amended

9    Complaint at Page 36, Note 18.  That concession is corroborated

10   by plaintiffs' allegations in the SEC investigation at               01:45PM

11   Paragraph 149 of the Second Amended Complaint and Exhibit 20 to

12   the Second Amended Complaint as well as the recent results from

13   that investigation.

14       What remains is conclusory pre-2016 allegations

15   lumping Walgreen's in with Theranos that certainly doesn't rule      01:45PM

16   out that Walgreen's was just a stooge here to Theranos's

17   alleged misdeeds.

18       In addition, it also doesn't rule out that each

19   plaintiff's alleged reliance is rendered implausible by the

20   timing problems and the allegations related to Theranos.            01:45PM

21   Theranos's overwhelming, alleged and overwhelming and repeated

22   fraud eviscerates any chance that plaintiffs relied on

23   Walgreen's silence.

24       Unless you have questions, I'm going to turn to joint

25   marketing.                                                          01:45PM

1          THE COURT:  No.  Go.  Go.

2          MR. GOLDFINE:  Even in their argument in their

3     opposition, plaintiffs resort to lumping together this joint

4     marketing theory.  That's Page 36 of their opposition.  I want

5     to first note that's an implied concession that they don't have          01:46PM

6     the allegations specifically that Walgreen's knew anything,

7     that Walgreen's had the intent prior to that point in time.

8          Also there's no legal support for this joint marketing

9     theory.  It gloms over these pleading failures.  And the

10    biggest problem is it gives no notice to Walgreen's what it did          01:46PM

11    that leads it to be in this Court.  Are we stuck having to

12    defend everything Theranos did and said just because we entered

13    into a business deal with them?

14         At Pages 8, Lines 1 through 8 of our initial brief,

15    moving to dismiss the Second Amended Complaint, Walgreen's          01:46PM

16    detailed why, absent allegations about Theranos, the timing of

17    plaintiffs' allegation in the Second Amended Complaint does not

18    implicate Walgreen's.  That's as to each and every plaintiff.

19    Plaintiff's 61-page opposition ignored this argument and simply

20    lumped Walgreen's in with Theranos.          01:47PM

21         I'd like to turn to the aiding and abetting, if that's

22    okay with you, Your Honor.

23         So I hate to do this, but with all due respect, Your

24    Honor, your June 13th, 2017 order misapplies the law regarding

25    aiding and abetting.  The plaintiffs haven't stated an aiding          01:47PM

1   and abetting claim yet under Rule 12(b).  They haven't stated

2   it later under Rule 12(c) and even later under Rules 56 and 60.

3   Aiding and abetting requires specific intent to aid a specific

4   intent tort.  Aiding and abetting requires actual knowledge of

5   what the intentional tort the primary wrongdoer did.  That's at      01:48PM

6   cases cited at Pages 14 and 15 of our brief.  Aiding and

7   abetting requires the aider and abetter to specifically intend

8   to aid and abet the primary wrongdoers' intentional tort, Pages

9   14 and 15.  Red flags, should have known, general awareness do

10  not meet the standard.                                               01:48PM

11          And the reason I think we got to this point is that

12  plaintiffs briefed the general awareness language in the *Dawson*

13  case as a malaprop.  Dawson simply does not use the term as a

14  way the plaintiffs argued to this Court and does not hold the

15  general awareness test applies to aiding and abetting as          01:48PM

16  plaintiffs have informed this Court.  *Dawson* and countless

17  cited cases, including Judge Campbell's decision in the *Stern*

18  case in this district hold that for aiding and abetting, the

19  actual general awareness requires actual knowledge of the

20  primary wrongdoers' intentional tort.  *Dawson*, *Stern*, and the    01:49PM

21  other cases cited reject general awareness based on suspicions,

22  deliberate indifference, red flags.  Actually, the Court in

23  *Dawson* rejected the same arguments the plaintiffs made here

24  about general awareness.  I'm going to read a short quote from

25  that decision with the Court's indulgence.  Quote, "That Turner      01:49PM

1   and Withycombe were aware of Futech's financial condition and

2   Goett's dishonest character and were aware that he was

3   soliciting funds from Dawson indicates poor judgment and risky

4   business practices.  It does not, however, rise to the level of

5   scienter required for aiding and abetting, specifically that                01:49PM

6   they were aware that Goett did or would, in fact, use

7   fraudulent statements as a means for procuring the loan."

