### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

```
In re:                         )
Arizona Theranos, Inc.,        )
Litigation                     )
                               )   No. CV16-02138-HRH
                               )       Phoenix, Arizona
                               )       January 23, 2020
                               )       9:00 a.m.
_____  )
```

#### BEFORE:  THE HONORABLE H. RUSSEL HOLLAND, JUDGE

#### REPORTER'S TRANSCRIPT OF PROCEEDINGS

#### ORAL ARGUMENT ON MOTION FOR CLASS CERTIFICATION

```
Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
```

1                    A P P E A R A N C E S

2  For the Plaintiff:
       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
3      By:  **Mr. Roger N. Heller**
            **Ms. Melissa A. Gardner**
4      275 Battery Street, 29th Floor
       San Francisco, California 94111
5
       KELLER ROHRBACK, LLP
6      By:  **Mr. T. David Copley**
       1201 3rd Avenue, Suite 3200
7      Seattle, Washington 98101

8  For the Defendant:
       DAVIS WRIGHT TREMAINE, LLP
9      By:  **Mr. Frederick B. Burnside**
       920 Fifth Avenue, Suite 3300
10     Seattle, Washington 98104

11     SIDLEY AUSTIN, LLP
       By:  **Ms. Kara L. McCall**
12          **Mr. Lawrence P. Fogel**
            **Ms. Stephanie Stern**
13          **Ms. Elizabeth Austin** - appearing telephonically
       1 S Dearborn Street, Suite C
14     Chicago, Illinois 60603

15     LEWIS ROCA ROTHGERBER CHRISTIE, LLP
       By:  **Mr. Bruce E. Samuels**
16     201 East Washington Street, Suite 1200
       Phoenix, Arizona 85004

17

18

19

20

21

22

23

24

25

                  UNITED  STATES  DISTRICT  COURT

**P R O C E E D I N G S**

1            COURTROOM DEPUTY:  Civil case 2016-2138, in re

2    Arizona Theranos, Incorporated, Litigation, on for motion

3    hearing.

4            Will the parties please announce.

5            MR. HELLER:  Roger Heller on behalf of plaintiffs,

6    Your Honor.  Good morning.

7            MS. GARDNER:  Melissa Gardner for the plaintiffs.

8    Good morning.

9            MR. COPLEY:  David Copley on behalf of the plaintiffs.

10           MS. MCCALL:  Kara McCall on behalf of Walgreens, also

11   with my colleagues Larry Fogel and Stephanie Stern.

12           MR. BURNSIDE:  And Fred Burnside on behalf of

13   Mr. Balwani, Your Honor.

14           THE COURT:  Thank you.  Am I correct in assuming,

15   Mr. Heller, that you are here for the plaintiffs?

16           MR. HELLER:  You are correct, yes.

17           THE COURT:  And, Ms. McCall, that you'll be arguing

18   for the Walgreens folks?

19           MS. MCCALL:  Correct.

20           THE COURT:  And we've scheduled this matter for

21   30 minutes for the plaintiffs, 45 minutes for all of the

22   defendants.  I would appreciate your abiding by that

23   suggestion.

24           Is there an understanding between the defendants as to

1   how their time would be divided up?

2          MS. MCCALL:  Yes, there is, Your Honor.

3          THE COURT:  Okay.

4          MS. MCCALL:  I'm going to start, take about 30 of the

5   minutes, and then Mr. Balwani's counsel will take the rest of

6   the time.

7          THE COURT:  What about Ms. Holmes, is she waiving any?

8          MS. MCCALL:  We have no idea, Your Honor.  She's on

9   the phone.

10         MS. HOLMES:  I'm here on the phone, Your Honor, and I

11  don't plan to make oral argument.

12         THE COURT:  Okay.  I will assume that you're joining

13  in the arguments that are made by the other defendants?

14         MS. HOLMES:  I am, Your Honor.

15         THE COURT:  Thank you.

16         Mr. Heller, let's go.

17         MR. HELLER:  First of all, I wanted to thank Your

18  Honor for having us here today and for presiding over this case

19  for a few years.  I know there has been a lot of material filed

20  that this Court has reviewed, and we do appreciate that.

21         At first blush, I think a case about a purported blood

22  testing service might seem like it could raise some challenges

23  from a class certification perspective, but I think if you look

24  at what this case is about and what it's not about, and the

25  claims that we're pursuing and the theories that we're

1   pursuing, it's really a case that's very well suited to class

2   treatment.

3           All of the claims here are going to turn on the

4   answers to really just a few common questions, each of which is

5   amenable to common answers in class-wide treatment, none of

6   which requires any sort of individualized analysis under any of

7   the theories that we're pursuing.

8           Before I jump into the substance, I do want to make

9   one sort of across-the-board point, because I think it affects

10  all of the issues to some degree, that is that this class

11  action that we're here about today really represents the last

12  realistic chance to do anything for these folks, to do right by

13  these folks.  It may not be perfect, but it is the last chance

14  to hold these particular defendants accountable to the class

15  for what they've done.  The realistic alternative, if there is

16  no class certification, is nothing.  Nobody is going to have

17  the wherewithal to bring an individual case for any of this.

18          Your Honor asked a few questions in an order last

19  week, so I do want to make sure I address those at the front

20  end.  Before I do, there are two things that I wanted to let

21  the Court know about, which we let counsel know about, I should

22  say, just before the hearing.  After review of the Court's

23  order, we have consulted with our clients and we are not going

24  to pursue certain of the claims.

25          In particular, we are not going to be pursuing -- and

1   this is for the class and the class representatives -- common

2   law fraud, aiding and abetting fraud, CLRA, unjust enrichment,

3   and the California statutory deceit claim.  We are only going

4   to be pursuing certification of the battery claims, the UCL and

5   false advertising claims under California law, the Arizona

6   Consumer Fraud Act claim, and the RICO claim.

7           The other thing I wanted to let the Court know is that

8   we also, in consulting with the plaintiffs Your Honor had noted

9   that they had reserved the right to sort of pursue other

10  claims, personal injury type claims, they've agreed they're not

11  going to pursue any of that.  They're going to be in the same

12  boat as the rest of the class.  They're going to pursue the

13  claims that this case is about and not pursue, you know,

14  different claims that the case isn't about.

15          I wanted to --

16          THE COURT:  Before you go on, let me be sure I

17  understand.  Are you telling me that there are not going to be

18  any emotional distress, et cetera, claims made as to any of the

19  causes of action?

20          MR. HELLER:  That's correct.

21          THE COURT:  As to what you seek class certification

22  claims?

23          MR. HELLER:  That is correct.  With the one caveat

24  that under the battery claim, arguably, the dignitary harm is

25  akin to an emotional distress type damage, and we are pursuing

1    the presumed damages under that claim, so just for that

2    clarification, yes.

3            THE COURT:  Understood.

4            MR. HELLER:  And so I think that answers the first

5    question that Your Honor had.

6            The second question, I think, is not applicable, in

7    light of the answer to the first question, I believe.  We're

8    going to pursue the claims that I just identified, which we

9    think are amenable to class treatment.  We are pursuing, you

10   know, dignitary harm on behalf of the battery victims, we're

11   pursuing refunds, to the extent that they have not yet been

12   effectuated, and we're pursuing punitive damages and treble

13   damages under the ACFA and RICO, respectively.

14           The third question that the Court had was whether this

15   raises a claims problem.  And the answer is there is -- it does

16   not.  There is no claim splitting problem here.  Adjudicating

17   the limited claims that we have here in the manner that we

18   proceed to certify them will not preclude anybody from pursuing

19   personal injury damages, emotional distress claims for

20   inaccurate test results and the like, just given the limited

21   nature of our claims and what they're about and what they're

22   not about, I think, with a couple of limited exceptions.

23           None of the remedies that Your Honor was asking about

24   are even available under any of the claims that we have in the

25   case.  I think you know the risk of any kind of preclusion --

1    and I do think that we'll talk about this a little bit later.

2    I think it's really theoretical preclusion, because the chance

3    of an actual individual filing a case is probably small, given

4    how much it costs to pursue one of those claims.  But I think

5    the risk of any kind of preclusion is limited to really a

6    couple of discrete things.  And one would be, like,

7    out-of-pocket costs paid for, like, a second test, or if you

8    went to visit a doctor because of unreliability of your tests.

