Mark D. Samson, Bar No. 011076
Ron Kilgard, Bar No. 005902
Alison E. Chase, Bar No. 028987
KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822
msamson@kellerrohrback.com
rkilgard@kellerrohrback.com
achase@kellerrohrback.com

Michael W. Sobol (*Pro Hac Vice*)
Roger N. Heller (*Pro Hac Vice*)
Melissa Gardner (*Pro Hac Vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
msobol@lchb.com
rheller@lchb.com
mgardner@lchb.com

*Co-Lead Class Counsel*
[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>Arizona THERANOS, INC. Litigation, | **No. 2:16-cv-2138- DGC**<br><br>(Consolidated with)<br>No. 2:16-cv-2373- HRH<br>No. 2:16-cv-2660- HRH<br>No. 2:16-cv-2775- DGC<br>                    -and-<br>No. 2:16-cv-3599- DGC<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS, DKT. 591** |

## <u>**TABLE OF CONTENTS**</u>

1.    Class and Settlement Payment Details ....................................................... 1

    A.    The Class Data List........................................................................ 3

    B.    The Class List and the Class Size.................................................. 4

    C.    Class and Subclass Member Testing Costs and
        Estimated Settlement Payments ..................................................... 5

2.    Effectiveness and Reliability of Class Notice ........................................... 8

3.    Treatment of Residual Settlement Funds .................................................. 9

4.    The Balwani and Theranos ABC Settlements ......................................... 10

    A.    Legal Framework and Theranos ABC Background ..................... 10

    B.    Other Creditors' Rights and Claims ............................................ 11

    C.    Process for Payment, Balwani's Appeal, and Payment
        Timing ......................................................................................... 11

5.    Class Representative Awards................................................................... 14

6.    Fees and Costs......................................................................................... 16

    A.    Legal Framework and Background .............................................. 16

    B.    Grounds for Anticipated Fee Request ......................................... 18

7.    Modifications to Notice Documents ....................................................... 20

    A.    "Unsubscribe" Language in Email Notices ................................. 20

    B.    Objection Requirement ................................................................ 21

    C.    Clarification in Long-Form Notice re Scope of
        Walgreens Edison Subclass.......................................................... 21

    D.    Corrected Typos .......................................................................... 22

8.    Conclusion .............................................................................................. 22

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Andrews v. Plains All-American Pipeline, L.P.*,
No. 2:15-cv-04113-PSG-JEM, 2022 WL 4453864 (C.D. Cal. Sept. 20,
2022) ................................................................................................................... 15

*In re Apple Inc. Device Performance Litig.*,
50 F.4th 769 (9th Cir. 2022) ............................................................................. 15

*Berg & Berg Enters., LLC v. Boyle*,
100 Cal. Rptr. 3d 875 (Ct. App. 2009) ............................................................. 10

*Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*,
32 Cal. Rptr. 3d 325 (Ct. App. 2005) ............................................................... 11

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ....................................................................... 16, 17

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .......................................................................................... 19

*Brawner v. Bank of Am. Nat'l Ass'n*,
No. 3:14-cv-02702-LB, 2016 WL 161295 (N.D. Cal. Jan. 14, 2016) .............. 15

*Credit Managers Ass'n v. Nat'l Indep. Bus. All.*,
209 Cal. Rptr. 119 (Ct. App. 1984) .................................................................. 10

*Garner v. State Farm Mut. Auto. Ins. Co.*,
No. CV 08 1365 CW (EMC), 2010 WL 1687832 (N.D. Cal. Apr. 22,
2010) ................................................................................................................... 15

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust
Litig.*,
No. 4:14-md-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017),
aff'd, 768 F. App'x 651 (9th Cir. 2019) ........................................................... 15

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ............................................................................ 15

**Statutes**

Ariz. Rev. Stat. § 44-302 ........................................................................................ 9

Ariz. Rev. Stat. § 44-307 ........................................................................................ 9

ii

Ariz. Rev. Stat. § 44-313 ............................................................................. 9

Ariz. Rev. Stat. § 44-317 ............................................................................. 9

Cal. Code Civ. Pro. §§ 493.010 to 493.060, 1800-1802 ............................ 10

Cal. Code Civ. Pro. §§ 493.010-493.020 .................................................... 11

Cal. Code Civ. Proc. §§ 1501.5, 1531 ....................................................... 10

**Rules**

Fed. R. Civ. P. 23 .............................................................................. 14, 16, 17

Local Civ. R. 54.2(i) ................................................................................... 17

**Other Authorities**

Benjamin Gould, *On the Lawfulness of Awards to Class Representatives*,
    2023 Cardozo L. Rev ............................................................................ 19

Geoffrey L. Berman, *General Assignments for the Benefit of Creditors* 3
    (2019) ..................................................................................................... 10

Schwartz & Ahart, California Practice Guide: Enforcing Judgments and
    Debts (The Rutter Group 2005) ............................................................. 11

# **EXHIBITS**

EXHIBIT 1          DECLARATION OF ARTHUR OLSEN OF CASSIS TECHNOLOGIES

EXHIBIT 2          DECLARATION OF JENNIFER KEOUGH OF JND LEGAL ADMINISTRATION

EXHIBIT 3          DECLARATION OF RACHEL P. STOIAN OF DORSEY & WHITNEY LLP

EXHIBIT 4          THERANOS ABC AND THERANOS, INC. ASSIGNMENT AGREEMENT

EXHIBIT 5          THERANOS ABC NOTICE TO THERANOS, INC. CREDITORS

EXHIBIT 6          EMAIL NOTICE A

EXHIBIT 7          EMAIL NOTICE B

EXHIBIT 8          POSTCARD NOTICE A

EXHIBIT 9          POSTCARD NOTICE B

EXHIBIT 10         DIGITAL NOTICE

EXHIBIT 11         LONG FORM NOTICE

EXHIBIT 12         PUBLICATION NOTICE

EXHIBIT 13         PROPOSED PRELIMINARY APPROVAL ORDER

Plaintiffs submit this Supplemental Memorandum to provide additional information responsive to the Court's comments and questions at the September 22, 2023 hearing. With this Memorandum, Plaintiffs also submit the Declaration of Arthur Olsen of Cassis Technologies (Olsen Decl., Exhibit 1), the Declaration of Jennifer Keough of JND Legal Administration (Keough Decl., Exhibit 2), and the Declaration of Rachel P. Stoian of Dorsey & Whitney LLP (Stoian Decl., Exhibit 3).