8          That's exactly what's taking place here.  And with all

9   due respect as to the aiding and abetting claim as to

10  Walgreen's, the Court misapplied the general awareness test.                01:50PM

11         Turning to the RICO, I'm not going to address all the

12  flaws in the RICO allegations.  I suspect that Theranos's

13  counsel will address many of them.  I just want to address one

14  that's idiosyncratic to Walgreen's.

15         Plaintiffs have failed to allege that Walgreen's                     01:50PM

16  operated or managed a distinct RICO enterprise.  As the Court

17  noted when it mentioned the *Volkswagen* case, plaintiffs'

18  reliance on the *Volkswagen* case is misplaced.  It helps

19  Walgreen's.  In *Volkswagen*, the operator-managed RICO element

20  turned on the allegation that the defendant retained complete               01:51PM

21  control over a method of fraud and deceit that allegedly

22  amounted to the RICO enterprise.  Here, plaintiffs only allege

23  that Walgreen's managed its own affairs and operations and did

24  not manage the fraud or deceit or alleged enterprise's affairs.

25  When the fraud and dispute that blood testing by Theranos was               01:51PM

1    not reliable and that the essential purpose of the blood draws

2    was Theranos's research and development, it is not a plausible

3    reading of this complaint that Walgreen's had complete control.

4    It's not even plausible that they had any control over

5    Theranos's research and development.  Walgreen's had no part in    01:51PM

6    the blood testing, no part in the research and development, and

7    no visibility into Theranos, and no allegations that they had

8    complete control over the fraud and deceit as set forth in the

9    *Volkswagen* case.

10         Now I'm going to close with just a quick comment on    01:52PM

11   the battery claim.  Plaintiffs' use of the general awareness

12   case has slipped into, or spilled over, into the battery

13   claims.  To state a battery claim, plaintiffs must allege that

14   Walgreen's had knowledge of what nullified consent.  And that

15   was the essential purpose of the blood draws, was Theranos's    01:52PM

16   research and development.  We made that argument and

17   plaintiffs' response in their opposition was entirely

18   conclusory.  Walgreen's knew.  That's at opposition Page 27.

19         There is no allegation that Walgreen's was privy to

20   Theranos's research and development or that that was the    01:52PM

21   essential purpose if, in fact, true.  Indeed, plaintiffs

22   alleged that there were testing results given to them from the

23   blood draws and that Walgreen's was aware of that.  But lastly,

24   even if plaintiffs had alleged that Walgreen's actual knowledge

25   of Theranos's essential purpose for the blood draws such as the    01:53PM

1    allegation -- is that such an allegation is implausible and

2    would have been rejected as a matter of law and stands for why

3    plaintiffs' claims against Walgreen's fail as a matter of law.

4    If Walgreen's knew constructively, or actually, that the

5    essential purpose was to further Theranos's research and          01:53PM

6    development because the Edison technology was not ready, why in

7    the world would Walgreen's pay $140 million to Theranos,

8    including the $100 million up front fee?  It defies common

9    sense.  It's economically irrational and logically impossible

10   and they have not alleged any specific fact or any fact showing   01:54PM

11   that we had that knowledge to defeat the inference that this is

12   implausible.

13            I'm happy to answer any questions or turn over to --

14            THE COURT:  You have just about run through your 15

15   minutes, so let's move on to the next.                            01:54PM

16            MR. CASAMASSIMA:  Good afternoon, Your Honor.  Hearing

17   what you are interested in, I'm going to make a few points and

18   let Mr. Benedetto address the consent decree and fraud topics.

19            First, Your Honor, this case is about the tiny blood

20   draws.  The inaccuracy rate of the tests run on those tiny       01:54PM

21   blood draws is why Theranos has had all of the very public

22   difficulties it's had and why this case exists.  There is no

23   non-conclusory set of allegations from which plaintiffs can

24   base claims on behalf of those who received regular venous

25   blood draws which were processed on, as plaintiffs allege,        01:55PM

1   third party analyzers.  The problem with the Theranos

2   proprietary technology was the issue.  The issue is not whether

3   a Siemens blood analyzer was inaccurate.  That is not the case

4   the plaintiffs have pled here.  This means that the non-Edison

5   subclass, those that didn't receive the tiny blood draws, their        01:55PM