9    Arguably, depending on the claim preclusion standard that

10   applies, arguably, that sort of thing could theoretically be

11   precluded.

12          The other thing is under the battery claim, you

13   basically have a choice of pursuing presumed damages or actual

14   damages.  And we're pursuing the presumed damages.  And so if a

15   judgment is entered on that claim, I think it's fair to say

16   that there would be preclusion for the other approach, for the

17   other choice.  But, of course, the way we can deal with that is

18   by providing them notice and letting them know that, and if

19   people want to opt out, I think it's unlikely many would

20   pursue, or any would pursue that, but they could opt out.

21          If the Court still has any concerns about potential

22   preclusion and the like, I will say that the answer is not

23   automatically, you know, finding of inadequacy.  Even in those

24   circumstances when there is real concerns about preclusion,

25   courts generally take a practical approach to this issue.  They

1   balance certain, you know, practical considerations, all of

2   which here weigh against inadequacy under all circumstances.

3          So one of the factors that courts look at is whether

4   there is a strategic value to the class in not pursuing

5   individual, vis-a-vis, class certification.  That's enormous

6   here, that value, because if we were to pursue individual

7   personal injury claims, I think it's fair to say that there is

8   a good chance the classes would not be certified and the

9   practical result would be people would get nothing.

10          The second, another factor that courts look at, is

11   sort of realistically what is the chance that there are going

12   to be these follow-on claims.  And I think the question there

13   is are people actually going to see claim preclusion arguments

14   in real life?  Is that actually going to happen?  And here I

15   think, given the cost of pursuing an individual claim, it's

16   unlikely that we would see that.  And we're now three or

17   four years out from the conduct, and I don't believe that there

18   is a single individual personal injury claim that's been filed.

19          Another factor that courts look at is if there is some

20   risk of preclusion, theoretical or otherwise, can that be

21   managed sufficiently by properly tailored notice that lets

22   people know what's being pursued, what's not being pursued, and

23   gives them, you know, the choice about whether they want to

24   stay in or not, which is something we would certainly do here

25   if the Court were to certify the class.

1           If you compare the circumstances here to a case like

2   Thompson, which is one of the cases that Your Honor cited, it's

3   really night and day.  In a case like Thompson, the whole gist

4   of that case was that people were suffering grave health

5   injuries as a result of long-term smoking and they knew that

6   there were large chunks of people in their class who had lung

7   cancer and emphysema and wrongful death, and that not only was

8   it realistic that they would be pursuing these individual

9   personal injury claims and thus running into claim preclusion

10  arguments, but there were already those claims and they already

11  existed.  And, of course, given the nature of the class in that

12  case, there wasn't the opportunity to provide notice in the

13  same way that there is in this case, so I think that's another

14  point of distinction.

15          I just wanted to circle back to the claim preclusion

16  issue, because I think it is important to remember that there

17  are different standards that courts apply in determining --

18  different states apply in determining whether a claim

19  constitutes the same claim for purposes of res judicata.  If

20  you look at the case law that the defendants cite, including

21  Thompson, St. Jude, and Brown, all of those cases are applying

22  the transactional approach to determining res judicata.  And I

23  mention that because under the Supreme Court's Semtek decision

24  in 2001, if there were, hypothetically, a follow-on personal

25  injury case here, unlikely as that might be, the likely

1   standard that would be applied would be the Arizona or the

2   California standard, depending on who the plaintiff was.  And

3   neither of those states have adopted the transactional approach

4   to res judicata.

5          In California they use the primary right test which

6   looks at whether the prior claims sought to vindicate the same

7   injury, so the focus is on the same injury.  The cite for that

8   is Friedman 120 Cal.App.4th 17 at Pen cite 27 to 29.

9          I mean, in this case if you look at the battery claim,

10  for example, clearly that is seeking to vindicate a completely

11  different injury, that is a personal injury claim based on an

12  inaccurate test result or something like that.  It's a

13  distinction of injury that's being sought under the battery

14  claim.  And so I don't think there would be a risk of

15  preclusion by virtue of adjudicating that battery claim under

16  the Arizona standard.  They do something called the same

17  evidence test, and the cite is E.C. Garcia 178 Arizona 510,

18  where basically it's only the same claim if -- oh, I should say

19  it's not the same claim, even if it arises out of the same

20  transaction, if proof of different or additional facts will be

21  required to establish the two claims.

22         Well, the elements of proof and the evidence for a

23  battery claim here are entirely different from the types of

24  elements of proof and evidence that you would need for a

25  personal injury claim.  There is certainly some overlap likely,

1    but under that standard there is really no risk of preclusion.

2           The point, Your Honor -- I don't want to belabor the

3    point -- the point is that it's really unlikely that the

4    remedies that Your Honor is talking about are going to actually

5    be precluded even if somebody were to bring one of these

6    claims.  There is some limited theoretical risk, but the answer

7    in that situation, given the practical considerations here,

8    would be to tailor the notice.  And we would work with the

9    parties and the Court to tailor the notice in the way that was

10   clear and let people know the information so that they could

11   make a choice.

12           I wanted to turn to predominance issues unless the

13   Court had additional questions about that issue.

14           THE COURT:  No.  Go right ahead.

15           MR. HELLER:  For the battery claim, I don't think

16   there is any dispute that all of the Edison Subclass members

17   were touched.  I don't think there is any dispute that they

18   believed, quite understandably, that the nature and purpose of

19   that touching was, you know, legitimate blood testing.  And so

20   the liability under that claim is going to really turn on the

21   answers to two questions:  Were those people mistaken; and did

22   Walgreens know?

23           And the first question, as Your Honor knows, our

24   theory is that the technology that was used to test these tiny

25   blood samples, all of them was nowhere near ready to serve that

1    purpose.  It was way early on in the design stage.  And that's

2    true about all of the technology that was used for that

3    purpose.

4          And I'm going to read what Dr. Baird said in his

5    report because I think it's apt.  He says that Theranos

6    fingerstick blood testing was not market ready or able to serve

7    the purpose of providing clinically useful, reliable diagnostic

8    test results at any time.  If we're right about that theory,

9    then, by definition, that could not have been the essential

10   nature or purpose, and, by definition, these folks were

11   operating under a mistaken belief.

12         All of that is going to be proven through common

13   evidence about the state of the technology, expert testimony

14   applying applicable industry standards to that evidence, and

15   common evidence about all of these test results being voided.

16   None of it is going to turn on the individual experiences or

17   feelings or anything else that is individualized.

18         On the second question, which is did Walgreens know,

19   of course Walgreens' story is going to be that they were --

20   they were hoodwinked just like everybody else.  And I find that

21   to be an implausible story based on the evidence.  Our version

22   and our allegation, of course, is that they did know, but the

23   point at class certification, I think, is that that is a

24   quintessential common question.  What they knew is going to

25   turn entirely on common evidence about their knowledge.

1          Walgreens has suggested that we cannot certify a

2    battery claim here if we can't show in each instance whether

3    somebody was touched by Walgreens or a Theranos technician.  I

4    think that, first of all, is a misunderstanding of battery law.

5    Because under applicable law, battery liability attaches not

6    just to the person who does the offensive touching, but to

7    anybody who does something that results in offensive touching

8    or who supports or encourages, under an aiding and abetting

9    theory, who supports or encourages an offensive touching.

10         The second point that I would make is even if we

11   somehow need at some point to isolate those people who were

12   touched by a Walgreens technician as opposed to a Theranos

13   technician, the data about these blood draws and blood tests

14   actually shows the identity of the technician.  And we have

15   that, we believe, if not for the entire Edison Subclass, at

16   least for the vast majority of the Edison Subclass.  I think it

17   very well may be that we have it for the entire Edison

18   Subclass.  And so if we're called upon at any point to do that,

19   we could do that.

20         Battery damages, we talked a little bit about that

21   before.  It's presumed damages.  The law basically gives you

22   the choice of proving up actual damages or presumed damages.