## 1.    Class and Settlement Payment Details

At the September 22, 2023 hearing, the Court asked for certain additional information regarding the size of the Class and Walgreens Edison Subclass, testing costs, the anticipated Settlement payment amounts, and related information. Plaintiffs submit herewith the Declaration of Database Expert Arthur Olsen of Cassis Technologies, and the Declaration of Class Action Settlement Administrator Jennifer Keough of JND Legal Administration, which contain the details requested and provide additional context for same. Exhibit 1 (Olsen Declaration); Exhibit 2 (Keough Declaration). The information is further summarized and explained herein.

As the Court will recall, prior to its dissolution, Theranos maintained Theranos Testing data in its Laboratory Information Systems (LIS) Database. The LIS Database contained contemporaneous data about the Theranos testing patients, their contact information, the amount of payment for Theranos testing, the type of blood draw(s) performed, the date, time, and location of each blood draw, and the technician who drew the blood among other information. *See* Dkt. 303 (Ps' Motion for Certification) at 21; Dkt. 439 (Declaration of Melissa Gardner) ¶¶ 66-67. Theranos was capable of running detailed reports from that data. *Id.* Theranos irrevocably dismantled the LIS database after ceasing operations in 2018. The copy of the LIS database that Theranos produced to Plaintiffs in this action was and is inaccessible.

Despite the inaccessibility of the database itself, as described in the November 2021 Declaration of Melissa Gardner (Dkt. 439), Plaintiffs have been able to re-create the vast majority of the pertinent data in the LIS database. Using widely accepted standard

methodology, and the extensive spreadsheets and reports that were generated from the LIS database during the regular course of Theranos's business produced during discovery in this case, Plaintiffs reconstructed the records associated with each Theranos testing visit. In order to do this, Plaintiffs engaged an experienced database expert, Mr. Olsen. While not able to duplicate exactly the LIS Database itself, Mr. Olsen was able to build a database of records nearly as comprehensive as the records Theranos dismantled.

Mr. Olsen was able to build this dataset based on the consistent presence of an "accession" number in Theranos' spreadsheet reports. The accession number is a unique numerical identifier that Theranos assigned for each patient visit. The accession number allows data in numerous spreadsheets to be re-associated with data in others, and reliably ties records about individual blood samples (including payment and blood draw data) back to the Theranos testing purchaser (including contact information). The documents that Mr. Olsen processed to perform his analysis, drawn from more than 7.8 million pages of documents produced in this case, include data produced by Theranos and Walgreens, as well as information produced by the Administrator for the AZ AG settlement with Theranos in 2017, when the LIS Database was still accessible. Each document used for these purposes individually contains some, but not all, of the information that Theranos maintained in the LIS, and each document associates particular data points with individual accession numbers.

Mr. Olsen previously served, at the appointment of the Court, in connection with the dissemination of litigation class notice, and was responsible for extracting the names and contact information of potential Class Members from records produced by Theranos. JND, in turn, implemented litigation class notice and was responsible for de-duplicating, updating, and using the data Mr. Olsen compiled to disseminate the mail and email notices to Class Members in 2022.

As described below and in the accompanying Olsen and Keough declarations, Mr. Olsen and JND have now compiled, from the various data spreadsheets, additional data fields (*i.e.*, beyond contact information) that correspond to each accession number. Using widely accepted standard methodology, this allows identification of who is in the Class and

Walgreens Edison Subclass, the Theranos Testing Costs associated with each visit, the type of blood draw, who conducted the blood draw, whether that Class Member received a refund under the 2017 AZ AG settlement and, if so, in what amount, and whether such refund check was negotiated. As discussed below and in the accompanying Olsen and Keough Declarations, this information, contained in a Class Data List, will be used to implement direct settlement notice and calculate settlement payments for the Class under the proposed Plan of Allocation.

### A.    The Class Data List

Mr. Olsen's Declaration submitted herewith describes his compilation of the "Class Data List" that is being used to calculate the amounts due to Class Members and to identify Walgreens Edison Subclass Members. In addition to Class Member names and contact information (which Mr. Olsen had previously extracted for purposes of the 2022 class notice), the Class Data List also contains information regarding Class Members' payments for Theranos tests, and whether those tests were fingerstick blood draws performed by a Walgreens employee. *See* Olsen Decl. ¶¶ 5-8.

Mr. Olsen's widely accepted standard methodology for identifying what Class Members paid for Theranos blood tests was thorough and inclusive. He processed more than 5,000 spreadsheets produced in the litigation and identified four types of payment data associated with unique accessions in Defendants' records: Payment and Coupon amount data in reports generated by Theranos; "Payment collected at POS" (point of sale) data generated by Walgreens, and records from Settlement Administrator Rust Consulting showing the amount of each refund issued pursuant to the Arizona Attorney General's 2017 Consent Decree with Theranos, as well as whether the refund check (if applicable) was cleared or voided. Olsen Decl. ¶ 6. Values were not available for all four fields for every accession, but where Mr. Olsen located non-zero values for multiple fields, the values were generally consistent within one cent. *Id.* ¶ 7. Mr. Olsen included all four values for each accession, where available, in the Class Data List.