6   claims should be dismissed in whole.  If you didn't receive a

7   tiny blood draw then there is no basis for a claim.  And that

8   would include Plaintiff AR, who notably is the only California

9   plaintiff, right.  So we would submit that all the California

10  claims should be dismissed.                                            01:55PM

11          Addressing RICO specifically, Your Honor, we think

12  there are two very strong bases for dismissal here.  And the

13  first is the RICO statute and subsequent case law is very clear

14  that there must be actual harm and actual injury and actual

15  damages for a RICO claim and that those injuries must be to a          01:56PM

16  party's business or property.  Personal injury damages,

17  including for emotional distress, are simply not compensable

18  under RICO.  We briefed this in our briefs here, and that's

19  because they are not a loss to business or property.  And

20  importantly, this also includes out-of-pocket losses that             01:56PM

21  derive from those personal injuries.  So that's the *Evans*

22  *versus Arizona Cardinals* case, and that's the *Allman versus*

23  *Phillip Morris* case where things that were related or flowed

24  from or in the *Evans*, the language of the *Evans* court derived

25  from personal injuries were not compensable under RICO.  That          01:57PM

1    included the *Evans* case, loss of earning capacity.  It included

2    the *Allmans* case, treatment for smoking-related illnesses,

3    smoking nicotine patches to help people get over cigarettes,

4    not included as harm or business property RICO damages,

5    therefore the RICO claim could not lie.                           01:57PM

6         And then the other reason why a RICO claim can't lie

7    here, as Mr. Goldfine touched on, there is no enterprise.

8    There's no plausible basis to conclude that Walgreen's agreed

9    with Theranos to engage in the alleged RICO Enterprises as

10   plaintiffs suggest.                                              01:57PM

11        Happy to answer questions on those points, but if not

12   I will turn it over to Mr. Benedetto to address the remaining.

13        THE COURT:  Go ahead.

14        MR. CASAMASSIMA:  And obviously, we'll reserve the

15   balance of our time.  Thank you.                                01:57PM

16        MR. BENEDETTO:  Good afternoon, Your Honor.  I want to

17   spend just a couple minutes talking about the effect of the

18   consent decree.  Your Honor began by noting in his preliminary

19   comments that at least the unjust enrichment claim would appear

20   to be vitiated by the provision of refunds by the Arizona       01:58PM

21   Attorney General.  We would submit that the effect of the

22   consent decree goes beyond unjust enrichment to reach both the

23   Arizona Consumer Fraud Act claims as well as the common law

24   fraud claims for sort of two primary reasons:  One, the

25   beneficiaries of the Arizona Attorney General consent decree is 01:58PM

1    identical to the Arizona class in this case.  And, in fact, the

2    provision of the CFA, which explains the mechanism for the

3    provision of the restitution, which is A.R.S. Section

4    44-1531.02, Subsection B, articulates that the restitution fund

5    is on behalf of specific identifiable persons.  And those          01:59PM

6    specific identifiable persons are, in fact, the members of the

7    Arizona class.  So we have identicality between the recipients

8    of the refunds pursuant to the consent decree and the Arizona

9    class in this action.

10          But beyond that, the -- and this is, I think, the more      01:59PM

11   conceptual point, the harm that is being redressed by -- that

12   was being redressed by the Arizona Attorney General, which is,

13   or can be characterized, as the right of Arizona consumers to

14   be free from misrepresentations as to merchandise that is

15   purchased by Arizona consumers, that right is identical to the    02:00PM

16   right of the Arizona plaintiffs that is being alleged here,

17   which is to say the right to be free from alleged false or

18   misleading representations about a product on which they

19   relied.

20          Any personal interests, which I suspect plaintiffs'        02:00PM

21   counsel would characterize the interests of their plaintiffs as

22   personal, are derivative of that kind of originary harm which

23   is the alleged harm in relying on representations about a

24   product that may not be true.  So it is Theranos's position

25   that the interest that was being vindicated by the Arizona        02:01PM

1   Attorney General, the fraud, if you will, kind of at the root

2   cause of this action, is identical to the fraud that is being

3   alleged, at least by the Arizona class through the CFA claim

4   and the common law fraud claims.

5          And so to the extent that in the same line of thinking   02:01PM

6   that would explain why the unjust enrichment claim would be

7   vitiated, we would submit that the fraud claims would be

8   vitiated as well.

9          I would note that some of the cases that the

10  plaintiffs have cited in their briefing, particularly the *Exxon*   02:01PM

11  *Valdez* case with which Your Honor is intimately familiar.