23   And the point there is that the law recognizes that this

24   invasion of human dignity is extremely serious, but it is also

25   extremely difficult, or maybe even impossible, to monetize

1    actual damages for that sort of harm, and so we're pursuing the

2    presumed damages route.  There is no individualized inquiry

3    required there at all.  It's a question for the jury.  And they

4    will apply an objective reasonable person standard that doesn't

5    turn on the subjective feelings or anything else like that of

6    the individual subclass members.

7         The cast that the jury would have is exactly the same

8    in a class case as it would be in an individual action.  It's

9    applying a reasonable person standard.  What would a reasonable

10   person think is necessary to account for this common harm to

11   human dignity that these folks have suffered?

12        On the fraud by omissions claims, as Your Honor knows,

13   the theory there -- and I think it's proven to be quite viable

14   -- is that there was a massive litany of problems that went to

15   the very heart of the service about the technology, about the

16   facilities, about the equipment, the personnel.  And, again,

17   I'm going to quote from Dr. Baird's report.  He says that no

18   patient or doctor can reasonably rely on any test results they

19   receive from Theranos and Walgreens given the broad prevalent

20   nature of the highly disturbing problems associated with the

21   equipment, laboratories, and personnel.

22        The point, Your Honor, is that at some point the

23   problems are so broad and of such a nature that it's just

24   unreasonable for anybody to rely on anything that came out of

25   this company.  And I think when the evidence is in in this

1    case, we're not going to cross that line.  We're going to be

2    way past that line in this case.  Nobody could rely on what

3    they got from this company.  And the liability, these claims

4    that we're talking about, the ACFA and the UCL false

5    advertising law claims, is going to turn on the answers to two

6    questions:  One was were there material problems of this sort

7    that were concealed from people that rise to that level of

8    rendering everything that came out of this company unreliable;

9    and, two, did the defendants know?  Both of those things are

10   subject to common proof.

11          And I should mention before I pass through this, there

12   is no dispute that none of these problems were disclosed,

13   right.  None of the problems were disclosed to any of the

14   consumers, of course.  You know, their defense is not going to

15   be that they were disclosed, their defense is going to be that

16   the problems didn't exist or they're not as bad as we said they

17   are.

18          With RICO, I don't want to repeat too much of what's

19   in my papers, but the RICO elements are likewise subject to

20   common proof in many of the exact same ways.  The remedies that

21   we're seeking under all of these claims are well suited to

22   class treatment.  Whether it's the presumed damages on the

23   batteries claim -- battery claims, the refunds under the other

24   claims, to the extent that they have not yet been effectuated,

25   we have information about the amounts that were paid and have

1    access to information about the extent to which the refunds

2    have been effectuated.

3           Punitive damages and treble damages are very well

4    suited to class treatment.  That's going to turn predominantly

5    on the state of mind of the defendant, and evidence will be

6    focused entirely on that, if not entirely predominantly on

7    that.

8           I wanted to talk about the superiority issue and the

9    arguments that the attorney general's settlement somehow

10   renders this case less than superior.  I think a starting point

11   for that analysis has to be what we're seeking here in this

12   case and what this case is about.  I mean, we're seeking

13   certification and we're seeking to prosecute claims against

14   Walgreens for their conduct, for their liability, for their

15   concealment.  And none of that has been addressed or resolved

16   or let alone adjudicated by the attorney general settlement.

17   Same for Walgreens and Holmes.  They were not parties.

18          THE COURT:  But the case, even though they're

19   resolved, they're still a defendant, aren't they?

20          MR. HELLER:  They are technically, yes.  They are

21   still a defendant, yes.  Yes, that's a -- thank you for

22   clarifying that.  Yeah, that's true.

23          But obviously none -- nothing has been adjudicated

24   with respect to any of the other defendants.  And the Arizona

25   Attorney General settlement did not address, let alone

1   adjudicate, this entirely separate harm that the Edison

2   Subclass members suffers by virtue of being subject to a

3   battery that was not mentioned, addressed in any way by the

4   attorney general's settlement.

5           Of course, the attorney general's settlement doesn't

6   have punitive damages or treble damages, and, of course,

7   nothing was provided or adjudicated for any of the California

8   folks who are in our class at all.  The point, Judge, is that

9   if you look at Kamm and these other cases that the defendants

10  cite, there are at least two principle ways to distinguish

11  those cases.

12          The first is if you look at Kamm and the other cases,

13  the, the controversy, the conduct that was being attempted to

14  be addressed in the class case was the same as the controversy

15  that had been adjudicated by the government action.  That's not

16  the case here, for the reasons we mentioned.

17          Now, I do, I do believe that in Kamm, I think it was

18  Kamm, the plaintiffs added a couple of additional sort of

19  secondary defendants and tried to argue that that made it

20  different.  And the court was not -- did not find that

21  compelling.

22          In this case we're not talking about secondary

23  defendants, we're talking about primary players in this who did

24  their own conduct, their own concealment, and have their own

25  liability, none of which has been adjudicated.

1          The other ground for distinguishing those cases --

2     there may be others -- if you look at those cases, one of the

3     primary concerns is that there is going to be significant

4     duplication of effort.  The government, the courts, the parties

5     have all done a lot of work, and here come the class

6     plaintiffs, you know, trying to jump on top and file a class

7     action and create all this duplicative work.  And this case is

8     obviously not like that.  We were litigating for a year before

9     the attorney general showed up.  They didn't litigate at all.

10    They filed it, settled, and that ended in about a week.

11         None of -- there was no -- no efforts at all from any

12    of these defendants.  They weren't even part of the attorney

13    general's settlement.  I think Your Honor knows that, as

14    between these two cases, all of the work has been done in this

15    case by Your Honor and by the parties in terms of the

16    pleadings, in terms the briefing, in terms of the discovery

17    and investigation.  There is no risk of duplication of effort

18    of that sort.

19         When you talk about superiority, ultimately it boils

20    down to a question of alternatives.  Is a class case superior

21    or not to the alternative?  And so you can't escape the

22    question of what is the alternative.  The alternative here to a

23    class action is nothing.  It is nobody gets anything.  None of

24    these victims of battery get anything to compensate for that.

25    These defendants are held entirely unaccountable.  And I don't

1   see how that is superior to what we can do here, which is

2   certify these claims, allow these class members to go forward

3   and get relief for these common harms that they've suffered,

4   tried to hold these defendants accountable, defendants who

5   weren't part of the settlement with the attorney general.

6          One last point that I wanted to address -- actually, I

7   think I might have two.  Sorry.

8          THE COURT:  Well, you're sort of at a break.  You're

9   down to five to seven minutes, if you want to reserve any time

10  to rebut.

11         MR. HELLER:  I'm going to reserve maybe a few minutes.

12  I just have maybe a minute or so here.

13         The ability to identify the class members, the

14  defendants keep pointing to that we haven't accessed the LIS

15  database, but that, actually, even if we're ultimately not able

16  to, that doesn't affect the analysis.  It's clear under Ninth

17  Circuit law that there is no ascertainability requirement.

18  This is a ConAgra case along the lines the defendant was

19  suggesting.  As long as you have a clear objective class

20  definition, which we have here, that is sufficient.

21         And we can identify the class members even without the

22  LIS database.  We have customer lists that have names, that

23  have contact information, if not for the entire class, we have

24  that for at least a vast, vast majority of the class.  Customer

25  lists, lists of people who went into Walgreens.  We have lists

1   of all of the voided tests, which, by the way, show which ones

2   were Edison, which ones were the sorts of handily modified

3   machines that were used to test tiny blood draws.  We do have

4   those lists.  We have not filed them, largely because of the

5   person -- you know, very personally sensitive information

6   that's in those spreadsheets.  But the point, Your Honor, is

7   that we actually do have the ability to identify the class

8   members, at least for the vast majority of them, contact

9   information for them that will allow for a notice program here

10  that would be primarily direct notice to the class members,

11  which we could supplement as needed through targeted media,

12  social media notice that would be targeted to very limited

13  geographic areas which could be done very effectively that are

14  at issue here.

15          I will reserve the rest of my time.  Thank you.

16          THE COURT:  Very well.

17          Mr. Heller, before you go.  You gave me a list of

18  claims that you're not going to pursue.  Let me ask you to

19  confirm what you are going to pursue.  I know you're going to

20  pursue the battery claims.