Mr. Olsen's methodology for identifying fingerstick blood draws performed by Walgreens employees—"flagging" each unique accession number in Theranos's reports associated with a "CTN" (fingerstick) blood draw and a Walgreens employee—mirrors the approach described in the November 29, 2021 Declaration of Melissa Gardner. *See* Dkt. 439. It differs only in that, whereas Plaintiffs' counsel Ms. Gardner limited her analysis to the 20 spreadsheets submitted with her Declaration, Mr. Olsen processed over 5,000 spreadsheets to extract data relevant to the task. Olsen Decl. ¶¶ 4-5.

The Class Data List is organized by accession, not by individual, such that each person who had multiple visits would have multiple entries on the Class Data List, each containing all available payment data about each blood visit in each of the four payment amount fields, and each indicating whether Theranos and Walgreens' records identified that particular blood test as a fingerstick blood draw performed by a Walgreens employee, or not.

Mr. Olsen's Class Data List was provided to JND for purposes of effectuating the proposed Notice Plan (Walgreens Settlement Ex. A) and Plan of Allocation (*id.* Ex. C). *See* Olsen Decl. ¶ 10; Keough Decl. ¶ 4.

**B.    The Class List and the Class Size**

As described in the Declaration of Jennifer Keough, JND has refined the output of Mr. Olsen's analysis using industry standard deduplication processes, in order to associate the accession-level (individual testing visit-level) data to unique Class Members. As prepared by Mr. Olsen, the Class Data List contained 315,281 records, including duplicate records for some accessions and records for individuals who are outside the Class definition. Keough Decl. ¶ 4. Because Mr. Olsen's analysis was performed at the accession level, rather than the Class Member level, a single individual could have multiple entries, reflecting a series of distinct visits for Theranos testing, on the Class Data List. JND's additional processing and deduplication of this data, through which JND identified 299,345 unique accessions belonging to 198,982 Class Members (Keough Decl. ¶ 7), has enabled JND to

4

provide the calculations and estimates requested by the Court, and, if the Settlement is approved, will ultimately facilitate JND's issuance of notices and settlement payments.

JND provides the following estimates in response to the Court's specific questions regarding the Class and Subclass size:

- <u>Class size</u>: 198,982 (This is the number of entries with a unique combination of name, address, and date of birth in the Class Data List after exclusions and deduplication by JND). *See* Keough Decl. ¶¶ 5-7.

- <u>Walgreens Edison Subclass size</u>: 7,866 (This is the number of unique Class Members flagged in the Class Data List as having one or more accessions meeting the criteria for inclusion in the Subclass). Keough Decl. ¶ 8.

### C. Class and Subclass Member Testing Costs and Estimated Settlement Payments

The Court also requested information regarding Theranos Testing Costs of the Class and the expected settlement payment amounts for the Class and Walgreens Edison Subclass.

As described in the proposed Plan of Allocation (Walgreens Settlement, Ex. C), Class Member payments will be calculated as follows: (a) $10 (the "Base Payment"); plus (b) two times the amount of the Class Member's Theranos Testing Costs, minus the amount of any negotiated refund checks for that Class Member from the 2017 AZ AG settlement as reflected in the Class Data List. These amounts (other than the $10 base payment portion) comprise the "Unadjusted Class Member Payment" that will be subject to a higher or lower *pro rata* adjustment depending on the funds available for distribution ("Net Settlement Fund"). The Walgreens Edison Subclass member payments are calculated as $1,000 per Walgreens Edison Subclass member, subject to adjustment on the same basis as the Unadjusted Class Member Payment.

As such, the Plan of Allocation requires JND to perform a number of calculations. First, it must identify the "Theranos Testing Costs" for the 299,345 accessions on the Class Data List. JND has done so pursuant to the following guidance: JND used the four Testing

Costs-related data fields in the Class Data List described above. Where all values in those fields were the same for an accession, that value was identified as the Theranos Testing Costs for that accession. In any instances where the Class Data List contains more than one value in the four Testing Costs-related fields (*i.e.*, if there was any variation at all), Plaintiffs instructed JND to use the highest of the available values for purposes of calculating the "Theranos Testing Cost" of a particular accession. Keough Decl. ¶ 10. Plaintiffs believe this is the most appropriate and equitable method to address the modest variations within the data regarding Class Member payment information. Finally, no Theranos Testing Cost data was available (values in all four fields were blank) for 34,632 accessions on the Class Data List. Keough Decl. ¶ 12. The Plan of Allocation requires JND to assign the average of the Theranos Testing Costs that are available to those accessions. Walgreens Settlement Ex. C ¶ 1-B.

Second, JND must identify the amounts of any refunds negotiated by Class Members in order to deduct that amount from each Class Member's final payment. With respect to offsets for the AZ AG refunds, the Class Data List identifies, for each accession, whether a refund was sent and in what amount, and whether that refund was negotiated or not. Keough Decl. ¶¶ 10, 14. As Mr. Olsen explains, that information was provided by Rust Consulting, the administrator of the AZ AG settlement. Olsen Decl. ¶ 6(b)-(c).

JND then totaled the Theranos Testing Costs for each individual Class Member based on their accessions, and thus provides the following calculations relevant to Class Member Payment amounts:

- Total Theranos Testing Costs (excluding accessions where the average costs were used due to missing data): $10,556,737.19

- Average Theranos Testing Costs per accession: $39.88 (This is the average cost per Theranos Testing visit. On average, Class Members were associated with more than one (approximately 1.5) Theranos Testing visit in the Class Data List.)

- <u>Total Theranos Testing Costs including average costs for accessions with no payment data</u>: $11,937,861.35

- <u>Two times the total Theranos Testing Costs ("Unadjusted Class Member Payments" as defined in Plan of Allocation)</u>: $23,875,722.70

- <u>Total number of Arizona Attorney General Refunds issued to Class Members</u>: 104,142

- <u>Total number of Arizona Attorney General Refunds negotiated by Class Members</u>: 81,001

- <u>Total dollar amount of Arizona Attorney General Refunds Issued to Class Members</u>: $4,108,060.21.

- <u>Total dollar amount of Class Members' negotiated Arizona Attorney General Refund Checks</u>: $3,337,199.32.