12          THE COURT:  I shudder every time I hear it.

13          MR. BENEDETTO:  I think that that case supports, at a

14  minimum, that the State of Arizona and the Arizona class here

15  were privities because, again, the harm that was being          02:02PM

16  redressed by the Attorney General sort of extends to the same

17  set of misrepresentations that have been alleged by the Arizona

18  class.

19          And those are sort of the main points that I want to

20  make on the consent decree.  I'm happy to answer any questions   02:02PM

21  if Your Honor has any.

22          THE COURT:  No.  I understand where you are.

23          MR. BENEDETTO:  Thank you very much.

24          MR. HELLER:  Your Honor, what's alleged in this case

25  is no doubt shocking and really disturbing.  It's not your      02:03PM

1    run-of-the-mill consumer case where it's just a matter of some

2    people paid some money and didn't quite get what they paid for.

3    It's far more serious than that, and you really just need to

4    look at the situation of these named plaintiffs, both the

5    Edison people and the non-Edison people.  People were diagnosed    02:03PM

6    falsely with serious conditions.  People refrained from

7    treatment as a result of this.  People took medication that

8    they weren't supposed to take as a result of this.

9         And I say this to emphasize that this is not your

10   run-of-the-mill consumer case.  The harms here went well beyond    02:03PM

11   just the money that these people paid out of pocket.

12        And to address the consent decree first, sort of

13   taking these in slightly reverse order here, as we discussed in

14   our papers, the attorney general's powers are defined and

15   limited by statute.  It has no authority whatsoever to bring       02:04PM

16   common law claims, RICO claims, and the like.  And it did not

17   purport to do so in this case, nor could it resolve or release

18   the private claims of individuals just as a matter of basic due

19   process without providing notice, opt-out rights, the

20   opportunity to weigh in, none of which occurred in this case.      02:04PM

21        With respect to the refunds themselves, it's a nice

22   step, it's a good thing that people are getting some money back

23   but it falls well short of addressing all of the harms in this

24   case and it doesn't moot out any of the claims.  Among the harm

25   that is entirely unaddressed by the consent decree includes the    02:04PM

1    dignity harm that was suffered by the Edison plaintiffs who

2    were subjected to battery; money that people paid out of pocket

3    for things like retests, doctor visits, unnecessary

4    prescriptions, serious physical and emotional damage that

5    people suffered here.  Consider Plaintiff RG who was falsely          02:05PM

6    diagnosed as being HIV positive.  He had to live with that for

7    some time.  Really serious stuff, totally unaddressed by the

8    consent decree.

9          Punitive damages, and plaintiffs often will plead

10   punitive damages.  This is a case where based on what's alleged      02:05PM

11   respectfully punitive damages are in play in this case.  We

12   have certainly alleged conduct that's knowing, conduct that's

13   willful, and it's not just a matter of these defendants knowing

14   that the testing services were unreliable or that the Edison

15   technology was unready.  It's that, but it's also that              02:05PM

16   defendants here understood that people here, these consumers,

17   would be relying on these test results to make critical

18   decisions about their health.  So punitives are very much in

19   play, and there are several claims where that's an available

20   remedy.  Treble damages under RICO; disgorgement of other ill      02:06PM

21   gotten gains that these defendants received.  Of course the

22   consent decree provides nothing for the California people, and

23   it requires Walgreen's to do absolutely nothing.

24         Now, the defendants have pointed to four claims where

25   they say the consent decree moots out the claim because they       02:06PM

1    say all of the harm is addressed.  It's not true with respect

2    to any of those claims.  For the ACFA claim and the fraud

3    claims, punitive damages are available under the ACFA,

4    disgorgement of other benefits that these defendants received

5    is available under the ACFA.  Under a fraud claim the other          02:06PM

6    out-of-pocket losses that these folks had including for doctor

7    visits, retests and the like, totally unaddressed and

8    available.  Punitive damages and physical and emotional harm

9    resulting from the fraud are also available and totally

10   unaddressed.                                                          02:07PM

11           With respect to the unjust enrichment claim, under

12   Arizona law, punitive damages are available as an element there

13   as well.  And there's also disgorgement of other benefits that

14   these defendants received on top of the amounts that were paid

15   for the test.  I'm talking about benefits that Theranos, and by       02:07PM

16   extension in this case, Walgreen's have received through the

17   development of the technology and the increased value of the

18   technology, benefits that Walgreen's has received through cross

19   marketing efforts, and increased foot traffic in their store.