21          MR. HELLER:  Yes.

22          THE COURT:  I know you're going to pursue the RICO

23  claim.  What else?

24          MR. HELLER:  So beyond battery and RICO is the Arizona

25  Consumer Fraud Act claim, omissions based, and the California

1   unfair competition law and false advertising law claims,

2   omissions based as well.  Technically, those are two claims,

3   but they're sometimes treated as a single claim.

4           THE COURT:  Okay.  Thank you.

5           Over to you, Ms. McCall.

6           MS. MCCALL:  Thank you.  Thank you, Your Honor.

7   Again, Kara McCall from Sidley Austin on behalf of Walgreens,

8   the Walgreens defendants.

9           The case that Mr. Heller just finished explaining to

10  you is obviously significantly different from the case as it

11  was brought, and, more importantly, significantly different

12  from the case that plaintiffs, themselves, think that they have

13  brought.  To hear Mr. Heller stand up today and say that he is

14  not pursuing emotional distress damages and he's not pursuing

15  medical damages on behalf of his class, because those are

16  small, minor claims, nobody ever is going to bring them, is so

17  directly opposite of what the plaintiffs told us when we took

18  their deposition.

19          With no exception, every single one said they were

20  bringing the suit in order to recover emotional distress.  And

21  many of them said they were bringing this suit in order to

22  recover the cost of subsequent medical treatment that they

23  believe was required.

24          Just as an example, one of the plaintiffs, goes by the

25  initials RG, he's one that expressly testified he's seeking

1    compensation for emotional distress.  He was told by Theranos,

2    actually on the phone, he was told by Theranos that he was HIV

3    positive.  Twenty-four hours later with the subsequent test he

4    found out he was not.  In his deposition he sat there and told

5    us everything he thought about for twenty-four hours.  For

6    Mr. Heller to stand up here and say he doesn't really have any

7    emotional distress damages or he's never going to bring a case,

8    would be quite a surprise to him.

9         And I notice, of course, that none of their clients

10   are actually sitting in the audience today.  All of the

11   plaintiffs would be quite surprised and upset to find out that

12   their counsel has abandoned their claims for emotional distress

13   and medical treatment.

14        Additional examples of the very real and significant

15   potential emotional distress claims of the class were just

16   recently detailed in a filing submitted by the DOJ in the

17   criminal case against Ms. Holmes and Mr. Balwani.  They tell

18   the story of a patient who had been trying unsuccessfully to

19   have a child, becomes pregnant, only to take a Theranos blood

20   test and think that she's not, right.

21        Or another patient received a Theranos test indicating

22   she wasn't pregnant, and, in fact, she was having an ectopic

23   pregnancy which could have threatened her life.  And Mr. Heller

24   is saying again that those folks don't get a chance to seek

25   emotional distress or medical treatment.

1          The failure to prosecute viable, and obviously

2     important claims, claims that are central to this case, you

3     read the complaint, those claims are central to the case that

4     was brought, this demonstrates an insurmountable conflict of

5     interest between plaintiffs and the class members.

6          Of course, plaintiffs' counsel don't have to pursue

7     every possible claim, but when each and every plaintiff

8     testifies, without exception, that that is what they want out

9     of this case, plaintiffs' counsel cannot abandon those claims

10    in just -- in an attempt to get a class certified.

11         It's no answer to say that everyone who wants to

12    pursue emotional damages can just opt out.  If that's what

13    they're suggesting, they would have no class representatives

14    left, because, according to their testimony, all of the class

15    representatives would have opted out of this case.  So even

16    putting res judicata aside, the fact that plaintiffs' counsel

17    are abandoning the claims that are central to this case makes

18    them inadequate representatives.

19         Let's talk about res judicata, though, for a second as

20    well.  We don't -- unfortunately, Judge, you don't get to

21    decide res judicata, right.  When these claims come up later in

22    a subsequent court, that judge is the judge who gets to decide

23    whether those claims should have been brought in the original

24    case.  And it's that risk that the cases that Your Honor

25    identified in the order, the Fosmire case, the Thompson case,

1   it's that risk that those courts were very concerned about.

2   And Mr. Heller can get up here and state, oh, it's not a real

3   risk, it's just a threat of a risk, but it's that threat, it's

4   not a real thing, it's just a risk, but it's the risk itself,

5   whether it was going to happen or not, that those courts found

6   very problematic.

7           Mr. Heller talked about, well, it's not the same

8   injury and it's not the same evidence, but, again, you can

9   foresee various ways in which a subsequent court could say this

10  is the same injury.  You're complaining about your Theranos

11  test result, that's the same injury.  It's the same evidence.

12  It's evidence related to what happened, you know, how your

13  blood was taken and how it was tested and whether it's

14  accurate.  That threat, that risk that the class members will

15  ultimately be left without having recovered any emotional

16  distress or medical treatment, which is the real crux of their

17  claims, makes this case completely uncertifiable.

18          And I guess the question that then arises is, well, if

19  they're not seeking emotional distress, they're not seeking any

20  of their healthcare damages, damages related to the medical

21  treatment, then what are they saying?  What are they seeking?

22          For the first time today Mr. Heller says, we're

23  seeking three things:  We're seeking the battery harms, the

24  dignitary harms, which he, himself, admitted are akin to

25  emotional distress, and I'll get into a moment why his theory

1    of presumed damages has no basis in the law.

2         So he's seeking emotional distress for the battery

3    claims, which we know and fully discussed in our brief are

4    inherently subjective and inherently individual.  He's seeking

5    a refund, which we know the vast majority of the class already

6    received.  So, again, we don't need a class action to get them

7    a refund.  And then he's seeking punitive damages or treble

8    damages under RICO.

9         Arizona law, however, does not allow for an award of

10   punitive damages without also compensatory damages.  By setting

11   up their claims here, trying to avoid the findings, the

12   individual findings that would be necessary for compensatory

13   damages, just seeking punitives doesn't solve that problem.

14        And to the extent they're seeking treble damages under

15   RICO, without a finding of compensatory damages, how do you

16   know what the treble damages even are?  Treble of what?  Is it

17   triple of the refund that everybody already got?  In that case,

18   you know, RG, the man who thought he was HIV positive, he's

19   going to get 300 bucks.  Again, why would he forego an

20   emotional distress claim which is worth far more than that in

21   order to get the so-called treble damages that he's going to

22   get as a class member under RICO?

23        And I'm also -- again, to the extent that plaintiffs'

24   counsel didn't say how he's figuring out treble damages, right,

25   he didn't say it would be triple of what, I'm assuming it's the

1   consent decree awards.  But, again, that consent decree award

2   was only against Theranos, it was not against Walgreens, so it

3   would be completely unfair to somehow require Walgreens to pay

4   a punitive damages award where there has been no compensatory

5   damages found.

6           So let me turn -- I'll try to do it in the order that

7   Mr. Heller went in.  So let me turn to the battery claim next.

8   Your Honor, no court in the Ninth Circuit has ever certified a

9   class based on a battery theory, and it's easy to understand

10  why.  First of all, we have to know that there was a touching.

11  There not only has to have been a touching, there has to have

12  been a touching by the defendant, and that same defendant has

13  to have been the one that made the misrepresentation that led

14  to the kinds of, you know, consent that plaintiffs are saying

15  they wouldn't have given.

16          In this case, we know that sometimes Theranos

17  technicians took the fingerstick blood and sometimes Walgreens

18  technicians did.  It depended on the store, it depended upon

19  the time period, it depended upon the test.  There can be

20  nothing more individual than having to ask a plaintiff:  Who

21  took your blood?  We asked that of every single one of the

22  named plaintiffs.  Most of them didn't know.  Most of them -- a

23  few of them said, I think the person had a Walgreens jacket on,

24  but I'm not sure.  Most of them didn't know.

25          Now, plaintiffs tried to sidestep this question

1   altogether and say it doesn't matter, right.  They -- they came

2   up with this language today that said, as long as Walgreens

3   encouraged the touching by Theranos, they are somehow

4   responsible.  There is no language that they have found in any

5   case law, in any statement, in any principle of law that says

6   someone can be found liable for an intentional tort like

7   battery by simply encouraging it.