Pursuant to the proposed Plan of Allocation, the Unadjusted Class Member Payment Amount portion of the Class Member Payment and the default Walgreens Edison Subclass Payment amount ($1,000 per Walgreens Edison Subclass Member) are subject to *pro rata* adjustment depending on the extent to which the Net Settlement Fund (*i.e.*, the amount available for distribution to the Class after payment of attorneys' fees, costs, service awards, and administrative costs) is either insufficient or more than enough to make all payments at the default amounts. Assuming that the Net Settlement Fund available for distribution is $30,422,766.42—calculated as the total amount provided by the Settlements ($45,331,094.88), <u>minus</u> the requested attorneys' fees ($13.2 million, i.e., 30% of the $44 million Walgreens Settlement amount), estimated attorneys' costs ($1.3 million), estimated administrative costs ($500,000; *see* Dkt. 591-16, ¶ 33), and maximum requested service awards ($70,000; *i.e.*, $10,000 for each of the seven class representatives)—JND provides the following estimated payment amounts:

- <u>*Pro rata* adjustment (not applicable to $10 base payment or AZ AG offset)</u>: 1.000895447

- • <u>Total Class Member Payments</u>: $22,549,722.82 (including the $10 Base Payment and accounting for the AZ AG offset)
- • <u>Average Class Member Payment</u>: $113.33 (including the $10 Base Payment and accounting for the AZ AG offset)
- • <u>Walgreens Edison Subclass Member Payment</u>: $1,000.89
- • <u>Total Walgreens Edison Subclass Member Payments</u>: $7,873,043.59

*See* Keough Decl. ¶¶ 16-19.

Thus, Plaintiffs expect that the Net Settlement Fund is adequate to make payments equal to slightly more than double each Class Member's Theranos Testing Costs minus the AZ AG offset (with the average payment per Class Member reflecting the fact that the average Class Member had 1.5 Theranos Testing visits), plus the $10 Base Payment, plus approximately $1,000 to each member of the Edison Subclass.

### 2.    Effectiveness and Reliability of Class Notice

At the September 22, 2023 hearing, the Court asked for information regarding the effectiveness of the notice program for the 2022 notice of class certification.

The 2022 notice program, like the one proposed for settlement notice, included direct notice via mail/email and a targeted digital notice campaign. JND reported that: (a) 91% of the mailed notices were deemed delivered and 9% were deemed undeliverable; and (b) 94% of the email notices were deemed delivered and 6% were deemed undeliverable (Dkt. 482-1, ¶¶ 7, 9). JND further reported that the 2022 digital notice program, which ran for approximately six weeks, delivered a total of 8,517,481 digital impressions (Dkt. 482-1, ¶ 10).

The mailing and email address information used for the 2022 notice came from Theranos' testing records and was updated by JND through its standard processes (including updating addresses, where possible, and re-mailing notices that were returned undeliverable) (Dkt. 482-1, ¶¶ 3, 6). This data will be used for settlement notice and JND will make additional efforts to further update addresses and maximize deliverability of the

direct settlement notices (Dkt. 591-16, ¶¶ 19-23). The proposed settlement notice program also includes a digital notice program that tracks the prior digital program and is expected to deliver a total of 8.3 million impressions (Dkt. 591-16, ¶¶ 26-27). The proposed settlement notice program also includes publication notice in the *Arizona Republic*, a settlement website, and informational toll-free number.

### 3. Treatment of Residual Settlement Funds

The Court requested further information regarding the proposal for distribution of residual funds, and in particular regarding unclaimed property procedures. Under the proposed Plan of Allocation, if a second distribution is not practicable, or if there are still remaining residual funds following a second distribution, the remaining funds would be treated as unclaimed property of the corresponding Class Members subject to applicable state unclaimed property procedures (Dkt. 591-11, ¶ 7). The unclaimed property procedures and timing vary by state.

In Arizona, where most of the Class Members are expected to reside, following a one-year "dormancy period," during which the funds would be claimable directly from the Settlement Administrator (Ariz. Rev. Stat. § 44-302), and after a "due diligence" notice about the funds is sent to the Class Members with unclaimed funds (*Id.* § 44-307(E)), the funds that remain unclaimed along with the corresponding names, payment amounts, and last known addresses, would be sent to the Arizona Department of Revenue for deposit in the state's general fund (*Id.* § 44-313). At that point, the Class Members with unclaimed funds will be able to claim the funds for 35 years (the escheatment period) by following the state unclaimed property procedure (*Id.* § 44-317(E)).

The process in California is similar. Following a three-year "dormancy period," during which the funds would be claimable from the Settlement Administrator, and after a "due diligence" notice about the funds is sent to Class Members with unclaimed funds, the funds that remain unclaimed, along with the corresponding names, payment amounts, and last known addresses, would be sent to the California State Controller's Office for deposit in the State's general fund. At that point, the Class Members with unclaimed funds will still

be able to claim the funds by following the state unclaimed property procedure; in California, there is no time limit for submitting such claims (i.e., the funds would be available to claim in perpetuity). *See* Cal. Code Civ. Proc. §§ 1501.5, 1531; *see also*, *Unclaimed Property*, Cali. State Controller, https://ucpi.sco.ca.gov/ (last visited Oct. 5, 2023).

Class Counsel believe that treating the ultimate residual funds as unclaimed property is the best option for the class because it provides additional opportunities for Class Members to receive funds directly. If the Court's preference, however, is for the residual funds to be distributed *cy pres*, Class Counsel and Walgreens can promptly propose appropriate recipient(s).