20   All these benefits were derived directly from the blood of our       02:07PM

21   plaintiffs.  None of that is addressed by the consent decree.

22           And the Court asked earlier with respect to the RICO

23   claim what's left besides the money that's paid for the tests.

24   Well, there's economic damages in the form of money that our

25   plaintiffs paid for retests, doctor visits, other medication,        02:08PM

1    other out-of-pocket losses that are not stemming from emotional

2    damage or anything of that sort, actual damages and actual

3    economic damages, out-of-pocket damages.  And treble damages

4    are also available under RICO.  And a defendant can't avoid the

5    possibility of treble damages by agreeing sometime before                02:08PM

6    judgment to pay off the out-of-pocket losses.  They can't avoid

7    it just by doing that.  Otherwise a defendant could always

8    avoid that simply by paying off the actual amounts.  But again,

9    those out-of-pockets for the tests themselves doesn't cover

10   everything anyway.                                                       02:08PM

11           Turning to the battery claim, the Court has already

12   found that plaintiffs plausibly allege facts that it, too,

13   would support plaintiffs' version of what the essential nature

14   and purpose was of these tiny blood draws.  And facts that

15   would tend to exclude the defendants' version, which is this is        02:09PM

16   all about testing and everything else was collateral, right.

17           Defendants here are liable under *Duncan* and the

18   Restatement if one of two things is true:  Either the defendant

19   had knowledge of the mistake or defendants substantially

20   contributed to the mistake.  Under *Duncan* and the Restatement,       02:09PM

21   either is sufficient.  And in this case we alleged both.  And

22   that obviously applies to Theranos, but it also applies to

23   Walgreen's as well.  We allege that Walgreen's knew the truth

24   about Edison throughout the relevant time period and that to

25   the extent it lacked any more detailed knowledge it was by            02:09PM

1    virtue of its own deliberate choice.

2         Now Walgreen's comes in here today, as they have said

3    in their brief, and they say all we have alleged is red flags

4    that they should have picked up.  We clearly allege more than

5    just red flags.  What we allege is that -- we allege facts that        02:10PM

6    support the conclusion that Walgreen's knew that Edison wasn't

7    ready and to the point where they were actually sending people

8    to Theranos to try to address their own concerns when they were

9    getting stopped at the door by Theranos, they decided to heck

10   with it, we're just going to go forward with it anyway even           02:10PM

11   though we know it's not ready.  This is not just a conclusory

12   allegation.  I would refer the Court to the following

13   paragraphs in the amended complaint:  54 through 68 that

14   discuss some of the factual basis for our allegation concerning

15   Walgreen's knowledge.                                                  02:10PM

16        We also allege both defendants substantially

17   contributed to the mistake.  Both defendants consistently

18   portrayed these tiny blood draws throughout their marketing

19   campaigns as being legitimate testing reliable blood tests.

20   That substantially contributes to mistake, and that alone would      02:11PM

21   be sufficient.  Walgreen's says it didn't know the true

22   purpose.  Well, that doesn't get Walgreen's off the hook for

23   battery.  If Walgreen's knew that legitimate blood testing and

24   reliable test results could not possibly have been the

25   essential nature or purpose, that's sufficient.  They had to          02:11PM

1    have known there was some other purpose.  We allege that they

2    did know the development purpose.  Likewise, it would be

3    independently sufficient if Walgreen's substantially

4    contributed to the mistake these folks had.  And we allege they

5    did through their consistent portrayal of these services as            02:11PM

6    being about tiny blood draws.

7            Turning to the fraud claims, this sort previously

8    analyzed those claims sort of on two tracks; the concealment

9    track and the affirmative representation track.  On the

10   concealment track, we continue to make the same allegations           02:12PM

11   this Court previously found to be sufficient.  We make them

12   with respect to Edison and with expect to non-Edison.  On the

13   Edison side, we alleged certainly that none of these defendants

14   disclose the fact that the Edison technology was still in

15   development not ready for market.  All of the Edison plaintiffs       02:12PM

16   allege that they -- had they known those facts about Edison

17   they would not have submitted to the tiny blood draws.  On the

18   non-Edison side, the complaint includes a litany of facts.  And

19   I refer the Court to the following:  Paragraphs 5, 8, 12, 66,

20   70, 121, 126, 133, 140, 142, 144 to 148, 151, and 167.  These        02:12PM