8          Now, today they throughout -- well, maybe it's aiding

9   and abetting.  They have no aiding and abetting battery claim.

10  They can't argue that somehow Walgreens was responsible for

11  aiding and abetting.  They are arguing that Walgreens is

12  responsible for battery itself, which requires an intent to

13  cause the offensive touching.  So it does matter who touched.

14         Now, plaintiffs then say, well, even if we need -- we

15  did need to know who did the touching, we can get this

16  information through this LIS database, this magical database

17  that they keep raising.  What they failed to tell you, Your

18  Honor, is this database is encrypted.  And they spent the last

19  year asking for depositions of people who they thought might be

20  able to un-encrypt it.  And, you know what, nobody did.  That

21  database remains encrypted today.  It's a Theranos database,

22  so, obviously, Walgreens has no control over it, but we have

23  not been able to actually see what's in it.

24         There is nothing in the record that would support

25  Mr. Heller's theory that he can solve all the problems by

1    looking at this database.  Right.  He says, I can get all the

2    names in the database.  I can look at the database and know who

3    got the fingerstick and whether it was a Walgreens or Theranos

4    technician.  They give two examples of people for whom they

5    figured this out.  There is nothing in the record that would

6    support his -- his statement to you today that they can

7    identify every single person or even what he called, quote, a

8    vast majority of the people.  Plaintiffs have failed to present

9    a reliable means of addressing any of those individual

10   questions.

11        Finally, and something that plaintiffs have ignored,

12   is that they have to show that the party who made the

13   representation that the plaintiff relied upon about the true

14   nature of the testing is the same party that actually did the

15   touching.  They have to -- they have to establish that this

16   party who explained the nature of the testing is the same party

17   who did the touching.  So, again, finding out whether it was a

18   Walgreens person or a Theranos person who explained the nature

19   of this test to the patient, again, is an individual issue that

20   cannot be determined from any class-wide evidence.

21        So now let's turn to damages with respect to the

22   battery claim.  Mr. Heller said today that there is, quote,

23   presumed -- well, he said two things.  First he said it's akin

24   to emotional distress, but then later on he said it's presumed

25   damages.  There is no case law whatsoever for the statement

1    that damages are presumed.

2          There is an objective standard for battery, but that

3    is an objective standard about whether the touching is

4    offensive not the measure of damages.  In that fact, there

5    is -- the Arizona courts have recognized that battery damages

6    rely on, quote, the plaintiff's subjective testimony of pain,

7    mental and subjective inquiries into mental disturbance, such

8    as fright, revulsion, or humiliation.

9          Damages for battery will not be the same for everyone.

10   Again, just pointing to our plaintiffs, you know, someone who

11   got a fingerstick and is deathly afraid of, you know, super

12   afraid of needles, is not the same person who got a fingerstick

13   and has blood taken all the time.  Or what about the person who

14   had ten fingersticks versus the person who had one?  What about

15   a child versus an adult versus a disabled person?  Each of

16   those people are going to have different damages.

17         And, again, I think Mr. Heller was right when he

18   talked about battery damages as akin to emotional distress,

19   because all of the problems you would have with emotional

20   distress damages and the individual issues, those all continue

21   to come into play when we're talking about battery.

22         So going back to predominance for a second.

23   Plaintiffs' theory clearly is a theory of, quote,

24   unreliability.  They say, we don't actually have to determine

25   if a test was accurate, because we're saying they were all

1    unreliable even if they were accurate.  And we've explained in

2    our brief that there are many, many ways in which a blood test

3    could have gone through the process and ended up with accurate

4    results, right.  Some people's blood was taken with a venous

5    draw, traditional venous draw, and was ultimately sent to a

6    non-Theranos lab.  There is no reason to believe that those

7    blood tests came back with inaccurate results.  Similarly,

8    someone whose blood was sent to the Arizona lab which used

9    regular old commercial blood testing machines, again, there is

10   no reason to believe that that person's test result was

11   inaccurate.

12        And this lines up with what we learned from the

13   plaintiffs in their depositions.  Every single one testified

14   that no doctor had ever told them that their results were

15   inaccurate.  And every single one also testified that when they

16   had -- I shouldn't say every single one.  Most of them

17   testified that when they had subsequent testing done by a

18   different lab, it was consistent with their Theranos test

19   results.

20        So plaintiffs are trying to avoid all of those

21   individual issues associated with accuracy and say, well, we

22   don't have to worry about accuracy, the injury is

23   unreliability.  But really all they're doing is saying, we want

24   you to presume injury.  Because a result has a Theranos name on

25   it, we're asking you to presume injury.  And there is just no

1    basis based on the facts in this case to do that.

2            In fact, their expert, Mr. Baird, was very careful to

3    say, I'm not testifying about accuracy.  I can't tell you if

4    these results are accurate or not.  I'm just telling you that I

5    think they're -- at least the fingerstick, which is what they

6    focused on, were unreliable.  The unreliability theory doesn't

7    really save their case because we still have to look at how the

8    blood was collected, you know, where did it go after that?

9    What lab did it go to?  What equipment was it tested on?  Those

10   are all individual issues that are going to require lots of

11   individualized evidence.

12           But even if they could proceed on this theory of

13   unreliability, what would be their damages?  It seems like a

14   theory of unreliability is I didn't quite get the value of what

15   I thought I was getting, right?  I thought I was getting a

16   hundred percent reliable test and instead I got one that was

17   only maybe 95 percent reliable.  There is some delta there that

18   those are maybe damages I should get back.  The problem is, of

19   course, that the vast majority of the class already got a

20   refund.  So there is no -- there is no damages from the

21   unreliability, other than perhaps having to go get subsequent

22   tests, which we've now learned are being completely abandoned

23   here.

24           And with -- you know, again, I think plaintiffs

25   continue to try to limit their case in such a way that they

1    don't have to show causation or reliance or injury, but, again,

2    even under their -- their RICO claims and their consumer fraud

3    claims that they're continuing to bring, there have to be

4    showings of causation.  There have to be showings that someone

5    was actually injured by their test results.  And how do we know

6    they're injured, because they went and got medical treatment

7    that perhaps they didn't need, or they got prescription drugs

8    that perhaps they didn't need.  But, again, plaintiffs

9    recognize that they can't seek any of those damages, and

10   they're choosing not to, which leaves us with a class action

11   that really serves no purpose here.

12        You know, in their brief they cite to cases where the

13   court said causation or reliance will be presumed because it's

14   some kind of fraudulent scheme.  Those are cases in which,

15   simply by entering into the financial or the business

16   transaction, the class members were defrauded.  So those are

17   cases where everybody in the class purchased an appraisal for

18   their home and they didn't get one.  Everybody in the class was

19   overcharged for a fee.  All of the class members were supplied

20   with a material misstatement.

21        In this case here, there is nothing that we can say

22   happened to all of the class members.  We can't say that they

23   all received inaccurate test results.  We can't say that they

24   all received results from testing on modified, unapproved

25   machines.  We can't say that they all received unreliable

1    tests.  And we can't say that they all relied, to their

2    detriment, on their test results.

3         Plaintiffs' theory presumes that the entire class was

4    exposed to the same fraud, but we just know that's not the case

5    here.  The customer who had a venous draw that got sent to a

6    commercial lab and was tested on commercial machines, got

7    exactly what she or -- she or he paid for.

8         Before I sit down, I think it's helpful to think,

9    again, Mr. Heller was talking about thinking about this case

10   practically, and I actually agree with that.  In probably every

11   class action that Your Honor has ever considered, defendants

12   get up there and say -- I'm sorry, plaintiffs get up there and

13   say, it's all about the defendant's common course of conduct,

14   right.  And plaintiffs get up on the other side -- let me back

15   up.

16        In probably every case class action you've seen before

17   you, plaintiffs' counsel gets up and says, it's all about the

18   defendant's common course of conduct, right.  The defendants

19   get up and say, no, no, no, it's all about the plaintiffs'

20   experiences and the individual issues related to them and the

21   rest of the elements, and there is lots of predominating

22   individual issues.  Of course the case law says that Your Honor

23   is not supposed to take defendant's arguments and take

24   plaintiffs' arguments and kind of count the individual issues

25   and figure out which side wins, right.  It's not that simple,

1   nor should it be.