### 4.    The Balwani and Theranos ABC Settlements

#### A.    Legal Framework and Theranos ABC Background

An assignment for the benefit of creditors (or "ABC") "provides a means of liquidating the assets of a debtor in an orderly, controlled manner." Geoffrey L. Berman, *General Assignments for the Benefit of Creditors* 3 (2019). An ABC is a creature of California state law that functions as an alternative to liquidation under Chapter 7 of the Bankruptcy Code. *See, e.g.*, *Berg & Berg Enters., LLC v. Boyle*, 100 Cal. Rptr. 3d 875, 895 (Ct. App. 2009) (assignment for the benefit of creditors is "a recognized statutory alternative to liquidation through bankruptcy"); *Credit Managers Ass'n v. Nat'l Indep. Bus. All.*, 209 Cal. Rptr. 119, 121 (Ct. App. 1984) ("An assignment for benefit of creditors is a business liquidation device available to an insolvent debtor as an alternative to formal bankruptcy proceedings.").

Here, Theranos (assignment for the benefit of creditors), LLC ("Theranos ABC") was formed as a California limited liability company for the purpose of acting as assignee for the benefit of creditors of Theranos, Inc. *See* Exhibit 3 (Stoian Declaration). The assignment commenced with an assignment agreement, pursuant to which the distressed entity assigns all of its property rights, title, and interests to a third-party assignee. *See* Cal. Code Civ. Pro. §§ 493.010 to 493.060, 1800-1802. Assignments under California law do

not require a court filing or court supervision. *See generally id.* §§ 493.010-493.020. The assignment agreement between Theranos ABC and Theranos, Inc. is attached here as Exhibit 4.

### B.    Other Creditors' Rights and Claims

Under California's nonjudicial process, the assignee is responsible for liquidating the assets of the assignment estate and distributing the net proceeds, if any, to the assignor's creditors. Schwartz & Ahart, California Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2005) ¶ 5:166–5:168, pp. 5–59 to 5–60 ("The assignee acts very much like a Chapter 7 bankruptcy trustee; it collects all of the debtor's nonexempt assets, liquidates them, and pays the proceeds to creditors"). The process does not require creditors' "consent[,]" and other creditors would not have and are not given a right to object to the payment of claims. *See* Berman, *supra*, at 5. Rather, the assignee pays (or does not pay) claims at its discretion, subject to a fiduciary duty to Theranos, Inc.'s creditors, "akin to that of a trustee or administrator of an estate who owes fiduciary duties to the estate's beneficiaries." *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 32 Cal. Rptr. 3d 325, 341 (Ct. App. 2005).

### C.    Process for Payment, Balwani's Appeal, and Payment Timing

On September 12, 2018, Theranos, Inc. assigned all of its remaining assets to the Theranos ABC for liquidation and distribution to Theranos, Inc.'s creditors. *See* Exhibit 5, Theranos ABC Notice to Theranos, Inc. Creditors; Exhibit 3 (Stoian Declaration). On October 10, 2018, the Theranos ABC sent notice to Theranos, Inc.'s creditors of the assignment and setting a date for creditors to submit proofs of their claims (that date being March 11, 2019). *Id.*

The named plaintiffs in this litigation submitted a claim to Theranos ABC, on behalf of the putative class. Walgreens submitted a claim as well. Defendant Holmes submitted claims: (a) premised on Theranos, Inc.'s alleged obligation to indemnify Holmes for certain costs of her legal defense; and (b) based on her equity interest in Theranos, Inc. Defendant Balwani similarly submitted claims: (a) premised on Theranos, Inc.'s alleged obligation to

11

indemnify Balwani for certain costs of his legal defense; and (b) based on his equity interest in Theranos, Inc. A number of other, smaller claims were submitted by other creditors. Exhibit 3 (Stoian Declaration).

The remaining assets of the assignment estate are very limited and, according to Theranos ABC, are fully encumbered by a certain secured creditor of Theranos, Inc. that has agreed to release certain funds to allow Theranos ABC to make distributions to creditors subject to certain conditions. Exhibit 3 (Stoian Declaration). The maximum amount to be so released is limited—less than $5 million. *Id.* The Theranos ABC further reports that it has been unable to distribute the remaining limited assets of the assignment estate due to the magnitude of the Holmes and Balwani claims against the assets and the pendency of those defendants' respective appeals from their criminal convictions, which leaves their respective indemnification claims unsettled. Compounding this uncertainty, Theranos ABC must determine the valuation of the other creditors' remaining claims and ensure they are treated fairly; it is possible that, absent the ABC Agreement submitted for the Court's consideration in this case, Theranos ABC might conclude that the Class's claim against the remaining estate assets is subject to an offset by the amount of the Walgreens settlement and/or assign the Class's claim a *de minimis* value or possibly even zero value. Such position could result in further time consuming and expensive litigation which would further whittle away at the assets available for distribution by Theranos ABC.

Thus, in the absence of a settlement involving the assignment, there would be at least three uncertainties plaguing the Class's efforts to obtain compensation for their claim to the limited remining assets of Theranos ABC: (1) value and valuation of the claim, this is the task of the assignee at its discretion subject to a fiduciary duty to all creditors; the Assignee might determine that the claim has limited value or is subject to an offset by the amount of the Walgreens settlement here; (2) ongoing uncertainty regarding the validity and value of the Balwani and Holmes claims; and (3) timing, in that absent the ABC Agreement submitted for the Court's consideration here, the payment to the Class from the Theranos ABC—if any—would occur at an uncertain point in the future, likely at a time that is too

12

1  late for any such funds to be folded into the distribution of Class payments under the
2  Walgreens settlement.

3      With that background, Plaintiffs provide the following answers to the Court's
4  specific questions:

5      • __Amount of the Theranos ABC Payment to the Class__: The
6      amount of the payment is fixed at $1,331,094.88 pursuant to the ABC
7      Agreement (Dkt. 591-14, ¶ 2). Plaintiffs' Counsel apologize if the amount or
8      fixed nature of the payment was unclear in prior briefing. The forms of notice
9      will be updated to make this clearer. The amount the Class will receive from
10     the Theranos ABC is fixed pursuant to the proposed settlement and is not
11     contingent, for example, on the outcome of the Balwani or Holmes appeals.