21   are facts regarding deficiencies with the equipment, with the

22   facilities, unqualified personnel running these facilities, and

23   the overall unreliability of these testing services including

24   for non-Edison.  All you need to do, Your Honor, is look at the

25   named plaintiffs including the non-Edison plaintiffs.  They          02:13PM

1    received decidedly unreliable test results, false diagnoses

2    left and right:  False HIV-positive diagnoses; false reading of

3    liver levels; false diagnosis as diabetic; false diagnosis of

4    Hashimoto's disease.  And it goes on and own.  This service,

5    including non-Edison, was totally unreliable, completely                02:13PM

6    unreliable.  All of those facts highly material, all of them

7    concealed from the non-Edison consumers.

8         Walgreen's comes back and they say we didn't know

9    every detail.  We only had general knowledge.  Well, if you had

10   general knowledge that the service is unreliable, general             02:13PM

11   knowledge that these people are effectively being defrauded or

12   actually being defrauded, that's pretty material information

13   and information that I can assure you the non-Edison plaintiffs

14   would have liked to have known.  And all of them do allege that

15   had they known these material facts they would have acted            02:14PM

16   differently.

17        Turning to the affirmative representations, the

18   Court's prior concern was Rule 9(b) and not making it clear

19   enough what we were saying each of these defendants said and

20   did.  We believe that we have addressed that in the amended         02:14PM

21   complaint.  We have added additional allegations that add

22   statements that were made and attribute each of the statements

23   to the defendant.  In some cases it's Theranos; in some cases

24   it's Walgreen's, and in some cases it's both of them.  And when

25   we talk about representations that were made by both of them,       02:14PM

1  it's not exactly far-fetched.  Some of these things are like

2  joint press releases, advertisements that had both companies'

3  labels on them.  So to attribute those sorts of statements to

4  both defendants is completely plausible.  And the point, Your

5  Honor, is that in all cases we have made clear to these                    02:15PM

6  defendants what exactly it is we're saying they did.

7          On the Edison side of things, both of these defendants

8  consistently portrayed that the tiny blood draws as being about

9  legitimate blood tests, reliable test results, as alleged those

10 representations, those portrayals were false and misleading              02:15PM

11 because the technology was nowhere near ready to serve that

12 purpose.

13         Turning to aiding and abetting fraud, we continue to

14 make the allegations that this Court previously found to be

15 sufficient.  There are essentially two key elements to this             02:15PM

16 claim:  One is knowledge; the other is substantial assistance.

17 On the knowledge front we alleged, with facts supporting us,

18 that are based on investigative reports that Walgreen's knew

19 the truth and to the extent it lacked more detailed knowledge

20 it was by virtue of its own deliberate choice not to push what          02:16PM

21 Walgreen's was stopped at the door by Theranos.  Walgreen's

22 knew enough, and they certainly knew that there were

23 reliability issues, serious reliability problems.  They knew

24 that that information was being concealed from the consumers.

25 They knew that that information -- they knew that those                   02:16PM

1   consumers were being -- representations were being directed to

2   them that were, at the very least, misleading.  And that is

3   sufficient to have knowledge of the fraud.  They don't need to

4   know every single detail as long as they have knowledge that

5   there's a fraud going on.                                       02:16PM

6       And we certainly allege that, with factual support on

7   a substantial assistance element, we have clearly alleged

8   substantial assistance here.  Walgreen's engaged in

9   concealment.  They marketed this service.  They provided

10  locations in dozens of its stores to provide these testing     02:16PM

11  services and personnel to assist at all levels, including

12  drawing the blood.

13      And turning back, Your Honor, because I think I missed

14  this point earlier on the battery claim, Your Honor had

15  previously found that the battery claims were plausibly pled    02:17PM

16  but we needed to add detail for Rule 9(b).  And we have done

17  that in the amended complaint, including identifying who drew

18  the blood to the best of these plaintiffs' understanding and

19  all of the other details concerning -- all of the other details

20  concerning their experiences.                                  02:17PM

21      On the negligence claim, the Court previously found

22  that plaintiffs had not alleged a negligence theory that was

23  distinct from the misrepresentations.  We have addressed that

24  in the complaint.  Again, I know Your Honor mentioned earlier

25  that this is probably one we don't need to spend a whole lot of 02:17PM

1   time on, but I do want to point out that Walgreen's argument

2   that they don't owe a duty of care in this circumstance is

3   preposterous.  The case law consistently supports that the

4   standard of care and whether you have satisfied that standard

5   of care depends on the circumstances.  And that's normally a                02:18PM

6   question of fact that a jury answers based on evidence.  At

7   this stage, it suffices that we have alleged circumstances that

8   support the existence of multiple duties that Walgreen's, as

9   well as Theranos, have breached.  This is not some random

10  product on Walgreen's shelf.  We're not talking about there's a              02:18PM

11  problem with Nutrigrain bars in Aisle 7.  This is a testing

12  service that they intimately link themselves with.