2          But we are supposed to think about how a trial on

3   these cases would look, and whether it's fair to everyone, the

4   class members and the defendants, to try a named plaintiff's

5   case, and then apply the results of that trial to all of the

6   rest of the class members, right.  Because that's what happens

7   in a class action.

8          So let's say we go to trial with the current named

9   plaintiffs serving as class reps.  I'm going to use three real

10  life examples:  Plaintiff BP puts on his case.  And now based

11  on the class action rules, right, whatever comes out of his

12  case is going to be applied to the rest of the class.  So

13  plaintiff BP puts on his case, and he testifies, as he did at

14  deposition, that his Theranos test results were completely

15  consistent with his non-Theranos test results both before and

16  after.  He had 11 test results and they all showed high

17  cholesterol and diabetes.  A jury could, and should, find that

18  his results were accurate, right.  Therefore, he has suffered

19  no injury.

20         That means that there would be a finding that all

21  class members have suffered no injury and they all lose, even

22  if one of them could show, in fact, that she had test results

23  from Theranos that were inconsistent.  But BP's test results

24  were consistent, and by trying his case, those results apply to

25  the entire class.

1          As another example, let's look at plaintiff DL.  She

2     puts on her case, and the documents show that many of her tests

3     were performed on commercial devices not Theranos pieces of

4     equipment.  A jury could find that there was no fraud here

5     because plaintiff DL got exactly what she paid for, as most of

6     her testing wasn't even performed at Theranos.

7          This could lead to a finding by a jury that there was

8     no fraud as to her case, which must mean there was no fraud as

9     to all of the class members, even those who, perhaps, did have

10    testing that was done on Theranos lab equipment.

11          And a final example.  Let's say plaintiff SJ, which is

12    one of the Edison Subclass plaintiffs, puts -- let's say she

13    puts on her case and it's found, as she testified, that no one

14    from Walgreens ever touched her, and rather that all of the

15    fingersticks were done by a Theranos phlebotomist, so a jury

16    finds that Walgreens is not liable to this plaintiff for

17    medical battery.  That would mean that Walgreens is not liable

18    to any of the class members for medical battery even if

19    Walgreens did do the fingerstick for some of them.

20          So these are just a few examples of real, not

21    hypothetical, individual issues that will be dispositive as to

22    findings of liability.  And this shows how inherently unfair it

23    is, both to the class members and to Walgreens, to allow this

24    case to proceed as a class action.

25          I think I have a few more minutes, but I'm going to

1  sit down and let Mr. Balwani's counsel come up and spend a few

2  more minutes.

3         COURTROOM DEPUTY:  May I check on the telephonic?  We

4  lost them and I got them back.

5         Do I still have the telephonic with me?

6         MS. HOLMES:  Yes.

7         COURTROOM DEPUTY:  Both Ms. Holmes and Ms. Austin?

8         MS. AUSTIN:  Ms. Austin is on.

9         COURTROOM DEPUTY:  Okay.  Thank you.

10        Thank you, Judge.

11        THE COURT:  Okay.

12        MR. BURNSIDE:  Good morning, Your Honor.  May it

13 please the Court, Fred Burnside here representing Mr. Balwani.

14 As a fellow Alaskan, I want to say I appreciate the travels you

15 engaged in to get here.

16        In my time, I want to address two issues.  I want to

17 elaborate a little bit on what Ms. McCall just said regarding

18 how individual issues will predominate, and I want to talk

19 about the Arizona AG consent decree and why that shows these

20 claims as class actions not superior.

21        Before getting into that, though, I want to emphasize

22 one thing, the difference between the claims against

23 Mr. Balwani and the other defendant.  There is no battery claim

24 brought against Mr. Balwani.  There is no Edison Subclass claim

25 brought against Mr. Balwani.  So when you heard Mr. Heller in

1    his eloquent talk talking about superiority as being tied to

2    the battery claim, that shouldn't exist.  If that's the tent

3    pole holding it up, it doesn't apply to Mr. Balwani.

4            So, in this case, let's turn to the first issue.

5    Individual issues will predominate here.  And I'm going to

6    start with a very uncontroversial premises everyone would agree

7    with.  Class representation is a claim, and the claims rise and

8    fall with the claims of the named plaintiffs.  That whole idea

9    of predominance and a class action won't work where outcomes

10   can vary class member by class member.  That's in law from

11   Zinser on forward for the last 25 years.

12           So let's talk about the named plaintiffs and their

13   claims.  I want to do this by focusing on three named

14   plaintiffs as well, with some overlap to what Ms. McCall

15   discussed.

16           What did the plaintiffs tell the Court about the

17   claims and how he would be tried?  The answer is:  Nothing.

18   The plaintiffs only appear in the caption in the class

19   certification motion and not addressed at all in the reply

20   brief and not addressed at all here.  None of the facts by the

21   plaintiffs are addressed by plaintiffs' counsel.  They want

22   instead to pontificate about a class theory to presume

23   reliance, to presume injury, because they think they've got an

24   expert that can say things are unreliable.  But Rule 23

25   requires a named plaintiff for a reason.  That plaintiff has to

1    litigate her own, the claims, with the class winning or losing

2    based on the outcome.  So let's talk about those claims,

3    because I think a jury could clearly reach different outcomes

4    for these plaintiffs.  I'm going to discuss three.

5          Again, I'll start with RG, just as Ms. McCall did.

6    Now, he had a venous draw in September of 2015, after all

7    fingersticks had stopped.  He complains he was called and told

8    an HIV test was positive in error.  Now, reading that -- in

9    reading the briefs, you might be led to believe that he thinks

10   the Theranos technology was a culprit, but it wasn't.  There

11   was no Theranos technology involved in that test, as ultimately

12   the test was done entirely on third-party machines approved by

13   the FDA, and the test result was corrected in 12 minutes from

14   the time that he called.

15         So the problem wasn't with the HIV test, which was

16   100 percent accurate, the problem is the reporting of the test.

17   The lab director called and made a mistake.  He got the wrong

18   test results and reported it.  That has nothing to do with any,

19   allegedly, defective technology.  In fact, Dr. Baird, in

20   paragraph 55 of his report, admits commercially available

21   devices running standard protocols set by companies like

22   Siemens returned the expected results.  They have admitted that

23   the results that RG got are expected results and accurate.  He

24   had no issues with his other tests.  He received two refunds,

25   one from Theranos and one from the AG, so he's net positive for

1    his transaction with Theranos.

2           So what would a jury do with RG?  A jury might decide

3    there was nothing wrong with these tests since all of them were

4    on FDA approved devices.  He's not bringing any emotional

5    distress claims.  And while a 12-minute error may be annoying

6    and upsetting, it's not RICO and it's not statutory fraud.  If

7    the jury made that finding for the defendants, Your Honor would

8    find that supported by the evidence.

9           But that evidence, Your Honor, is individual evidence

10   unique to his facts:  The test, the machine, the error by the

11   lab director in looking at the wrong result, and that would not

12   generalize to a class.

13          So let's talk about BP, because BP was referenced

14   before.  BP is different.  BP's facts differ in ways that are

15   material, potentially, to a jury.  Unlike RG, BP did have a

16   fingerstick draw.  BP had a fingerstick draw in 2014, had both

17   venous and fingerstick in 2015, and, finally, venous in 2016.

18   So unlike RG, BP did have tests run on Theranos technology, but

19   what did he say in deposition?

20          What he said in deposition was the results of those

21   tests were reliable enough for medical action.  He's a

22   diabetic.  The Theranos results he got were consistent with the

23   tests he had both before and after.  He doesn't actually claim

24   the test results are in any way inaccurate.  What happened?

25   The doctor increased his medication in response to the Theranos

1    test and he's still on that same dosage today.  So I'll argue

2    to a jury that there Theranos gave actual results that actually

3    improved BP's health.  And, in any event, he was already fully

4    refunded by the AG.  It's theoretically possible the jury could

5    find in BP's favor.