12     • __Timing of the Theranos ABC Payment to the Class__: The timing
13     of the payment is also fixed pursuant to the ABC agreement, at 10 days
14     following the Court's final approval of the relevant provisions (as defined in
15     the ABC Agreement, principally the releases set forth therein) (Dkt. 591-14,
16     ¶ 2). The long-form notice will be updated to make this clearer.

17     • __Court Supervision and/or Approval of ABC Process__: As
18     discussed above, under California law, an assignment for the benefit of
19     creditors is not subject to supervision of a court; rather, the assignee acts as
20     a fiduciary for the benefit of Theranos, Inc.'s creditors.

21     • __Other Creditor Claims and Objections of Other Creditors__: The
22     claims of other creditors to the remaining Theranos ABC assets will remain
23     if the ABC Agreement is approved; those claims will be addressed in the
24     normal course of the ABC process. Other creditors do not have standing to
25     object to the Class claims. However, Plaintiffs note that Walgreens is the
26     largest remaining creditor (and as such, the assignee owes Walgreens a
27     fiduciary duty), and Walgreens has agreed to the valuation and the treatment
28     of the Class's claim pursuant to the ABC Agreement.

- **Balwani Conviction Status and Claim on Theranos ABC Assets:** The Court inquired whether, if Balwani's conviction is affirmed, his claim to the Theranos ABC's assets would be voided. In the event Mr. Balwani's conviction is affirmed, and assuming Balwani had not resolved his claims against the assignment estate, it is Plaintiffs' understanding that his claim to the Theranos ABC's assets would likely be void/rejected. However, the timing of this is indeterminate and may require a formal litigation by Theranos ABC against Balwani to obtain a determination that Balwani's indemnification claim is invalid as a result of his affirmed conviction.

Moreover, even if Mr. Balwani's conviction is affirmed and his claim is voided/rejected, that would not translate into payment of the Class's claim of any particular amount or on any particular timeframe. Rather, the uncertainties described above would remain. It is not known, for example, whether any payment to the Class would exceed the fixed $1,331,094.88 amount to be paid to the Class under the ABC Agreement. Even if it did exceed that amount, the fact that only very limited assets remain in the assignment estate (potentially reduced further by litigation with Balwani) and Walgreens' claim on the assets would remain, means that any such overage would likely be modest (if anything). There would also remain the costs of distributing to the Class any funds received at that later date, which would likely be in the hundreds of thousands of dollars, which would reduce any additional money going to the Class and likely erase any theoretical overage between this delayed payment and the fixed amount to be paid to the Class under the ABC Agreement. The Balwani Settlement and ABC Agreement guarantee payment for the Class's claim against the remaining assignment assets at a fixed amount, while also guaranteeing that payment will occur on a timeframe that allows the distribution of those funds in tandem with the Walgreens Settlement funds, reducing notice and administration costs for the Class.

### 5.     Class Representative Awards

The Class has not yet applied for service awards and service awards are not addressed specifically within Rule 23(e)(2). And while the Walgreens Settlement provides that

Plaintiffs may seek service awards and addresses the process for payment of any service awards granted, payment of service awards is expressly not a condition of the Walgreens Settlement (or the other settlements) (Dkt. 591-2, ¶¶ 70-71).

The Ninth Circuit, however, has "repeatedly held that reasonable incentive awards to class representatives are permitted." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785-87 (9th Cir. 2022) (quotation marks and citation omitted). Indeed, "[i]ncentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Service awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958-59.

Plaintiffs here intend to request $10,000 as a service award to each of the named class representatives. The class representatives here have been actively involved in this action for nearly seven years. They have sat for depositions; they have responded to written discovery; and they have produced documents. They have consulted with counsel throughout the course of this action. Service awards of $10,000 are within—if not below—the range approved within this Circuit, particularly where class representatives have participated in ways comparable to the class representatives' activities here. *Andrews v. Plains All-American Pipeline, L.P.*, No. 2:15-cv-04113-PSG-JEM, 2022 WL 4453864, at *4-5 (C.D. Cal. Sept. 20, 2022) (awarding $15,000 per class representative); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW, 2017 WL 6040065, at *11 (N.D. Cal. Dec. 6, 2017), aff'd, 768 F. App'x 651 (9th Cir. 2019) (awarding each of the four class representatives $20,000 service awards) (collecting cases); *Brawner v. Bank of Am. Nat'l Ass'n*, No. 3:14-cv-02702-LB, 2016 WL 161295, at *6 (N.D. Cal. Jan. 14, 2016) (approving $15,000 award for a named plaintiff who spent about 80 to 100 hours on the case); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *17 n.8 (N.D. Cal. Apr. 22, 2010) (collecting Ninth Circuit cases with service awards of $20,000 or higher).

Further details in support of the requested service awards will be provided in connection with Plaintiffs' application for attorneys' fees, costs, and service awards.

**6.    Fees and Costs**

**A.    Legal Framework and Background**

Federal Rule of Civil Procedure 23(h) provides that a motion for attorneys' fees and nontaxable costs in a class action shall be heard "at a time the court sets." In their Motion for Preliminary Approval, Class Plaintiffs request that the Court set a schedule for the filing of and hearing on their anticipated requests for fees and costs from the common fund created by the Walgreens Settlement (Dkt. 591-1, pp. 14-15).

Therefore, it is Plaintiffs' intent to file a full motion seeking fees and costs at a later date to be set by the Court. Specifically, under the proposed preliminary approval order, Class Counsel would file their fee motion at least 45 days before the Class Members' objection deadline.

At this preliminary approval stage, Plaintiffs' future fee and cost request may potentially implicate preliminary approval of the settlement and notice in three ways:

*First*, the Ninth Circuit has directed District Courts to examine any settlement agreement terms relating to the payment of attorneys' fees as those terms may indicate signs of collusion. In the *Bluetooth* case, the Ninth Circuit advised that settlements should be examined for the following signs of collusion, drawing on several different cases and different circuits' authorities:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,
> (2) when the parties negotiate a clear sailing arrangement providing for the payment of attorneys'' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class, and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

16

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (cleaned up; internal citations, quotation marks and alterations omitted). Here, none of the signs of potential collusion are present.