13          And Walgreen's asked the question earlier, why would

14  we pay $100 million?  They paid $100 million to try to help

15  develop this service.  Is it possible that at the time they                  02:18PM

16  made that investment they didn't know all the details?  That's

17  possible.  But by the time these services, this is our

18  allegation, by the time these services were in the market, at

19  very least by that point, Walgreen's knew the truth.  They knew

20  enough, and they decided not to push further and instead                     02:18PM

21  decided to press forward and offer these services in the

22  stores, subject these folks to battery, subject these folks to

23  testing services that were not only unsafe and unreliable but

24  decidedly dangerous for anybody that might have relied on them.

25          I just want to make sure I have addressed all the                    02:19PM

1    points that Your Honor raised earlier.

2         With respect to the Court asked earlier about the

3    contract claim and clearly there's a contract alleged with

4    respect to Walgreen's.  I understand that that allegation is

5    certainly -- that connection is clearer here because these          02:19PM

6    people bought the services at a Walgreen's store.  But the

7    services were offered by both Walgreen's and Theranos, and some

8    of the representations that were made that become contractual

9    obligations were made by Theranos as well as Walgreen's.  So

10   that would be the theory for Theranos being a party to the          02:19PM

11   contract.  But certainly Walgreen's is a party to the contract

12   as well.

13        Make sure I'm hitting everything here.  If the Court

14   has additional questions, I'm happy to answer them.

15        THE COURT:  I don't think so, Mr. Heller.  I have got         02:20PM

16   lots to deal with.

17        MR. HELLER:  I don't envy you.  Thank you, Your Honor.

18        MR. CASAMASSIMA:  Your Honor, again, Mr. Casamassima

19   for Theranos.  I'm going to make two very quick points and turn

20   it over to Mr. Goldfine unless you have questions.                   02:20PM

21        First, with respect to the battery, I'm not going to

22   go on about that.  We have spilt much ink now.  This is our

23   second hearing where this has come up.  And the case law is in

24   front of you.  But I think it has made very clear, the *Moore*

25   the *Cobbs*, the *Duncan* case, to the extent that there's a lack    02:20PM

| | |
|---|---|
| 1 | of informed consent it would support a claim.  That claim is |
| 2 | negligence, not battery.  I think the case law is clear the |
| 3 | consent is not vitiated and, therefore, it becomes a battery |
| 4 | claim.  It's really a lack of informed consent negligence |
| 5 | claim. |

02:21PM

6       Secondly, Mr. Heller, almost all of his comments were

7  with respect to the Edison subclass, the tiny blood draw

8  subclass, which reinforces my opening points, I think, that

9  that's what this case is really about.  With respect to the

10 fraud claim, which is where he did spend some time, listed some

11 paragraphs, talking about the non-Edison class, they amount to

12 essentially that the tests were more inaccurate than they

13 should have been.  That isn't a fraud claim.  Even if they were

14 unreliable tests, there's nowhere close to the sufficient bulk

15 of allegations or specificity or anything like that about fraud

16 even by omission with respect to the non-Edison subclass.  And

17 he listed the paragraphs.  I'm sure your clerk will look at

18 them and I think, upon review, you will agree too, Your Honor.

19       Thank you very much.  Turn it over to Mr. Goldfine.

20       MR. GOLDFINE:  I'm not going to address all of the

21 points.  As I indicated, the briefing is well done and complete

22 and thorough going.  I do want to mention something about

23 medical battery.  I welcome the Court to look at Paragraphs 54

24 to 68.  There's nothing but conclusory allegations and red

25 flags in those paragraphs.  There's no allegation that

02:21PM (line 10)
02:21PM (line 15)
02:22PM (line 20)
02:22PM (line 25)

1    Walgreen's knew anything in the 14, or I guess, 15 paragraphs

2    plaintiffs asked you to look at.