6          Mr. Heller, very persuasively, he would come up with a

7    reason, but a jury might find on these facts he's gotten

8    exactly what he paid for, a test run on commercial devices, FDA

9    approved, with accurate results.  A reporting error is not a

10   technology error.  It's human error.  Either way, the verdict

11   would be based on BP facts alone and would not be generalizable

12   to any other plaintiff.

13         Now let's talk about DL.  Again, DL's facts might also

14   matter to a jury.  DL complains she was incorrectly diagnosed

15   with Sjogren's syndrome.  Now, reading that you might think

16   that she's thinking there was a problem in Theranos testing,

17   that she didn't actually have it, but we know that's not true.

18   First of all, her test was performed for Sjogren's syndrome at

19   a reference lab in Utah.  And, yes, she had an earlier one in

20   Newark that also showed Sjogren's.  That just confirms the

21   accuracy of the test.

22         And you might think she's blaming the unreliable test

23   on Theranos, but, again, it was a reference lab, the same lab

24   that their expert witness uses.  Dr. Baird uses the exact same

25   lab.  She got accurate, reliable results with no Theranos

1     technology involved in that later test.

2          And so a jury will also discover that DL's doctor

3     agrees with the Sjogren diagnosis.  As a result, DL changed her

4     diet, which improved her health.  Could a jury find for

5     Mr. Balwani on DL claims?  Absolutely.  A jury could find the

6     test had great value, test run, FDA approved device, and it

7     changed her life for the better.  And, Your Honor, you would

8     find that verdict supported by the evidence, but that evidence

9     would be unique to DL and not generalizable to anybody else.

10    Plaintiffs know that.  And so that's why they conveniently omit

11    any reference to any facts about any plaintiff in any of their

12    class certification papers.

13         What they do instead is what I call the burden of

14    proof pivot.  They want to say, look over here, and let's look

15    at issues that we think absolve them of the burden of proof.

16    First they say the case is about reliability not accuracy.

17    Next they say the case is about omissions not

18    misrepresentations.  They argue it doesn't matter if people

19    never saw at all false advertising claim, if nobody has seen

20    the advertising, but I disagree.

21         Third, they say the Court must base the class

22    determination just on their theory.  They accuse the defendants

23    of highjacking their case and say the Court shouldn't look at

24    that.  In essence, they say they can recover even if all named

25    plaintiffs' tests were 100 percent accurate, and it appears

1    that they were, even if no named plaintiffs received any

2    marketing at all, and even if it tests exactly what they were

3    supposed to, but that is not the law.

4           The law shows the Court has to look at how the issues

5    would play at trial, this includes our case.  Defendants get to

6    put on a case too.  And that explains why individual defenses

7    can defeat certification.  Trial on these plaintiffs' claims

8    will show us on subjects of injury on an individual basis,

9    we'll show they got exactly what they paid for.  And we expect

10   a jury would agree.  That justifies denial of class

11   certification and reliability.  It's, here's an undisputed

12   proposition that more testing was not done on Theranos

13   technology, it was done on commercially available FDA approved

14   devices.  If that's the case, those people cannot recover.

15   They got exactly what they paid for.

16          In fact, Dr. Baird in paragraph 55 says those results

17   would be expected results.  He has no challenge to that

18   testing.  And the plaintiffs have no challenge as to use of

19   reference labs such as ARUP, as was done with DL.  And there is

20   no evidence to suggest unreliability is the same with method to

21   method, test to test.  Dr. Baird declares one sentence up

22   analytes focuses on fingerstick.  And if you look, for example,

23   at the section on scholarly literature, he says that supports

24   this idea that all Theranos testing is flawed.  One is a blog

25   post and one is a study he does cite actually involved only

1    fingerstick testing, so he's attacking fingerstick technology.

2         And when pressed in deposition, what did he say?  He

3    said, well, as to the non-fingerstick stuff, I think the CMS

4    report means nothing they did was reliable.  But remember the

5    CMS report at issue came out in February 2017.  And, in

6    response to that, Theranos looked at every possible test result

7    that could have been affected by any defect in the protocols

8    required by CMS and voided those results, and that was ten

9    percent of the results.  Seven million tests are unchallenged

10   and undaunted, unaffected by anything in the CMS reports.  And

11   there is no other evidence that Dr. Baird has that would bear

12   on that.

13        At trial we will attack Dr. Baird's broad liability

14   inclusion.  And we're going to produce evidence assay by assay.

15   If you look at his report on page 39, he admits different

16   assays have different requirements for accuracy.  That's a huge

17   admission.  That means each has to be examined to determine

18   whether or not it was accurate and reliable, intends to prove

19   them reliable.  And we think a jury would agree.

20        With that, Your Honor, I'll move to superiority of the

21   second argument unless Your Honor has any questions.

22        We explained that we think the class action isn't

23   superior here, primarily because of the Arizona AG consent

24   decree.  Now, in response, Mr. Heller stood up and he explained

25   why that shouldn't be the case, emphasizing battery claims,

1   but, again, there are no battery claims brought against

2   Mr. Balwani.  So to the extent that's the argument as to why

3   the case is superior, it simply doesn't apply to Mr. Balwani,

4   so the genesis lies in the nature of plaintiffs' claims.  This

5   is exactly what they say in paragraph -- I'm sorry, page 21 of

6   their reply brief.  Under the non battery claims, again, the

7   only claims brought against Mr. Balwani, plaintiffs allege that

8   they and the class paid for tests that are of worthless and,

9   worse yet, dangerous, and thus were injured in the amount of

10  their purchases.  Repeat, that they're suing to redress injury

11  in the amount of the purchases.

12          They already got that, remember?  There was one

13  testing center in California and 40 in Arizona.  The vast

14  majority of class members got all the relief they were entitled

15  to.  That redress has been obtained.  The relief they sought

16  duplicates that in these circumstances a class action is not

17  superior.  That's exactly what the Ninth Circuit held in Kamm

18  and the Conde case we recently submitted as supplemental

19  authority.  Plaintiffs strain to distinguish Kamm, but each

20  effort misses the mark.

21          First plaintiffs argue that, well, in Kamm the AG sued

22  first, but nothing in Kamm suggests a filing sequence matters.

23  What matters is whether at the time Your Honor is deciding

24  whether or not this is superior, have the class members

25  obtained redress.  And they have.

1          Here the AG decree came in April 2017, just

2    two-and-a-half months after Mr. Balwani and Walgreens named as

3    defendants early in the life of the case.

4          The next arguments plaintiffs make is that nothing

5    shows, though extensively the AG investigated this, goes to

6    duplication of efforts argument.  They argue there is just ten

7    days between the filing and the AG consent decree.  Now, they

8    made that argument for the first time in the reply, Your Honor,

9    so we didn't get a chance to address it, but it's just not

10   true.

11         Looking at that argument, if you look on the Arizona

12   Attorney General Web site, in January 2017 before Mr. Balwani

13   was a defendant, the Arizona AG sent out a request for proposal

14   to investigate and lawsuit to Theranos.  So that argument just

15   isn't true factually.  They're implying private attorney

16   general is better than the actual attorney general, and I don't

17   think that's fair or right.  There is a strong public policy

18   embodied in the Kamm case that explain we want to encourage

19   defendants to resolve their disputes with attorneys general to

20   provide immediate relief, and if they're just going to get sued

21   again, that's going to deter that very action.

22         The AG action was superior here because it

23   accomplished in ten days what the plaintiffs haven't done in

24   over three-and-a-half years.

25         Plaintiffs argue the case next is different because it

1    alleges battery and seeks punitive damages.  Again, no battery

2    claims have been brought against Mr. Balwani.  And the fact

3    they seek additional damages doesn't matter.  That's exactly

4    the argument the court rejected in Kamm.

5            In Kamm the court noted that the AG action would not

6    recover in an amount that was even close to that sought in

7    class action, less than $0.02 on the dollar.  Ultimately,

8    that's because any plaintiff's counsel worth his salt can get

9    around that by seeking additional punitive damages, treble

10   damages, hoisting up their claims with as many causes of action

11   as possible, as many theories as possible.  That didn't matter

12   in Kamm.  The support said it was not superior.

13   Ninety-seven percent of the class got no relief from FTC, and

14   the court still said class action wasn't superior.