*Second*, Fed. R. Civ. P. 23(e)(1)(B)(i) and 23(e)(2)(C)(iii) direct the Court to consider at the preliminary approval stage "the terms of any proposed award of attorney's fees, including timing of payment." Here, neither the entitlement to, nor the amount of, attorneys' fees is a term of any of the three settlements. The Walgreens Settlement expressly states that "the effectiveness of this Settlement Agreement is not contingent upon the Court's approval of any Attorneys' Fees and Expenses Application" (Dkt. 591-2, ¶ 71). Neither the Balwani nor ABC settlements require the payment of any particular attorneys' fees (Dkt. 591-13, ¶ 8; Dkt. 591-14, ¶ 10). Instead, the Walgreens Settlement provides only that Plaintiffs may seek an award of attorneys' fees to be paid from the common settlement fund created by the Walgreens Settlement, with the availability and amount of such award being left for the Court to decide, and specifies the procedure and timing of payment of any such amounts awarded by the Court (Dkt. 591-2, ¶¶ 67-69).

*Third*, Local Rule 54.2(i) states that a "fair estimate" of the fees and costs to be sought in connection with a class action settlement must be provided in the class notice:

> (i)    Class Action Settlements. Notice of the amount of any attorneys' fees and related non-taxable costs, or fair estimate thereof, to be sought in connection with any action certified as a class action pursuant to Rule 23, Federal Rules of Civil Procedure shall be given to all class members at the time, and in accordance with, the notice provided to the class members given pursuant to Rule 23(e), Federal Rules of Civil Procedure.

*Id.*

The Local Rule likewise requires only a fair estimate of the fee request, and not a final request or requested amount, for purposes of the notice. Therefore, Class Counsel proposed that the forms of class notice advise Class Members that counsel would seek a fee of *up to* one-third of the $44 million Walgreens Settlement amount. This was not a final request or necessarily the exact amount that Class Counsel would eventually seek, but it did provide the Class information about the *maximum* fee.

In connection with their eventual fee and cost application, Class Counsel intend to provide more comprehensive information and argument to support their request. As noted below, counsel intend to seek 30% of the Walgreens Settlement amount in their forthcoming fee application, and have revised the proposed notice documents accordingly.

### B.    Grounds for Anticipated Fee Request

As the Court has requested additional information to support the fee Class Counsel might later request, we provide the following information:

Lodestar: Class Counsel have conducted a review of their fee records. It is Class Counsel's practice to further review their detailed fee records before submitting a final lodestar figure in connection with their actual application for attorneys' fees. This review typically results in some reduction of lodestar in the exercise of billing judgment. However, Class Counsel's lodestar here is highly unlikely to fall below the amount proposed for inclusion in the notices: this is because, as of present, Class Counsel's lodestar is $25,595,184.55, inclusive of the time of all firms who worked on this matter from inception of the litigation through September 30, 2023.

| Firm | Cumulative Hours | Cumulative Lodestar |
|------|-----------------:|--------------------:|
| Lieff Cabraser | 23,668.90 | $14,838,966.00 |
| Keller Rohrback | 14,035.70 | $8,950,113.50 |
| Kaplan Fox | 2,118.25 | $1,186,279.75 |
| McCune Law Group | 1,005.80 | $477,775.00 |
| Hagens Berman | 246.70 | $114,598.30 |
| **Totals:** | **41,075.35** | **$25,567,732.55** |

In arriving at this figure, counsel have removed all fees incurred by timekeepers who worked less than 20 hours on this matter. Again, Class Counsel will perform a further review of time recorded in this action prior to submitting a fee application. Based on counsel's experience, however, it is highly unlikely that lodestar would fall below one-third of the Walgreens Settlement amount.

1   <u>Fee Agreements:</u> The Court inquired whether a one-third fee was required by any

2   agreements counsel have with the class representatives. Those agreements were not the

3   basis for the one-third not-to-exceed fee amount proposed for the notice. None of the

4   agreements purport to require the Court to award attorneys' fees (at all, or in any particular

5   amount). As is normal in class actions,[1] the Court determines whether to award attorneys'

6   fees. The Walgreens Settlement here contemplates that Class Counsel will *move* the Court

7   for an award of attorneys' fees, and expressly states that the fee award (in any amount) is

8   not a condition for the settlement (Dkt. 591-2, ¶ 71) ("the effectiveness of this Settlement

9   Agreement is not contingent upon the Court's approval of any Attorneys' Fees and

10  Expenses Application"). The Court's authority to award fees comes from its equitable

11  powers. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). As noted above, Class

12  Counsel intend and expect that their motion for attorneys' fees, when filed, will seek 30%

13  of the fund created pursuant to the Walgreens Settlement, which Plaintiffs have confirmed

14  is consistent with the fee agreements.

15  <u>Costs:</u> The proposed forms of notice indicate that Class Counsel will seek

16  reimbursement of costs in an estimated amount of up to $1.3 million. Class Counsel request

17  that the Court set a date for filing and hearing on their request for costs. That request will

18  include additional detail and argument. Under the proposed preliminary approval order, that

19  request would be filed at least 45 days before the Class Members' objection deadline. Class

20  Counsel have gathered cost information to provide context for the estimated cost figure used

21  in the proposed forms of notice, inclusive of the costs expended by all firms who worked

22  on this matter:

| Category* | Amounts |
|---|---|
| Consultant / Expert Fees | $433,707.50 |
| JND Costs | $322,820.12 |
| Relativity Database Expenses | $83,026.76 |

---

[1] *See* Benjamin Gould, *On the Lawfulness of Awards to Class Representatives*, 2023 Cardozo L. Rev de novo 1, 15 (discussing why this is the case).

| | |
|---|---|
| Deposition Costs | $81,386.53 |
| Travel Expenses | $77,528.40 |
| Online Research (Westlaw, Lexis, etc.) | $50,334.18 |
| In-House Photocopying | $35,654.40 |
| Transcripts (incl. certain deposition transcription services) | $25,686.76 |
| Investigation Fees / Service Fees | $12,804.00 |
| Court Fees | $6,837.38 |
| Outside Photocopying | $6,493.50 |
| Federal Express / Local Courier | $6,041.14 |
| Miscellaneous | $774.88 |
| Long Distance | $454.42 |
| Postage Charges | $427.34 |
| **Total:** | **$1,143,977.31** |

*These numbers have not yet been audited and should be treated as approximations rather than as final numbers.