3          The reason actual knowledge, or knowledge, is

4    important is that that lies in the consent in the battery

5    context that the plaintiff would not consent but for the lie.          02:23PM

6    But the liar, or the alleged liar in this particular instance,

7    had to know what the lie was in order to be able to predict the

8    lack of consent.  There is no allegation there that supports

9    that.

10          I'm surprised on the breach of contract claim by the          02:23PM

11   plaintiffs.  This Court said it was implausible that the

12   plaintiffs contracted with each defendant.  There's nothing in

13   the second amended complaint that cures that implausibility.

14   As to contracting with Walgreen's, I ask what that contract

15   might have been.  There is no allegation as to what discernable          02:23PM

16   terms Walgreen's agreed to.

17          On the aiding and abetting case, I'm surprised that

18   plaintiffs have come back to this general awareness.  Let me go

19   back to the breach of contract.  If Walgreen's was a party to

20   the breach of contract it was to draw blood.  There is no          02:24PM

21   allegations it did not draw blood in this case.  It was not to

22   test it.

23          In the aiding and abetting case, plaintiffs come back

24   to this generalized fraud concept.  That is contrary to the

25   language in the *Dawson* case that they rely on.  It is clear          02:24PM

1    that in the *Dawson* case that the facts were that there was

2    fraud.  The Court rejected that as a matter of law and says

3    that some generalized knowledge of fraud does not rise to the

4    level of scienter for aiding and abetting.  They would have to

5    know, in fact, that the primary wrongdoer used fraudulent          02:24PM

6    statements as a means to procuring the loan, not some

7    generalized concept.

8              In even today's argument, just close with this, they

9    glom -- plaintiffs glom together that somehow Walgreen's,

10   without an allegation, knew about the research and testing,      02:25PM

11   this allegedly essential purpose of the research and testing.

12   It is just not plausible that Walgreen's would have paid $100

13   million.  What Walgreen's knew was that they needed -- that

14   Theranos needed help bringing their product that had been

15   accepted as being not only valid but working to market.  That's   02:25PM

16   what the $100 million was.  That is contrary to the idea that

17   we knew it did not work as promised.  If we knew that,

18   Walgreen's knew that, it just would not have invested the $140

19   million or made the $100 million up front payment.

20             Happy to answer any questions Your Honor has, but        02:26PM

21   again, I think this is thoroughly briefed and I think all the

22   issues are thoroughly addressed there.

23             THE COURT:  I agree with you on that point.

24             MR. GOLDFINE:  Thanks.

25             MR. HELLER:  Your Honor, if I could make one more        02:26PM

1    point, I wanted to refer the Court to its prior order on aiding

2    and abetting claim.  Because I think the Court said something

3    that's inconsistent with what Walgreen's is saying today.  The

4    Court looked at the series of allegations that we made which

5    were part of the factual support regarding Walgreen's knowledge    02:26PM

6    in the last complaint, which actually had been supplemented by,

7    I think, at least one or two additional allegations.  And the

8    Court said that these allegations are sufficient to suggest

9    that it is plausible that Walgreen's was aware of more than

10   just suspicious activity but was actually aware of the alleged    02:26PM

11   fraud.  And that's at Docket 139 at 34 through 36.

12           Thank you.

13           THE COURT:  We're done.  Thank you very much for your

14   additional input, Gentlemen.  The matters are taken under

15   advisement.  I usually tell people we will have a decision for    02:27PM

16   you soon.  This one's going to take a while.

17           We'll be in recess subject to call.

18           (Proceeding concluded at. 2:27 p.m.)

19

20

21

22

23

24

25

1
2
3
4
5                          C E R T I F I C A T E
6
7           I, LAURIE A. ADAMS, do hereby certify that I am duly
8   appointed and qualified to act as Official Court Reporter for
9   the United States District Court for the District of Arizona.
10          I FURTHER CERTIFY that the foregoing pages constitute
11  a full, true, and accurate transcript of all of that portion of
12  the proceedings contained herein, had in the above-entitled
13  cause on the date specified therein, and that said transcript
14  was prepared under my direction and control.
15          DATED at Phoenix, Arizona, this 5th day of April,
16  2018.
17
18                          s/Laurie A. Adams
19                          _____
                            Laurie A. Adams, RMR, CRR
20
21
22
23
24
25