15           Compare that to here where 100 percent of the people

16   in Arizona got a refund from the Arizona Attorney General, and,

17   again, to the extent they raised it in their paper to Your

18   Honor, this is different than the issue you decided on motion

19   to dismiss that was about mootness.  Mootness and superiority

20   are very different concepts.  Mootness requires identity of

21   claims, but Kamm makes clear that these considerations have no

22   bearing, because in that case there were additional claims.

23   There wasn't identity of claims.  And it still found the case

24   was not superior.  If a class is certified, this case is going

25   to last a year or two further, given that the AG already

1   achieved regress.  That's not superior.  The Court should deny

2   certification of an Arizona class on that basis.

3          So in sum, Your Honor, plaintiffs want to run from the

4   facts of their plaintiffs.  Those plaintiffs' claims require

5   individual facts that are not generalizable to a class, and

6   this is not the superior method of adjudication because redress

7   has already been provided.

8          Thank you.

9          THE COURT:  Mr. Heller, back to you for about five

10  minutes.

11         MR. HELLER:  Okay.  I've got several points to hit.  I

12  will try to hit them in quick fashion.  There seem to be some

13  confusion from Walgreens, they suggested that our plaintiffs

14  would be shocked that they're not pursuing personal injury type

15  damages.  I think I was clear initially, but just to be clear,

16  we have consulted with them.  They have -- they all agree.

17  They understand.  They would not be shocked.  They are

18  committed to this class case.  They are committed to being in

19  the same boat as the rest of the class members.

20         I wanted to say that we have always -- if you look at

21  the second amended complaint, the focus of those -- of the

22  claims here, the focus of the remedies has always been on

23  rectifying this battery harm that the Edison Subclass members

24  have suffered.  Refunds, punitive damages, treble damages, that

25  has always been the focus of this case, and what we've been

1   after in this case, notwithstanding the defendant's suggestion

2   to the contrary.

3        I do find it interesting, and, frankly, disingenuous

4   for the defendants, in particular Walgreens, to come up here

5   and act like they care about preserving the class members'

6   rights in the class members' ability to get emotional distress

7   damages.  I mean, what they care about is not getting a class

8   certified, because they know that if that happens, they're scot

9   -- they get off scot-free.  They're not going to be held

10  equitable at all.

11       There was a suggestion by Walgreens there is no legal

12  support for presumed damages being available.  That's just flat

13  wrong.  We cited it in our papers the Johnson case, which is

14  196 Arizona 621.  Next to Johnson -- I'm sorry, I don't have

15  the actual number in front of me -- but we also cited the

16  Arizona jury instruction which also makes it crystal clear that

17  that is an available remedy, and makes it crystal clear that

18  that is a jury determination based on a reasonable person

19  standard.  That does not turn on anything subjective in the way

20  that Walgreens has suggested, or remotely so.

21       Punitive damages and treble damages under very clear

22  case law is available, notwithstanding the fact that there is

23  some voluntary repayment of the actual damages.  And if you

24  think about the sort of practical consequence, if the defendant

25  could avoid punitive damages by simply paying back the money

1    after they were sued, then every defendant would have that

2    opportunity.  That's not the law.

3         Walgreens suggested for battery that somehow we would

4    need to connect the touching to a misrepresentation, but the

5    law is very clear, Duncan and the restatement section that

6    Duncan is based on, that there doesn't need to be any

7    misrepresentation by the defendant.  Their knowledge of the

8    mistaken belief alone is sufficient for them to be liable.

9         I will reiterate, though, that -- and I think maybe

10   this was also unclear -- but the data does show the identity of

11   the technician, whether it's a Walgreens or a Theranos

12   technician.  We have data separate, entirely separate from the

13   LIS database.  We're not counting on being able to access that

14   at all.  Walgreens suggested that there is no aiding and

15   abetting battery liability, or there is any authority for that.

16   We've cited that in our papers too.  We cite the Ramirez case.

17   And they suggested that we don't have allegations of aiding and

18   abetting battery.  That is also false.

19        If you look at the second amended complaint at

20   paragraph 434, it is not broken out as a separate cause of

21   action, but it need not be.  It is a torts theory for battery

22   liability.  There was a suggestion that there would be a

23   variation in experiences in terms of the battery harm, because

24   some people are more afraid of needles than others, but that is

25   a complete misunderstanding of battery harm here.  The battery

1   harm is the harmed human dignity associated with these folks,

2   being associated, treated as human guinea pigs, unwittingly,

3   and that doesn't vary from person to person.

4          An overall point, both of the defendants have come up

5   here and argued that individual issues are predominating, but

6   if you look at all of their arguments, they're ignoring our

7   theories entirely.  And they don't get to do that.  They get to

8   come in if they want to at trial and try to undermine our

9   theories, and I'm sure they'll give it their best shot.  They

10  don't have an expert supporting anything, theory, hearsay.

11  Now, maybe they'll get one by the time trial rolls around,

12  they'll get the opportunity to do that, but they can't just

13  ignore our theories.  And we cited the United Steel case in our

14  papers for that premises.

15         They talk about trial and what that will look like for

16  all the plaintiffs, but they're, again, ignoring our theories.

17  All of the plaintiffs will testify that there is no -- that

18  they can't rely at all on anything they got from Theranos

19  because of this crazy amount of information that was concealed

20  from them and that's come to light now.  I mean, put yourself

21  in one of these people's shoes.  How could you possibly rely on

22  this?  They're saying a lot of people got accurate test

23  results, but how in the world would you know?  This company

24  voided a bunch of tests, then they voided more testing, and

25  then they just went out of business.  So if you're one of these

1    people that never got your test voided, how in the world could

2    you know?

3           And same with the Edison Subclass members and class

4    representatives.  All of them are going to testify that they

5    had their human dignity harmed by virtue of being treated as a

6    human guinea pig.

7           One point that I didn't address initially, but I want

8    to make sure I hit in case Your Honor had questions about it,

9    Balwani cited the Mazza case for the suggestion that somehow

10   you need to have common exposure to a reputation in order to

11   get a presumption of reliance on an omission.  That is not what

12   Mazza says.  That is not what Mazza stands for.  It's an

13   entirely different circumstance here where the concealed

14   information goes straight to the heart of what the service was

15   about.  The equivalent in Mazza would have been if the

16   concealed information was the brakes of the car don't work or

17   they're going to fail half the time, or something along those

18   lines.

19          With respect to the superiority, quickly.  It's not

20   just a matter that these people didn't get the full amount of

21   recovery that they possibly could get.  There are entire types

22   of liability, in particular the battery I think is the most

23   clear, entire types of harm, entire violations that are

24   completely unaddressed and completely unadjudicated by the

25   attorney general.

1          I did want to reference Your Honor to a few of the

2    cases that deal with this issue of choosing presumed damages

3    instead of actual damages.  There is some case law that we cite

4    in our papers, in particular the Murray case, that deals with

5    the question of a very similar choice that class

6    representatives often face in federal statutory cases that

7    provide for statutory damages.  There is a choice between

8    actual and statutory damages.  And courts have repeatedly

9    recognized it's completely okay to pursue the statutory

10   approach as long as you're providing notice and an opportunity

11   for people to opt out if they want to pursue the other

12   approach.

13          The last point I wanted to make, Your Honor, just sort

14   of an overall point, a conceptual point.  I think Walgreens

15   suggested we're left with a class action here that has no

16   purpose.  And I just -- I take offense to that personally,

17   because I think there is great purpose to this class action.

18   How about rectifying and vindicating the human dignity of these

19   Edison Subclass members, which has totally gone unaddressed.

20   How about penalizing and holding accountable these three

21   defendants, all of whom have engaged in willful concealment.

22   Those seem like pretty good purposes for this class case to go

23   on.

24          Thank you.

25          THE COURT:  Thank you, Mr. Heller.

1          The matter is taken under advisement.  We will get you

2      a decision just as quickly as we can.

3          Thank you for your additional input today.  You've

4      given us something to think about, a lot to think about,

5      actually.

6          We will be in recess.

7          (Proceedings concluded at 10:16 a.m.)

8                        *          *          *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3           I, CHRISTINE M. COALY, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 24th day of January,

13  2020.

14

15

16                  /s/ Christine M. Coaly_____
17                  Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25