**7.    Modifications to Notice Documents**

**A.    "Unsubscribe" Language in Email Notices**

At the September 22, 2023 hearing, the Court noted the following language at the end of the two proposed forms of email notice (Dkt. 591-3 and 591-4,): "To unsubscribe from this list, please click on the following link: Unsubscribe." The Court noted that this language could be confused by recipients as relating to opting out of the class.

The proposed Settlement Administrator, JND, has explained that it includes an "unsubscribe" link at the bottom of all emails to allow Class Members to remove their email address from any additional email notices from JND, which JND explains is essential to maintain JND's good reputation among the internet service providers and reduce complaints relating to the email campaign. Accordingly, rather than delete the "unsubscribe" language from the email notices in this case, JND would recommend adding language making clear that unsubscribing from further emails is not the same as opting out. Class Counsel propose

that the following sentences be added following the current "unsubscribe" sentence in both email notice forms:

"Unsubscribing from further emails is **not** the same as opting out of the class or the settlements. The deadline to opt-out in this case has already passed."

**B.    Objection Requirement**

At the September 22, 2023 hearing, the Court asked about the final objection requirement listed at Q. 17 of the proposed long-form notice (Dkt. 591-8) ("state that you submit to the jurisdiction of the Court with respect to the objection or request to be heard and the subject matter of the settlements of the Action, including, but not limited to, enforcement of the terms of the Settlement Agreements"). In response to the Court's question, that requirement was not intended to create any additional concession by any would-be objectors. Plaintiffs and Walgreens have conferred and have agreed to remove this objection requirement, including from Q.17 of the long-form notice.

**C.    Clarification in Long-Form Notice re Scope of Walgreens Edison Subclass.**

Pursuant to the Court's suggestion, Plaintiffs propose that the following language be added to Q.12 of the long-form notice (Dkt. 591-8) to clarify that only those tiny blood draw recipients whose blood was drawn by a Walgreens employee are in the Walgreens Edison Subclass and entitled to the additional Walgreens Edison Subclass Payment:

"*Please note* that not every Class Member who had a 'tiny' blood draw (fingerprick) is a Walgreens Edison Subclass Member. Only Class Members who had a 'tiny' blood draw (fingerprick) *performed by a Walgreens employee* are in the Walgreens Edison Subclass and qualify for the additional Walgreens Edison Subclass Member Payment. If you only had 'tiny' blood draw(s) (fingerpricks) performed by Theranos employee(s), you are not in the Walgreens Edison Subclass. The Court previously ruled in this case that 'tiny' blood draws (fingerpricks) performed by Theranos employees could not be the basis for a battery claim against Walgreens. The Walgreens Edison Subclass Member Payments are being

made to resolve the battery claims against Walgreens. See Questions 4 and 5, above for further information."

### D. Corrected Typos

At the September 22, 2023 hearing, the Court noted two typos, both of which will be corrected: (a) "if approved, provide" will be changed to "if approved, will provide," in all notices where that typo exists; and (b) in paragraph 20 of the proposed preliminary approval order, "opt out" will be changed to "opted out."

The revised, redlined documents, including all of the above-described edits, are attached hereto as Exhibits 6 through 13.

### 8. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order granting preliminary approval of the proposed settlements, directing dissemination of notice to the Class, and set a schedule for remaining settlement approval proceedings.

DATED this 6th day of October, 2023.

KELLER ROHRBACK L.L.P.


By *s/ Alison E. Chase*
    Mark D. Samson, Bar No. 011076
    Ron Kilgard, Bar No. 005902
    Alison E. Chase, Bar No. 028987
    3101 North Central Avenue, Suite 1400
    Phoenix, AZ 85012
    Telephone: (602) 248-0088
    Facsimile: (602) 248-2822
    Email: msamson@kellerrohrback.com
    Email: rkilgard@kellerrohrback.com
    Email: achase@kellerrohrback.com

    Lynn Lincoln Sarko, Bar No. 35345 (*Pro Hac Vice*)
    Gretchen Freeman Cappio (*Pro Hac Vice*)
    Benjamin B. Gould (*Pro Hac Vice*)
    Sydney Read (*Pro Hac Vice*)
    KELLER ROHRBACK L.L.P.
    1201 3rd Ave., Ste. 3200
    Seattle, WA 98101

Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: gcappio@kellerrohrback.com
Email: bgould@kellerrohrback.com
Email: sread@kellerrohrback.com

Michael W. Sobol (*Pro Hac Vice*)
Roger N. Heller (*Pro Hac Vice*)
Melissa Gardner (*Pro Hac Vice*)
Michael K. Sheen (*Pro Hac Vice*)
John D. Maher (*Pro Hac Vice*)
Amelia Haselkorn (*Pro Hac Vice*)
LIEFF CABRASER HEIMANN
& BERNSTEIN LLP
275 Battery St, 29th Floor
San Francisco, CA 94111
Telephone (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com
Email: rheller@lchb.com
Email: mgardner@lchb.com
Email: msheen@lchb.com
Email: jmaher@lchb.com
Email: ehaselkorn@lchb.com

*Co-Lead Class Counsel*

1

## <u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on October 6, 2023, I electronically transmitted the foregoing

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to all CM/ECF registrants.

5                                   *s/ Alison E. Chase*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28